UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHARLES BROWN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 05-10400-RCL |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| BIOGEN IDEC INC., et al., | ) ) | |
| Defendants. | ) ) ) | |
| CARY GRILL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 05-10453-RCL |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| BIOGEN IDEC INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

[Caption continued on following page.]

DECLARATION OF THEODORE M. HESS-MAHAN IN FURTHER SUPPORT OF THE
MOTION OF THE LONDON PENSIONS FUND AUTHORITY AND NATIONAL
ELEVATOR INDUSTRY PENSION FUND FOR CONSOLIDATION, APPOINTMENT AS
LEAD PLAINTIFFS AND FOR APPROVAL OF SELECTION OF LEAD AND LIAISON
COUNSEL AND IN OPPOSITION TO THE COMPETING MOTIONS

ROCHELLE LOBEL, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiff,

   vs.

BIOGEN IDEC INC., et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 05-10801-RCL

<u>CLASS ACTION</u>

Theodore M. Hess-Mahan, declares, under penalty of perjury:

1.      I am an associate of Shapiro Haber & Urmy LLP ("Shapiro Haber").  I submit this Declaration in further support of the motion of The London Pensions Fund Authority and National Elevator Industry Pension Fund for Consolidation, Appointment as Lead Plaintiffs and for Approval of Selection of Lead and Liaison Counsel and in Opposition to the Competing Motions.

2.      Attached hereto as Exhibit A is a true and accurate copy of a printout of the pages of the website located at http://www.3mt.net

3.      Attached hereto as Exhibit B is a true and accurate copy of Letter from Samuel H. Rudman to Steven G. Schulman and Vincent Cappucci, dated May 9, 2005.

4.      Attached hereto as Exhibit C are true and accurate copies of the Notices of Motion of the Institutional Investor Group, dated May 3, 2005, filed in *Barnet v. Elan Corp.*, 05-cv-02860-RJH (S.D.N.Y.) and *Williams v. Elan Corp.*, 05-cv-10413 (JLT) (D. Mass.).

5.      Attached hereto as Exhibit D is a true and accurate copy of the Order in *In re Williams, Inc. Securities Litigation*, 02-cv-7H(M) (N.D. Okl. July 8, 2002).

6.      Attached hereto as Exhibit E is a true and accurate copy of an article from *MarketWatch.com*, dated September 14, 1998.

7.      Attached hereto as Exhibit F is a true and accurate copy of the registration information for the domain name, http://www.thirdmillenniumtrading.com, as provided on www.register.com.

8.      Attached hereto as Exhibit G is a true and accurate copy of the homepage for the website located at http://www.thirdmillenniumtrading.com

9.      Attached hereto as Exhibit H is a true and accurate copy of the addresses and phone numbers for Third Millennium Trading and Pax Clearing Corporation.

- 1 -

10.    Attached hereto as Exhibit I is a true and accurate copy of a printout from *Bloomberg*, indicating that Merrill Lynch served as the lead underwriter for a stock offering from Biogen IDEC in November 2000.

DATED:  May 16, 2005

/S/ Theodore M. Hess-Mahan
THEODORE M. HESS-MAHAN

- 2 -



*"Creating Liquidity for a Global Marketplace"*









advanced trading

ensuring our

Third Millennium Trading (TMT) is the  premier options trading Firm. Our technologically

desk and proprietary systems secure our ability to quickly and correctly calculate edge while

ability  to provide liquidity to the marketplace.



arbitrage

To identify and capture edge in options trading by incorporating a strategy based on basic

relationships.



What does TMT do?

TMT is a firm employing market makers whom trades with the firm's capital (private
capital) in order to profit.
Market-making is the process where a trader will buy and sell a security (options, future,
stock, etc.). The

market maker must be willing to buy on their bid and sell on their offer.





*"Options Trading for the Next Millennium"*









     This is a brief description of the training provided....

Third Millennium offers a training program that ensures the future success of all trainees within the company. Once hired, trader trainees begin a comprehensive course on options trading that is taught by our experienced professional option traders. The course begins by covering the basics of options trading, and later on explores more advanced trading strategies. Trainees attend class in a group setting, however training may be altered to fit the individual progress.



In addition to the options class, trainees engage in mock trading several times a week. These practice sessions are conducted in order to give the trainees practice in a stimulated trading environment. Mock is often the highlight of the day and allows trainees an opportunity for a little competition. This process also exhibits to management how advanced the various trainees have become toward getting a badge and becoming an actual trader.



Case 1:05-cv-10400-WGY     Document 35-2     Filed 05/16/2005     Page 3 of 8

Aside from the class and mock trading, clerks are expected to assist market makers -- by bringing  them "runs" on
the trading floor, ensuring that their trades are entered properly into their position, and helping to manage their
positions when they are away. Trainees are encouraged to stand with the market makers and monitor th evarious
trades that occur during the trading day. This helps the clerk to gety hands-on experience with trading on the
Options Exchange Floor. Additonally, TMT's market makers and partners are always available to answer questions
that the clerk may have.

Send mail to kpurnell@thirdmillenniumtrading.com with questions or comments about this web site.
Copyright © 2004 Third Millennium Trading

TMT was formed in 1996 in order to take advantage of the existing, incredible opportunities in making markets in stock options. We began by recruiting a select few individuals in the Chicago land area to become market makers (options traders). Due to our continued success, we have expanded that search to the entire United States.



For further information or inquiries please feel free to contact us:

**Primary Number:**
(312) 260-5252

**Primary fax:**
(312) 260-5285

**Postal Address:**
440 S. LaSalle, Chicago IL

**Please Send Resumes via email to: :**
noelsmith@hotmail.com

**General Information:**
ssteuber@3rdmt.com

Also visit the Chicago Board Options Exchange Website to learn more about the stock options trading industry.

end mail to kpurnell@thirdmillenniumtrading.com with questions or comments about this web site.

Copyright © 2004 Third Millennium Trading



*"Options Trading for the Next Millennium"*











Third Millennium Trading is looking for competitive individuals with strong analytical skills who can operate in a high pressure environment. Computer skills would be a plus. The firm will train its clerks and teach them to trade (see TRAINING). Trader trainees also assist TMT's market makers, work on projects, spreadsheets, and general problem-solving.



TMT is always looking to interview experienced stock options traders for a position with the firm. TMT offers competitive compensation for all its traders.



The Third Millennium training program is so intense and encompassing that once the trainee is deemed ready to trade, the firm is confident enough in its trader's ability that the trader is given significant freedom to conduct his or her business on the exchange floor. Third Millennium veteran traders are available, however, in case new traders need advice on their positions.

Send mail to kpurnell@thirdmillenniumtrading.com with questions or comments about this web site.
Copyright © 2004 Third Millennium Trading



*"Options Trading for the Next Millennium"*









   

### The Basics of Options Trading

A stock option gives the owner of the option the right to buy (in the case of a call) or sell (in the case of a put) the underlying stock at a specified price during a specified time period. For example, if you were to own January 100 calls in AOL, that means that you have bought the right to buy a specified number of shares of AOL stock at 100 dollars per share, and this right will expire on the options expiration day in January.

### What factors affect the price of an option?

Numerous factors affect the price of an option. The most important of these factors are the price of the underlying stock and the expected future movement (the volatility) of the underlying. Other factors include interest rates on buying or selling stock, future dividends of the stock, and the prices of related options in the same underlying stock.

### Understanding Risk

In today's volatile markets, it is crucial that market-makers understand the various risks that a trade will potentially have an effect on a position. One thing that the market-maker does to reduce

the risk of the options in their position is to hedge. Hedging is the practice of making trades in the underlying stock by either buying or selling the stock to reduce the risk of a directional move in the underlying from causing a large loss.

Send mail to  kpurnell@thirdmillenniumtrading.com with questions or comments about this web site.
Copyright © 2004 Third Millennium Trading



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

SAN DIEGO • SAN FRANCISCO
LOS ANGELES • NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
PHILADELPHIA • SEATTLE

Samuel H. Rudman
SRudman@lerachlaw.com

May 9, 2005

<u>VIA FACSIMILE</u>

Steven G. Schulman
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, New York 10119

Vincent R. Cappucci
Entwistle & Cappucci LLP
299 Park Avenue, 14th Floor
New York, New York 10171

Re:    *Charles Brown v. Biogen IDEC, Inc., et al.*
       Civil Action No.:  05-10400-RCL and all related actions

Gentlemen:

    We have received a copy of the motion filed by your clients, the Biogen Institutional Investor Group, seeking their appointment as lead plaintiffs in the above-referenced actions. In reviewing the motion, we request clarification of the following:

    1.    ***Horatio Capital LLC*** ("Horatio Capital") - Aside from not filing a certification relating to its transactions and its willingness to serve as a lead plaintiff, you failed to provide any transactional information concerning Horatio Capital's trades during the Class Period. Instead, you claim that its losses are approximately $500,000. By failing to provide any supporting data for Horatio Capital's claimed losses, we are unable to evaluate how its claimed losses were calculated. Accordingly, and to avoid any further delay, please provide us with a listing of Horatio Capital's transactions in Biogen IDEC securities by the close of business tomorrow.

    2.    ***Third Millennium Trading LLP*** ("Third Millennium") - Based on our review of Third Millennium's trading, and its website where it identifies itself as an options trading firm, Third Millennium may have engaged in trading of Biogen IDEC options during the Class Period. Third Millennium's certification, however, does not list any options trades. Since options are part of the "securities" that are covered by these actions, please provide us, by the close of business tomorrow, with a listing of Third Millennium's transactions in Biogen IDEC options during the Class Period.



May 9, 2005
Page 2

     3.    ***Folksam Asset Management*** - Please disclose, by the close of business tomorrow, the relationship between Folksam Asset Management and Folksam, the Swedish insurance company.

     I look forward to receiving your prompt response.

                   Very truly yours,

                   Samuel H. Rudman

cc:  William S. Lerach

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                           :

| | |
|---|---|
| PHILIP BARNET, RICKIE D. FRAZIER and ZELMA T. FRAZIER, on behalf of themselves and all others similarly situated, | Case No. 05-CV-02860-RJH |
| | CLASS ACTION |
| Plaintiffs, | |
| vs. | |
| ELAN CORP., PLC., KELLY MARTIN, LARS ECKMAN and SHANE COOKE, | |
| Defendants. | |

| | |
|---|---|
| GLENN G. MALLOFF, THE IRVING SHACK TRUST, and PATRICIA MARCONI MALLOFF, on behalf of themselves and all others similarly situated, | Case No. 05-CV-03166-RJH |
| | CLASS ACTION |
| Plaintiffs, | |
| vs. | |
| ELAN CORP., PLC., KELLY MARTIN, LARS ECKMAN and SHANE COOKE, | |
| Defendants. | |

**NOTICE OF MOTION OF THE INSTITUTIONAL INVESTOR GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL**

PLEASE TAKE NOTICE that Class members MN Services, Activest Investmentgesellschaft mbH, Electronic Trading Group L.L.C., Third Millenium Trading, LLP, Horatio Capital LLC, and Donald S. Frank (the "Institutional Investor Group" (the "Institutional Investor Group"), by their counsel, will hereby move this Court on a date and at such time as may be designated by the Court, at 500 Pearl Street, New York, New York for an Order (attached as Exhibit A hereto): (i) consolidating the above-captioned actions; (ii) appointing the Institutional Investor Group as Lead Plaintiff; (iii) approving the Institutional Investor Group's selection of the law firms of Milberg Weiss Bershad & Schulman LLP and Entwistle & Cappucci LLP to serve as Lead Counsel; and (iv) granting such other and further relief as the Court may deem just and proper.  In support of this Motion, Movants submit herewith a Memorandum of Law, [Proposed] Order and the Declaration of Andrei V. Rado dated May 3, 2005.

DATED: May 3, 2005

**MILBERG WEISS BERSHAD & SCHULMAN LLP**

By:      /s/  Andrei V. Rado
Steven G. Schulman  (SS-2561)
Peter E. Seidman (PS-8769)
Andrei V. Rado (AR-3724)
One Pennsylvania Plaza - 49th Floor
New York, NY  10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci
Stephen D. Oestreich
Robert N. Cappucci
299 Park Avenue
New York, NY  10171

**Proposed Lead Counsel**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
320 East 39th Street
New York, NY  10016
(212) 983-9330

**Plaintiff's Counsel**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

——————————————————————x
:
| | |
|---|---|
| WENDELL WILLIAMS, Individually and on behalf of all others similarly situated, | : Case No. 05-CV-10413 (JLT) |
| : | |
| Plaintiff, | : CLASS ACTION |
| : | |
| vs. | : |
| : | |
| ELAN CORPORATION, PLC., G. KELLY MARTIN, LARS ECKMAN and SHANE COOKE, | : |
| : | |
| Defendants. | : |
| : | |

:
| | |
|---|---|
| SIDNEY D. FELDMAN FAMILY TRUST, Individually and on behalf of all others similarly situated, | : Case No. 05-CV-10481 (JLT) |
| : | |
| Plaintiff, | : CLASS ACTION |
| : | |
| vs. | : |
| : | |
| ELAN CORPORATION, PLC., G. KELLY MARTIN, LARS ECKMAN and SHANE COOKE, | : |
| : | |
| Defendants. | : |
| : | |

**MOTION OF THE INSTITUTIONAL INVESTOR GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL**

MN Services, Activest Investmentgesellschaft mbH, Electronic Trading Group L.L.C., Third Millenium Trading, LLP, Horatio Capital LLC and Donald S. Frank (collectively, the "Institutional Investor Group"), by their counsel, hereby move this Court for an Order: (i) consolidating the above-captioned actions; (ii) appointing the Institutional Investor Group as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (iii) approving the Institutional Investor Group's selection of Milberg Weiss Bershad & Schulman LLP and Entwistle & Cappucci LLP as Lead Counsel, and Moulton & Gans, P.C. as Liaison Counsel of the actions, pursuant to the PSLRA.  In support of this Motion, Movants submit herewith a Memorandum of Law, a Declaration, and a [Proposed] Order.

### REQUEST FOR ORAL ARGUMENT

Movants respectfully request oral argument on this motion.

DATED:        May 3, 2005

Boston, Massachusetts                    Respectfully submitted,

                                         **MOULTON & GANS, P.C.**


                                         By: /s/ Nancy Freeman Gans
                                         Nancy Freeman Gans, BBO #184540
                                         33 Broad Street, Suite 1100
                                         Boston, MA  02109
                                         Telephone:  (617) 369-7979

                                         *Proposed Liaison Counsel*

                                         **MILBERG WEISS BERSHAD
                                           & SCHULMAN LLP**
                                         Steven G. Schulman
                                         Anita B. Kartalopoulos
                                         One Pennsylvania Plaza
                                         New York, NY 10119
                                         (212) 594-5300

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci
Stephen D. Oestreich
Robert N. Cappucci
299 Park Avenue
New York, NY  10171

***Proposed Lead Counsel***


## LOCAL RULE 7.1 CERTIFICATE

I, Nancy Freeman Gans, hereby certify that as of today, May 3, 2005, no counsel has filed an appearance for any of the defendants in the above-entitled cases, and I have therefore been unable to consult regarding the Motion for Consolidation.  The Motion for Appointment of Lead Plaintiff and for Approval of Selection of Lead Counsel and Liaison is required by statute and therefore the issue cannot be resolved or narrowed..

/s/ Nancy Freeman Gans
Nancy Freeman Gans


## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Nancy Freeman Gans
Nancy Freeman Gans

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:                                  )       Case Nos.  02-CV-72-H(M)
                                        )                  Lead Case
WILLIAMS SECURITIES                     )
LITIGATION                              )
                                        )
                                        )       **F I L E D**
                                        )
                                        )          JUL   8 2002
                                        )
                                        )        Phil Lombardi, Clerk
                                                U.S. DISTRICT COURT

## ORDER

This matter comes before the Court on the motions to appoint lead plaintiff and lead
counsel, filed on April 1, 2002 (Docket Nos. 16, 17, 19, 20, 25, 26, 34, 35, 38, 39).  The Court
issued an order on June 21, 2002 (Docket No. 123) consolidating the four remaining related
cases with Case No. 02-CV-72-H(M) and bifurcating the action into the following subclasses:
purchasers of Williams Communications Group, Inc. ("WCG") securities and purchasers of
Williams Companies, Inc. ("WMB") securities.  As contemplated by the Private Securities
Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii) and 15 U.S.C. §
77z-1(a)(3)(B)(ii), which requires the Court to appoint the most adequate plaintiff as the lead
plaintiff for the consolidated action "as soon as practicable" after the decision on the motions to
consolidate is rendered, the Court will now address the motions for appointment of lead plaintiff
·and lead counsel.

The Court has carefully reviewed the briefs submitted by the five lead plaintiff movants,
and, for the reasons set forth below, hereby orders the appointment of Alex Meruelo as the lead
plaintiff for the subclass of purchasers of WCG securities and HGK Asset Management ("HGK")

1



as lead plaintiff for the subclass of purchasers of WMB securities. The Court further orders the appointment of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Weiss & Yourman, and Morrel West Saffa Craige & Hicks Inc ("Morrel West") as counsel for the subclass of purchasers of WCG securities and Schoengold & Sporn and the Seymour Law Firm as counsel for the subclass of purchasers of WMB securities.

I

The PSLRA sets forth detailed procedures for the appointment of lead plaintiff(s) in a private class action arising under the securities laws. 15 U.S.C. § 78u-4(a).[1] Among those procedures is the requirement that the named plaintiff in the action must file notice within twenty days of filing suit to inform potential class members of their right to move to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Such notice must be published "in a widely circulated national business-oriented publication or wire service." Id. Not later than sixty days after the date on which this notice is published, any member of the putative class may move the court to be appointed lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

The PSLRA then requires the Court to appoint a lead plaintiff for the class after determining which applicant is "most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B). In determining which applicant should be named lead plaintiff, the Court must accept the presumption that the most adequate plaintiff in any private action is the person(s) who: (1) has either filed the complaint or made a motion in response to a

---

[1] The PSLRA amended both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by adding identical sections to both acts, Section 27 to the Securities Act and Section 21D to the Exchange Act. See 15 U.S.C. § 77z-1(a)(3) and 15 U.S.C. § 78u-4(a)(3). For convenience, the Court will cite only to the Exchange Act when referring to the PSLRA.

notice; (2) in the determination of the Court, has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Under the PSLRA, the Court's determination of the "most adequate plaintiff" may be rebutted only upon proof that the presumptive lead plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

II

A. Appointment of Lead Plaintiff for the WCG Subclass

On January 29, 2002, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(A)(i)(I), the first notice of the pendency of this class action was published in a national business-oriented wire service. See Press Release, Milberg Weiss Bershad Hynes & Lerach LLP, Milberg Weiss Announces Class Action Suit Against Williams Companies, Inc. and Williams Communications Group, Inc. (Jan. 29, 2002) (Seymour Decl. Ex. A). Within sixty days following the date of that publication, on April 1, 2002, lead plaintiff applications were submitted by the following individuals or groups, now seeking to be appointed lead plaintiff for the subclass of purchasers of WCG securities ("WCG Subclass"): Mr. Meruelo;[2] Blaine Watkins, Bruce and Kathleen Smith and Bruce Russell ("the Watkins Group"); and Market Street Securities, Inc. ("Market Street").[3]

---

[2]    The lead plaintiff application of Mr. Meruelo was originally submitted on behalf of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronayn ("the Meruelo Group"). In its June 6, 2002 memorandum, however, the Meruelo Group stated that, in light of the bifurcation of the action into subclasses of WMB and WCG securities purchasers, the group sought to put forward only Alex Meruelo as the proposed lead plaintiff.

[3]    Douglas E. Miller and Carol Moore, purchasers of WMB and WCG securities, jointly filed a motion seeking to be appointed lead plaintiff on April 1, 2002 (Docket Nos. 22 and 23). Mr. Miller and Ms. Moore have not submitted the additional briefing ordered by the Court to

3

Because all three lead plaintiff motions were submitted within the time period established by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), all applicants have satisfied the first requirement of the statutory test for determining the presumptive "most adequate plaintiff."

The Court must next determine the person or group of persons who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The PSLRA, however, does not specify the procedure for the Court to follow in making this determination. See In re Enron Sec. Litig., 2002 WL 530588, at *7 (S.D. Tex. 2002); see also In re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1999). Several courts addressing this question have applied the four-factor test articulated by the district court in Lax v. First Merchs. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). See, e.g., Enron, 2002 WL 530588, at *7; In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); Nice Sys., 188 F.R.D. 206, 217 (D.N.J. 1999). The four Lax factors used to determine the largest financial interest are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Lax, 1997 WL 461036, at *5. "These factors are useful because they look to relatively objective indicators, such as the number of shares purchased or sold, rather than to the ultimate question of damages." Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999). Notably, one of the WCG Subclass movants in this case, despite the Court's request at the April 12, 2002 hearing for clear and specific information regarding loss calculations, failed to provide information stated in these terms. Accordingly, the Court has

---

support their motion, and, accordingly, the Court deems the motion to have been withdrawn. Westmonte Plaza Inc. (Docket No. 28) and Darryl Abramowitz (Docket Nos. 30 and 31) also filed lead plaintiff applications on behalf of WCG securities purchasers. Both applications, however, were formally withdrawn and, therefore, will not be addressed here.

focused its analysis on the movants' claimed losses, the only common denominator addressed by each of the WCG Subclass movants.[4]

On the basis of the losses claimed by the lead plaintiff movants, Mr. Meruelo appears to be the lead plaintiff applicant with the largest financial interest in the outcome of the litigation. The losses claimed by the respective movants are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| Alex Meruelo | $3,905,136.80[5] |
| Market Street | $2,300,000.00 |
| The Watkins Group | $ 224,000.00 |

Market Street argues, however, that Mr. Meruelo's losses are overstated and that instead Market Street is the movant with the largest financial interest. Market Street attacks Mr. Meruelo's loss calculation on several grounds, claiming it is overstated because: (1) Mr. Meruelo made errors in his certifications and loss calculations; (2) Mr. Meruelo improperly

---

[4] The Court recognizes its obligation under the PSLRA to "determine" the plaintiff with the "largest financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (requiring that the "most adequate plaintiff" be the person or persons that, "in the determination of the court, has the largest financial interest in the relief sought by the class") (emphasis added); see also Aronson, 79 F. Supp. 2d at 1157. The Court further recognizes, however, that the statutory scheme for the speedy resolution of the lead plaintiff question makes it undesirable for courts to prejudge damages through an extensive fact-finding process. See Aronson, 79 F. Supp. 2d at 1157. The Court has reviewed the numerous motions and supporting memoranda addressing the lead plaintiff question and generally accepts the representations of the movants as true. Based on these representations and the unnecessary delay that would be occasioned by further proceedings, Market Street's motion for oral argument (Docket No. 119) on these issues is hereby denied.

[5] See Notice of Submission of Corrected Loss Calculation and Trading Data by Alex Meruelo; Declaration of Behram V. Parekh, filed June 6, 2002, ("Corrected Loss Calculation").

included purchases after the disclosure of fraud; and (3) Mr. Meruelo improperly calculated his losses by using the average trading price of WCG during the 90-day period following the close of the class period. The Court will address each of Market Street's criticisms in turn below.[6]

First, Market Street criticizes Mr. Meruelo's certification and therefore his loss calculation, arguing that the certification listed "numerous trades in the common stock of WCG at prices outside the range at which WCG traded on those dates." Market Street then calculates the amount by which Mr. Meruelo's losses would be reduced if the Court rejected all trades listed on the certification at prices outside the range at which the stock traded on those dates, arguing that Mr. Meruelo's claimed losses should be reduced by $1,128,665.00.

On June 6, 2002, however, Mr. Meruelo submitted a Corrected Loss Calculation and actual trading data supporting his motion for appointment as lead plaintiff. The revised loss calculation was submitted to correct the following discrepancies: (1) the trading data attached to Mr. Meruelo's certification reflected settlement dates rather than trading dates for the stock; and (2) the trading data attached to Mr. Meruelo's certification included the commission charge as part of the price of the securities, rather than reflecting just the trade price of the securities. After correcting for these errors, Mr. Meruelo's losses amount to $3,905,136.80; a total more than the

---

[6] In its June 6, 2002 Response Memorandum, Market Street also argued that Mr. Meruelo's losses were overstated because the Meruelo Group and Mr. Meruelo: (1) failed to assign value to Mr. Paronyan's shares; and (2) improperly aggregated the claims of the individuals in the Meruelo Group. Because the other individual lead plaintiff applicants in the former "Meruelo Group" have withdrawn their applications in support of Mr. Meruelo, the Court need not address these arguments.

6

amount stated in Mr. Meruelo's original submission.[7]  The Court has reviewed the revised loss

calculations and supporting trading data and finds that the errors identified by Market Street (and

certain other lead plaintiff movants) have been sufficiently addressed.  Accordingly, the Court

finds unnecessary any reduction of Mr. Meruelo's loss calculation on the basis that the trade

prices stated on the certification are in error.[8]

  Market Street next claims that Mr. Meruelo's losses are overstated because his

certification includes purchases of WCG securities effected after the disclosure of the fraud.

Market Street argues that Mr. Meruelo's purchases of 171,700 shares of WCG stock on January

29, 2002 should be excluded from his loss calculation because the WMB press release describing

the contingent guarantee of WCG debt was issued at 7:31 a.m. on January 29, 2002, before the

market opened for trading.

  Mr. Meruelo contends, however, that the January 29 purchases were appropriately

included in his loss calculation because the class period alleged in the complaints filed in this

action end on and include January 29, 2002.  See, e.g., Cali, et al. v. Williams Cos. Inc., et al.,

Compl. at ¶ 18 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

---

  [7] Mr. Meruelo's Corrected Loss Calculation explains that the increase in the amount of
loss is due to the inadvertent exclusion from his original submission of purchases that were
"settled" after the end of the class period but "transacted" within the class period.

  [8] The Court finds that the corrected errors in Mr. Meruelo's certification and loss
calculation do not provide a sufficient basis for denying his motion to be appointed lead plaintiff.
Cf. Amended Memo. Of Law in Opp'n to the Competing Lead Plaintiff Motions and in Further
Support of the Motion of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis
Paronyan for Consolidation, Appointment as Lead Plaintiff and For Approval and Selection of
Lead and Liaison Counsel (4/19/02) ("The fact that none of the three certifications that were filed
by Market Street Securities was accurate, in and of itself, provides additional grounds for
denying its motion.").

otherwise acquired the securities of WMB and/or WCG between July 24, 2000 and January 29, 2002 inclusive (the 'Class Period') and who were damaged thereby") (emphasis added). Mr. Meruelo further contends that, in addition to the press release purportedly issued at 7:31 a.m., WCG issued its own press release on January 29, which may have contradicted WMB's prior statements. Mr. Meruelo argues that these conflicting press releases created confusion in the market regarding WMB and WCG's securities.

The Court finds that a determination regarding whether the shares purchased by Mr. Meruelo on January 29, 2002 occurred after the market became aware of the alleged fraud requires an extended inquiry and factual determination as to the exact moment investors were on notice of the negative information. The Court finds that such an inquiry is inappropriate and unnecessary at this stage of the litigation and, accordingly, declines to exclude Mr. Meruelo's January 29, 2002 purchases of WCG stock from Mr. Meruelo's loss calculation on that basis.

Finally, in addition to the criticisms of the trading prices stated in Mr. Meruelo's certification, Market Street also attacks the method by which Mr. Meruelo calculates his losses. Market Street argues that Mr. Meruelo's loss calculation, based on the PSLRA'S 90-day average trading price, 15 U.S.C. § 78u-4(e), is an inappropriate measure of loss at the lead plaintiff appointment stage.[9] Instead, Market Street argues that the appropriate measure of loss would be one based on the closing price for WCG common stock on January 29, 2002, the day the alleged fraud was disclosed. Market Street further argues that Mr. Meruelo's use of the 90-day average

---

[9] The PSLRA provides a limit on the amount of damages that can be recovered in a private action where the plaintiff seeks to establish damages by reference to the market price of a security. 15 U.S.C. § 78u-4(e)(1). That limit is calculated by determining "the mean trading price of [the] security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Id.

8

trading price is an attempt to claim "more than $1,700,000 worth of losses that occurred well after the disclosure of the fraud and the end of the class period."

Market Street cites the district court's decision in In re Ribozyme Pharms., Inc. Sec. Litig., 192 F.R.D. 656, 661 (D. Colo. 2000), to support its position that the 90-day average trading price should not be used to determine the lead plaintiff with the largest financial interest in the litigation. In Ribozyme, the court found that the loss calculation for the so-called "retention" plaintiffs was the value to which the stock price fell at the end of the class period; the court also explicitly rejected the use of the 90-day average trading price as a method for calculating damages:

> The "Lead Plaintiffs" Group argues against this novel valuation method and states that it is error to read the PSLRA's "90-day bounce back" provision regarding the calculation of damages into the lead plaintiff provision regarding the largest financial interest. I agree that the determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term "damages" but instead, "largest financial interest."

192 F.R.D. at 661.

The Court does not consider Ribozyme's analysis persuasive in light of the number of district courts relying upon the 90-day average trading price in comparing claimed losses. See, e.g., In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000) (using 90-day period after the close of the class period to determine largest financial interest); Steiner v. Nat'l Auto Credit, 1998 U.S. Dist. LEXIS 21804, at *12 (N.D. Ohio July 16, 1998) (using the "mean trading price," or the average of the daily trading price of the security "during the 90 day period," to determine the largest financial interest in the case).[10] In fact, the Court is unaware of any other

---

[10] The Ribozyme court stated that it relied on several non-published opinions in its district that have employed the "retention value" method for determining the largest financial interest pursuant to the PSLRA. See Ribozyme, 192 F.R.D. at 660 (citing In re New Era Networks, Inc. Sec. Litig., Civil Action No. 99-WM-473 (Colo. 1999); In re Samsonite Corp. Sec. Litig., Civil Action No. 98-K-1878 (Colo. 1998); In re Boston Chicken Sec. Litig., Civil

opinion holding that the "retention value" method is the only appropriate method of calculating damages.[11]

Moreover, the Court finds that Market Street failed to follow the directive at the April 12, 2002 hearing to articulate with clarity and specificity the bases and methods for calculating its own losses. Market Street's original certification and loss calculation, unlike those of other lead plaintiff movants, failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest. Furthermore, despite its sharp criticism of other lead plaintiff movants' calculations, Market Street has not provided any additional information to supplement its original submission in the four rounds of briefing following its April 1, 2002 motion.

In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated using the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo; and (3) the claimed losses of Market Street are also significantly less than those of Mr. Meruelo.

---

Action No. 97-WM-1308 (Colo. 1997); In re New Era of Networks, Inc. Sec. Litig., Civil Action No. 99-WM-1274 (Colo. 1999)). The Court finds that each of these four opinions is inapposite because none of them endorses the "retention value" method or even mentions how the largest financial interest was determined. See id. Furthermore, two of the cases, New Era, Civil Action No. 99-WM-473; and Samsonite, Civil Action No. 98-K-1878, involved unopposed motions for the appointment of lead plaintiff, thereby explaining the absence of any discussion regarding the appropriate method for determining which movant had the "largest financial interest."

[11] The Court finds Market Street's attacks on Mr. Meruelo's use of the 90-day average trading price notable given Market Street's failure to make the argument before final briefs were submitted on June 6, 2002. This failure is particularly perplexing in light of the number of lead plaintiff movants calculating "losses" and financial interest using that method.

10

Having determined that Mr. Meruelo has the largest financial interest in the outcome of the litigation, the Court turns to whether Mr. Meruelo satisfies the requirements of Fed. R. of Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Many courts agree, however, that a "wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4)." Lax, 1997 WL 461036, at *6 (internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d 427; Aronson, 79 F. Supp. 2d at 1158 (citations omitted) (holding that, at the lead plaintiff appointment stage, "all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate.").

Market Street claims Mr. Meruelo's losses are not typical of those of the WCG Subclass under Rule 23(a) because Mr. Meruelo is subject to unique defenses as a result of his purchases of securities after the alleged disclosure of the fraud on January 29, 2002. In support of this position, Market Street quotes a brief purportedly filed by Mr. Meruelo's counsel, Milberg Weiss, on behalf of another client in an unrelated case. Market Street argues that Mr. Meruelo's purchases of WCG securities on January 29, 2002 are similar to the purchases of the lead plaintiff movant in Enron where the court determined the movant was subject to unique defenses and therefore was atypical because it purchased millions of shares of Enron stock after the disclosure of the fraud. Enron, 2002 WL 530588, at *22; see also Berwecky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65 (S.D.N.Y. 2000) (holding that a person who increases his holding after

11

revelation of the fraud is subject to unique defenses that preclude him from serving as class representative); <u>Kreindler v. Sambo's Rest., Inc.</u>, 1985 U.S. Dist. Lexis 23388 (S.D.N.Y. 1985) (same).

Mr. Meruelo contends that his purchases of WCG securities on January 29, 2002, the last day of the class period, can be distinguished from those of the lead plaintiff movant in <u>Enron</u>, the Florida State Board of Administration ("FSBA"). Mr. Meruelo explains that the FSBA's purchases of Enron securities were made on its behalf by its investment advisor, Alliance Capital Management Holding, well after the first Enron shareholder suits were filed against Enron and after the announcement of the SEC investigation into Enron.

Under Fed. R. Civ. P. 23(a)(3), the claims of the representative parties must be typical of those of the putative class. Typicality is achieved where the named plaintiff's claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." <u>Enron</u>, 2002 WL 530588, at *8 (citations omitted). Even though the typicality requirement is not satisfied when the "plaintiff's factual or legal stance is not characteristic of that of other members," <u>id.</u>, at *13 (citations omitted), the existence of minor distinctions will not preclude the typicality requirement from being met, <u>Olsten</u>, 3 F. Supp. 2d at 296; <u>see also</u> <u>Nice Sys.</u>, 188 F.R.D. at 217; <u>Enron</u>, 2002 WL 530588, at *13.

The Court finds that Mr. Meruelo's purchases of WCG stock on January 29, 2002, the first day the alleged fraud was disclosed, may be distinguished from the purchases of FSBA because the purchases of FSBA occurred "after the initial public disclosure regarding [its] overstatement of its assets and partnership liabilities, after the first suits in this consolidated action were filed, and after the SEC announced that it was investigating [the company]." <u>Enron</u>, 2002 WL 530588, at *22. In this case, the purchases upon which Market Street seeks to disqualify Mr. Meruelo occurred on January 29, 2002, the date the plaintiffs claim the first WMB

12

or WCG press release regarding the alleged fraud was issued. In Enron, the court found that FSBA's claims were atypical because, unlike this case, FSBA's purchases occurred so long after the first disclosure of the fraud that FSBA, unlike other investors, did not buy the stock relying upon either the market or statements by Enron or its agents.[12] The Court finds that Mr. Meruelo's purchases were not atypical so as to disqualify him from serving as lead plaintiff.

The Watkins Group, seeking to be appointed lead plaintiff on behalf of WCG bondholders, argues that its interests will not be adequately protected by Mr. Meruelo, or any other equity holder lead plaintiff. The Watkins Group objects on the following grounds: (1) WCG shareholders do not have standing to pursue claims on behalf of WCG bondholders; and (2) because the interests of WCG shareholders and WCG bondholders are divergent, the WCG bondholders will not be adequately represented by a shareholder lead plaintiff.

To the extent the Watkins Group's first argument relates to the typicality of Mr. Meruelo's claims, the Court finds that Mr. Meruelo's claims are typical because the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6 (N.D. Ill. 1997); see also Enron, 2002 WL 530588, at *13 ("When plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.") (internal quotations omitted). Moreover, the Court finds that, insofar as the appointment of Mr. Meruelo

---

[12] The lead plaintiff movants, here, dispute whether the market, and Mr. Meruelo, had notice of the alleged fraud when the securities were purchased. As the Court explained above, an extended inquiry and factual determination into the exact moment investors were on notice is inappropriate and unnecessary at this stage of the litigation and will not be taken up here.

as WCG Subclass lead plaintiff presents standing issues, those issues can be resolved by the filing of an amended complaint.

The Watkins Group's second attack goes to the adequacy of Mr. Meruelo, or any shareholder lead plaintiff movant, to represent the interests of WCG bondholders. The Watkins Group, stressing the significance of the WCG bankruptcy, claims that it should also be appointed lead plaintiff in order to "ensure that the interests of bond purchasers are adequately represented and protected during any settlement negotiations, and particularly during any allocation of funds in the event of recovery." Watkins Group Reply Mem. (Jun. 6, 2002), at 4.

Under Fed. R. Civ. P. 23(a)(4), class representatives must adequately represent the interests of the putative class. This requirement is satisfied where: "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members do not have interests that are antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous adequacy." Olsten, 3 F. Supp. 2d at 296 (citations and internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d at 435-36. In other words, "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." Nice Sys., 188 F.R.D. at 219.

The Court finds that Mr. Meruelo's representation meets the Rule 23(a)(4) standard for adequacy. First, the Court finds Milberg Weiss, Weiss & Yourman, and Morrel West, the counsel selected by Mr. Meruelo, to be qualified and experienced lawyers who are unquestionably capable of conducting the litigation on behalf of the WCG Subclass. Second, the Court finds that any problems due to alleged conflicts of interest between WCG's debt and equity holders amounts to mere speculation at the present time. At this stage of the litigation, the

14

holders of both types of securities have the common goal of establishing the omissions and misrepresentations allegedly made to the market. See generally Enron, 2002 WL 530588, at *13. The Court further finds that the inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in an unnecessary and undesirable weakening of the bargaining power of the WCG Subclass. See Nice Sys., 188 F.R.D. at 220 ("Representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation.") (internal quotations omitted). Finally, the Watkins Group's contention that Mr. Meruelo, or another shareholder lead plaintiff, will not vigorously pursue the claims of the bondholder class members is unsubstantiated. The Court finds that Mr. Meruelo's own financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action on all fronts. See generally Nice Sys., 188 F.R.D. at 219.

The final issue with respect to the appointment of Mr. Meruelo as lead plaintiff is whether any lead plaintiff movant has successfully rebutted the presumption that Mr. Meruelo is the "most adequate plaintiff." Under the PSLRA, the presumptive lead plaintiff may only be rebutted upon proof that the plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Both Market Street's and the Watkins Group's arguments for the disqualification of Mr. Meruelo on the grounds that his claims are atypical or inadequate under Rule 23(a) may be construed as rebuttal challenges under the PSLRA. See id. The Court addressed and rejected these arguments above. Therefore, the Court finds that the presumption that Mr. Meruelo is the "most adequate plaintiff" for the subclass has not been rebutted. Accordingly, the Court hereby appoints Mr. Meruelo as the lead plaintiff for the WCG subclass.

## B. Appointment of Counsel for the WCG Subclass

The Court now turns to the approval of lead counsel for the WCG Subclass. As noted above, the Court finds that Mr. Meruelo's selections, Milberg Weiss, Weiss & Yourman, and Morrel West, are qualified, experienced counsel who will adequately represent the interests of the class. Accordingly, the Court approves Mr. Meruelo's selection of Milberg Weiss and Weiss & Yourman as co-lead counsel, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7 (noting the use of co-lead counsel should not result in increased attorneys' fees and expenses). The Court also approves Mr. Meruelo's selection of Tulsa law firm Morrel West as local counsel for the WCG Subclass.

### III

### A. Appointment of Lead Plaintiff for the WMB Subclass

On April 1, 2002, motions seeking lead plaintiff status were filed by HGK and Teamsters Local 710 Pension Fund and Health & Welfare Fund ("Local 710"); both movants now seek to be appointed lead plaintiff for the subclass of purchasers of WMB securities ("WMB Subclass"). HGK and Local 710 submitted motions, as required by the PSLRA, within sixty days from the January 29, 2002 publication of the notice of the pendency of this class action. See 15 U.S.C. § 78u-4(a)(A)(i)(II). The potential lead plaintiffs for the WMB Subclass, therefore, both satisfy the first requirement for becoming the presumptive "most adequate plaintiff."

The Court must next determine which movant "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The financial interest claimed by the two lead plaintiff movants for the WMB Subclass are as follows:

16

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| HGK | $3,774,142.00 |
| Local 710 | $ 146,166.00[13] |

As previously discussed, determining which lead plaintiff movant has the largest financial interest in the litigation is, generally, the most significant inquiry for the Court in appointing a lead plaintiff. See, e.g., Aronson, 79 F. Supp. 2d at 1157. In the case of the WMB Subclass, however, HGK's alleged losses dwarf those of Local 710, and Local 710 has failed to demonstrate that HGK's claimed WMB holdings or losses are erroneously calculated or otherwise overstated. Accordingly, the Court finds that HGK has the "largest financial interest in the outcome of the litigation." See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Local 710 argues that it should be appointed a separate lead plaintiff for a subclass of WMB bondholders.[14] Asserting similar justifications as those argued by the Watkins Group, Local 710 contends that no shareholder lead plaintiff movant has the standing required to pursue claims on behalf of the bondholders, and that Local 710's interests will not be adequately represented by a shareholder lead plaintiff.[15]

---

[13] HGK's losses were suffered in connection with its purchase of shares of WMB common stock and were determined after deducting gains from the sale of its WCG shares received as dividends; Local 710's losses were suffered in connection of its purchases of WMB notes.

[14] In its memoranda addressing the appointment of lead plaintiff, Local 710 urges the Court to appoint it lead plaintiff of a separate subclass of purchasers of WMB notes. The Court denied Local 710's request for the creation of a separate subclass in its June 21, 2002 order (Docket No. 123), and will not address that issue again here.

[15] It is unclear whether Local 710's attack is based on the grounds of typicality and adequacy under Rule 23 or an attack on HGK as the presumptive lead plaintiff.

As noted above, in determining the most adequate plaintiff, the Court must address Rule 23(a)'s typicality and adequacy requirements. The Court finds that HGK's representation meets the Rule 23(a) standards for typicality and adequacy. First, the Court finds that HGK's claims are typical of the WMB bondholders because the claims asserted by HGK on behalf of the shareholder plaintiffs "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6. As discussed above, the Court finds that, to the extent the appointment of HGK as WMB Subclass lead plaintiff presents standing issues, those issues can also be resolved at the appropriate time by the filing of an amended complaint. Second, the Court finds that HGK's representation of the class is adequate for the reasons identified previously with respect to appointment of a lead plaintiff for the WCG Subclass because HGK: (1) has selected qualified and experienced counsel; (2) does not have any present conflicts of interest with the WMB bondholders; and (3) will vigorously prosecute the action.

Accordingly, because HGK (1) filed its lead plaintiff application within 60 days of the notice of the pendency of the action; (2) has been determined by the Court to have the largest financial interest in the litigation's outcome; and (3) satisfies the requirements of Rule 23, HGK is presumed to be the "most adequate" plaintiff. The Court finds that Local 710 has not successfully rebutted this presumption or otherwise shown that HGK cannot or will not adequately represent the class. Accordingly, the Court hereby appoints HGK as the lead plaintiff for the WMB Subclass.

### B.  Appointment of Counsel for the WMB Subclass

The Court now turns to the approval of lead counsel for the WMB Subclass. The Court finds that HGK's selections, Schoengold & Sporn and the Seymour Law Firm, are qualified,

18

experienced counsel who will adequately represent the interests of the class. Accordingly, the Court hereby approves HGK's selection of Schoengold & Sporn and the Tulsa law firm, the Seymour Law Firm, as co-lead counsel for the subclass of purchasers of WMB securities, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7.

## IV

On March 15, 2002, the parties filed a Joint Stipulation and Proposed Scheduling Order to govern the timing of submissions following the entry of the Court's order appointing lead plaintiff and lead counsel. Pursuant to this Order, and in accordance with that Joint Stipulation, the Court hereby orders the following:

1.   Lead Plaintiffs for the WCG and WMB Subclasses shall file consolidated amended complaints on behalf of their respective subclasses incorporating all causes of action on behalf of all putative subclass members no later than 45 days from this order;

2.   Defendants shall have 45 days from service of the consolidated amended complaints to file responsive pleadings;

3.   Lead Plaintiffs shall have 45 days to file any oppositions to the responsive pleadings; and

4.   Defendants shall have 15 days to reply to Plaintiffs' opposition.

IT IS SO ORDERED.

This 8TH day of July, 2002.

_____
Sven Erik Holmes
United States District Judge

19

CBS MarketWatch September 14, 1998 Monday

FOCUS - 6 of 7 DOCUMENTS

Copyright 1998 MarketWatch.com Inc., All Rights Reserved
CBS MarketWatch

September 14, 1998 Monday

LENGTH: 512 words

HEADLINE: Some options firms under pressure as market slides 9-11-98

BYLINE: Brenon Daly

BODY:
 mailto:bdaly@marketwatch.com Brenon Daly

] Taking it on the chin Market's slide squeezes some options firms By  mailto:bdaly@marketwatch.com Brenon Daly (trv) options and that powerhouse Spear Leeds & Kellogg is now the specialist.

Two Philly traders said they'd heard Park Avenue no longer met capital requirements and sold the coveted specialist position to Spear.

Adair declined to comment about the shift, and traders for both Park Avenue and Spear hung up the phone when contacted for an interview.

What happened?

Just the term "derivative losses" scares most investors. Wasn't that what Barings Bank -- which counted Britain's Queen Mother as a customer -- blamed when it went under?

But Palumbo is a no Nick Leeson. Instead, Palumbo just bet over the summer that the seven-year bull market would continue.

"We just basically got caught long [in the stock market]", Palumbo said. "There were individual stocks that hurt, but not one in particular."

Among the stocks that hurt Third Millennium: Ciena (CIEN) (cien),which edged above 90 in July and now changes hands for about 16, and McDonald's (MCD) (mcd), whichhas seen its shares shed one-third of their value over the past two months.

"It's tough to learn from [the recent problems] because so many outlandish things happened at once," Palumbo said.

Market makers

Also complicating Third Millennium's situation is that, as a market maker, the firm is sometimes required to take a position it may not necessarily want.

"Market makers have to offer a two-sided market. They can't just buy and buy and buy and then say, 'OK, that's it, I'm going home now,' " said CBOE spokeswoman Lynne Howard. "Because of that, it's very easy to get locked into a bad position."

The exchange requires market makers to ensure liquidity and allow investors to get into and out of positions.

Further, it really isn't uncommon for options traders to hit a rough patch, Howard said. Even if traders break even on their account, they face a month's seat-lease fee of about $5,000 and typically rack up about $10,000 each month in trading commissions.

Taking lumps

CBS MarketWatch September 14, 1998 Monday

"And your fate is really out of your control," said Howard, who traded for a number of years before joining the CBOE. She said she went "belly up" three times during her career.

Jeff Wolfson -- chairman of Pax Clearing Company, which clears for Third Millennium and about 300 other customers -- agreed that a lot of traders have "taken a lot of lumps" on the floor.

"But the key in this business," Wolfson said, "is to always be able to come back tomorrow.

1997-2002 MarketWatch.com, Inc. All rights reserved.  See details at http://custom.marketwatch.com/custom/docs/useragreement.asp.

LOAD-DATE: January 21, 2003





HOME    DOMAINS    EMAIL    WEB SITES    HOSTING    DRIVE TRAFFIC    YOUR BUSINESS    INCORPORATE

LOG IN    CUSTOMER SUPPORT    FAQS

## THIS DOMAIN NAME IS REGISTERED TO:

Send an anonymous offer to buy this name

The data in Register.com's WHOIS database is provided to you by
Register.com for information purposes only, that is, to assist you in
obtaining information about or related to a domain name registration
record.  Register.com makes this information available "as is," and
does not guarantee its accuracy.  By submitting a WHOIS query, you
agree that you will use this data only for lawful purposes and that,
under no circumstances will you use this data to: (1) allow, enable,
or otherwise support the transmission of mass unsolicited, commercial
advertising or solicitations via direct mail, electronic mail, or by
telephone; or (2) enable high volume, automated, electronic processes
that apply to Register.com (or its systems).  The compilation,
repackaging, dissemination or other use of this data is expressly
prohibited without the prior written consent of Register.com.
Register.com reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by these terms.


     Organization:
        Third Millennium Trading
        Ian Farnung
        440 S. LaSalle
        Chicago, IL 60605
        US
        Phone: (312)260-5068
        Fax..: (312)260-5396
        Email: ianfarnung@hotmail.com

     Registrar Name....: Register.com
     Registrar Whois...: whois.register.com
     Registrar Homepage: http://www.register.com

     Domain Name: THIRDMILLENNIUMTRADING.COM

        Created on..............: Mon, Mar 26, 2001
        Expires on..............: Sat, Mar 26, 2011
        Record last updated on..: Fri, Mar 22, 2002

     Administrative Contact:
        Third Millennium Trading
        Ian Farnung
        440 S. LaSalle
        Chicago, IL 60605
        US
        Phone: (312)260-5068
        Fax..: (312)260-5396
        Email: ianfarnung@hotmail.com

     Technical Contact, Zone Contact:
        Register.Com
        Domain Registrar
        575 8th Avenue - 11th Floor
        New York, NY 10018
        US
        Phone: 902-749-2701
        Fax..: 902-749-5429
        Email: domain-registrar@register.com

     Domain servers in listed order:

     DNS1.PAXCLEARING.COM                    65.112.82.18
     DNS2.PAXCLEARING.COM                    65.112.210.18

   Register your domain name at http://www.register.com


   Send an anonymous offer to buy this name


         Site Map  |   Rules  |   Pricing  |   Investor Relations  |   Press Room  |   Employment  |   Advertising  |   Affiliate
              Individuals & Families  |  Small Businesses  |  Corporate Services  |  Global Resellers  |  Business Solutions

Bulk Registrations  |  Web Site Forwarding  |  Newsletter Archive



© 1995-2005 by Register.com®. Please read our Disclaimer, Privacy Notice, Services Agreement, Dispute Policy and DMCA Notice.



PAX Division of Merrill Lynch Professional Clearing Corp. - Microsoft Internet Explorer

File   Edit   View   Favorites   Tools   Help

Back  •        •           Search    Favorites    Media              •         •

Address  http://www.thirdmillenniumtrading.com/                          Go    Links

Search the Web          Go      Visual Bookmarks  +   Pop-up Bin     Search Results     Vi

## Merrill Lynch

# PAX Division of Merrill Lynch Professional Clearing Corp.          16 May, 20

In the fast-moving, volatile and highly leveraged world of options markets, where trading horizons may change in a matter of minutes, instantaneous information and mathematical analysis can give traders a crucial edge.

PAX Division of Merrill Lynch Professional Clearing Corp. attracts and retains sophisticated and experienced professional, registered broker dealers by continually developing innovative information management systems that set industry standards.

**Home**

**PEACE Clearing**

**Dividend Report**

**Stock Loan Availability**

**Trading Systems**

**Client Download**

**Support**

### PAX Clearing Corporation Agrees To Be Acquired By Merrill Lynch
### NEW YORK, March 3, 2005

PAX Clearing Corporation, the Chicago-based options, stock and futures clearing firm, said today that it has agreed to be acquired by Merrill Lynch (NYSE: MER). Terms of the transaction were not disclosed.

The transaction will augment Merrill Lynch's position in the clearing business and enhance the quality of service it provides to clients. The unit will become part of Merrill Lynch Professional Clearing, or ML Pro.

Internet

PAX Division of Merrill Lynch Professional Clearing Corp.                      Page 1 of 2

Case 1:05-cv-10400-WGY    Document 35-8    Filed 05/16/2005    Page 2 of 3



PAX Division of Merrill Lynch Professional Clearing Corp.                      16 May, 2005



- [Home](#)
- [PEACE Clearing](#)
- [Dividend Report](#)
- [Stock Loan Availability](#)
- [Trading Systems](#)
- [Client Download](#)
- [Support](#)

In the fast-moving, volatile and highly leveraged world of options markets, where trading horizons may change in a matter of minutes, instantaneous information and mathematical analysis can give traders a crucial edge.

PAX Division of Merrill Lynch Professional Clearing Corp. attracts and retains sophisticated and experienced professional, registered broker dealers by continually developing innovative information management systems that set industry standards.

PAX Clearing Corporation Agrees to Be Acquired by Merrill Lynch
NEW YORK, March 3, 2005

PAX Clearing Corporation, the Chicago-based options, stock and futures clearing firm, said today that it has agreed to be acquired by Merrill Lynch (NYSE: MER). Terms of the transaction were not disclosed.

The transaction will augment Merrill Lynch's position in the clearing business and enhance the quality of service it provides to clients. The unit will become part of Merrill Lynch Professional Clearing, or ML Pro.

PAX shareholders and employees are very optimistic about the future prospects for the clearing industry and look forward to joining the Merrill Lynch organization, and together providing enhanced benefits to our clients in the future," said Collin Carrico, CEO of PAX Clearing Corporation.

"Options trading volumes continue to grow, and we believe that by integrating this platform with our existing clearing, execution and financing capabilities, we will significantly improve our ability to serve our clients," said Gary Yetman, vice chairman of Global Equity Financing & Services at Merrill Lynch.

The transaction is subject to the approval of PAX Clearing Corporation's shareholders. Shareholders representing in excess of 90% of PAX Clearing Corporation's capital stock have agreed to vote their shares in favor of the transaction. The transaction is subject to customary regulatory approvals.

Founded in 1996, PAX Clearing Corporation is a full-service options, stock and futures clearing firm based in Chicago, Illinois. PAX provides a variety of securities trading-related services, including option and stock clearance and execution, financing, technology infrastructure, risk management and administrative functions. PAX's customer base includes high end broker-dealers acting as specialists and market makers that operate on the floor at the traditional U.S. options exchanges and various off-floor professional traders and trading firms. The company has operations in Chicago, New York, Philadelphia and San Francisco.

Merrill Lynch is one of the world's leading financial management and advisory companies, with offices in 36 countries and total client assets of approximately $1.6 trillion. As an investment bank, it is a leading global underwriter of debt and equity securities and strategic advisor to corporations, governments, institutions and individuals worldwide. Through Merrill Lynch Investment Managers, the company is one of the world's largest managers of financial assets. Firmwide, assets under management total $501 billion. For more information on Merrill Lynch, please visit www.ml.com

• Privacy Statement    • Terms of Use                    © Copyright 2005 Merrill Lynch & Co., Inc.





| FIND A BUSINESS | FIND A PERSON | SEARCH BY PHONE | WEB SEARCH | AREA & ZIP CODES | MAPS/DIRECTIONS |



**View Results On a Map**

Search for: _Search Tips_    City    State _List_    or Zip

pax clearing    Chicago    IL    [ Search ]

## Narrow your search

**Legal & Finance** (2)
- Investments (1)
- Loans (1)

## Matching Name Results

Found: 2 businesses  (shown 1-2)

Help

**Ads by Google**

**Corporate Finance**
Innovative financial
solutions. Inquire Today!
www.CapitalSource.com

**Operational Risk
Software**
Manage & communicate risk
status for Project, Compliance
& Corporate
www.ris3.com

**Project & Risk
Management**
Quantitative Risk Evaluation
System Bid Risk, EVM, Doc
Mgmt, S-Curve
www.cbratproject.com

**GS Specialty Lending**
Goldman Sachs Specialty
Lending loans to middle
middle-market co.
www.gsslg.com

**Risk Management**
Get Firm Profiles, Risk
Management Job Listings,
Salary Surveys, More!
www.vault.com/finance

### FEATURED SITES

**$1000 Payday Loans with No Credit Check**  www.mycashnow.com
We want to ensure that when you need a payday loan, we are your first and only choice.
We'll put up to $1000 in your checking account overnight - no direct deposit ...

**$100 - $1,000 Personal Loans Overnight**  www.paydaymax.com
No games. Check our very low rate. We're fast, easy and confidential. No credit check,
apply online or call us.

**$1,000 Personal Loan**  www.discountadvances.com
Only $17.50/$100 loaned. Cash goes in your account overnight. Fast. No credit check.
Discount advances without discount service.

### ALL BUSINESSES

**Pax Clearing**
400 S La Salle St
Chicago, IL 60605-1023
Phone: (312) 291-0230
Search the Web

_Free refinance offers - NextTag_

**Business Types:** Personal Loans

Map  |  Directions  |  What's Nearby?  |  NEW Send to Mobile Phone  |  Dun &
Bradstreet Business Info

**Pax Clearing**
440 S La Salle St Ste 3100
Chicago, IL 60605-5020
Phone: (312) 260-5000
Visit Web site
Search the Web

**Business Types:** Security Brokers, Dealers, & Flotation Companies, more...

Map  |  Directions  |  What's Nearby?  |  NEW Send to Mobile Phone  |  Dun &
Bradstreet Business Info

## Or Consider These Related Businesses

### Personal Loans:

**YEBOAH YAW**
6150 N KENMORE AVE
nna
CHICAGO, IL 60660
Phone: (773) 338-7665

• Visit Web site

**Business Types:** Personal Loans

**SMITH ROTHCHILD FINANCIAL COMPANY INC**
221 N LA SALLE ST SUITE 400
CHICAGO, IL 60601
Phone: (312) 977-0101
Fax:    (312) 604-0432

• Visit Web site

**Services:** Equal Housing Lender, Fast Approval, Fixed Rate Mortgage, more...
**General Info:** Licensed, Free Pre-Qualifying By Phone, more...
**Business Types:** Personal Loans

More Info  |  Map  |  Directions  |  What's Nearby?  |  NEW Send to Mobile Phone

**GREENWOOD PRATT AND SLOAN FINANCIAL**

5875 N Lincoln Ave Ste 145
Chicago, IL 60659
Phone: (773) 907-0065
Fax:    (773) 907-0024

• Visit Web site

**Business Types:** Personal Loans

Map  |  Directions  |  What's Nearby?  |  NEW 📱 Send to Mobile Phone

**See all Personal Loans results**

## Stock & Bond Brokers:

### ARCHIPELAGO
100 S WACKER DRIVE SUITE# 2012
CHICAGO, IL 60606
Phone: (312) 960-1696
Fax:    (312) 960-1369

• Visit Web site

**Business Types:** Stock & Bond Brokers

Map  |  Directions  |  What's Nearby?  |  NEW 📱 Send to Mobile Phone

### Options Xpress Inc
Po Box 2197
Chicago, IL 60690
Phone: (312) 629-5455

• Visit Web site

**Business Types:** Stock & Bond Brokers

What's Nearby?  |  NEW 📱 Send to Mobile Phone

### Modify Search

**Search For:**                                        Search Tips

pax clearing

**City**                                               **State** List

Chicago                                                IL

or **Zip**

☐  Include surrounding areas                           *SEARCH*

About Switchboard | Contact Us | National Advertising | Privacy Policy | Help

Terms of Use

*data by* ACXIOM

**InfoSpace Search Resources:** Search engines at Dogpile        Yellow pages and White pages at InfoSpace

© 2005 InfoSpace INC. All Rights Reserved.
Switchboard is a subsidiary of InfoSpace, Inc.



*"Creating Liquidity for a Global Marketplace"*











advanced trading

ensuring our

Third Millennium Trading (TMT) is the  premier options trading Firm. Our technologically

desk and proprietary systems secure our ability to quickly and correctly calculate edge while

ability  to provide liquidity to the marketplace.



arbitrage

To identify and capture edge in options trading by incorporating a strategy based on basic

relationships.



What does TMT do?

TMT is a firm employing market makers whom trades with the firm's capital (private
capital) in order to profit.
Market-making is the process where a trader will buy and sell a security (options, future,
stock, etc.). The
market maker must be willing to buy on their bid and sell on their offer.



Case 1:05-cv-10400-WGY     Document 35-9     Filed 05/16/2005     Page 4 of 5

TMT was formed in 1996 in order to take advantage of the existing, incredible opportunities in making markets in stock options. We began by recruiting a select few individuals in the Chicago land area to become market makers (options traders). Due to our continued success, we have expanded that search to the entire United States.

## Contact Information

For further information or inquiries please feel free to contact us:

**Primary Number:**
(312) 260-5252

**Primary fax:**
(312) 260-5285

**Postal Address:**
440 S. LaSalle, Chicago IL

**Please Send Resumes via email to: :**
noelsmith@hotmail.com

**General Information:**
ssteuber@3rdmt.com

Also visit the Chicago Board Options Exchange Website to learn more about the stock options trading industry.

end mail to kpurnell@thirdmillenniumtrading.com with questions or comments about this web site.

Copyright © 2004 Third Millennium Trading

Case 1:05-cv-10400-WGY     Document 35-10     Filed 05/16/2005     Page 1 of 1

# SHAREHOLDER  INFORMATION

BIOGEN IDEC INC

PUBLIC OFFERINGS

1)CACS CORPORATE ACTION CALENDAR

| Date | Shares Offered | | Price | Share Split Adj Shares | Split Adj Price | Type | Lead Manager |
|------|-------|---|-------|--------|-------|------|--------------|
| 11/00 | 2.60M | $ | 181.81s | 7.80M | 60.60 | COMMON | Merrill Lynch & Co |
| 6/96 | 1.80M | $ | 24.00s | 10.80M | 4.00 | COMMON | Morgan Stanley |
| 9/91 | 3.00M | $ | 15.00r | 18.00M | 2.50 | COMMON | Banc of America Securities |

I = Initial public offering              S = Public offering              R = Rights offering

---

| INSIDER TRADING | | | INSTITUTIONAL OWNERSHIP | |
|---|---|---|---|---|
| Net $ Value Buys and Sells As Of 03/15/05 | | | # of Buyers | 445 |
| (1985 - Present In Dollars) | | | # of Sellers | 510 |
| Lowest activity | 02/00 | -64.37MLN | # of Holders | 1,065 |
| Highest activity | 09/95 | 337950.00 | Shares Held | 283.48MLN |
| Mean: | | -6.53MLN | % Shares Out. | 82.26 |
| Most recent 45 days | | -15.68MLN | Shares Sold | 7.19MLN |

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
H350-114-0 16-May-05 18:16:10