UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  | | Civil Action No. 1:05-cv-10400 (RCL) |
|---|---|---|
| In Re: BIOGEN IDEC, INC., SECURITIES LITIGATION, | ) ) ) ) | |

**THE LONDON PENSIONS FUND AUTHORITY'S AND NATIONAL ELEVATOR INDUSTRY PENSION FUND'S OBJECTION TO THE ORDER OF THE MAGISTRATE JUDGE APPOINTING LEAD PLAINTIFFS AND LEAD COUNSEL**

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  ARGUMENT ..........................................................................................................3

    A.   The Biogen Institutional Investor Group Was Prematurely Designated the
        Presumptive Lead Plaintiff .........................................................................3

        1.   The Biogen Institutional Investor Group Grossly Overstated Its
               Losses and It Does Not Represent the Largest Financial Interest ..............8

        2.   Two Members of the Biogen Institutional Investor Group are
               Atypical and Inadequate to Represent the Class........................................11

III. CONCLUSION........................................................................................................12

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Bank One Shareholders Class Action*,
  96 F. Supp. 2d 780 (N.D. Ill. 2000) ............................................................................... 11

*In re Microstrategy, Inc. Sec. Litig.*,
  110 F. Supp. 427 (E.D. Va. 2000) .............................................................................. 5, 11

*In re Sonus Networks, Inc. Sec. Litig.*,
  No. 02-11315, 2005 U.S. Dist. LEXIS 16910 (D. Mass. Aug. 15, 2005) ...................... 1

## STATUTES

15 U.S.C.
  §78c(a)(10) .................................................................................................................... 4
  §78u-4(a)(2) ................................................................................................................... 4
  §78u-4(a)(3) ................................................................................................................... 1
  §78u-4(a)(3)(I) ............................................................................................................... 3
  §78u-4(a)(3) at 5, n.5 ..................................................................................................... 8

Pursuant to Fed. R. Civ. P. 72,[1] Institutional Investors The London Pensions Fund Authority and National Elevator Industry Pension Fund ("London Pensions Fund/National Elevator") respectfully submit this memorandum of law in support of their objection to the Order, dated September 23, 2005, appointing Lead Plaintiffs and Lead Counsel in the above-captioned consolidated action.

## I.    PRELIMINARY STATEMENT

On September 23, 2005, Magistrate Judge Bowler issued a one-line electronic order (the "9/23/05 Order") granting the Lead Plaintiff motion of the self-styled Biogen Institutional Investor Group. As set forth herein, London Pensions Fund/National Elevator respectfully object to the Order on the grounds that the Magistrate Judge failed to appoint the Lead Plaintiff movant with the largest financial interest as Lead Plaintiff, as required by the Private Securities Litigation Reform Act (the "PSLRA") and further appointed the Biogen Institutional Investor Group as Lead Plaintiff when they are subject to unique defenses and are inadequate and atypical to serve as Lead Plaintiff.

The selection of the Lead Plaintiff is a critical and important decision at the outset of a securities litigation that can lead to disastrous consequences for the Court and the Class if proper care is not taken. *See In re Sonus Networks, Inc. Sec. Litig.*, No. 02-11315, 2005 U.S. Dist. LEXIS 16910 (D. Mass. Aug. 15, 2005) (denying class certification because of, among other reasons, problems with Lead Plaintiff's certification which failed to list all of the Lead Plaintiff's securities transactions). Thus, the formula set forth in the PSLRA for selecting a lead plaintiff – identifying the presumptive lead plaintiff with the largest financial interest and then ensuring that they are

---

[1] Pursuant to Fed. R. Civ. P. 72, London Pensions Fund/National Elevator's counsel have arranged for the transcription of the motion hearing held by Magistrate Judge Bowler on September 23, 2005. At the time of this filing, the transcript was not completed.

adequate and typical –, s*ee* 15 U.S.C. §78u-4(a)(3)(B)(iii), should be carefully followed to ensure that the interests of the Class are sufficiently protected.

As explained herein, London Pensions Fund/National Elevator are the movants who represent the largest financial interest of all other movants. As such, they should have been afforded the presumption of most adequate plaintiff and, being otherwise adequate and typical, their motion should have been granted in full.

Instead, Magistrate Judge Bowler found the Biogen Institutional Investor Group to be the presumptive lead plaintiff since, based on the initial representation of its financial interest, it appeared to represent the largest financial interest. However, in its memoranda filed in further support of its motion and in a presentation made to the Court at oral argument, London Pensions Fund/National Elevator raised serious concerns about the typicality and adequacy of certain members of the Biogen Institutional Investor Group to serve as lead plaintiff. Specifically, London Pensions Fund/National Elevator demonstrated that Biogen Institutional Investor Group members Third Millennium Trading LLP ("Third Millennium") and Horatio Capital LLC ("Horatio") are sophisticated options traders who engaged in unique trading strategies in their trading of Biogen securities. Moreover, London Pensions Fund/National Elevator also argued that neither Third Millennium or Horatio – who describe themselves as options trading firms – had disclosed any of the details of their trades in Biogen options on their certifications which were filed in connection with their motion and it was simply not possible to fully determine what their financial interest in this action is until their trades in **all Biogen securities**, including options, are disclosed.

When it became apparent that certain members of the Biogen Institutional Investor Group had failed to disclose all of their trades in Biogen securities that took place during the Class Period, Magistrate Bowler should have removed the Biogen Institutional Investor Group's status as

presumptive lead plaintiff. Moreover, when these undisclosed trades were ultimately disclosed, they demonstrated that the Biogen Institutional Investor Group had actually incurred a significant profit on those trades, which greatly reduced their claimed financial interest ($3,656,370) to below that of London Pensions Fund/National Elevator ($3,758,993). *See* Declaration of Frank Partnoy in Support of the London Pensions Fund Authority and National Elevator Industry Pension Fund, dated October 7, 2005 (the "Partnoy Declaration") at ¶¶4, 8 (finding that Third Millennium Trading, one of the members of the Biogen Institutional Investor Group, incurred a previously undisclosed profit of $1.3 million on its trading of Biogen options).

For these reasons, and as set forth in all of their prior submissions, London Pensions Fund/National Elevator respectfully request that the Court vacate the 9/23/05 Order and grant their motion in full.

## II.    ARGUMENT

### A.    The Biogen Institutional Investor Group Was Prematurely Designated the Presumptive Lead Plaintiff

On May 2, 2005, four groups of investors filed motions seeking their appointment as lead plaintiffs and approval of their selection of counsel to serve as counsel for the class. Following the submission of these motions, the movants filed memoranda in further support of their motions, followed by reply memoranda. The motions were referred to Magistrate Judge Bowler who heard oral argument on July 21, 2005 (the "7/21/05 Hearing").

At that point in time, based on all of the transactional data provided in the movants' certifications, it appeared that the Biogen Institutional Investor Group represented the largest financial interest of all other movants. Nevertheless, as provided in the PSLRA, even if a movant claims to represent the largest financial interest, before being appointed as lead plaintiff, he must

- 3 -

demonstrate that he is also otherwise and typical of the rest of the class.  *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc).

At oral argument, counsel for London Pensions Fund/National Elevator argued that certain members of the Biogen Institutional Investor Group, specifically Third Millennium and Horatio, had not provided data for all of their transactions in Biogen-IDEC, Inc. ("Biogen") securities[2] as required by the PSLRA and this missing data (which appeared to be the trading of Biogen options) would demonstrate that Third Millennium and Horatio had engaged in trading strategies which were far different than the trading strategies employed by typical investors.   Moreover, counsel for London Pensions Fund/National Elevator also argued that Third Millennium and Horatio's failure to provide data for all of its transactions in Biogen securities made it difficult, if not impossible, to determine what their true financial interest in the litigation actually is.

Following the 7/21/05 Hearing, Magistrate Bowler issued an order, dated July 26, 2005 (the "7/26/05 Order"), in which she afforded the status of presumptive lead plaintiff to the Biogen Institutional Investor Group, based on the size of its claimed financial interest at the time of the filing of its lead plaintiff motion.  *See* 7/26/05 Order at *5 (finding that "the Biogen Institutional

---

[2]     Since the underlying complaints in this consolidated action were brought on behalf of the purchasers of all securities of Biogen, each member of the Biogen Institutional Investor Group, like all of the other movants seeking appointment as lead plaintiff, was required to file a certification that "sets forth all of [its] transactions . . . in the ***security*** that is the ***subject of the complaint***" by the statutory deadline.  15 U.S.C. § 78u-4(a)(2)(A)(iv) (emphasis added).  Indeed, the Securities and Exchange Act of 1934 defines security to include "any put, call . . . option or privilege on any security."  15 U.S.C. §78c(a)(10).  Here, the Class has been defined to include purchasers of all Biogen IDEC "securities," thereby encompassing Biogen options.  *See Brown v. Biogen IDEC, Inc.*, 05-cv-10400, "on behalf of purchasers of the *publicly traded securities* of Biogen;" *Grill v. Biogen IDEC, Inc.*, 05-cv-10453, "on behalf of purchasers of the *publicly traded securities* of Biogen IDEC, Inc.;" and *Lobel v. Biogen IDEC, Inc.*, 05-cv-10801, "on behalf of purchasers of the *securities* of Biogen."  Any suggestion that options should be excluded from this case is not only made without any basis, but is also prejudicial to those investors who traded options and lost money as a result (as opposed to Third Millennium and Horatio who made money on their options trading).

Investor Group appears to set forth the largest financial interest *at the present time*") (emphasis

added).  Moreover, in response to the issues raised in London Pensions Fund/National Elevator's

submissions and presentation at the 7/21/05 Hearing, the 7/26/05 Order also allowed London

Pensions Fund/National Elevator to take limited discovery of the Biogen Institutional Investor

Group.  *See* 7/26/05 Order at *6 ("Having reviewed London's filings and considered the presentation

made in open court, this court will allow London a limited period to conduct discovery into the issue

of the adequacy of the seven member Biogen Institutional Investor Group to best serve as lead

plaintiff under 15 U.S.C. §78u-4(a)(3)(B)(iv).").

As set forth in greater detail in the memorandum filed in support of London Pensions

Fund/National Elevator's motion for particularized discovery,[3] dated September 9, 2005, London

Pensions Fund/National Elevator, on the same day that they received the 7/26/05 Order, requested

from the Biogen Institutional Investor Group that they immediately provide details of their trading in

Biogen options.

The initial response from the Biogen Institutional Investor Group was received on August 16,

2005.  In that response, counsel for the Biogen Institutional Investor Group provided 26 pages of

documents, 24 of which were dated April 29, 2005 and obviously had been available since that date,

---

[3]    The motion for particularized discovery was filed, in part, to obtain permission from the
Court to serve a subpoena on Pax Clearing Corporation**,** the clearing agent for Third Millennium and
Horatio, seeking copies of Third Millennium and Horatio's brokerage statements (since the trading
record of only one option trade had been produced at that point).  As explained by Professor Partnoy
in his declaration, filed contemporaneously herewith, without copies of these brokerage statements,
it is impossible to know precisely what Third Millennium's losses are.  *See* Partnoy Decl. at 5, n. 4.
Third Millennium and Horatio's failure to provide us with copies of these statements after being
ordered to do so by the Court, would alone have been a sufficient basis for denying their motion.
*See e.g. In re Microstrategy, Inc. Sec. Litig.*, 110 F. Supp. 427, 436 (E.D. Va. 2000) (refusing to
appoint Lead Plaintiff movant who failed to submit trading information necessary to "permit a
confident conclusion that its loss was as large as it averred").

but their production had been delayed (without any explanation as to why).  The remaining 2 pages identified a single option trade, despite Third Millennium's prior representation that it had $500,000 in trading profits from its trading of Biogen options.  *See* Reply Affidavit of Neil Kazaross in Further Support of the Motion of the Biogen Institutional Investor Group, dated May 25, 2005 (the "First Kazaross Affidavit"), at 8 (stating that Third Millennium "made approximately $500,000 as a result of its Biogen options transactions").  Shortly after receiving a copy of this one option trade, London Pensions Fund/National Elevator contacted counsel for the Biogen Institutional Investor Group and advised them that it appeared that certain option trades had still not been disclosed.

Despite continued requests for more trade details, no further options trades were provided to London Pensions Fund/National Elevator until London Pensions Fund/National Elevator advised counsel for the Biogen Institutional Investor Group that it would seek leave of the Court to serve a subpoena on Pax Clearing Corporation to obtain copies of all of Third Millennium and Horatio's trading records in all Biogen securities.  At that point, Third Millennium and Horatio finally produced an additional listing of more than 150 options trades that they claimed they had previously overlooked.  Surprisingly, most of those missing trades, which were first disclosed on September 19, 2005, were listed on a printout dated August 16, 2005 – the very day that Third Millennium and Horatio represented that they had already produced all of their options trades.[4]

---

[4]    At the 9/23/05 Hearing, counsel for the Biogen Institutional Investor Group claimed that while these documents were in the possession of its clients by that date, they as counsel had not yet received them and they were therefore not immediately produced.  Such a response, however, raises serious questions as to Third Millennium's intentions in not timely producing documents that it knew it had been explicitly ordered by Magistrate Bowler to produce. *See* 7/26/05 Order at *6.

Upon receiving these options trades, counsel for London Pensions Fund/National Elevator retained Professor Frank Partnoy[5] to review these trades and compute the actual gains or losses from these trades. The findings of Professor Partnoy were explained at the 9/23/05 Hearing, during which counsel for London Pensions Fund/National Elevator submitted a printout of a chart which analyzed the claimed losses of the Biogen Institutional Investor Group in light of the newly disclosed options trades of Third Millennium and Horatio. *See* 9/23/05 Hearing, London's Exhibit and Witness List, Exhibit 3, "Trade Analysis." As then explained by counsel for London Pensions Fund/National Elevator, those newly disclosed trades demonstrated that Third Millennium and Horatio had actually incurred significant gains on their trading of Biogen options, which reduced their claimed financial interest to below the claimed financial interest of London Pensions Fund/National Elevator. *See id*. (stating that the Biogen Institutional Investor Group's revised financial interest, including the options gains of both Third Millennium and Horatio, is approximately $3,413,365, as compared with the financial interest of London Pensions Fund/National Elevator of $3,758,992.74).[6]

In light of the downward revision of the financial interest of the Biogen Institutional Investor Group, whose losses were now reduced to below those of London Pensions Fund/National Elevator, and in accordance with the PSLRA, Magistrate Bowler should have removed the presumption of

---

[5]    Professor Partnoy is a nationally-known expert on issues related to corporate and securities law, finance, financial market regulation and derivatives. He currently serves as the co-chair of the American Bar Association Subcommittee on Futures and Derivatives Litigation and is very familiar with the type of trading strategies employed by Third Millennium and Horatio. *See* Partnoy Decl. Exhibit A (attaching resumé).

[6]    At the 9/23/05 Hearing, counsel for London Pensions Fund/National Elevator also spent a considerable amount of time describing some of the unique trading strategies that were actually employed by Third Millennium and Horatio in their trading of Biogen securities.

lead plaintiff that she had previously afforded to the Biogen Institutional Investor Group and given the presumption instead to London Pensions Fund/National Elevator.

>    1.    **The Biogen Institutional Investor Group Grossly Overstated Its Losses and It Does Not Represent the Largest Financial Interest**

In its numerous submissions filed with the Court, the Biogen Institutional Investor Group made at least three different claims of its financial interest in this litigation.  In its opening motion, it claimed that its financial interest was "in excess of $4 million."  Memorandum of Law in Support of the Motion of the Biogen Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff and Approval of [Selection of Counsel], dated May 2, 2005, at 3.  Then, in its reply memorandum, it claimed that Third Millennium, one of its members, had a previously undisclosed $500,000 gain on its options trading during the Class Period and its losses were thus $4.4 million. *See* Reply Memorandum of Law in Further Support of the Motion of the Biogen Institutional Investor Group at 7.  Finally, in its memorandum in opposition to London Pensions Fund/National Elevator's motion for particularized discovery, the Biogen Institutional Investor Group most recently claimed that Third Millennium only had a profit of $303,490 on its Biogen options trades.  *See* Memorandum of the Biogen Institutional Investor Group in Opposition to the Motion of the London Pensions Fund Authority and National Elevator Industry Pension Fund for Particularized Discovery Pursuant to 15 U.S.C. 78u-4(a)(3)(B)(iv) at 5, n.5.  In truth and in fact, however, Third Millennium's profit from its trading of Biogen options during the Class Period exceeded $1.3 million, thereby reducing the claimed financial interest of the Biogen Institutional Investor Group ($3,656,370) to below that of London Pensions Fund/National Elevator ($3,758,993).[7]

---

[7]    When the gains from Horatio's options trades are also included, the Biogen Institutional Investor Group's financial interest is even further reduced.

Following the assertion of its more than $4 million financial interest in its opening motion, the Biogen Institutional Investor Group filed the Affidavit of Neil Kazaross together with its reply memorandum. In that affidavit, Mr. Kazaross represented – for the first time – that Third Millennium had a gain of approximately $500,000 on its trading of Biogen options and that the Biogen Institutional Investor Group's claimed financial interest would be reduced at most to $4.4 million, which would still be greater than the financial interest of London Pensions Fund/National Elevator. *See* First Kazaross Affidavit at ¶8.

Then, at approximately 4:30 p.m. on September 22, 2005 (only hours before the 9/23/05 Hearing the next morning at 10:00 a.m.), we were served, together with the Biogen Institutional Investor Group's memorandum in opposition to our motion for particularized discovery, with a Declaration and two affidavits, one affidavit signed by Neil Kazaross, a partner at Third Millennium (the "Second Kazaross Affidavit"), and one affidavit signed by Kevin F. Dages, a principal at Chicago Partner, L.P., an economics consulting firm (the "Dages Affidavit"). The Second Kazaross Affidavit now stated that Third Millennium's profit from options trading was actually $303,490 and not the $500,000 previously reported. Moreover, the calculation of this latest rendition of the value of Third Millenium's claimed profit on its options trading, described as "Third Millennium Option Gain Calculation," was attached as Appendix C to the Dages Affidavit.[8]

---

[8]     Curiously, while Mr. Dages claims to have performed a thorough analysis of all of the lead plaintiff motions (*see e.g.* Dages Affidavit ¶¶3, 16-21) and "examined the options and stock trading data" (Dages Affidavit ¶28), the chart produced at Appendix C does not appear to have been prepared by him or even reviewed by him for accuracy. *See* Dages Affidavit ¶30 (stating that Third Millennium itself calculated its losses in Appendix C). Moreover, it is unclear why the chart, which appears to have been prepared by Mr. Kazaross, or, at the very least, someone from his firm, was attached as an exhibit to the Dages Affidavit.

Appendix C purports to be a revised calculation of the profit made by certain members of the Biogen Institutional Investor Group from their trading in Biogen options. At the 9/23/05 Hearing, we advised the Court that the calculations of Appendix C appeared to be inaccurate and did not appear to comport with the actual prices of certain of the options that were identified on the chart and invited counsel for the Biogen Institutional Investor Group to explain how it had it arrived at its conclusion of a profit of $303,490. Counsel for the Biogen Institutional Investor Group declined our invitation and no explanation was provided.

As explained in the Partnoy Declaration, the trades detailed in Appendix C do not support Mr. Kazaross's claim that Third Millennium had a profit of $303,490 on its trading of Biogen options; rather, the trades demonstrate that Third Millennium, the self-described "premier options trading Firm," actually had a profit of more than $1.3 million on its trading of Biogen options, thereby reducing the claimed financial interest of the Biogen Institutional Investor Group to below that of London Pensions Fund/National Elevator. *See* Partnoy Decl. at ¶¶12, 13 (explaining that the prices used in Appendix C to calculate Third Millennium's profit on its Biogen options trading "bear no relationship to reality" and are "obviously inaccurate").

Thus, the Biogen Institutional Investor Group's financial interest in this litigation has been grossly overstated. Accordingly, not only should it not have been appointed as lead plaintiff, but it should not have been afforded the status of presumptive lead plaintiff (or at the very least, the presumption should have been removed once it became apparent that serious issues had been raised as to whether all of its trades in Biogen securities had been disclosed).

### 2.    Two Members of the Biogen Institutional Investor Group are Atypical and Inadequate to Represent the Class

As set forth in great detail in our prior submissions,[9] and as conceded by the Biogen Institutional Investor Group in their submission of the Dages Affidavit, Third Millennium and Horatio engaged in trading strategies that greatly differed from the trading strategies employed by the rest of the class.  *See* Dages Aff, Exhibit 7a.  Indeed, as detailed on its website, Third Millennium trades by "incorporating a strategy based on basic arbitrage relationships" and it hedges its options positions by "making trades in the underlying stock by either buying or selling the stock to reduce the risk of a directional move in the underlying [stock] from causing a large loss."  *See* http://www.3mt.net and http://www.3mt.net/Trading%20options.htm.

As explained in detail at the 9/23/05 Hearing, and as explained by Professor Partnoy in his declaration, unlike a typical investor, Third Millennium and Horatio would not necessarily lose money when the share price of Biogen stock declined.  Nor would it necessarily make money when the share price of Biogen stock rose.  Rather, depending on the range of stock prices, Third Millennium and Horatio could potentially (and at certain times did) have exactly the opposite incentives for purchasing Biogen securities as a typical shareholder.  *See* Partnoy Decl. at ¶23.

For example, while the typical investor that purchased shares of Biogen common stock on January 27, 2005 only made one trade at a time, Third Millennium engaged in five simultaneous trades with the intention of hedging each trade against the other.  *See* Partnoy Decl. at ¶¶22-24.  The typical investor simply made a purchase of shares of Biogen common stock; Third Millennium purchased shares of common stock, purchased a put, sold a put, purchased a call and sold a call.  *See*

---

[9]    London Pensions Fund/National Elevator hereby incorporate all of the arguments set forth in their previously-filed memoranda and made at oral argument that relate to the adequacy and typicality of Third Millennium and Horatio to serve as lead plaintiff.

Partnoy Decl. at 3, n.1 (defining "put" and "call") and ¶¶22-24 (explaining in detail the strategy employed by Third Millennium regarding its trades on January 27, 2005).

Courts have routinely found that investors who engage in these type of unique trading strategies are inadequate to serve as lead plaintiffs. *See MicroStrategy,* 110 F. Supp. 2d, 437 (refusing to appoint as lead plaintiff an investor that specialized in options trading finding that it "may have been subject to unique defenses based on its method of doing business"); s*ee also In re Bank One Shareholders Class Action*, 96 F. Supp. 2d 780 (N.D. Ill. 2000) (denying the lead plaintiff motion of an investor that engaged in unique trading strategies).

Thus, the members of the Biogen Institutional Investor Group are clearly not the typical investor and, despite their smaller financial interest, on this basis alone should have never been appointed as lead plaintiffs.

## III.    CONCLUSION

Although Magistrate Bowler initially afforded the presumption of lead plaintiff to the Biogen Institutional Investor Group because "at [that] time," they appeared to have the largest financial interest, when it became apparent that their claimed financial interest was actually smaller than that of London Pensions Fund/National Elevator, that presumption should have been removed and, at that point, the Court should have afforded the presumption to London Pensions Fund/National Elevator. In all of the memoranda filed, and in all of the arguments made in open court, no issues were raised as to the adequacy or typicality of London Pensions Fund/National Elevator to serve as Lead Plaintiff.

Accordingly, it is respectfully submitted that, as the movants with the largest financial interest, who are otherwise adequate and typical, London Pensions Fund/National Elevator should be appointed as Lead Plaintiffs and their choice of counsel should be approved and the 9/23/05 Order should be vacated.

DATED:  October 7, 2005                    Respectfully submitted,


                                           /s/  Theodore Hess-Mahan
                                           Thomas G. Shapiro BBO #454680
                                           Theodore M. Hess-Mahan BBO #557109
                                           Shapiro Haber & Urmy LLP
                                           53 State Street
                                           Boston, MA  02109
                                           Telephone:  617/439-3939
                                           617/439-0134 (fax)

                                           [Proposed] Liaison Counsel

                                           LERACH COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           MARIO ALBA JR.
                                           200 Broadhollow Road, Suite 406
                                           Melville, NY 11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

                                           LERACH COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           WILLIAM S. LERACH
                                           DARREN J. ROBBINS
                                           PATRICK W. DANIELS
                                           401 B Street, Suite 1600
                                           San Diego, CA  92101
                                           Telephone: 619/231-1058
                                           619/231-7423 (fax)

                                           [Proposed] Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————— x

In Re: BIOGEN IDEC, INC. SECURITIES
LITIGATION

—————————————————————————

:    Civil Action No. 05-10400-RCL

:

:    CLASS ACTION

:

**DECLARATION OF FRANK PARTNOY
IN SUPPORT OF THE LONDON PENSIONS FUND AUTHORITY
AND NATIONAL ELEVATOR INDUSTRY PENSION FUND**

I, FRANK PARTNOY, swear as follows:

1.      I am a Professor of Law at the University of San Diego School of Law, and a graduate of Yale Law School.  Since 1997, I have taught various courses in the areas of corporate and securities law, finance, financial market regulation, and derivatives, and I am the author of several dozen articles and three books in these areas.  Before 1997, I practiced law at Covington & Burling, and worked on the derivatives trading desks at Morgan Stanley and CS First Boston.  I have degrees in mathematics and economics, and have dealt extensively with the kinds of securities transactions at issue on this motion.  I passed the Series 3, 7, and 63 registered securities, options, and futures licensing examinations, and am a member of the New York and District of Columbia bars.  I currently co-chair the American Bar Association Subcommittee on Futures and Derivatives Litigation.  A copy of my resume is attached as Exhibit A.

2.      During the previous four years, I have given trial and deposition testimony as an expert in *Rossco Holdings Inc., et al. v. Bank of America*, No. 1220031401 (JAMS Los Angeles County, CA), *Tustin Nissan, et al. v. Bank of America*, No. 73 Y 181 00138 03  (AAA Orange County, CA), and *Body Perfection, Inc. v. Fitness Warehouse, Inc.*, Case No. GIC 800781 (Superior Court, San Diego County), and I have given deposition testimony as an expert in *Daehan Investment Trust Management Co., Ltd. and Daehan Global Bond II Investment (L) Limited v. J.P. Morgan Chase Bank*, 02 Civ. 12175 (S.D.N.Y.), *Federico Javier Duran Perez and Nora Franco de Duran v. Citibank, N.A.*, 02 Civ. 9793 (S.D.N.Y.), and *R4 Holdings, LLC, and Hill International, Inc. vs. General Atlantic Partners 46, L.P., et al.*, 02 CC 06740 (Superior Court, Orange County).  I also have submitted reports as an expert on various financial and securities matters, including numerous comments to the Securities and Exchange Commission,

and sworn expert testimony before committees of both the United States Senate and House of
Representatives.

3.      I have been retained as an expert in this matter by counsel for the London
Pensions Fund Authority and National Elevator Industry Pension Fund.  I have reviewed the
Memorandum in Further Support of the Motion of the London Pensions Fund Authority and
National Elevator Pension Fund for Consolidation, Appointment as Lead Plaintiff and for
Approval of Selection of Lead and Liaison Counsel and in Opposition to the Competing
Motions; the Certification of Michael J. Palumbo, Managing Partner, Third Millennium Trading,
LLP, and Schedule A attached thereto ("Schedule A"); the Reply Memorandum of Law in
Further Support of the Motion of the Biogen Institutional Investor Group for Consolidation,
Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Co-Lead and
Liaison Counsel ("Reply Memo."); the Reply Affidavit of Neil Kazaross in Further Support of
the Motion of the Biogen Institutional Investor Group for Consolidation, Appointment as Lead
Plaintiff, and Approval of Lead Plaintiff's Selection of Co-Lead and Liaison Counsel and in
Opposition to the Competing Motions ("Kazaross Aff."); the Memorandum of the Biogen
Institutional Investor Group in Opposition to the Motion of the London Pensions Fund Authority
and National Elevator Industry Pension Fund for Particularized Discovery Pursuant to 15 U.S.C.
§ 78U-4(A)(3)(B)(IV); and the Affidavit of Kevin F. Dages in Further Support of the Motion of
the Biogen Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff, and
Approval of Lead Plaintiff's Selection of Co-Lead and Liaison Counsel ("Dages Aff.").  I have
personal knowledge of the facts stated in this declaration, and if called as a witness could
competently testify to them.

4.     I make this declaration to respond to the assertion by the Biogen Institutional Investor Group that it has the "largest financial interest" in this action and is the "most adequate plaintiff" under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  In particular, I am responding to the assertion that Third Millennium Trading LLP, one of the members of the Biogen Institutional Investor Group, lost more than $2.76 million on securities of Biogen IDEC Inc.

5.     In order to determine whether a particular investor has the "largest financial interest" or is the "most adequate plaintiff," it is important to understand not only the investor's trades in shares of the subject company, but also the investor's trades in derivative securities, including options, based on those shares.[1]  If the investor does not trade derivatives, the calculation of a "financial interest" is straightforward: the amount of money the investor lost trading shares.  But if the investor has also traded derivatives, the calculation of a "financial interest" is more complex: the amount of money the investor lost trading shares minus the amount of money the investor made trading related derivatives, including options.  Indeed, if the investor's gain from trading derivatives is greater than its loss from trading shares, the investor might appear – just from looking at the trading of shares – to have a large "financial interest," whereas in reality the investor actually made money overall, and therefore would have no "financial interest" in litigation.

---

[1] A "derivative" security is a financial instrument whose value is based on, or "derived" from, some underlying instrument or index.  An option is one type of derivative – its value is "derived' from price of the underlying share.  Options are financial contracts representing the right to buy or sell a security at a specified time and price.  The right to buy shares is known as a call option; the right to sell shares is known as a put option.  *See* Frank Partnoy, *Adding Derivatives to the Corporate Law Mix*, 34 GA. L. REV. 599, 604-05 (2000).  On its website, Third Millennium claims to be "the premier options trading Firm."  http://www.3mt.net/.

6.      As this case shows, if an investor has engaged in derivatives trading, it can be difficult to ascertain the size of that investor's financial interest.  I understand that the parties in this case have been disputing the size of Third Millennium's financial interest for several months, and even Third Millennium's estimate of its own losses has changed substantially during this period.[2]  I further understand that the parties have been engaged in a discovery dispute with respect to documents related to Third Millennium's options trading.  In assessing derivatives trading, it is particularly important that parties look to the actual brokerage records of trades, because the trading strategies can be complex and it is easy to make mistakes in calculating gains and losses.  Unfortunately, Third Millennium has not produced actual brokerage records of its options trades.  Instead, Third Millennium produced its own calculations of gains and losses on its options trades.  In my opinion, those calculations are in error in several important ways, as I describe in detail below.

7.      I am submitting this Declaration to make one simple point: **<u>Third Millennium made \$1.3 million trading options</u>** and therefore its losses were not equal to any of the numbers it has asserted as its losses in this litigation.[3]  If those gains from option trading are added to the

---

[2] Although the Biogen Institutional Investor Group originally asserted that Third Millennium's losses were over \$3 million, Third Millennium later admitted that its losses were only approximately \$2.5 million.  *Contrast* Reply Memo. at 4 *with* Kazaross Aff. at 4.  Later, a Third Millennium partner asserted that the firm's options transactions "did not significantly alter the damages the Firm suffered" and that "the Firm made approximately \$500,000 as a result of its Biogen options transactions."  Id.  Most recently, a Third Millennium partner claimed that the options profits were \$303,490, so that the losses were \$2.77 million.  See Affidavit of Neil Kazaross in Opposition to the London Group's Motion for Particularized Discovery, at 3.

[3] Those estimates, which have ranged from \$2.76 million to more than \$3 million, have included each of the following numbers: \$2,764,990.56, \$2,765,990.56, \$3,068,480.56, and \$2,568,480.56.  In my opinion, none of these estimates is correct.

losses asserted by the Biogen Institutional Investor Group, the total losses of that group were $3,656,370, as shown below.[4]

| | |
|---|---|
| Asserted Biogen Institutional Investor Group Loss | $4,964,110 |
| -    Third Millennium Estimated Options Profit | $1,307,740 |
| Total Biogen Institutional Investor Group Loss | $3,656,370 |

8.    **Accordingly, the Biogen Institutional Investor Group does not have the largest "financial interest" in this litigation.**  Instead, the London Pensions Fund Authority and National Elevator Industry Pension Fund – which did not engage in derivatives trading during the class period – suffered a larger loss, $3,758,993, and therefore have the largest "financial interest."  Moreover, the losses of the Biogen Institutional Investor Group likely will be even further reduced by the profits made by Horatio in its options trading.

9.    In the remainder of this declaration, I cover two issues.  First, I describe the details associated with the serious errors Third Millennium made in representing its gains from trading options.  Then I assess how Third Millennium differed from a typical investor in shares.[5]  The most egregious mistake was that Third Millennium used stale option prices to calculate the value of its trades as of Monday, February 28, 2005, when it closed many of its options

---

[4] As noted above, it is impossible to know precisely what Third Millennium's losses were without brokerage records setting forth their actual trades.  However, it is possible to place a cap on those losses, based on publicly available information, and in any event it is easy to conclude based on available data that Third Millennium's asserted losses are not correct.

[5] It appears that Horatio also engaged in unique trading strategies using options and therefore also is atypical.

positions.[6]  On that date, Biogen IDEC shares plunged from a price of approximately $67 to a

price of approximately $39.  Yet Third Millennium claims it traded at option prices that did not

reflect the decline in share price.  **This mistake alone inflated Third Millennium's "financial**

**interest" in this litigation by roughly one million dollars.**

10.      For example, Appendix C – which purports to show Third Millennium's

calculation of its gains from trading options – indicates that on January 28, 2005, Third

Millennium bought 1,000 March 60 put option contracts.  These contracts gave Third

Millennium the right to sell 100,000 Biogen IDEC shares at a price of $60 with an expiration

date of March 18, 2005, the third Friday of March.[7]  Accordingly, these put option contracts

would be valuable on the expiration date only if the share price were below $60.  (The

contractual right to sell shares for $60 would be worthless if one could elect to sell shares in the

market at a higher price.)  Prior to the expiration date, when the share price was high (i.e., above

$60), these options were not very valuable.  In fact, Third Millennium purchased them on

January 28, 2005, for just $1.60 per single share option.[8]

11.      However, when the Biogen IDEC share price plummeted on February 28, 2005,

those put option contracts became extremely valuable.  Because the options gave Third

Millennium the right to sell shares for $60, Third Millennium was much better off than other

investors, who could only sell their shares in the market, for perhaps $39.  In other words, the

---

[6] It also appears that Third Millennium mistakenly recorded the prices of call options it
purchased on May 21, 2004.  Those options were recorded at prices of $0.80 and $0.95, when
available data suggests the actual price was $1.50.  In any event, these trades were small, and the
primary understatement of gains arises from the option trades on February 28, 2005.

[7] Each option contract corresponds to 100 underlying shares.

[8] The share price of Biogen IDEC was in the range of $62 on January 28, 2005.

right to sell shares at a high price became much more valuable as the share price declined. On February 28, 2005, as Biogen IDEC shares fell, the March 60 put option contracts skyrocketed in value, and were trading in the range of $22 per option.[9]

12.     In recording the value of these put options in Appendix C, Third Millennium simply noted a price of $0.05. It did not explain how it arrived at that price. Nor did it produce brokerage records showing it actually traded options at that price. That price is obviously inaccurate. Indeed, the assertion that the right to sell a Biogen IDEC share for $60 would be worth only a nickel on February 28, 2005, when shares had fallen more than $20 in value, is absurd.

13.     Third Millennium made similar mistakes for all of its options trades that took place on February 28, 2005. The prices it recorded in Appendix C bear no relationship to reality. Third Millennium made these mistakes with respect to both put options and call options: the put option prices are all much too low (e.g., $0.05 instead of $22.40), whereas the call option prices are all much too high (e.g., $4.00 instead of $0.15). In other words, Third Millennium incorrectly assumed that it was able to trade options on February 28, 2005, at stale prices. It ignored the fact that the Biogen IDEC shares underlying Third Millennium's options contracts had fallen by nearly half.

14.     I have reconstructed Third Millennium's Appendix C using the actual February 28, 2005, closing prices for the put and call option contracts Third Millennium says it traded on that date. Specifically, I recalculated the profits and losses for all 21 different option contracts

---

[9] This amount roughly represented the $21 difference between the share price and the $60 exercise price of the option and the $39 share price, plus a small "time value" premium for the fact that the option did not expire for several weeks. These options closed on February 28, 2005, at a price of $22.40.

listed in Appendix C using the same contract-by-contract basis Third Millennium employed,[10] and using historical option pricing data from the DeltaNeutral pricing service.

15.    Exhibit B sets forth the relevant data in the restated version of Appendix C.  I have highlighted under the "ACTUAL PRICE" columns the differences between the prices Third Millennium assumed for different options contracts and the actual closing prices of those contracts in the market.  The differences are very substantial, both for contracts purchased and for contracts written.  The far right column shows the difference between the asserted and corrected calculations in dollar terms.  In aggregate, Third Millennium understated its gains by $1,004,250.

16.    The result is that Third Millennium's asserted total gain from options trading of $303,490 is not accurate.  Instead, the total gain is much higher: $1,307,740.  **Simply put, Third Millennium made more than $1.3 million trading options.**  Once these gains are accounted for, the Biogen Institutional Investor Group does not have the largest "financial interest" in this litigation.  And, as noted above, those losses likely will be reduced even further by profits Horatio made trading options.

17.    I want to make one final point with respect to the nature of Third Millennium as an investor and potential lead plaintiff.  I very much agree with findings by Mr. Dages, the expert for the Biogen Institutional Investor Group, showing the extent to which Third Millennium engaged in a much different kind of share trading than did the other plaintiffs, particularly the

---

[10] Alternatively, one could track Third Millennium's profits and losses on a day-by-day basis. The results would be the same for either approach, although the day-by-day basis would give a picture of the changes in Third Millennium's net positions over time.  Because Third Millennium chose to use a contract-by-contract basis, and because the day-by-day basis is more complicated, I have followed the contract-by-contract basis.

London Group.  See Dages Aff, Exhibit 7a.  For example, Third Millennium engaged in 647

trades during the class period, whereas The London Pensions Fund Authority engaged in just 10

trades.  See id.  Indeed, Third Millennium engaged in more than 30 times more trades than the

average number of trades by any other member of the Biogen Institutional Investor Group.

18.     These data are consistent with the conclusion that Third Millennium was an

atypical investor.   It engaged in such frequent share trading, not because it was responding to

new information about the share price or even generally about Biogen IDEC, but merely because

share trading formed a part of its option trading strategies.  Third Millennium was, by its own

admission, a sophisticated options trading firm that made money, not from simply buying and

holding shares, but from actively trading shares and derivatives, such as options.  Like other

options trading firms, Third Millennium sought to profit by trading options, or options in

combination with shares, but typically not from trading shares alone.  In general, an options

trading firm such as Third Millennium would rarely, or perhaps never, trade shares of a company

without also trading options or other derivatives based on those shares. Instead, options trading

firms rely on the mispricing of options relative to shares or to other options.  These firms make

money from such mispricing regardless of whether the underlying share price rises or falls, or

even whether the share price is inflated due to misrepresentations.  Such firms frequently rely

primarily on factors other than the integrity of the share price as part of their option strategies.

Indeed, it is telling that on several occasions Third Millennium bought shares – not by making

open market purchases – but by exercising call options.  Likewise, substantial numbers of Third

Millennium's 647 shares trades occurred on dates that were close to or on the dates of its options

trades or options expiration dates, thereby indicating that its share trades were part of an option

trading strategy.

19.    Many options trading firms, including Third Millennium, purport to engage in arbitrage strategies, which range from relatively straightforward to inconceivably complex.[11]  In the most basic instance, a firm might buy one share and simultaneously buy a put option and sell a call option.  Buying a put option and selling a call option is roughly the mirror opposite of a share purchase, so that if the combined put/call position loses money, the share position gains enough to offset the loss, and vice versa.  If a firm can buy cheap put options and sell expensive call options, it will receive more money for the mirror position than it will pay for a share.  Thus, it can make a riskless arbitrage profit: it will make money regardless of what happens to the price of the share.  With respect to this basic example, if the price of the share declines, the put option acts as insurance; if the price rises, the loss on the call option offsets any gain on the share.

20.    Such arbitrage strategies depend only on relative changes among prices of options or other derivatives and shares, not on absolute changes in the share price.  To the extent one observed a loss on one part of an arbitrage transaction (e.g., the purchase of shares), one would expect to find a gain on the remaining part of the transaction (e.g., the trading of options).  In other words, it would not matter to an options trader engaging in arbitrage whether the price of an underlying share went up or down.  Such a trader would be like a person who took bets on both sides of a tennis match: just as this person would make money regardless of who won the match (even if the match had been rigged), the options trading firm would make money

---

[11] On its website, Third Millennium states: "Our Mission: To identify and capture edge in options trading by incorporating a strategy based on basic arbitrage relationships." http://www.3mt.net/.  This mission statement suggests that Third Millennium engages in precisely the type of option and share arbitrage trading described above.  Further supporting this suggestion is the job recruiting section of the website, stressing strong analytical and computer skills, which would be necessary to a firm trying to find underpriced or overpriced options to buy and sell.  http://www.3mt.net/Opportunities.htm.

regardless of whether the shares went up or down (even if the share price were artificially inflated due to misstatements).

21.    Third Millennium engaged in such complex strategies, one of which is illustrated in the chart below.



Payoff Profile for Trades on Jan. 27, 2005

22.    The above chart sets forth the payoff profile associated with Third Millennium's share and options trades as of January 27, 2005.  A typical share position is depicted by the dashed straight line rising from left to right.  That line represents the payoff profile of a typical share investor.  In contrast, the payoff profile associated with Third Millennium's "shares-plus-options" positions is depicted by the dark jagged lined that moves up-down-up-down-up from left to right.  As Mr. Dages noted in his affidavit, Third Millennium held not only shares but a variety of options positions in late January.  See Dages Aff. at 11.  Those option positions were

of four varieties: long put, short put, long call, and short call. The long put would have made money as the share price declined below $60, whereas the short put would have lost money as the share price declined below $55.[12] The long call would have made money as the share price rose above $70, whereas the short call would have lost money as the share price rose above $65.[13]

23.    The point of the above chart is to show that, unlike a typical investor, Third Millennium would not necessarily lose money when the share price declined. Nor would it necessarily make money when the share price rose. For example, if the Biogen IDEC share price had declined to $55, Third Millennium would have lost money on its shares, but the profits from its put options trading would more than offset those losses. Conversely, if the share price had risen to $70, Third Millennium would have lost money on its shares, but the losses from its call options trading would more than offset those gains. In other words, depending on the range of stock prices, Third Millennium would have exactly the opposite incentives as a typical shareholder.

24.    In any event, the main point of the above analysis is to show not only that Third Millennium made money trading options, but that it was an atypical investor – and is an atypical lead plaintiff. Third Millennium owned shares, but it also held countervailing positions that made money when the share price fell. Those profits were the reasons Third Millennium has so seriously overstated its losses. In other words, the fact that Third Millennium overstated its losses and the fact that Third Millennium was a sophisticated options trader go hand-in-hand.

---

[12] Below a stock price of $55, the long put and the short put would offset each other.

[13] Above a stock price of $70, the long call and the short call would offset each other.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 7th day of October 2005, at San Diego, California.

FRANK PARTNOY

# Frank Partnoy

5998 Alcalá Park, San Diego, CA 92110-2492
619-260-2352 ● fpartnoy@sandiego.edu

## Education

| | |
|---|---|
| Yale Law School | J.D., 1992.<br>Thurman Arnold Prize, Potter Stewart Prize. |
| University of Kansas | B.A. mathematics, 1989, *summa cum laude*.<br>B.S. economics, 1989, *summa cum laude*. |

## Employment

University of San Diego School of Law, San Diego, CA, 1997-.
  Professor, 2001-; Associate Professor, 1999-2001; Assistant Professor, 1997-99.

  Courses: Corporations, Corporate Finance, Deals, Emerging Financial Markets, International Finance (at University of Paris I), Latin American Financial Markets, White Collar Offenses.

  Awards: Herzog Endowed Scholar, 2003-04.
  Thorsnes Prize for Excellence in Teaching, 1998-99.

  Service: Chair, Appointments Committee (2001-2003); Chair, Faculty Colloquium Committee (2000-2001); Chair, Junior Faculty Roundtable (1997-2001); Director, Law Alumni Board of Directors (1999-2001); Treasurer, Law Alumni Faculty Golf League (1997-2001); Member, Self-Study Committee (2004-05); Member, Appointments Committee (2004-05); Member, Curriculum Committee (2000-2005); Member, Development Committee (1998-2001); Member, Graduate Programs Committee (1997-1999).

Rady School of Management, University of California, San Diego, San Diego, CA
  Visiting Professor, 2005.

  Course: Regulation and Innovation.

Covington & Burling, Washington, DC, 1995-97.

Derivative Products Group, Morgan Stanley & Co., New York, NY, 1994-95.

Emerging Markets Derivatives, CS First Boston, New York, NY, 1993-94.

Law Clerk, Hon. Michael B. Mukasey, U.S. District Judge, SDNY, New York, NY, 1992-93.

## Publications

### BOOKS

CORPORATIONS LAW AND POLICY: MATERIALS AND PROBLEMS (Thomson West 2005 Supp., 6th Ed. forthcoming 2006, with Jeffrey D. Bauman and Alan R. Palmiter).

INFECTIOUS GREED: HOW DECEIT AND RISK CORRUPTED THE FINANCIAL MARKETS (Henry Holt/Times Books 2003).

| | |
|---|---|
| Editions: | Paperback (Henry Holt/Owl Books 2004); Australian, British, Hong Kong. |
| Translations: | Korean, Spanish. |
| Reviews: | New York Times Book Review, Washington Post Book World, Wall Street Journal, London Times, Financial Times, several dozen others. |

F.I.A.S.C.O.: BLOOD IN THE WATER ON WALL STREET (W.W. Norton 1997).

| | |
|---|---|
| Editions: | Paperback (Penguin 1999); Australian, British, Hong Kong. |
| Translations: | Chinese, Japanese, German, Korean, Portuguese, Russian. |
| Awards: | Finalist, Financial Times/Booz-Allen Global Business Book Award, 1997. San Diego Union Tribune Author of the Year, 1997. |
| Reviews: | New York Times Book Review, Los Angeles Times Book Review, London Times, Financial Times, several dozen others. |

### BOOK CHAPTERS

*Enron and the Derivatives World*, in ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS (Foundation Press 2004, Nancy B. Rapoport and Bala G. Dharan, eds.).

*ISDA, NASD, CFMA, and SDNY: The Four Horsemen of Derivatives Regulation?*, in BROOKINGS-WHARTON PAPERS ON FINANCIAL SERVICES (Brookings Institution Press 2002, Robert E. Litan and Richard Herring, eds.).

*The Paradox of Credit Ratings*, in THE ROLE OF CREDIT REPORTING SYSTEMS IN THE INTERNATIONAL ECONOMY (Kluwer Academic Publishers 2002, Richard M. Levitch, Giovanni Majnoni, and Carmen Reinhart, eds.).

### ARTICLES

*Finance and Patent Length* (unpublished 45-page manuscript).

*Financial Derivatives and the Rules-Standards Debate*, __ BOSTON UNIVERSITY LAW REVIEW __ (forthcoming 2006) (invited symposium).

*Options and Intellectual Property*, __ WASHINGTON UNIVERSITY LAW QUARTERLY __ (forthcoming 2006) (invited symposium).

*Credit Rating Agencies as Gatekeepers*, BROOKINGS-NOMURA PAPERS ON FINANCIAL SERVICES __ (forthcoming 2006) (invited symposium)

*Financial Innovation and Corporate Law*, __ JOURNAL OF CORPORATION LAW __ (forthcoming 2006) (invited symposium).

*Encumbered Shares*, __ UNIVERSITY OF ILLINOIS LAW REVIEW (forthcoming 2005) (with Shaun P. Martin).

*Synthetic Common Law*, 53 UNIVERSITY OF KANSAS LAW REVIEW 281 (2005).

*Strict Liability for Gatekeepers: A Reply to Professor Coffee*, 84 BOSTON UNIVERSITY LAW REVIEW 365 (2004) (invited symposium).

*A Revisionist View of Enron and the Sudden Death of "May,"* 48 VILLANOVA LAW REVIEW 1245 (2003) (invited symposium).

*Multinational Regulatory Competition and Single-Stock Futures,* 21 NORTHWESTERN JOURNAL OF LAW AND INTERNATIONAL BUSINESS 641 (2001) (invited symposium).

*Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime*, 79 WASHINGTON UNIVERSITY LAW QUARTERLY 491 (2001) (invited symposium).

*The Shifting Contours of Global Derivatives Regulation*, 22 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 421 (2001) (invited symposium).

*Why Markets Crash and What Law Can Do About It*, 61 UNIVERSITY OF PITTSBURGH LAW REVIEW 741 (2000).

*Adding Derivatives to the Corporate Law Mix*, 34 GEORGIA LAW REVIEW 599 (2000) (invited symposium).

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies,* 77 WASHINGTON UNIVERSITY LAW QUARTERLY 619 (1999), reprinted at 33 SECURITIES LAW REVIEW 161 (2001).

*Financial Derivatives and the Costs of Regulatory Arbitrage*, 22 JOURNAL OF CORPORATION LAW 211 (1997).

<u>ESSAYS AND OTHER PUBLICATIONS</u>

*The Case against Alan Greenspan*, EUROMONEY (forthcoming Sept. 2005).

*Must-Reads for Budding Fraudsters*, FINANCIAL TIMES, Aug. 10, 2005, at 11.

*A Serious Question for All the Overpaid Bankers*, FINANCIAL TIMES, Aug. 4, 2005, at 15.

*Wall Street's Franchise Is Fading*, FINANCIAL TIMES, Apr. 6, 2005, at 13.

*Cautionary Tales of Internet Stocks*, FINANCIAL TIMES, Feb. 14, 2005, at 19.

*Road Rules for Hedge Funds*, NEW YORK TIMES, Dec. 14, 2004.

*Financial Engineering and Law*, FINANCIAL ENGINEERING NEWS, Nov./Dec. 2004.

*Why Nobody Mentioned Markets*, FINANCIAL TIMES, Oct. 20, 2004, at 17.

*A Man's Game in Need of Women*, FINANCIAL TIMES, Jul. 26, 2004, at 17.

*The Way to a Politician's Heart*, FINANCIAL TIMES, Jun. 14, 2004, at 13.

*The Case for Smarter Prosecutions*, FINANCIAL TIMES, Mar. 11, 2004, at 21.

*The Real Mutual Fund Problem*, SAN DIEGO UNION-TRIBUNE, Dec. 5, 2003, at B-7.

*Financial Risk Management*, TREASURY & RISK MANAGEMENT, Jul./Aug. 2003, at 44.

*Want to Vote?  Answer This …*, NEW YORK TIMES, Jul. 28, 2003, at A17.

*The Wrong Way to Prosecute Fraud*, SAN DIEGO UNION-TRIBUNE, May 11, 2003, at G-3.

*A Comparative Political History of the CFMA and Sarbanes-Oxley,* FUTURES & DERIVATIVES LAW REPORT, Apr. 2003, at 4.

*Reaping a Bitter Harvest from the Years of Greed*, EVENING STANDARD, Apr. 23, 2003, at 34.

*Building a Library: Finance*, INDEPENDENT ON SUNDAY (LONDON), Apr. 20, 2003, at 13.

*Unsound Advice from the Sage of Omaha,* FINANCIAL TIMES, Apr. 3, 2003, at 19.

*The Rating Agency Paradox,* TREASURY & RISK MANAGEMENT, Dec./Jan. 2003, at 52.

*Enron and Derivatives*, FUTURES & DERIVATIVES LAW REPORT, 2002.

*Tracing the Roots of Enron's Downfall*, SAN DIEGO UNION-TRIBUNE, Jan. 27, 2002, at G3.

*What Dogs Can Teach Us About Securities Regulation: Why Fining Two Mutual Funds For "Window Dressing" Was A Mistake*, FINDLAW, Aug. 20, 2001, <http://writ.news.findlaw.com/commentary/ >.

*Some Policy Implications of Single-Stock Futures,* FUTURES & DERIVATIVES LAW REPORT, Mar. 2001, at 8.

*Derivatives on TV: A Tale of Two Derivatives Debacles in Prime-Time,* GREENBAG (2001) (with Kimberly D. Krawiec and Peter H. Huang), reprinted at 2 DERIVATIVES REP. 15 (2001).

*Stock Gambling on the Cheap*, NEW YORK TIMES, Dec. 21, 2000, at A39.

*Harassment on "The Street,"* THE READ, Jun. 22, 2000, <http://www.oxygen.com/read/>.

*Beating Regis: How to Win on "Who Wants to Be a Millionaire,"* FINDLAW, June 19, 2000, <http://writ.news.findlaw.com/commentary/ >.

*Strange New Math of Palm Inc.*, NEW YORK TIMES, Mar. 15, 2000, at A29.

*Decoding Greenspan*, OPEN COURT, AMERICAN LAWYER MEDIA, Apr. 1999 <http://www.lawnewsnetwork.com/opencourt/>.

*Comments on Proposed Bulgarian Pass-Through Bonds and Mortgage Bonds Act*, CENTRAL AND EAST EUROPEAN LAW INITIATIVE (CEELI), Feb. 9, 1999.

*Betting on Suing*, OPEN COURT, AMERICAN LAWYER MEDIA, Dec. 1998. <http://www.lawnewsnetwork.com/opencourt/>.

*Do You Know Where Your Money Is Now?*, MAIL ON SUNDAY, Oct. 25, 1998, at 45.

*Playing Roulette with the Global Economy*, NEW YORK TIMES, Sep. 30, 1998, at A17.

*High-Finance Fiction*, LOS ANGELES TIMES BOOK REVIEW, Feb. 8, 1998, at 16.

*Riding the Rap*, WORTH, Feb. 1998, at 113.


## Invited Talks and Panels

*Options and Intellectual Property*, Washington University in St. Louis Conference on Commercializing Innovation, Washington University School of Law, St. Louis, MO, Nov. 4, 2005 (invited).

*An Assessment of the Global Risks Associated with Synthetic Collateralized Debt Obligations*, Bayerische Hypo- und Vereinsbank AG Financial Institutions and Agency Funding Conference, Munich, Germany, Sep. 30, 2005.

*How and Why Credit Rating Agencies are Not Like Other Gatekeepers*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 28, 2005.

*Capital Structure Primacy and the Firm as a Nexus of Option Contracts*, University of Iowa College of Law, Iowa City, IA, Sep. 9, 2005.

*Where Is the Risk?*, Euromoney Global Borrowers & Investors Forum, London, England, Jun. 23, 2005.

*Designing Groups: Voting Preferences and Path Dependence*, The Law and Society Association Annual Meeting, Las Vegas, NV, Jun. 2, 2005.

*Infectious Greed*, Wilson Lecture in Law and Business, Wake Forest University School of Law and Babcock School of Management, Winston-Salem, NC, Mar. 29, 2005.

*Encumbered Shares*, University of Kansas School of Law, Lawrence, KS, Feb. 28, 2005.

*Encumbered Shares*, Boalt Hall School of Law, Berkeley, CA, Jan. 24, 2005.

*Mutual Funds, Financial Innovation, and the Product/Service Distinction*, University of Maryland Law School, Baltimore, MD, Nov. 5, 2004.

*Encumbered Shares*, University of San Diego School of Law, San Diego, CA, Oct. 14, 2004.

*Director Ethics*, Corporate Directors' Forum, San Diego, CA, Oct. 6, 2004.

*Infectious Greed*, UCLA School of Law, Los Angeles, CA, Feb. 2, 2004.

*Are the Markets Out of Control?*, University of San Diego School of Law, San Diego, CA, Nov. 17, 2003.

*Recent Issues in Corporate Governance*, Keynote Address, Society of Actuaries Annual Investment Conference, Toronto, CA, Nov. 11, 2003.

*Corporate Voting and Encumbered Shares*, Washington University School of Law, St. Louis, MO, Oct. 21, 2003.

*Emerging Issues in Structured Finance*, Seoul National University College of Law, Seoul, Republic of Korea, Jun. 20, 2003.

*Structured Financial Products: Regulation, Law, and Policy*, Korean Securities Dealers Association, Seoul, Republic of Korea, Jun. 19, 2003.

*Credit Derivatives: Be Afraid, Be Very Afraid*, Grant's Interest Rate Observer Spring Investment Conference, New York, NY, Apr. 30, 2003.

*Financial Innovation and Accounting*, 57th Annual Conference of Accountants, University of Tulsa, Tulsa, OK, Apr. 29, 2003.

*Credit Derivatives and Insurance Regulation*, National Association of Insurance Commissioners National Meeting, San Diego, CA, Dec. 9, 2002.

*An Economic Reality Standard for Financial Market Regulation*, Goizueta Business School, Emory University, Atlanta, GA, Nov. 19, 2002.

*Research Studies of Individual Companies*, Conference on Field Study Methodologies in Legal Research and Teaching about Business, Georgetown Law School, Washington, D.C., Nov. 1, 2002.

*Enron and Derivatives*, George Washington University School of Law, Washington, D.C., Oct. 7, 2002.

*Enron and Derivatives*, Villanova Law School Symposium on Lessons from Enron, Villanova, PA, Oct. 5, 2002.

*Law and Finance*, Keynote Lecture, Courant Institute for Mathematical Finance, New York University, New York, NY, Oct. 3, 2002.

*Enron, Derivatives, and the Gatekeepers*, Thomas Jefferson School of Law, San Diego, CA, Feb. 26, 2002.

Testimony on Enron and Derivatives before the U.S. Senate Governmental Affairs Committee, Washington, D.C., Jan. 24, 2002.

*The Next Stages of Financial Derivatives Regulation*, Brookings-Wharton Papers on Financial Services, Washington, D.C., Jan. 10-11, 2002.

*Terrorist Insider Trading, Enron, and Financial Derivatives*, Heller Ehrman White & McAuliffe, San Diego, CA, Dec. 5, 2001.

*The Paradox of Credit Ratings*, University of California at San Diego, San Diego, CA, Oct. 11, 2001.

*The Gatekeepers of Financial Markets*, Institute for Law and Economic Policy Conference on Corporate Accountability, Scottsdale, AZ, Mar. 10, 2001.

*The Paradox of Credit Ratings*, Conference on the Role of Credit Reporting Systems in the International Economy, Sponsored by The University of Maryland Center for International Economics, New York University Stern School of Business and The World Bank, Washington, D.C., Mar. 2, 2001.

*Financial Derivatives Regulation and Synthetic Common Law*, London Guildhall University Department of Law, London, England, Jan. 23, 2001.

*The Globalization of the Financial Derivatives Markets*, University of Pennsylvania School of Law, Philadelphia, PA, Jan. 19, 2001.

*The Future of Derivatives Regulation*, American Association of Law Schools Annual Conference, Section on Securities Regulation, San Francisco, CA, Jan. 6, 2001.

*Conference on Financial Derivatives* (Host and Moderator), University of San Diego School of Law, San Diego, CA, Nov. 10, 2000.

*Finance Entrepreneurs and Short-Duration Intellectual Property,* Law & Entrepreneurship Conference, Lewis & Clark Northwestern School of Law, Portland, OR, Oct. 20, 2000.

*Synthetic Common Law*, UCLA Second Annual Conference on Corporate Governance, UCLA Law School, Los Angeles, CA, Oct. 13, 2000.

*Synthetic Common Law*, University of North Carolina School of Law, Chapel Hill, NC, Oct. 5, 2000.

*Derivatives Regulation and the U.S. Thrift Industry*, Keynote Address, Office of Thrift Supervision West Region Annual Conference, Rohnert Park, CA, Aug. 29, 2000.

*Financial Derivatives and Popular Culture,* The Law & Society Annual Meeting, Miami, FL, May 27, 2000.

*Why Markets Crash and What Law Can Do About It*, Northeastern University School of Law, Boston, MA, Mar. 23, 2000.

*Rating Agencies: Substitute or Necessary Corollary to the Regulation of Debt Markets?*, Duke University Global Capital Markets Center Conference: Reexamining the Regulation of Capital Markets for Debt Securities, Washington, DC, Oct. 18-19, 1999.

*Adding Derivatives to the Corporate Law Mix*, University of Georgia School of Law Corporate Law Conference, Athens, GA, Oct. 15-16, 1999.

*Mark-to-Market for Publicly Traded Securities and Derivatives*, University of San Diego Tax Conference: Emerging Changes in Our Tax System? Exploring Potential Benefits and Problems, San Diego, CA, Mar. 19, 1999.

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies,* University of San Diego School of Law Faculty Colloquium, San Diego, CA, Jan. 15, 1999.

*Information Asymmetry, Suitability, and the Role of Derivatives Dealers*, Derivatives Strategy Derivatives Hall of Fame Conference, New York, NY, Feb. 9, 1998.

*The Culture and Economics of Derivatives Trading*, Keynote Address, North American Securities Administrators Association (NASAA), 80th Annual Conference, San Antonio, TX, Nov. 17, 1997.

Hundreds of media interviews, including The News Hour and NPR, 1997-date.


**Professional Licenses and Affiliations**

Co-Chair, American Bar Association, Futures and Derivatives Litigation Subcommittee.
Member, Association of American Law Schools, Business Law Committee.
Member, New York and District of Columbia bars.
Series 3, 7, and 63 registered securities, options, and futures examinations.
Advisory Board Member, Financial Services Policy Institute.
Board Member, Futures and Derivatives Law Report.

## EXHIBIT B - RESTATED APPENDIX C
### Third Millennium Options Gain Calculation

| # | DESCRIPTION | QUANTITY | CONTRACTS PURCHASED | | ACTUAL PRICE | CONTRACTS WRITTEN | | ACTUAL PRICE | ASSERTED PROFIT/LOSS | CORRECTED PROFIT/LOSS | DIFFERENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | DATE | PRICE | | DATE | PRICE | | | | |
| 1 | March 45 CALL | 25,000 | 3/18/2004 | $ 8.3000 | $ 8.3000 | 3/20/2004 | Exercised as Common | | $ (207,500.00) | $ (207,500.00) | $ - |
| 2 | April 50 CALL | 25,000 | 4/17/2004 | Assigned as common | | 3/18/2004 | $ 4.8000 | $ 4.8000 | $ 120,000.00 | $ 120,000.00 | $ - |
| | January 45 PUT | 10,000 | 10/18/2004 | $ 1.1500 | $ 1.1500 | 9/16/2004 | $ 0.9000 | $ 0.9000 | $ (2,500.00) | $ (2,500.00) | $ - |
| 3 | January 45 PUT | 240,000 | 1/22/2005 | Expired Worthless | | 9/16/2004 | $ 0.9000 | $ 0.9000 | $ 216,000.00 | $ 216,000.00 | $ - |
| | January 45 PUT | 10,000 | 1/22/2005 | Expired Worthless | | 10/18/2004 | $ 1.1500 | $ 1.1500 | $ 11,500.00 | $ 11,500.00 | $ - |
| 4 | January 55 PUT | 13,500 | 1/22/2005 | Expired Worthless | | 12/10/2004 | $ 0.3000 | $ 0.3000 | $ 4,050.00 | $ 4,050.00 | $ - |
| | January 55 PUT | 13,500 | 1/22/2005 | Expired Worthless | | 12/10/2004 | $ 0.2500 | $ 0.2500 | $ 3,375.00 | $ 3,375.00 | $ - |
| | March 55 PUT | 50,000 | 2/28/2005 | $ 0.1000 | $ 18.3000 | 1/27/2005 | $ 0.5000 | $ 0.5000 | $ 20,000.00 | $ (890,000.00) | $ (910,000.00) |
| 5 | March 55 PUT | 30,000 | 2/28/2005 | $ 0.1000 | $ 18.3000 | 1/28/2005 | $ 0.6500 | $ 0.6500 | $ 16,500.00 | $ (529,500.00) | $ (546,000.00) |
| | March 55 PUT | 100,000 | 2/28/2005 | $ 0.1000 | $ 18.3000 | 1/28/2005 | $ 0.6500 | $ 0.6500 | $ 55,000.00 | $ (1,765,000.00) | $ (1,820,000.00) |
| | March 55 PUT | 75,000 | 2/28/2005 | $ 0.1500 | $ 18.3000 | 2/14/2005 | $ 0.4000 | $ 0.1500 | $ 18,750.00 | $ (1,361,250.00) | $ (1,380,000.00) |
| 6 | January 60 CALL | 50,000 | 1/22/2005 | Assigned as common | | 10/22/2004 | $ 3.9000 | $ 3.7000 | $ 195,000.00 | $ 195,000.00 | $ - |
| | January 60 CALL | 50,000 | 1/20/2005 | $ 7.7000 | $ 5.5000 | 10/22/2004 | $ 3.9000 | $ 3.7000 | $ (190,000.00) | $ (190,000.00) | $ - |
| 7 | February 60 CALL | 37,500 | 2/19/2005 | Assigned as common | | 1/20/2005 | $ 8.4000 | $ 8.4000 | $ 315,000.00 | $ 315,000.00 | $ - |
| | February 60 CALL | 12,500 | 2/19/2005 | Assigned as common | | 1/20/2005 | $ 8.3000 | $ 8.3000 | $ 103,750.00 | $ 103,750.00 | $ - |
| | March 65 CALL | 50,000 | 2/28/2005 | $ 2.9000 | $ 0.0500 | 1/27/2005 | $ 2.4000 | $ 2.4000 | $ (25,000.00) | $ 117,500.00 | $ 142,500.00 |
| 8 | March 65 CALL | 10,100 | 2/28/2005 | $ 2.9000 | $ 0.0500 | 1/28/2005 | $ 1.7000 | $ 1.7000 | $ (12,120.00) | $ 16,665.00 | $ 28,785.00 |
| | March 65 CALL | 89,900 | 2/28/2005 | $ 2.9000 | $ 0.0500 | 1/28/2005 | $ 1.7500 | $ 1.7500 | $ (103,385.00) | $ 152,830.00 | $ 256,215.00 |
| 9 | March 70 CALL | 50,000 | 1/27/2005 | $ 0.7000 | $ 0.7000 | 2/28/2005 | $ 0.3500 | $ 0.0500 | $ (17,500.00) | $ (17,500.00) | $ - |
| | March 70 CALL | 100,000 | 1/28/2005 | $ 0.4500 | $ 0.4500 | 2/28/2005 | $ 0.3500 | $ 0.0500 | $ (10,000.00) | $ (10,000.00) | $ - |
| 10 | April 65 CALL | 75,000 | 2/28/2005 | $ 4.0000 | $ 0.1500 | 2/14/2005 | $ 4.6000 | $ 4.6000 | $ 45,000.00 | $ 333,750.00 | $ 288,750.00 |
| 11 | April 70 CALL | 75,000 | 2/14/2005 | $ 2.0000 | $ 2.0000 | 2/28/2005 | $ 1.5000 | $ 0.1000 | $ (37,500.00) | $ (142,500.00) | $ (105,000.00) |
| | May 60 CALL | 300 | 5/21/2004 | $ 0.8000 | $ 1.5000 | 5/22/2004 | Exercised as Common | | $ (240.00) | $ (450.00) | $ (210.00) |
| 12 | May 60 CALL | 25,000 | 5/21/2004 | $ 0.9500 | $ 1.5000 | 5/22/2004 | Exercised as Common | | $ (23,750.00) | $ (37,500.00) | $ (13,750.00) |
| | May 60 CALL | 4,700 | 5/21/2004 | $ 0.8000 | $ 1.5000 | 5/22/2004 | Exercised as Common | | $ (3,760.00) | $ (7,050.00) | $ (3,290.00) |
| 13 | June 60 CALL | 25,000 | 6/19/2004 | Expired Worthless | | 5/21/2004 | $ 3.4000 | $ 3.4000 | $ 85,000.00 | $ 85,000.00 | $ - |
| | June 60 CALL | 5,000 | 6/19/2004 | Expired Worthless | | 5/21/2004 | $ 3.3000 | $ 3.3000 | $ 16,500.00 | $ 16,500.00 | $ - |
| 14 | October 65 CALL | 25,000 | 9/13/2004 | $ 1.0000 | $ 1.0000 | 10/16/2004 | Expired worthless | | $ (25,000.00) | $ (25,000.00) | $ - |
| 15 | November 60 CALL | 20,000 | 11/20/2004 | Expired Worthless | | 9/22/2004 | $ 3.5000 | $ 3.5000 | $ 70,000.00 | $ 70,000.00 | $ - |
| 16 | November 65 CALL | 20,000 | 9/22/2004 | $ 1.3500 | $ 1.3500 | 11/20/2004 | Expired worthless | | $ (27,000.00) | $ (27,000.00) | $ - |
| 17 | January 60 PUT | 20,000 | 1/22/2005 | Expired Worthless | | 12/13/2004 | $ 0.6500 | $ 0.6500 | $ 13,000.00 | $ 13,000.00 | $ - |
| 18 | January 65 PUT | 20,000 | 12/13/2004 | $ 2.0000 | $ 1.8500 | 1/21/2005 | $ 0.1500 | $ 0.1500 | $ (37,000.00) | $ (37,000.00) | $ - |
| 19 | March 60 PUT | 50,000 | 1/27/2005 | $ 1.2500 | $ 1.2500 | 2/28/2005 | $ 0.0500 | $ 22.4000 | $ (60,000.00) | $ 1,057,500.00 | $ 1,117,500.00 |
| | March 60 PUT | 100,000 | 1/28/2005 | $ 1.6000 | $ 1.7500 | 2/28/2005 | $ 0.0500 | $ 22.4000 | $ (155,000.00) | $ 2,080,000.00 | $ 2,235,000.00 |
| 20 | April 60 PUT | 75,000 | 2/14/2005 | $ 1.0500 | $ 1.0500 | 2/28/2005 | $ 0.4500 | $ 23.3000 | $ (45,000.00) | $ 1,668,750.00 | $ 1,713,750.00 |
| 21 | November 60 PUT | 21,600 | 11/8/2004 | $ 1.0500 | $ 1.4000 | 11/20/2004 | Expired worthless | | $ (22,680.00) | $ (22,680.00) | $ - |

**Total Gain** $ 303,490.00 | $ **1,307,740.00** | $ 1,004,250.00