UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE BIOGEN IDEC INC. SECURITIES LITIGATION, | ) ) ) ) ) | Civil Action No. 05-10400-RCL |

### THE LONDON PENSIONS FUND AUTHORITY'S AND NATIONAL ELEVATOR INDUSTRY PENSION FUND'S MOTION TO SUPPLEMENT THE RECORD IN SUPPORT OF THEIR OBJECTION TO THE ORDER OF THE MAGISTRATE JUDGE APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL

Institutional Investors The London Pensions Fund Authority and National Elevator Industry Pension Fund ("London Pensions Fund/National Elevator") hereby move this Court for leave to supplement the record in support of their Objection (the "Objection") to the Order of the Magistrate Judge Appointing Lead Plaintiff and Lead Counsel in order to submit the Transcript of Motion Hearing Before The Honorable Marianne B. Bowler United States Magistrate Judge Held on September 23, 2005 (the "Transcript").   As reasons therefore, London Pensions Fund/National Elevator state that the Transcript was not available at the time they filed their Objection.  London Pensions Fund/National Elevator's counsel have conferred with counsel of record for the other parties and they do not object to this motion.

A copy of the Transcript is attached hereto as Exhibit A.

DATED: December 12, 2005                    Respectfully submitted,


**/s/Theodore M. Hess-Mahan**
Thomas G. Shapiro BBO No. 454680
Theodore M. Hess-Mahan BBO No. 557109
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA  02109
617-439-3939

- 1 -

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
200 Broadhollow Road, Suite 406
Melville, NY 11747
631-367-7100

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
PATRICK W. DANIELS
401 B Street, Suite 1600
San Diego, CA  92101
619-231-1058

*Attorneys for London Pensions Fund Authority*
*and National Elevator Industry Pension Fund*

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

I hereby certify that the parties' counsel have conferred in a good faith effort to narrow or resolve the issues raised in this motion.  Counsel of record for all other parties do not object to this motion.

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10400-RCL

CHARLES BROWN, et al
    Plaintiffs

        v.

BIOGEN IDEC INC., et al
    Defendants

· · · · · · · · · · · · · ·

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON SEPTEMBER 23, 2005

APPEARANCES:

For the London Pension Authority and National Elevators Pension:
Samuel Rudman, Esquire, David Rosenfeld, Esquire, Lerach
Coughlin, Stoia, Geller, Rudman & Robbins, LLP, 200 Broadhollow
Road, Ste. 406, Melville, NY  11747, (631) 367-7100; Ted Hess-
Mahan, Esquire, Shapiro Haber & Urmy, LLP, 53 State Street,
Boston, Massachusetts  02109; (617) 439-3939.

For Biogen Institutional Investor Group:  Richard Weiss,
Esquire, Milberg, Weiss, Bershad & Schulmann, LLP, One
Pennsylvania Plaza, New York, NY  10119, (212) 594-5300;
Vincent Cappucci, Esquire, Entwistle & Cappucci, 299 Park
Avenue, New York, NY  10171, (212) 894-7200; Sanford Dumain,
Esquire; Nancy Freeman Gans, Moulton & Gans, 33 Broad Street,
Suite 1100, Boston, MA 02109, (617) 369-7979.

For Biogen Idec Inc., James Mullen and William Rastetter:
Matthew Matule, Esquire, Skadden, Arps, Slate, Meagher & Flom, One
Beacon Street, 31st Floor, Boston, MA 02108, (617) 573-4800.

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

---

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

1                              I N D E X

2       Proceedings                                            4

3       **Exhibits:**        **Description**              **Marked**   **Admitted**

4       London's:

5        1               Chart                          19        19

6        2               Class Action Info              19        19

7        3               Trade Analysis                 19        19

8        4               Third Millennium Trades, 1/27/05 19      19

9        5               Payout Profile, 1/27/05        19        19

10       6               Payout Profile, 1/27/05        23        23

11       7               Horatio Calendar Spread        29        29

12      Biogen's:

13      Exhibit A        Presentation for Oral Argument  37       37

14

15

16

17

18

19

20

21

22

23

24

25

26

3

1                    P R O C E E D I N G S

2          (Court called into session)

3               THE CLERK:  Today is Friday, September 23, 2004.  The

4     case of Charles Brown v. Biogen Idec Incorporated, et al, Civil

5     Action No. 05-10400 will now be heard before this Court.  Will

6     counsel please identify themselves for the record.

7               MR. RUDMAN:  Good morning, your Honor, Samuel Rudman

8     from Lerach Coughlin Stoia Geller Rudman & Robbins for the

9     London Pension Authority and the National Elevator Pension

10    Fund.

11              THE COURT:  Thank you.

12              MR. ROSENFELD:  David Rosenfeld from Lerach Coughlin

13    on behalf of the same plaintiffs.

14              THE COURT:  Thank you.

15              MR. HESS-MAHAN:  Good morning, your Honor,

16    Ted Hess-Mahan from Shapiro Haber & Urmy also on behalf of the

17    same plaintiffs.

18              MR. CAPPUCCI:  Good morning, your Honor, Vincent

19    Cappucci, Entwistle & Cappucci for the Biogen Institutional

20    Investor Group.

21              THE COURT:  Thank you.

22              MR. DUMAIN:  Good morning, your Honor, Sanford Dumain

23    for the same plaintiffs.

24              MR. WEISS:  Good morning, your Honor, Richard Weiss

25    from Milberg, Weiss, Bershad & Schulmann for the same

4

1    plaintiffs.

2         MS. GANS:  Nancy Freeman Gans, Moulton & Gans for the

3    same plaintiffs.

4         MR. MATULE:  Your Honor, I don't know if the rest of

5    the plaintiffs' counsel is going to identify themselves but--

6         THE COURT:  Might as well get credit.

7         MR. MATULE:  Yes.  Well, I happen to represent Biogen

8    Idec Inc., James Mullen and William Rastetter.  It's Matthew

9    Matule from Skadden Arps in Boston on behalf of those

10   defendants and with me from my office is Michael Hines.

11        THE COURT:  Thank you.

12        All right.  Well, we're here for the remaining

13   portions of docket entries number 17 and 22 for the appointment

14   of lead counsel, and I'll hear the moving party.

15        MR. RUDMAN:  Good morning, your Honor.  This hearing

16   is a continuation of the lead plaintiff hearing we had before

17   this Court several months ago, and as the Court will recall at

18   the hearing the issue was which moving group was going to be

19   appointed lead plaintiff.  There were two key issues at that

20   hearing.  One was which moving group represented the largest

21   financial interest, and the other was we had contended that the

22   Biogen Institutional Investor Group had overstated its losses

23   and was inadequate and atypical primarily because two of its

24   members, Third Millennium and Horatio Capital, were options

25   traders and they had only reported to the Court their stock

5

1    trades.

2         We argued at that hearing that the Court could not be

3    confident that the loss figures that had been reported by Third

4    Millennium and Horatio as part of the Biogen Institutional

5    Investors Group's losses were accurate because we believed that

6    since they were options traders there were profits associated

7    with options trades and that their overall true economic

8    interest and any recovery in this suit was reduced by profits

9    they had in options trading.  We further argued at that hearing

10   that an options trade for a sophisticated options trader like

11   Third Millennium and Horatio engages in unique options trading

12   strategies that take it far a field from the ordinary investor

13   rendering it atypical and not satisfying Rule 23.

14        The response at that hearing, your Honor, from the

15   Biogen Institutional Investor Group was to contend that Third

16   Millennium and Horatio were simply sophisticated institutional

17   investors who had traded Biogen common stock like other

18   investors, and that any options trading was minimal or

19   relatively de minimus when compared to the stock trading.

20   Following that hearing as the Court is aware the Court issued

21   an order ordering discovery, and then the order stated that we

22   should be providing, gave the presumption to the Biogen

23   Institutional Investor Group based on their representations as

24   to their financial interests and provided that our clients

25   could take discovery of the Biogen Institutional Investor Group

6

1    to check out the options trading and determine if they were

2    adequate and typical.  And as I looked over the hearing

3    transcript and looked over the correspondence on this, you

4    know, our motion papers to the Court it was clear that what was

5    envisioned was that Third Millennium and Horatio would give us

6    all of the their options trading or any securities trading that

7    related to their trading in Biogen and Idec and that they would

8    make available for deposition, after we received that make

9    available for deposition the traders so that we could discuss

10   with them the trading strategies that were employed.  In

11   addition, we also asked for any trading manuals or procedures

12   or policies relating to those trading strategies.

13        I looked back at my brief where we requested and I

14   looked back at the hearing transcript and it was plain on its

15   face we made clear to the Court what we wanted and we thought

16   the Court's order was very clear as to what should be produced.

17   Also in that order the Court laid down a very tight schedule

18   for the next hearing, basically giving us eight days, eight or

19   nine days if my memory serves me correctly to complete that

20   discovery.  Quite frankly, Judge, I couldn't make it eight or

21   nine days later.  I understand that Mr. Cappucci couldn't.  And

22   we came to an agreement amongst counsel to postpone the hearing

23   until the beginning of September, which actually comported with

24   a vacation, a long scheduled vacation schedule that I had.

25   However, immediately after receiving your order we promptly

1   produced a letter requesting all the things we had said we

2   wanted at the hearing and in our prior papers, just give us

3   your options trading, tell us if there's any other securities

4   trading that's related to Biogen Idec, tell us who the traders

5   are, let's depose them, let's find out what the facts are and

6   let's argue the facts as to what these, whether or not these

7   individuals, whether or not these entities' financial interests

8   is what they claim and whether or not they're adequate and

9   typical. Let's get the facts out and have a fair discussion.

10  We can disagree on what those facts mean but at least we'll

11  have all the facts. Three weeks of emails and letters and I

12  didn't receive any of the documents. Now, just so we're clear,

13  this is a sophisticated institutional investor that clears its

14  trade through a sophisticated clearing firm, when getting

15  options data or options traded is as simple as turning around

16  and pushing a button on your computer and asking a search to be

17  performed and a machine should spit out pages. I mean getting

18  the brokerage records that show these trades should be as

19  simple since they're a regulated entity and registered with the

20  NASD as turning around to a file cabinet, taking a bunch of

21  brokerage statements out of a file cabinet, photocopying them

22  and sending them to me. Instead what happened is that I

23  received a letter attaching 26 pages of documents, 24 of which

24  relates solely to common stock trade and indicate they were

25  printed April 26, 2005, which is prior to when the lead

8

1    plaintiff's motions were made.  Two of the pages relate to the

2    taking on of a singles options position by Third Millennium.

3    Now, I say I received these pages.  I received them the night I

4    left for my vacation, which counsel for the Biogen

5    Institutional Investor Group knew about.  Although my associate

6    did tell me what was in the papers, I didn't react to any of

7    the assertions in the Biogen Institutional Group's cover letter

8    covering the documents, their assertions that the trading does

9    not evidence some atypical trading model or that this is a

10   fishing expedition and they've produced to us all the

11   documents.  Instead, your Honor, when I got back from vacation

12   I prepared a motion, the motion that's before you today because

13   we believe at that point in time there was additional options

14   trades that hadn't been disclosed, and that even after court

15   ordered discovery we still did not have all of the documents.

16   As is required by this court's local rules, after preparing my

17   motion I also called the defendants or communicated with them

18   and called counsel for the Biogen Institutional Investor Group

19   and advised them of my motion.  I was going to be seeking

20   permission of the court to serve a subpoena on their clearing

21   agent to make sure I had all of the trades.  I wanted the names

22   of the traders at Horatio and Third Millennium.  I wanted to

23   take depositions.  I thought it was clear the last time we were

24   before you that we were entitled to that.  I wanted an explicit

25   court order requiring them to appear so there would be no

1   ambiguity as to that fact, and I also wanted the deposition of

2   Neil Kazaross. You'll remember that on their prior papers Mr.

3   Kazaross, who's a principal of Third Millennium, submitted a

4   declaration stating that although they did trade options they

5   only made $500,000 during their options trading during the

6   class period and since they only had given me one slip of paper

7   with one trade on it, I believe that called into question all

8   the representations Mr. Kazaross had made in his declaration

9   and believe that in order to clarify those matters I wanted the

10  deposition of Mr. Kazaross, and we filed those papers. We

11  filed those papers shortly before we were supposed to appear

12  before this Court on September 12th. Primarily the timing was

13  related, Judge, to a contention by the Biogen Institutional

14  Investor Group, one, my vacation, two, the Biogen Institutional

15  Investor Group's contention that we had agreed between

16  ourselves to extend discovery until the day of the September

17  12th hearing. And so any motion that I hadn't received

18  discovery prior to that in essence would have been premature

19  because I hadn't given them the full amount of time to produce

20  the documents putting aside the fact that I wasn't in any way

21  going to be able to take anyone's deposition prior to getting

22  all of the documents.

23          The response to my motion was that we should adjourn

24  - after much discussion we agreed that it would be useful to

25  the Court that we adjourn the hearing before you to give them

1  an opportunity to respond to my papers. We didn't think it

2  was useful to appear before your Honor the next day after I

3  filed the motion only to have counsel for Biogen Institutional

4  Investor Group say we need to respond to those papers or for

5  the Court to say I would like to hear what they have to say

6  before I make any decision about that. So I agree that I

7  thought was an appropriate rationale for adjourning that

8  hearing. That was on September 11th or 12th or the weekend

9  shortly before that. Then we received what I guess were

10 conflicting orders as to what or some confusion as to when the

11 hearing would be set down for. I originally received a

12 communication it was going to be October 24th. Then I received

13 something it was going to be September 23rd.

14         THE COURT: Well, because we're dealing with a period

15 here that was a statutory period. I want to get it done.

16         MR. RUDMAN: I appreciate that, your Honor. And the

17 response to that was that last Friday I received a call from

18 counsel for the Biogen Institutional Investor Group saying we

19 have located more options trades. This is Friday at 4:00, this

20 past Friday, a week ago today. We've located more options

21 trades. We're going to send them to you either later today or

22 Monday, and probably Monday, and we will make available Noel

23 Smith, who I had never heard his name before, for deposition

24 4:00 on Tuesday in Chicago. Now, one, I wasn't going to be -

25 in my, based on that call I didn't believe I was going to be

11

1    receiving the documents until Monday morning.    Two, I have the

2    documents here I'm going to show them to you.    I think you'll

3    see it's extensive options trading.    It's hundreds of or not

4    hundreds but tens and tens of trades and it's exceedingly

5    complex.    To believe that, and I had to have a professor of

6    finance who's nationally known review it for two and a half,

7    three days to piece together what happened.    To expect us to be

8    able to take a deposition on that compact of timeframe I

9    believe is unreasonable and unfair.    So for them to contend

10   that I somehow waived because they made some witness available

11   to me at some point in time without giving me the information

12   in a timely manner I think is ridiculous.

13         Now that is basically a snapshot of what took place

14   in discovery.    I understand that they could have a different

15   view of what took place in discovery but as to when we received

16   documents or information there simply can't be any dispute.

17   And, your Honor, to add insult to injury, when we did get the

18   documents last Friday the options trading for Horatio indicates

19   that it was printed by the clearing agent August 16, 2005, more

20   than a month ago, the very day Mr. Cappucci sent me the letter

21   telling me this was the extent of the documents that they had.

22   So if I'm somewhat skeptical of the fact that I received all

23   the options trades even though the counsel at this table are

24   close friends of mine and I have litigated with them in the

25   past--

12

1          THE COURT:  Why the delay if you had it August 16th?

2          MR. CAPPUCCI:  Your Honor, I do not believe that that

3    is what the record accurately reflects, and I will respond to

4    the suggestions of Mr. Rudman.  I want to assure the Court that

5    we moved in good faith throughout this process and proffered

6    our witness for deposition on two occasions.  But I would, if

7    the Court would permit me to respond to this after he finishes

8    I think I can--

9          THE COURT:  Well, I'm asking right now.  Why if you

10   had it in hand on August 16th--

11         MR. CAPPUCCI:  We didn't have all the - we did not

12   have all the data.  Mr. Rudman pressed for a much fuller

13   breadth of data.  In the interim, we received his motion

14   seeking to serve a subpoena on our firms clearing agent and

15   what we were attempting to do during this process in late

16   August was to ensure that we had done everything we possibly

17   could to get him a full record of transactions and not just one

18   options contract but a multitude or series of options which

19   trade related to the common stock.  This was not such a

20   simplistic exercise as reflected by Mr. Rudman.  We went to the

21   clearing firm by whom he sought to serve a subpoena on to save

22   the Court the time to deal with that, and, of course, we know

23   that right now he has not withdrawn his request for a subpoena

24   on Pax notwithstanding the fact, your Honor, that in the record

25   as of today is a letter from Pax, the clearing firm, saying

13

1  that we've given him anything.  He's known about this issue

2  for months.

3          THE COURT:  Anything or everything?

4          MR. CAPPUCCI:  Everything.  They have given him,

5  given us and we've given him everything.  There was a cover

6  letter to that effect.  He's known about this options issue for

7  months.  He's litigated this issue before in other cases.  This

8  is not a surprise.  We proffered the witness on two separate

9  occasions.  Noel Smith is here in court today.  I don't see

10 anyone from the London Pension Fund Authority in court and they

11 haven't been here yet in this case.  All right.  The fact of

12 the matter is he had an opportunity to depose the witness to

13 make as much progress as he wanted and he could have taken the

14 position at that time, your Honor, I took his deposition, I

15 asked questions, I pressed the witness, I didn't get enough and

16 sure enough at the eleventh hour they pressed me for - they

17 produced all this additional documentation.  That's not what he

18 did.  Congress envisioned a quick process.  This was not open

19 ended.  It was not extended.  Your Honor gave us a week and a

20 half to do this.  So it was a compressed timeframe to begin

21 with.  He could have made progress with that deposition.  He

22 elected not to.  He elected not to proceed with that to develop

23 a factual record.  That should be held against him and our

24 position is that they've waived.  But to say that there has

25 been no good faith on this side of the table, your Honor, is

14

1    absolutely not true.

2            THE COURT:  Okay.

3            MR. RUDMAN:  All right, your Honor, I want to hand up

4    the additional trades.  Look, I'm not going to get into a he

5    said, she said with Mr. Cappucci.  I think it's self evident,

6    you know, getting trading records from a brokerage firm is a

7    five-minute exercise not a month and a half.

8            MR. CAPPUCCI:  Your Honor, just for the record here,

9    we're not a brokerage firm by the way.  I just want it clear on

10   the record.

11           MR. RUDMAN:  Well, a sophisticated options trading

12   firm.

13           MR. CAPPUCCI:  I object to that language in

14   characterization as well.

15           MR. RUDMAN:  That's how they describe themselves on

16   their website, your Honor.  Now options data is complex and

17   it's hard to figure out.  The first two pages of the very fine

18   type--

19           THE COURT:  Which document?

20           MR. RUDMAN:  That one.

21           THE COURT:  This document?

22           MR. RUDMAN:  Yeah.  The one in your right hand would

23   be Third Millennium's trading and the other one would be

24   Horatio's trading.  If you look at the top of the page on

25   Horatio that was the day I was referring to, August 16, 2005.

15

1        THE COURT:  Yeah, I see that, 8/16.

2        MR. RUDMAN:  Okay.  The Third Millennium page, I, to

3   me simply looks like a spreadsheet that was – maybe Mr. Smith

4   can tell us about this if he's going to say anything today

5   which I'm not sure if that would be proper, that looks like a

6   spreadsheet that was prepared by Third Millennium.  When my

7   expert looked at that he said there isn't any way any firm

8   that's trading keeps their records that way.  The trades are

9   all jumbled up.  They appear to be put in a manner designed to

10  confuse us.  All I can say is it took a long time to straighten

11  that trade out.  The pages with the small print, the Third

12  Millennium trades, we couldn't – originally the documents came

13  to us by fax.  We couldn't read them.  We had to get a clean

14  copy from them which they gave to us this past Monday.  Now

15  what we – you know, this information answers a big question

16  that we had from the beginning of this proceeding, which was

17  our contention that they had engaged in extensive options

18  trading and their contention that the options trading hadn't

19  been extensive.  Here's the facts, the options trading was

20  extensive.  And I can tell you, your Honor, when we had our

21  expert look at it, it was also exceedingly complicated

22  strategies that they engaged in.  So that's the first thing,

23  there's extensive options trading.

24        What is the second piece of information?  Well, we

25  told your Honor the first time that we believed they made money

1  off of trading options.  We've had our expert take a look at

2  it.  I've put together - I'm going to describe their trading a

3  little bit more in a minute, but I do want to hand you a sheet

4  which we shared all of this with them prior to the hearing.

5  They would frequently pair trades on a given day as you can see

6  from this sheet.  They would buy a call and sell a call--

7           MR. CAPPUCCI:  Just for the record, your Honor, we

8  received this at midnight last night.  I just want to make the

9  record clear.

10           MR. RUDMAN:  Do you want to give him the email, Stan,

11  from yesterday morning when we sent it to him?  They'd buy a

12  call, sell a call and what we did here was just pair up a bunch

13  of different trades where we could actually tell or surmise

14  what took place.  If an options position, for example, there

15  were some calls that they had sold that we know based on how

16  the stock price reacted they expired or wouldn't have been

17  exercised, and we came up with a figure as to how much that

18  would reduce their losses.

19           Now, admittedly there's some assumptions in here

20  about what happened but, and there was other trading that they

21  did during the class period, but we can't tell whether that was

22  at a profit or a loss because they haven't given us their

23  records.  We don't have their brokerage records.  But based on

24  what they gave us it looks to us like Third Millennium picked

25  up almost a million and a half in options trading profits and

17

1    that Horatio did 90,000 and that would take the numbers down

2    to 3.4 million below the London Elevator.

3            Now, I recognize they have a chart that shows 300,000

4    in losses but for the life of me, and that chart I received

5    from their expert yesterday, for the life of me I can't figure

6    out and maybe Mr. Cappucci will explain it, how they - that

7    chart seems to be divorced from economic reality.   And I think

8    after he explains it, I'd like the opportunity to respond to

9    whatever it is he says.   But I think this makes clear what we

10   spoke about at our first hearing which was the losses aren't as

11   they seem.

12           Now that's what you would expect because this was an

13   options trading firm and they're not in the business of trading

14   common stock and trying to and taking loan positions.   They're

15   in the business of hedging positions with various securities,

16   mitigating the risk and trying to make money up front for

17   taking a risk in a position, and that's what they did here and

18   that's why they're inadequate and atypical.   Now, we had our

19   expert take a look at one trade on one given day and I want to

20   explain to the Court this is for Third Millennium and then I'm

21   going to do Horatio, the trading strategy.

22           Your Honor, these are a set of trades from Third

23   Millennium on January 27, 2005.   I've made a graphical

24   representation that our expert prepared that show you the

25   payouts.

18

1          THE COURT:  I mean, are these things you want marked

2    as exhibits for this hearing?  They're not in the papers.

3          MR. RUDMAN:  Certainly then, your Honor.  I guess we

4    would mark the--

5          THE COURT:  Okay.  So let's - why don't you read them

6    into the record and--

7          MR. RUDMAN:  Well, let's mark the--

8          THE COURT:  Let me give you this packet right here.

9          MR. RUDMAN:  Okay.

10          THE COURT:  Read them into the record in the order in

11    which you want, giving them to the clerk, and I will assign

12    them a number as we go.  Madam clerk, could you pass them back?

13    (Pause)

14          MR. RUDMAN:  Okay.  I'm going to mark as report

15    London Exhibit No. 1, Third Millennium's options trades.

16    Should I give you the bates numbers, your Honor, or is that

17    sufficient?

18          THE COURT:  No, just give me the document.

19          MR. RUDMAN:  Here.

20          THE COURT:  And then--

21          MR. RUDMAN:  Okay, we'll mark this as--

22          THE COURT:  -- that will be marked as Exhibit, London

23    Exhibit No. 1.  That way the record is clear.

24          (London Exhibit No. 1, admitted)

25          MR. RUDMAN:  Thank you, your Honor.  Then we have

19

1   Horatio Capital's options trades which could be London Exhibit

2   No. 2.

3           THE COURT:  All right, shall be marked London Exhibit

4   No. 2 for the purpose of this hearing.

5       (London Exhibit No. 2, admitted)

6           MR. RUDMAN:  Then we have our calculation of the

7   reduction in their financial interests.

8           THE COURT:  Shall be marked London Exhibit No. 3 for

9   the purpose of this hearing.

10      (London Exhibit No. 3, admitted)

11          MR. RUDMAN:  Then we have a chart, Third Millennium's

12  trades on January 27, 2005.

13          THE COURT:  Will be marked London Exhibit No. 4 for

14  the purpose of this hearing.

15      (London Exhibit No. 4, admitted)

16          MR. RUDMAN:  And we have a payout profile for their

17  trades on January 27, 2005.

18          THE COURT:  Which will be marked as London Exhibit

19  No. 5 for the purpose of this hearing.

20      (London Exhibit No. 5, admitted)

21  (Pause)

22          MR. RUDMAN:  Okay, your Honor.  Thank you very much.

23          THE COURT:  So we have a total of five exhibits made

24  part of the record.

25          MR. RUDMAN:  I will have a couple more.  You want me

20

1  just to mark--

2          THE COURT:  No, as we go.

3          MR. RUDMAN:  As we go, okay, that's fine.  Okay, what

4  we did, your Honor, we tried as best we could to understand

5  their trading based on the day that they gave us and the time

6  we had to digest it.  Like I said, I had an expert review it.

7  I don't have a declaration or an affidavit from him.  I could

8  get one if the Court wants.  I hope the Court will accept my

9  representation this is a nationally known finance professor

10  that writes books on finance and options trading.

11          THE COURT:  By name?

12          MR. RUDMAN:  His name is Frank Partnoy at the

13  University of San Diego.  Exhibit No. 4 is Third Millennium's

14  trades on January 27, 2005 which I handed up to the Court.  And

15  Exhibit No. 5 is a graphical representation of that trade.

16  Okay.

17          Our expert tells us this five-part trade, which is

18  the buy of a purchase of stock as you can see on Exhibit number

19  4.  There's a purchase of stock, a buy of a call, a buy of put,

20  a sell of a call and a sell of a put, and I am going to assume

21  that unless the Court would like me to, would you like me to

22  explain--

23          THE COURT:  No, you can give me credit for that

24  amount.

25          MR. RUDMAN:  Okay.  Thank you, your Honor.

1    THE COURT:  I do read the business section of the

2    *Times* everyday so.

3    MR. RUDMAN:  On that day these were the five trades

4    they did.  My expert tells me that's called, this is called

5    options arbitrage.  They're setting up a position to capture

6    what they believe are disparities in the relative prices of

7    options, and they're hedging the position with the purchase of

8    common stock.  Okay?  Now if you look at the payout profiles

9    you can see exactly how this position would have played out for

10   them as they're sitting at their computer screens on January

11   27, 2005.  The line down the middle is the share price and that

12   was, remember they bought 21,000 shares, $64 a share.  The

13   yellow line is the long put.  That is they bought 500 contracts

14   to put the stock to somebody at $60 a share.  Okay?

15   THE COURT:  Yep.

16   MR. RUDMAN:  And that line shows what's going to

17   happen in the future.  By the way that was with a March `05

18   expiration.  That's key, Judge, because you remember the end of

19   the class period is February 25th.  That's when the stock goes

20   from 68 to 30 something. Okay?  So that contract is going to be

21   worth a lot of money when the stock goes down.  That yellow

22   line shows you what's going to happen when the stock declines,

23   okay.  The light blue line is a short put.  They also sold a

24   put.  So sold someone a right to put the stock to them at 55.

25   Okay?  And that short blue line shows their downside risk as

1   the, you know, their downside exposure as the stock goes down.

2   The, I want to call it purplish line, is the long call.  Okay,

3   that's on the right side of the graph and that shows the call

4   they bought, the right to buy the stock from somebody at 70 and

5   the profit they're going to make if the stock goes up.  Okay?

6   And then the other orangish type line I guess, some weird

7   colors of burnt orange, going down is the short call.  Okay?

8   Five different trades on one day in options arbitrage strategy.

9   All right?  The dark green line is the net pay off.  That's

10  what's going to happen before March 19th depending on where the

11  stock goes.  The blue line is the P&L.  That's the profit or

12  loss.  What's the difference between the green and blue you're

13  asking yourself?  The difference is the premium they took in

14  for selling the call and selling the put.  That's the

15  difference.  That's going to be their profit or--

16          THE COURT:  So that's why they're basically parallel?

17          MR. RUDMAN:  Right.

18          THE COURT:  It's the margin.

19          MR. RUDMAN:  Right, it's the margins they made on

20  selling those stock.  But what does this tell us?  This tells

21  us that on January 27th they were going to make money if the

22  stock went, you know, up a little bit or up a lot or down.

23          THE COURT:  Or down.

24          MR. RUDMAN:  Okay.  In fact, one could say the best

25  case scenario for them on January 27th would be a decline from

23

1    63 to 54.  So this was a bearish position, your Honor.  This

2    was a bet or this was a better outcome for them if the stock

3    started to move down.  Now, in all, in order to be - fully

4    explain everything I want to mark as Exhibit No. 5--

5                    THE COURT:  We have five.

6                    MR. RUDMAN:  -- Exhibit No. 6.

7                    THE COURT:  Six.

8                    MR. RUDMAN:  Sorry, I misspoke.  I want to show how

9    the common stock hedged here.  Okay?  Why they're not like

10   another investor just in the market buying stock.  Look at what

11   the purchase of the common stock did.  This is London's Exhibit

12   No. 6.

13                   THE COURT:  Described as?

14                   MR. RUDMAN:  It's a pay out profile for the options

15   trades without the common stock purchased.

16                   THE COURT:  Marked as London Exhibit No. 6 for the

17   purpose of this hearing.

18        (London Exhibit No. 6, admitted)

19                   MR. RUDMAN:  Now--

20                   THE COURT:  Payout profile for January 27th.

21                   MR. RUDMAN:  Now look, comparing five and six, your

22   Honor, look at how the common stock, only net common stock was

23   a hedge to them.  Look at how it takes the payoffs and the

24   potential downsides.  You're looking at that blue line and that

25   green line and it kind of flattens it out a lot.  All right.

24

1   That's because they're going to have the stock to deliver or

2   not deliver or hold if it goes up.  That's why the stock is

3   there, your Honor.  It's there as a hedge against this options

4   trade.  They're trading options and using the stock as a hedge.

5   So what matters to them is the prices they buy the options for

6   on that day and the price of the stock.  Now obviously they're

7   going to care about where the stock goes because it affects

8   their payout profile.  Okay.  But, your Honor, this is not a

9   typical investor in Biogen stock.  The typical investor like my

10  clients who are only buying stock during the class period

11  bought stock hoping it would go up.  Third Millennium bought

12  stock not really caring which way it went only hoping that

13  there wasn't some sharp directional move in the stock that

14  would have impacted them.

15          THE COURT:  Okay, I have one question.

16          MR. RUDMAN:  Go ahead.

17          THE COURT:  In looking at Exhibits 5 and 6--

18          MR. RUDMAN:  Uh-huh.

19          THE COURT:  -- this is the activity for that day?  I

20  mean the X axis shows dollars but what's the time span here

21  that's represented?

22          MR. RUDMAN:  This is just this day.

23          THE COURT:  Just this day.

24          MR. RUDMAN:  And this is what's going to happen in

25  the future before those options expire--

25

1          THE COURT:  Okay.

2          MR. RUDMAN:  -- depending on what happens to the

3   price.

4          THE COURT:  Okay.

5          MR. RUDMAN:  And the price is along that line in the

6   middle.  You know, the price is down here.  The price is, you

7   know, straight across.

8          THE COURT:  That's the X axis.

9          MR. RUDMAN:  Right.  Right.  Now, I mean, this is, in

10  our expert's view this is what the people who conducted this

11  trade are looking at.  Now not all of their trades during the

12  class period, you know, from what we can tell are of this five

13  piece, five component model that I'm showing you here.  This

14  one I think is significant because this one comes into play on

15  the end of the class period because the stock does take a sharp

16  directional move, goes down here and they do lose some money

17  but their losses are ameliorated, you know, mitigated by this

18  hedging.

19          During the class period they had trades where there

20  were three trades or two trades.  Some of the bets were a

21  little more aggressive on the bullish side.  Some of the bets

22  were a little more aggressive on the bearish side.  I didn't

23  think it would be necessary to go through all of their trading

24  here with you today because I think this makes my point.

25  They're not adequate and they're not typical.  They're not like

1    other investors who are buying Biogen stock.  When I buy a

2    stock, your Honor, I want it to go up.  When they buy a stock

3    they only want to make sure that it doesn't move sharply in one

4    direction or another because their strategy is to take on some

5    risks for an up front payment of money which is what happens

6    when they buy these contracts all on January 27, 2005.

7    To go back some of these trades are listed in London Exhibit

8    No. 3.  Some of them are listed there.  So I submit, your

9    Honor, that when you look at the trading data for Third

10   Millennium it supports what we said when we were before you

11   previously.  They're not adequate.  They're not typical.  And

12   if you think this took me a long time to explain, if they

13   become the, you know, if the definition of unique defense is

14   something that will distract from the prosecution of the case,

15   Mr. Matule will spend three days deposing Third Millennium in

16   their class certification deposition, and if they're lucky to

17   be certified four and a half weeks deposed, you know, taking

18   their testimony on the stand and there isn't any jury in

19   America that's going to think these kinds of sophisticated

20   options traders were defrauded by anybody.  That's with respect

21   to Third Millennium.

22           Now, before I move onto what Horatio did there was

23   significant stock trading activity in the beginning of 2004.

24   We have relatively few trades, options trades for 2004, which

25   is why we continue to believe based on what we can tell from

27

1  their trading that when they buy stock they're using it for an

2  options position to hedge an options position.  We believe that

3  we would still need to, if the Court doesn't think I've now

4  shown by enough evidence that their financial loss is

5  overstated and they're inadequate and atypical, we would still

6  need to serve a subpoena on Pax to get all of the trade.  Now

7  just so we're clear that subpoena is not overly burdensome.

8  Pax is a clearing firm who gets hit with subpoenas every single

9  day.  They probably have someone there that their job is only

10  to deal with responding to subpoenas, and it's simply running

11  some simple computer searches and getting the documents.  So if

12  the Court wants to be, wants to go down that road, we would ask

13  that we be permitted to serve a subpoena on Pax to get what we

14  believe are, to just, to finally confirm once and for all what

15  the extent of the options trade is.

16          Now, I want to just briefly - oh, I'm reminded about

17  one point.  I want to go back to London Exhibit No. 5 for a

18  minute and I want to describe - this is a tad bit of a

19  hypothesis or speculation, your Honor, but I think it's what

20  the kind of thinking you have to do when you analyze someone's

21  adequacy or typicality.  When you look at five you see that,

22  London's Exhibit No. 5, you can see that if the stock declined

23  from 63 to 54 they're in the money, okay.  It's a profitable

24  transaction going down.  Remember the drop here is some 30

25  points.  Okay.  What if the expert, defendant's expert comes in

28

1    and says, you know, of that 30-point drop the Biotech

2    Industries were down X percent, the market was down X percent.

3    There was other prevailing market forces pushing the stock down

4    and out of that only eight or nine points of it are really

5    related.  I'm not saying that's going to be the case, I'm just

6    speculating eight or nine points of that are related to the

7    withdrawal of Desabre.  Okay.  And that's the prevailing view.

8    They made money, okay.  They're in the making money situation.

9    They're not a loser, okay, so that's a dura-type analysis of

10   why these guys would be, another reason why we believe that

11   they're inadequate or atypical.

12        Now if you go to Horatio – am I up to six?

13        UNIDENTIFIED:  No, number seven.

14        MR. RUDMAN:  Number seven.  Your Honor, please mark

15   this as London Exhibit No. 7.

16        THE COURT:  All right, it is for the record –

17   description?

18        MR. RUDMAN:  Your Honor, this is called Horatio

19   calendar spread.  This is just a--

20        THE COURT:  All right.

21        MR. RUDMAN:  -- a chart--

22        THE COURT:  Being marked as London's Exhibit No. 7

23   for the purpose of this hearing.

24        (Plaintiffs Exhibit No. 7, admitted)

25   (Pause)

29

1        MR. RUDMAN:  Your Honor, Horatio's strategy was much

2    different than Third Millennium's at least with respect to

3    Biogen Idec trading.  They engaged in what we would call a

4    modified calendar spread strategy which is you buy a – what

5    they were doing were buying a very short term call and selling,

6    right – is that right?

7        UNIDENTIFIED:  Yep.

8        MR. RUDMAN:  Buying a very short-term call and

9    selling a call for the following month.  So what you can see

10   here is they bought a call in December for a stock price of 60

11   on December 14th I believe it is, right, December 14th.  The same

12   day they sold a call on that day for January.  They sold them

13   in two different transactions, okay, and they picked up 50

14   grand on that transaction.  All right.  Now that's a bet or

15   that trader, okay, hopes the stock will go up a little bit in

16   the short term and then he hopes it goes down when it comes to

17   January so the stock doesn't get called from him and that

18   contract that he sold expires worthless.  What actually, so

19   this I would submit, your Honor, again is an example of a

20   bearish position taken by Horatio unlike the regular investor

21   in Biogen who simply wanted the stock to go one way, up.

22       Now what actually happens with Horatio is a little

23   confusing for us because that call that they buy they exercise

24   and they buy the stock.  Okay.  So they take on a 60,000 share

25   position at the end of December '04 and take it into inventory

30

1    and are holding that, appear to be holding that through the

2    end of the year.  When I asked our expert, well, that doesn't

3    seem to be consistent with their strategy?  So we don't have

4    enough information to know what they were doing.  Frequently

5    hedge funds or partnerships like this need to show a certain

6    amount of capital or equity at the end of the year.  For return

7    reasons, there could be all kinds of reasons they were holding

8    the stock.  So I really don't know why they bought it and held

9    it.  I can only speculate those are some of the reasons why

10.  they might have done it.  I do know what they then went and did

11   was they sold calls against it in January and February which is

12   basically selling covered calls, a conservative strategy but

13   again I would say a somewhat bearish position on the stock

14   because you're hoping the stock doesn't go up and that call

15   expires and you simply keep your premium and keep your stock.

16   So that's Horatio.

17         I think when you wrap the whole thing together, your

18   Honor, it's pretty clear that these are inadequate and atypical

19   investors and not like the ordinary type of investors.  I

20   recognize that Congress called to, made a call out to

21   institutional investors to come into these cases.  And I

22   recognize they wanted that process to be done quickly, but I

23   also recognize that the PSLRA has a provision for discovery and

24   specifically says that whoever the lead plaintiff is going to

25   be must otherwise satisfy Rule 23.  That has to mean something.

31

1    There has to be some kind of test that the Court looks at to

2    determine whether or not they comply with that. It's not a,

3    oh, well, they bought stock like everybody else so they must be

4    adequate and typical. And here, your Honor, I think that based

5    on all of the evidence we've marshaled up we certainly have

6    supported what we said to you in the beginning which is that

7    they're an options trading firm, they're inadequate and

8    atypical.

9        I don't, although we think the financial interest

10   point is interesting and we believe that they've overstated

11   their financial interests, I don't believe the Court needs to

12   even visit that today, your Honor, because your opinions

13   accorded them the presumption but gave us the opportunity to

14   rebut that presumption. I respectfully submit, your Honor,

15   even on the incomplete discovery that we've been given, the

16   fact that we weren't given adequate time with documents or time

17   to prepare a deposition, even with this limited amount of

18   evidence we've more than rebutted any presumption of adequacy

19   or typicality.

20       If the Court wants to end this process now it can do

21   so. I would respectfully submit there's more than enough

22   evidence here for you to find them inadequate and atypical.

23   You don't need to reach the financial interest point. But if

24   the Court is still not satisfied, we stand ready, willing and

25   able to serve a subpoena on Pax, take these depositions and

32

1    come back to your Honor in short order once again with

2    additional facts--

3              THE COURT:  Short order.  How much time?

4              MR. RUDMAN:  We can take, I mean assuming Pax - I

5    would serve a subpoena on them.  Assuming they comply with the

6    subpoena and then we could take their deposition, assuming the

7    data remain relatively the same - what's the statutory time to

8    respond to a subpoena, 20 days?

9              UNIDENTIFIED:  20, thirty days.

10             MR. RUDMAN:  I mean I think we're talking about a

11   month, a month and a half so--

12             THE COURT:  All right.  Let me hear from the

13   opposition.

14             MR. CAPPUCCI:  Thank you, your Honor.  There's a lot

15   to respond to.

16             First of all, just to clear up the record, the

17   document that the Court was referring to which had the August

18   16th date was not a document that we had in our possession.

19   This is a document for, and I'm sorry I didn't bring this up,

20   this is a document which was in the possession of the clearing

21   firm.  So they have generated it on that date.  We didn't have

22   it.

23             THE COURT:  And when did you receive it?

24             MR. CAPPUCCI:  I am not sure about the precise date,

25   but I would assume it was very close to the date upon which we

33

1    produced it.  And let me just read the letter, again from the

2    clearing firm.  I mean unless Mr. Rudman is saying that he

3    doesn't accept our representation as counsel, I don't think he

4    intends to infer that, but the letter is dated September 20,

5    2005 from Merrill Lynch Pax division.  It is addressed to our

6    firm and it talks about an extensive search that they did for

7    the records, your Honor, at our direction because we understood

8    his position and rather than rely on our internal

9    documentation, the best source of that data is the clearing

10   firm and that's why he wants to serve a subpoena on the

11   clearing firm.  It's all here, your Honor.  He has everything.

12   If your Honor wants to authorize the service of subpoena so be

13   it, but frankly there's a representation by counsel that he has

14   all the documents and it's a complete waste of time to go down

15   that path as well as it would just delay the proceedings.  So

16   that responds to that, your Honor.

17        We are missing, missing, missing the point here.

18   Mr. Rudman is a skillful lawyer.  I've worked with him on many

19   cases but what he has done is he's created an absolute

20   distraction in a satellite process, which is taking us away

21   from what is really the case.  This case was brought first by

22   the filing of three separate complaints.  The plaintiffs in

23   those cases and those are the Brown action, the Lobel action

24   and the Grill action, the only three complaints filed, none of

25   which was filed by his firm, they were filed on behalf of

34

1  plaintiffs who solely purchased common stock.  Those cases

2  were brought to represent persons who acquired Biogen

3  Securities, and I am delighted to hear today, I am to hear that

4  Mr. Rudman no longer takes the position that an option is the

5  security of the company.  I'm delighted that he has accepted

6  that and there's no question about that in the record.

7        THE COURT:  Some dot on his face.

8        MR. CAPPUCCI:  Okay, but he has to, your Honor, it's

9  a given fact.  Mr. Rudman's client, the London Pension Fund,

10  has no options transactions.  It may not assert claims on

11  behalf of options purchasers, sellers what have you.  They will

12  never be part of this case.  This case will be as it's been

13  brought from the outset in behalf of purchasers of the

14  securities of Biogen.  It will never include options.

15        What is he trying to do?  He is trying to point to

16  our options trading which I admit existed but I still submit

17  was limited, using that activity outside this case which we and

18  no other plaintiff will recover for in this case, to diminish

19  our financial interest--

20        THE COURT:  I can hear you.

21        MR. CAPPUCCI:  I'm sorry.  I apologize.  In the very

22  litigation it is a non-sequitur, it is illogical, it is not

23  appropriate.  Now, what else does he admit?  He admits,

24  absolutely admits that on the common stock that we purchased

25  and held throughout the end of the class period, your Honor,

35

1    182,000 shares compared to his 84,000 shares, he admits that

2    we, that our group held those shares throughout and he admits

3    all the damages on those common shares.  Admitted, not in any

4    way challenged.  And on the basis of the common stock that's in

5    the case, the common stock that's the subject of this

6    litigation our losses are 4.8 million and his are 3.7.  We get

7    the presumption.  We should be afforded the leadership of the

8    case.

9            Now, what else does he admit?  Our group consists of

10   the New Jersey Carpenters Pension Fund, the Carpenters Annuity

11   Fund, the Folksam Asset Management and Deerfield Beach and the

12   Plumbers and Pipefitters.  He has absolutely nothing to say

13   about those clients.  He doesn't challenge their adequacy.  He

14   doesn't challenge their standing.  He makes no mention of them.

15   So in the most remote of scenarios where there was an issue at

16   class certification we have other class representatives who

17   would remedy in protective class.  Not to say that would

18   happen, but just so that the record is clear, he's only

19   challenging two members of our group.  Okay.

20           The Court was correct when it pointed to the fact

21   that this has to be an expeditious process.  This is not an

22   unlimited fishing expedition.  And Mr. Rudman skillfully, and I

23   think the Court in its desire to achieve fairness and reach the

24   right decision has allowed him to go on this frolicking detour

25   into our options trading.  The fact of the matter is, your

36

1    Honor, everything Mr. Rudman said is unfounded.  It is not

2    supported by expert affidavit.  He has no expert in court to

3    testify as to that.  That is his opinion, his opinion, on our

4    trading.  Unlike, and for the record as a matter of evidence,

5    we have submitted the Kevin Dages' affidavit.  Your Honor, can

6    I just hand you please a book which includes things that are in

7    the record which may help the situation if I could just do

8    that?

9              THE COURT:  Do you have a copy for your--

10             MR. CAPPUCCI:  Yeah, we have a book for the Court.

11   I'm not saying I'm definitely going to get to it.  I'd like

12   to--

13             THE COURT:  Do you have a copy for your brother?

14             MR. CAPPUCCI:  I've already given it to my brother.

15             THE COURT:  All right.  Fine.

16             MR. CAPPUCCI:  Here.

17             THE COURT:  To be marked as your Exhibit A for this

18   hearing.

19             MR. CAPPUCCI:  Thank you, your Honor.

20             MR. MATULE:  Your Honor, are defendants entitled to a

21   copy too?

22             MR. CAPPUCCI:  Yes, yes.

23             THE COURT:  Certainly.

24             MR. CAPPUCCI:  I'm sorry, I neglected to send it to

25   my good friends over at Skadden Arps.

37

1            MR. MATULE:  Thank you.

2            MR. CAPPUCCI:  Who are by the way, your Honor,

3    licking their chops as the plaintiffs proceed here.  And that's

4    another point.

5            THE COURT:  Biogen Exhibit A.

6        (Biogen Exhibit A, admitted)

7            MR. CAPPUCCI:  As I wrote in my various letters to

8    Mr. Rudman extensive discovery in the lead plaintiff stage on

9    merits issues is not in the best interest of the plaintiff

10   class.  I understand that.  He's approaching limited issues,

11   but we all have to be mindful of the fact that they're sitting

12   and waiting back here watching our every move.

13            Your Honor, I also point out and I'm going to address

14   Noel Smith who is a principal of Third Millennium, he's in from

15   Chicago and he's delighted to be here and has assured us and

16   will assure the Court that his firm is committed if appointed

17   as a lead plaintiff to be monitoring this litigation and

18   directing the skillful work of counsel.  And let me just say

19   another thing, I think that in these cases it is important to

20   have intelligent, sophisticated institutions who understand the

21   market because that can help the case.  That helps the damage

22   claim.  That helps the allegation about inflation per share,

23   about what the effect is on non-disclosure.  These are market

24   professionals.  They add tremendous, tremendous assets to the

25   prosecution of the case.  That's the sophisticated view.  The

38

1    narrow view just says they have some options trades, oh, maybe

2    they trade derivatives, maybe they do this, maybe they do that,

3    that's not the intelligent approach here.  One has to look at

4    the total picture.  And I would say and I would hope this would

5    not be disputed that folks like this add a lot of talent and

6    can help the prosecution of the case in a very smart way.

7         Mr. Noel Smith also possesses some highly impressive

8    skills and degrees undergraduate.  He was studying to be a

9    neurosurgeon, I believe, so he has a medical background as well

10   which would add to this.  But my sole point really is that

11   intelligent, skillful people in the driver's seat always helps

12   the case.

13        Another very big point, London Pension Fund

14   Authority, we know them well, they're the newest player, the

15   newest client of the Lerach firm which I guess we'll be seeing

16   in these cases.  Mr. Rudman has said nothing about his client.

17   What does his client do?  How does his client buy and sell

18   stock?  He would have you think that his client is like a widow

19   and orphan.  That it buys a couple of shares here.  It sells a

20   couple of shares here.  It does nothing special.  It's not

21   unique or atypical.  It's not overly sophisticated.  It is so

22   vanilla.  It is a purebred.  It is the best lead plaintiff you

23   would want.  That is such a mischaracterization of who they

24   are.

25        Your Honor, we didn't think we would have to go down

39

1  this road and this is not said in any disparaging way, but

2  again I make these points as I'll get to just point out that

3  when you're dealing with institutional plaintiffs that are

4  managing a lot of money they all do the same thing.  They all

5  trade options.  They all trade futures.  In their own quarterly

6  reports and their investment reports they admit, they admit

7  that the fund is authorized to trade futures and options.  They

8  do the same thing, but let's not get into that because I don't

9  want to enter the speculative phase.

10         Their funds are what we call index based.  I don't

11  know if the Court has had an opportunity maybe in the sense of

12  the judicial pension funds that is something that we deal with,

13  but let me just explain what happens with an index fund.

14         THE COURT:  I've had other securities cases so--

15         MR. CAPPUCCI:  Okay.

16         THE COURT:  -- you know.

17         MR. CAPPUCCI:  The fact of the matter is, is that we

18  have determined, and this is in Kevin Dages' affidavit which is

19  the first exhibit, we have determined just to sort of show you

20  what happens on their side, that their large purchase of 31,000

21  shares on September 30th of last year, their 31,000 share

22  purchase, why was it executed, because they were rebalancing

23  their index portfolio.  It's in the record, your Honor, it's in

24  the Kevin Dages' affidavit, this large transaction right smack

25  in the middle of the class period one of their biggest trades

1    they bought it for no reason having anything to do with

2    Biogen.  They bought it because Biogen at that time had a

3    certain place in an overall S&P index, which is affected by

4    thousands of items.  It's affected by performance of all the

5    other companies in the index and has nothing to do with the

6    merits of the investment.  That's typical?  That's not, you

7    know, different?  He didn't tell you about that.  He didn't

8    want to say anything about his index trading because it makes

9    him look like us.  It makes him sound sophisticated and

10   different.  Okay.  But Congress wanted the institutions.  They

11   wanted clients like his and they wanted clients like ours.

12   They wanted to bring this intelligence to the marketplace, but

13   the fact of the matter is, is that they're no different.

14   They're no different.

15          Now unlike supposition, hypothetical guesswork, Kevin

16   Dages, a principal of Chicago Partners — I don't know if the

17   Court has had experience as a practitioner with that firm, they

18   are clearly one of the most preeminent firms in the damage

19   analysis study.  They testify as to evaluations mostly for

20   defendants.  The plaintiffs' bar started using them because

21   they were so effective on the other side.  Kevin Dages being a

22   student of the Chicago School of Economics, very, very skilled.

23   We gave them all the data.  We gave them all the paperwork.  We

24   gave them the options trades and we said look at all of this

25   and let us know what you found.  Well, here's what they found.

41

1   First point, they found that with respect to Third Millennium,

2   and we had them focus on Third Millennium that the trading

3   pattern in the common stock, the volume of shares that we

4   bought, the timing, the aspects of the trading, the prices that

5   we paid resembled the same pattern of the top 25 institutions

6   that are in that stock.  Chicago Partners concluded that our

7   trading pattern was virtually if not identical, was in the same

8   pattern of trading as the top 25 holders.  Now, it also

9   recognized that the top 25 institutions, which owned most of

10  the stock, are regular traders.  They trade quite actively and

11  sometimes they disguise their trading, sometimes they bungle

12  their trades, but when putting our clients grouping with the

13  top 25 institutions it was analogous.  And, your Honor, I'll

14  spare the Court with going through the details of each and

15  every point, but let's just say that it is un-refuted.  That

16  affidavit basically concludes that we are similar and typical

17  to all the other institutions, the top institutions trading the

18  stock.

19        What else does it say?  It says that institutions

20  also trade options.  It's not a mystery.  They do.  And for

21  that matter we're no different than anyone else.  We had a

22  conservative strategy to in some way hedge our common stock

23  position but, A) it's not part of the case and, B) even if the

24  Court looked at it and it was appropriate to look at it that

25  number is only $300,000 and some change.  My view as I said to

42

1  the Court at the last hearing was that that was not a major

2  distraction or offset for all the losses in excess of $3

3  million.  Chicago Partners concluded that based upon its review

4  of the evidence we had the largest financial interest in the

5  case.  We were entitled to the presumption.  We were entitled

6  to the presumption and on the record that is presented it has

7  absolutely not been refuted.

8       A little bit more about our client.  Yes, as

9  Mr. Rudman pointed out, member of the NASD.  Yes, as Mr. Rudman

10  pointed out, licensed by the Securities Exchange Commission and

11  supervised by the Securities Exchange Commission, not a fly by

12  night outfit, member of the Chicago Board of Exchange and the

13  Mercantile Exchange, he has pointed to a single violation or

14  problem that this firm has had since its long years in

15  existence, not suggesting any issue or problem or taint on

16  their reputation so as to deprive them their right to lead this

17  litigation.  Your Honor, I can sit here, I can refute his

18  analysis of the options.  We absolutely disagree with his

19  mismatching and hypothetical.  We stand on the Dages'

20  assessment of our profit and loss on the options.  And I know

21  my client was chuckling here when he heard Mr. Rudman speak

22  about how much money they made or could have made on these

23  positions.  It simply didn't happen.  It didn't happen.

24       Let me just conclude, and again the points about just

25  to go back, the points about the London Pension Funds having

43

1  all the index trading and that is all in the record under the

2  Dages' affidavit, your Honor, if your Honor wants to refer to

3  that but it's fully on the record, but let me just refer to one

4  other thing which is another valuable point to this process

5  which has not been addressed.  The Milberg Weiss firm and our

6  firm are lead counsel in the, I'm not going to say companion

7  Elon case but the related Elon case which was filed in this

8  district.  And Judge Tauro appointed us lead counsel in that

9  case to lead the prosecution.

10      There are great efficiencies under Rule 23(g) to

11  having this team of lawyers prosecute this case as well.  It

12  will save the class costs and expense.  It will save the class

13  fees at the end of the day because this will be a coordinated

14  prosecution.  There is absolutely no conflict.  But there are

15  clear efficiencies that I believe that the desires of the new

16  amendment to Rule 23 clearly require the Court to look behind

17  the scenes to see what else counsel could bring.  We believe

18  that we're way ahead, way ahead of the game in terms of our

19  investigation.  That case has already - well in process, ahead

20  of this case and we believe that we can add tremendous,

21  tremendous benefits to the class through a coordinated

22  litigation.

23      THE COURT:  What's your response to that argument?

24      MR. RUDMAN:  My response to that is that's not the

25  test under the PSLRA.  The test is who has the largest

44

1    financial interest, who's otherwise adequate and typical.  I

2    don't think Mr. Cappucci or the Milberg Weiss firm who I was

3    partners with not too long ago would have any doubt that I or

4    the people in my office couldn't competently handle this case.

5    or prepare an amended complaint or defend a motion to dismiss

6    any different than them.  I understand that sure you could

7    point to it and say that there are efficiencies in two people

8    running the same case.  The same person could look at that and

9    say there is a potential conflict down the road if the

10.   discovery doesn't turn out the way they anticipate it now or if

11   there's some issue as to funds or insurance policies or

12   defenses and the like.  So one might say that representing both

13   classes presented a conflict issue.  But certainly I can't

14   argue with the commonsense notion that two people - that the

15   firm litigating one case on the same set of facts against

16   another company there wouldn't be some efficiencies but that's

17   not the test.  That's not what's required.

18          THE COURT:  All right.

19          MR. RUDMAN:  And nobody moved against them in the

20   Elon case.

21          MR. CAPPUCCI:  Just so the record is clear, your

22   Honor, that was a June 6, 2005 order by Judge Tauro appointing

23   us as lead.

24          Lastly, again in the record is the affidavit of Neil

25   Kazaross one of the other principals of the firm who testifies

45

1    unequivocally that in purchasing the Biogen securities they

2    relied at all times on the market price, taking the benefit of

3    the efficiency of the market, doing fundamental analysis.

4    That's what these folks do.  They're smart.  They look at all

5    the information and they were defrauded just like London

6    Pension Fund as a result of the disclosure with respect to

7    Desabre, the MS product that is being marketed or was marketed

8    by the defendant.

9           So I'm here to answer any questions clear - if the

10   Court has any questions for our client he is available.  We

11   would like to see this process concluded as I'm sure the Court

12   would.  I think that the request again for the Pax is a waste

13   of time and Mr. Rudman with all do respect should have

14   proceeded with that examine on Tuesday.  I'm sorry, he didn't,

15   he didn't and that should be the end of the inquiry.  Thank you

16   very much, your Honor.

17          THE COURT:  All right.

18          MR. DUMAIN:  May I have a moment, your Honor?

19          THE COURT:  You may.

20          MR. DUMAIN:  Thank you.  Sanford Dumain from Milberg

21   Weiss.  I will be brief and I just want to emphasize one or two

22   of the things that Mr. Cappucci said.  The process here is such

23   that Congress wanted the opportunity to challenge a lead

24   plaintiff applicant.  But what happened in this case, your

25   Honor, since the Biogen Investor Group had the largest loss and

1  was presumptively the lead plaintiff, the focus as Mr.

2  Cappucci said has been very skillfully placed on Third

3  Millennium and Horatio, two of the six members of our group.

4  There has been no discussion of London, and the reason that's

5  important, your Honor, is that the only reason why London and

6  Mr. Rudman are saying that Third Millennium is atypical is

7  because it did sophisticated things.  And the only reason it is

8  able to do that is because it has been able to focus on this

9  group because we had the larger loss.  That doesn't mean that

10  it defaults to London.  For sure if your Honor were to accept

11  all of

12  Mr. Rudman's arguments, say that Third Millennium's not

13  adequate, say that Horatio is not adequate, therefore, their

14  group is bigger and appoint them lead plaintiff and in lead

15  counsel for sure come class certification time, the defendants

16  would be doing everything with respect to their clients that

17  they're doing to our clients.  It just hasn't happened in this

18  process because they've taken the position in letters to

19  Mr. Cappucci that because this group, the Biogen Institutional

20  Investor Group is presumptively the best most adequate

21  plaintiff, that's where the discovery needs to be focused.  And

22  that's one of the great leaps that Mr. Rudman is asking this

23  Court to make.  Don't look at London at all, just assume that

24  we're fine because they're not.  What the fact is as Mr.

25  Cappucci explained London is as sophisticated an investor as

1  are our clients.  One of the things that makes them all

2  typical is that they all relied on the integrity of the market

3  at price of the stock.  When our clients were buying the stock

4  they thought it was being fairly priced.  When their clients

5  were buying the stock they thought it was being fairly priced.

6  And that's true for the whole class.  What Congress did in

7  setting up this procedure and allowing very limited discovery

8  of proposed lead plaintiffs was to ensure that you didn't have

9  a lead plaintiff that truly had a disqualifying interest such

10 as inside information, such as a very close relationship with

11 the defendants.  We don't have any of that here.  All we have

12 here is the undisputed fact that we have sophisticated clients

13 on both sides fighting for this leadership fight.  And when you

14 have a situation like that, Mr. Rudman's request that you knock

15 us out and just accept him just doesn't work.  That's not what

16 Congress envisioned here at all.  All we have is a situation

17 where we have the most presumptive losses here.  Mr. Rudman

18 hasn't shown anything that should knock us out on those

19 grounds.

20      Now, Congress was very careful to set up a specific

21 statutory scheme for how lead plaintiffs were appointed.  If

22 Mr. Rudman is right, which we obviously emphatically deny and

23 come class certification time we will fight vigorously, if Mr.

24 Rudman is right and Skadden very skillfully convinces the Court

25 at the time of class certification that everything he said was

48

1    right, Third Millennium is too sophisticated, there are four

2    other members of the group who can be certified as class

3    representatives who are institutions, who aren't being

4    challenged at all who are perfectly adequate class

5    representatives.  It doesn't mean that it defaults to London.

6    A group is before your Honor seeking to be appointed lead

7    plaintiff and there is no reason not to so appoint.  Thank you,

8    your Honor.

9              THE COURT:  All right, anyone else?

10             MR. RUDMAN:  Your Honor, may I briefly--

11             THE COURT:  Very briefly.

12             MR. RUDMAN:  I will be very, very brief.  I do want

13   to say one thing.  First of all, we didn't create the process,

14   Congress did.  The process is who has the largest financial

15   interest.  That group gets the presumption.  That can then be

16   challenged in discovery if a reasonable basis is brought that

17   was brought by the other movant.  That was the Court's holding

18   the last time we were here.  We have a reasonable basis.  For

19   them to say, well, London hasn't said anything, well, we don't

20   have the presumption.  Not only that, we had a briefing on the

21   lead plaintiff motion.  They had an opposition brief and a

22   reply brief.  In neither of those briefs were there any, at

23   least as I understood it, any serious facts marshaled to show

24   there was any problems with our clients.  In fact, the position

25   in those briefs were that they had a bigger loss than us and

49

1    everything with their clients was okay.  So the notion that

2    this is a one sided process and we're skillfully doing

3    something or focusing on them, well, you decided, the Court

4    held they had the presumption and we're entitled to discovery

5    and that's what the statute says.  If they had some problem

6    with their clients they could have discussed it in their

7    papers.  They didn't do that.  To bring it up now when we've

8    raised what we think are serious issues is improper.  This has

9    never been a fishing expedition.  Their website says that they

10   traded options.  We're vigorously representing our clients in

11   the interest of the class in determining if they had that

12   options trade and it plays out.  We weren't fishing.  We

13   weren't casting a wide net in searching for things.  We said

14   since the first day they traded options.  It turns out they did

15   and that they were engaged in very complex strategies.  The

16   Dages' affidavit is interesting in what it doesn't say.  It

17   doesn't mention any options trading strategies they're engaged

18   in.  It also doesn't say they got all the options data.  It

19   says they reviewed the data on their certifications and put it

20   into a spreadsheet.  At paragraph 30 it says it's been told by

21   Third Millennium that its profits on options trading was only

22   300,000.  Interestingly they don't say we reviewed the options

23   data.  We crunched it.  We took a look at it.  There's no

24   inadequate, there's no trading patterns here.  It was just

25   simple trading of options.  There's nothing in that affidavit

50

1    about that.

2          Although I don't think I have to I'm going to

3    respond.  An index fund--

4          THE COURT:  Briefly.

5          MR. RUDMAN:  Briefly.  Well, Mr. Dumain, an index

6    fund inadequate, atypical?  Everyone buys stock in an index

7    fund or indexes their stock purchases.  That, your Honor, is

8    just like everybody else.  Engaging in five part options

9    transactions where you're going to make money if the stock goes

10   down isn't, and by the way I didn't hear Mr. Cappucci or

11   Mr. Dumain have anything to say about those charts or anything

12   to say about their adequacy and typicality if they were betting

13   the stock was going to go down during the class period.  I

14   think we can all agree that the average investor who is buying

15   the stock wasn't betting it was going to go down.

16         And finally, if the Court wants to look at what other

17   courts have done when faced with similar situations, I

18   respectfully refer the Court to our brief in *Micro Strategy*, in

19   *Bank One*, in *Seaman's Auto*, in *Williams Communications*, and all

20   the other cases we cite courts have looked to the very

21   provisions we're relying on here and knocked out lead plaintiff

22   movants.

23         And lastly, doesn't - the group rises or falls on

24   Third Millennium or Horatio because without them the financial

25   interest of our clients is far greater than theirs.  And the

51

1  notion you can ride into a major multi billion dollar

2  securities case on a car with a broken engine the expectation

3  that somebody else is going to come and fix it later is not

4  what was intended by the PSLRA.

5       THE COURT:  All right.  Well, I'll take it under

6  advisement.  I'll give you a prompt ruling.  But I think while

7  you are here I want to hear about discovery and a proposed

8  schedule.

9       MR. RUDMAN:  You mean with respect to the Pax and--

10       THE COURT:  No, I mean about everything.  I mean the

11  case in general.

12       MR. RUDMAN:  Oh, you mean setting a schedule, you

13  mean with the defendants?

14       MR. MATULE:  Your Honor--

15       MR. RUDMAN:  You're talking about the filing of an

16  amended complaint, that kind of scheduling, your Honor?

17       THE COURT:  Exactly.  Exactly.

18       MR. RUDMAN:  Okay.

19       MR. MATULE:  Your Honor, Matthew Matule on behalf of

20  the defendants.  We've been an interested, albeit much of a

21  bystander, in these proceedings pursuant to the *Greeble* and the

22  other decisions in the First Circuit and we're awaiting the

23  conclusion of the lead plaintiffs, lead counsel motions so that

24  we actually know who we are going to be up against in this

25  matter.  We do not have an operative complaint.  It won't be

52

1    until sometime I assume after lead plaintiffs and their

2    counsel are selected.  We will most definitely be moving to

3    dismiss that amended complaint if and when it does get filed

4    and pursuant to the PSLRA all discovery as to the merits or

5    classification are stayed pending--

6              THE COURT:  Right.

7              MR. MATULE:  -- that motion so.

8              THE COURT:  But I want some sense of if it does go

9    forward, you know, what kind of a discovery period are we

10   looking at?  I want to get some sense of what I might be

11   dealing with.

12             MR. CAPPUCCI:  Your Honor, could I just answer this

13   because again we are somewhat ahead in the Elon case.  We would

14   need 30 days to prepare a complaint, consolidated amended

15   complaint.  It's a one-year class period.  It's a relatively

16   simple case.  We have all the financial pharmacology and all

17   the medical research already done.  There are insider trading

18   allegations in the case and they would have to be brought

19   forward.  But typically the defendants would move, we would

20   actually move for a lifting of the stay of discovery in this

21   case based upon the merits.

22             THE COURT:  Well, that's why I'm thinking ahead and--

23             MR. CAPPUCCI:  That is what should be expected.  We

24   would move for a lifting of the stay.  That would be one of the

25   motions that the Court would face.  They of course would oppose

53

1    that and they would be filing their motion to dismiss promptly

2    probably within 30 or 45 days from the filing of our complaint.

3    Not a terribly complex case.  Assuming that the complaint is

4    sustained which we are confident it will happen, this is a case

5    which is in no way in need of more than 15 depositions per

6    side.  We would of course probably ask for more but this is a

7    case which I think can be prosecuted very efficient--

8              THE COURT:  Don't count on getting it.

9              MR. CAPPUCCI:  Yeah, I understand that.

10             THE COURT:  Without a very strong showing.

11             MR. CAPPUCCI:  I understand that but--

12             THE COURT:  I tend to try and keep discovery on a

13   short leash.

14             MR. CAPPUCCI:  I understand that and that's why I use

15   the number 15.  We have cases where we've taken a hundred

16   depositions in a case but that's not this case.  But that's

17   along the lines of what we would propose to the Court and how

18   fast we would be in a position to move.

19             MR. RUDMAN:  Your Honor--

20             MR. CAPPUCCI:  As you can see there's a lot - go

21   ahead.

22             MR. RUDMAN:  -- if I might make a suggestion.  Do you

23   want us to recess for a minute, the three of us could talk with

24   the defendants and come up with some kind of proposal.

25             THE COURT:  Always helpful.

54

1          MR. MATULE:  I do agree that it would be helpful.  I

2   don't know if on a short recess we'd be able to--

3          MR. RUDMAN:  Do you want us to submit something in a

4   day or two?

5          MR. MATULE:  -- address.

6          THE COURT:  Well, you can submit something.

7          MR. MATULE:  -- because--

8          MR. RUDMAN:  Why don't the three of us just circulate

9   something.  We obviously don't know yet until we hear from the

10  Court as to who's going to be running the case, but we

11  certainly can all discuss an appropriate schedule and try and

12  put together a--

13         THE COURT:  As a proposed what you think is

14  reasonable.

15         MR. MATULE:  We can certainly work together to try

16  and present something to the Court that would either be agreed

17  upon or at least would should the competing visions of how the

18  case should proceed, the interests being the grounds for any

19  motion for lifting the statutory--

20         THE COURT:  Yeah, of course.

21         MR. MATULE:  -- stay of discovery.

22         THE COURT:  Of course.

23         MR. MATULE:  We would also submit to the Court that

24  in light of a lot of the issues that were raised in these

25  proceedings that it would be beneficial to bifurcate and

55

1   address.  Plus if in fact any complaint that does get filed

2   gets past the motion to dismiss stage there would be class

3   certification proceedings and we would submit that the only

4   discovery that should take place after and if a motion to

5   dismiss is denied would be limited to class certification

6   issues to see if any such case is certifiable as a class.  And

7   only after that gets resolved we could get to any discovery on

8   the merits of the case so--

9          THE COURT:  And I have it for dispositive motions so

10  I would be doing those.

11         MR. CAPPUCCI::  Your Honor, just that last statement

12  about staying merit discovery permitting class discovery we

13  would so strenuously oppose that application as you noticed.

14         THE COURT:  I knew that.

15         MR. RUDMAN:  Yeah.

16         MR. CAPPUCCI:  Okay.  I mean I'm sort of salivating

17  after hearing it, but--

18         THE COURT:  All right, I'll take the matter under

19  advisement.  I'll try and give you a prompt ruling.

20         MR. CAPPUCCI:  Thank you, your Honor.

21         MR. RUDMAN:  Thank you, your Honor.

22         MR. CAPPUCCI:  Thank you very much.

23         THE COURT:  I probably won't write off, but we'll

24  give you something brief electronically.

25         MR. CAPPUCCI:  Thank you, your Honor.

56

1          MR. RUDMAN:  Thank you.

2          THE COURT:  All right.  And there is just for the

3  docket, docket entry number 50, which is motion for leave to

4  file a joint declaration, no opposition.

5          MR. RUDMAN:  That's fine, your Honor.

6          THE COURT:  So it would be allowed.

7          MR. CAPPUCCI:  Okay.  Thank you.

8          THE COURT:  All right.  All right, we stand in

9  recess.

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //