UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE BIOGEN IDEC, INC.   : Civil Action
SECURITIES LITIGATION   : No. 05-10400-RCL

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**APPENDIX OF THE PUBLICLY-AVAILABLE COMPLETE
TRANSCRIPT OF THE MARCH 7-8, 2006 ADVISORY COMMITTEE HEARINGS**


James R. Carroll
Matthew J. Matule
Michael S. Hines
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800


Counsel for Defendants Biogen Idec Inc.,
James C. Mullen, Burt A. Adelman,
Peter N. Kellogg, William H. Rastetter
and William Rohn


Dated: November 15, 2006

**DOCUMENT**                                                                                    **EXHIBIT**

Peripheral and Central Nervous System Drugs
Advisory Committee Hearing Transcript (3/7/06) (*available at*
http://www.fda.gov/OHRMS/DOCKETS/AC/06/transcripts/2006-4208T1.pdf)...........................1

Peripheral and Central Nervous System Drugs
Advisory Committee Hearing Transcript (3/8/06) (*available at*
http://www.fda.gov/OHRMS/DOCKETS/AC/06/transcripts/2006-4208T2.pdf)...........................2

Dated:  November 15, 2006                        Respectfully submitted,
      Boston, Massachusetts

                    /s/  James R. Carroll
                    James R. Carroll (BBO #554426)
                    Matthew J. Matule (BBO #632075)
                    Michael S. Hines (BBO #653943)
                    SKADDEN, ARPS, SLATE,
                     MEAGHER & FLOM LLP
                    One Beacon Street
                    Boston, Massachusetts 02108
                    (617) 573-4800

                    Counsel for Defendants Biogen Idec Inc.,
                    James C. Mullen, Burt A. Adelman,
                    Peter N. Kellogg, William H. Rastetter
                    and William Rohn

## CERTIFICATE OF SERVICE

        I, Michael S. Hines, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on November 15, 2006.

Dated: November 15, 2006                        /s/  Michael S. Hines
                    Michael S. Hines

2

# EXHIBIT 1

DEPARTMENT OF HEALTH AND HUMAN SERVICES

FOOD AND DRUG ADMINISTRATION

CENTER FOR DRUG EVALUATION AND RESEARCH


PERIPHERAL AND CENTRAL NERVOUS SYSTEM DRUGS

ADVISORY COMMITTEE

Volume I


Tuesday, March 7, 2006

1:55 p.m.


Holiday Inn Gaithersburg
The Ballrooms
2 Montgomery Village Avenue
Gaithersburg, Maryland

PARTICIPANTS

Karl Kieburtz, M.D., M.P.H., Chair
Sohail Mosaddegh, RPh., Pharm.D., Acting Exec. Sec.

COMMITTEE MEMBERS (VOTING)

James R. Couch, Jr., M.D., Ph.D., F.A.C.P.
Steven T. DeKosky, M.D.
Larry B. Goldstein, M.D.
Michael D. Hughes, Ph.D.
Lily K.F. Jung, M.D., M.M.M.  (Consumer
Representative)
Ralph L. Sacco, M.D., M.S.

COMMITTEE MEMBER (Non-Voting)

Roger Porter, M.D.  (Industry Representative)

TEMPORARY CONSULTANTS

Carol Koski, M.D.
Justin C. McArthur, M.D.
George Ricaurte, M.D., Ph.D.
James Sejvar, M.D.
Cynthia Sitcov  (Patient Representative)

FDA PARTICIPANTS

Russell Katz, M.D.
Marc Walton, Ph.D., M.D.
Susan McDermott, M.D.
Alice Hughes, M.D.
Robert Temple, M.D.
Gerald Dal Pan, M.D., MHS
Douglas Throckmorton, M.D.
Diane Wysowski, Ph.D.

3

# C O N T E N T S

                                                        PAGE

Call to Order and Introductions
          Karl Kieburtz, M.D., M.P.H.                     5

Conflict of Interest Statement:
          Sohail Mosaddegh, RPh., Pharm.D.               10

Opening Remarks and Overview of Issues
          Russell Katz, M.D.                             13

                Sponsor Presentation
                     Biogen Idec

Introduction
          Burt Adelman, M.D.                             21

Efficacy Data
          Alfred Sandrock, M.D., Ph.D.                   30

Safety Data
          Michael A. Panzara, M.D., M.P.H.               48

Risk Management Plan
          Carmen Bozic, M.D.                             87

Clinical Perspective
          Richard A. Rudick, M.D.                       113

Questions From Committee to Sponsor                     123

                   FDA Presentation

Background, Efficacy and PML
          Susan McDermott, M.D.                         140

Safety
          Alice Hughes, M.D.                            158

Risk Minimization Action Plan
          Diane Wysowski, Ph.D.                         188

Questions from Committee to FDA                         202

4

CONTENTS

PAGE

Open Public Hearing

     Jason Mark                     223
     Beth Ann Smith           223
     Dr. Gregory Shoukimas     225
     Lisa Casanova            232
     Pamela Sue Clark        234
     Dr. Christopher Hughes    237
     Virginia Ladd            240
     Emily Canavan            245
     Dr. William Stuart      248
     Christy Cocksey        --
     K.T. Lyons               254
     Sonda Lawson             256
     Barbara Crooks          261
     Stephen Melvin Lore     264
     Cheryl Bloom            266
     Mike Barron             269
     Dr. Richard Richert     272
     Lauren Roberts         277
     Carol Keller Fuquay     279
     Charlie Richardson      280
     Alison Kutler            283
     Karen Miller            286
     David Miller            289
     Barbara Sales           291
     Heather Smith            293
     Dr. Peter Wade         296
     Audrey Ann Greenfield    299
     Doug Franklin           302
     Marcy Canavan            308
     Stan Croydon            311
     Barbara Tiburtius      314
     Dr. Mark Godec         317
     Martha Rogers           320
     Larry P. Keller         323
     Dr. David Smith        326
     Frank Burroughs       329
     Clive Milton            333
     Michael Kahn            335
     John Calfee             338
     Steven Triedman        342

Questions from the Committee     345

1                    P R O C E E D I N G S

2                Call to Order and Introductions

3          DR. KIEBURTZ:  We are going to get

4    started, so if people would take their seats,

5    please.

6              It may seem like a relatively long time,

7    but we only have approximately 16 hours to do some

8    serious deliberations here, and the bulk of today,

9    we will be hearing from various presenters.  We

10   will hear from the sponsor, Biogen Idec, we will

11   hear from the FDA, and we will hear from the

12   public.

13             There is an agenda, and we will stick to

14   the agenda.  I would just like to advise all

15   parties who are speaking that we will stick to the

16   agenda, so please be mindful for your speakers of

17   the time.

18             We will start the sponsor's presentation

19   at 8:30, and that will conclude at 10:00, and the

20   same for the FDA. Presentations will begin at

21   10:30, and will conclude at 11:45.  I am sorry if

22   all your speakers haven't had a chance to speak by

```
 1   that time, but that will be the end of the
 2   presentation.
 3          In the afternoon, we have many comments
 4   from the public, and I would point out that there
 5   are approximately 44 public speakers registered to
 6   speak, but very few of them actually have signed
 7   in.  If you are registered as a potential public
 8   speaker, please be sure you sign in at the table,
 9   so that we know you are here.
10          The time for those presentations will be
11   tight because of the number of people.  In the
12   interest of being fair and equitable, we will keep
13   to the scheduled time for each speaker.  More about
14   that later.
15          There are also 15 seats available outside
16   with television monitor and audiovisual
17   information.
18          So, it is a long day.  The committee will
19   not deliberate today, so everybody is clear on
20   that.  The committee will begin deliberations
21   tomorrow.  No matter when we finish today, the
22   committee will not deliberate today.
```

file:///C|/dummy/0307PERI.TXT

1           Just one last thing for the ladies and

2     gentlemen of the press, just bear in mind it is not

3     appropriate for committee members to speak on the

4     record about this meeting until after the

5     conclusion of tomorrow.  Similarly, it is not

6     appropriate to ask them to do so, so please refrain

7     from doing so.

8           With those preliminaries set, I would like

9     to go around and have people introduce themselves.

10    Maybe we will start going clockwise.  After the

11    introductions, we will have the reading of the

12    Conflict of Interest Statement, and then we will

13    hear from Dr. Katz.

14          DR. THROCKMORTON:  I am Douglas

15    Throckmorton.  I am the Deputy Center Director in

16    the Center for Drug Evaluation and Research.

17          DR. KATZ:  I am Russ Katz, Director of the

18    Division of Neurology Products, FDA.

19          DR. McDERMOTT:  I am Susan McDermott.  I

20    am a clinical reviewer in the Division of Neurology

21    Products.

22          DR. A. HUGHES:  I am Alice Hughes.  I am a

8

1    clinical safety reviewer in the Division of

2    Neurology Products.

3            DR. DAL PAN:  I am Gerald Dal Pan, the

4    Director of the Office of Drug Safety at FDA.

5            DR. M. HUGHES:  I am Michael Hughes.  I am

6    Professor of Biostatistics at Harvard School of

7    Public Health.

8            DR. COUCH:  I am James Couch.  I am

9    Professor of Neurology and Chair of Neurology,

10   University of Oklahoma School of Medicine.

11           DR. MOSADDEGH:  I am Sohail Mosaddegh, the

12   Acting Executive Secretary for the Peripheral and

13   Central Nervous System Drugs Advisory Committee.

14           DR. KIEBURTZ:  I am Karl Kieburtz.  I am

15   Professor of Neurology at the University of

16   Rochester Medical Center, and serving as the Chair

17   of the PCNS Advisory Committee.

18           DR. McARTHUR:  I am Justin McArthur.  I am

19   Professor of Neurology at Johns Hopkins University.

20           MS. SITCOV:  I am Cynthia Sitcov.  I am

21   the Patient Representative.  I have been diagnosed

22   with MS for 31 years, and I did not go to medical

1    school.

2              DR. JUNG:  I am Lily Jung.  I am from

3    Seattle, Washington, and I am the Consumer

4    Representative for this committee.

5              DR. SACCO:  Ralph Sacco.  I am Professor

6    of Neurology and Epidemiology from Columbia

7    University.  I am a member of the panel.

8              DR. RICAURTE:  I am George Ricaurte.  I am

9    Associate Professor in the Department of Neurology

10   at Johns Hopkins University.

11             DR. SEJVAR:  Jim Sejvar.  I am a

12   neurologist and medical epidemiologist with the

13   Centers for Disease Control.

14             DR. DeKOSKY:  I am Steve DeKosky.  I am

15   the Chair of Neurology at the University of

16   Pittsburgh.

17             DR. GOLDSTEIN:  I am Larry Goldstein.  I

18   am Professor of Medicine and Director of the Stroke

19   Center at Duke.

20             DR. KOSKI:  Carol Koski, Professor of

21   Neurology, University of Maryland School of

22   Medicine.

```
 1              DR. PORTER:  Roger Porter, Adjunct

 2    Professor of Neurology at Penn, Adjunct Professor

 3    of Pharmacology at USUHS, non-voting pharma member.

 4              DR. KIEBURTZ:  Dr. Katz, is there anyone

 5    else from the FDA you want to have introduced at

 6    this point?

 7              DR. KATZ:  We expect a few others as you

 8    can see by the name tags, but they are not here.

 9    Marc Walton is the Deputy Director of Neurology

10    Products, and Dr. Temple is the Director of the

11    Office of Drug Evaluation I, who will be here

12    shortly, one hopes.

13              DR. KIEBURTZ:  Thanks.

14                 Conflict of Interest Statement

15              DR. MOSADDEGH:  The following announcement

16    addresses the issue of conflict of interest and is

17    made part of the record to preclude even the

18    appearance of such at this meeting.

19              Based on the submitted agenda and all

20    financial interests reported by the committee's

21    participants, it has been determined that all

22    interests in firms regulated by the Center for Drug
```

1   Evaluation and Research present no potential for an

2   appearance of a conflict of interest at this

3   meeting with the following exceptions.

4           In accordance with 18 U.S.C. Section

5   208(b)(3), the following participants have been

6   granted full waivers:

7           Dr. Steven DeKosky for unrelated

8   consulting and speakers bureau activities for a

9   competing firm for which he receives less than

10  $10,001 per year, and for unrelated activities in a

11  visiting professor program for a university which

12  receives support from a competing firm for which he

13  receives less than $10,001 per year;

14          Dr. Karl Kieburtz for consulting on

15  unrelated matters for the sponsor and three

16  competitors.  He receives between $10,001 and

17  $50,000 per year from the sponsor and less than

18  $10,001 per year per firm from the competitors;

19          Dr. Ralph Sacco for consulting on

20  unrelated matters for a competitor for which he

21  receives less than $10,001 per year;

22          Dr. Larry Goldstein for serving on an

12

1    advisory board and steering committee for a

2    competitor regarding unrelated issues for which he

3    receives from $10,001 to $50,000 per year and for

4    consulting on unrelated matters for a competitor

5    for which he receives less than $10,001 per year;

6          Dr. Lily Jung for serving on a speakers

7    bureau for the sponsor for which she receives from

8    $10,001 to $50,000 per year and for serving on

9    speakers bureau for two competitors for which she

10   receives less than $10,001 per year per firm.

11         A copy of the waiver statements may be

12   obtained by submitting a written request to the

13   Agency's Freedom of Information Office, Room 12A-30

14   of the Parklawn Building.

15         We would also like to note that Dr. Roger

16   J. Porter has been invited to participate as an

17   industry representative acting on behalf of

18   regulated industry.  Dr. Porter's role on this

19   committee is to represent industry interests in

20   general, and not any one particular company.  Dr.

21   Porter is a retired employee of Wyeth Research.

22         In the event that the discussions involve

13

1    any other products or firms not already on the

2    agenda for which an FDA participant has a financial

3    interest, the participants are aware of the need to

4    exclude themselves from such involvement and their

5    exclusion will be noted for the record.

6           With respect to all other participants, we

7    ask in the interest of fairness that they address

8    any current or previous financial involvement with

9    any firm whose product they may wish to comment

10   upon.

11          Thank you.

12          DR. KIEBURTZ:  Any further comments from

13   the committee on the Conflict of Interest

14   Statement?

15          [No response.]

16          DR. KIEBURTZ:  Dr. Katz.

17          Opening Remarks and Overview of Issues

18          DR. KATZ:  Thanks, Dr. Kieburtz.

19          I would just like to make a very few brief

20   opening remarks to sort of set the context for

21   today's discussion. First, I would like to welcome

22   the members of the PCNS Advisory Committee.

1          In particular, I would like to welcome our

2    invited guests who have agreed to come here and

3    help us with this very important issue, and

4    especially I would like to thank the committee and

5    guests for, at the very last minute, opening up

6    their schedules, so that they could be here or you

7    could be here for a second day, a second day that

8    was necessitated by the intense public interest in

9    this issue.

10          As you know, we are here to discuss the

11   BLA for the use of Tysabri, also known as

12   natalizumab, in the treatment of patients with

13   relapsing-remitting multiple sclerosis.

14          Tysabri again, as you know, is a

15   monoclonal antibody that binds to integrins on the

16   surface of leukocytes and presumably, as a result,

17   inhibits their migration into areas of

18   inflammation, and presumably, this is responsible

19   for its activity.

20          It was approved for marketing in November

21   of 2004 on the basis of results at one year in two

22   randomized controlled trials, Study 1801, which

1    examined the effects of Tysabri's monotherapy, in

2    Study 1802, which examined the effects of Tysabri

3    in conjunction with Avonex interferon beta 1a.

4           Each of these studies demonstrated

5    clinically important effects on annualized relapse

6    rate compared to control, and although drugs to

7    treat MS are typically required to show effects at

8    two years prior to approval, these effects were so

9    robust at one year that the drug was approved on

10   the basis of these results although the sponsor was

11   required under the Accelerated Approval regulations

12   of Subpart E to provide the results of two years of

13   study after approval.

14          Unfortunately, as everyone in the room

15   knows, in February of 2005, the sponsor informed

16   the Agency of two cases of progressive multifocal

17   leukoencephalopathy, or PML, a typically fatal

18   viral infection of the brain in patients receiving

19   Tysabri in conjunction with Avonex.

20          As a result of this, the product was

21   withdrawn from the market in February of 2005, and

22   the sponsor subsequently undertook an examination

16

1  of all their patients in their clinical trials and

2  detected one additional case of PML in a patient

3  with Crohn's disease.

4         The sponsor has now come back to us with

5  the results both of their two-year clinical trials,

6  as well as the results of their search for

7  additional cases of PML in their patients in the

8  clinical trials, and you will hear a great deal

9  about the details of this over the next two days. I

10  won't go into that.

11        The fundamental questions we bring to you

12  are whether or not you believe these data justify

13  the remarketing of Tysabri, and if you do, under

14  what circumstances you believe it would be

15  appropriate to do so, and in particular, we are

16  interested to know whether or not you believe its

17  use should be restricted in some way.  For example,

18  should it be reserved for patients who have failed

19  other treatments, who have severe disease, who are

20  not receiving other concomitant medications for MS

21  or perhaps in any other way you might deem

22  appropriate.

17

1          Importantly, the sponsor has also proposed

2     that Tysabri be remarketed under a so-called risk

3     minimization plan or a RiskMAP, which is a plan

4     designed to track all patients who receive the drug

5     with the goal of identifying, quantifying, and

6     ideally minimizing, at least in a global sense,

7     significant risks associated with the use of

8     Tysabri, and if you believe that Tysabri can be

9     remarketed under certain circumstances, we are

10    eager to learn your views about the critical

11    elements of such a monitoring plan, and if you have

12    seen the revised question list, you can see that we

13    have asked very detailed questions about the

14    specifics of the plan.  It is very important for us

15    to know what you believe about those.

16          It is important to note that when

17    marketing for Tysabri was suspended, all clinical

18    trials in all indications were suspended, as well,

19    and several weeks ago, as you probably know, we

20    agreed with the sponsor that patients with MS, who

21    had previously been receiving Tysabri in Phase 3

22    studies at the time of the suspension, could once

18

1   again receive treatment under the IND.

2           This re-initiation of treatment under the

3   IND is being undertaken with extensive close

4   monitoring including neurological exams and

5   measurement of serum JC virus, the virus that is

6   known to cause PML, prior to each monthly infusion.

7           It is clear therefore that the Agency has

8   decided that at least under certain circumstances,

9   certain patients can continue to receive Tysabri at

10  this time, but it is important to note that

11  treatment under these intensive monitored

12  conditions, and again which is limited to patients

13  who have already received Tysabri and were doing

14  well in someone's view, represents a very different

15  scenario than the one that the sponsor now proposes

16  for marketing.

17          It is absolutely critical to state at this

18  point that if marketing is permitted, we fully

19  expect that additional cases of PML, many likely to

20  be fatal, will occur.  We don't know with great

21  confidence the true rate of PML that is associated

22  with the use of Tysabri.

file:///C|/dummy/0307PERI.TXT

19

1        Although the current IND data suggest that

2    the accrued rate, at least in MS patients, is about

3    1 in 1,000, and we don't have detailed information

4    about many of the factors that might affect the

5    risk, including, but certainly not limited to,

6    whether or not the risk is affected by the use of

7    concomitant immunosuppressant or other treatments,

8    and importantly, whether the risk increases with

9    increasing duration of treatment.

10        Nonetheless, unless we can identify risk

11    factors or tests that can reliably permit an

12    intervention that will halt the progression or

13    onset of PML--and I should add that we don't think

14    such tests are available at this point--there will

15    be additional cases of PML and perhaps many cases,

16    and there will likely be considerable mortality

17    associated with the use of the drug, and this is a

18    fact that I don't believe will necessarily change

19    based on what you hear today and tomorrow, and it

20    is a fact that patients, their families, and

21    prescribers will need to consider very seriously.

22        Against this somewhat unknown risk will

1   need to be considered the fact that MS in an often

2   devastating disease for which current treatments

3   are not always adequate, and that the treatment

4   effect of Tysabri seems quite robust, at least

5   certain treatment effects, and in certain respects,

6   the treatment effect appears larger than that of

7   available treatments, although it has to be

8   admitted that there are no direct head-to-head

9   comparisons in controlled trials.

10          So, it is the difficult task of weighing

11  these risks somewhat unknown and benefits that we

12  have brought you here today and tomorrow to

13  discuss.

14          Let me just say a very brief word about

15  the agenda.  As you can see, and Dr. Kieburtz has

16  mentioned the agenda already, the sponsor will

17  present the bulk of the effectiveness and safety

18  data, and they will also present the elements of

19  their proposed risk minimization plan.

20          Following that, the Agency reviewers will

21  present some additional effectiveness data and

22  raise some safety issues, as well as some issues

1    that we believe still exist with the proposed

2    minimization plan.

3              Following these presentations, as you have

4    already heard, we will have the public session in

5    which over 40 speakers have registered to offer

6    their views on these issues.  Again, as you know,

7    because there are so many speakers, we have asked

8    you to come back tomorrow and have a full, complete

9    discussion in an unrushed way tomorrow.

10             Again, I will stop there, I would like to

11   thank the committee for coming, for the work you

12   have already done in preparation for today's

13   meeting, and for the work that you are about to do.

14             Thanks.

15             DR. KIEBURTZ:  Does anyone on the

16   committee have any questions for Dr. Katz?

17             [No response.]

18             DR. KIEBURTZ:  Well, the good news is we

19   are ahead of schedule.

20             The next speaker will be Dr. Adelman.

21                     Sponsor Presentation

22                        Biogen Idec

```
 1                    Introduction
 2            DR. ADELMAN:  Good morning, members of the
 3    Advisory Committee, colleagues from the Food and
 4    Drug Administration, and members of the audience.
 5            My name is Burt Adelman.  I am the
 6    Executive Vice President of Development at Biogen
 7    Idec.
 8            [Slide.]
 9            On behalf of my colleagues at Biogen Idec
10    and Elan Pharma, I want to thank you for coming
11    here today to consider our request to return
12    natalizumab, Tysabri, to the short list of drugs
13    available for the treatment of relapsing forms of
14    multiple sclerosis.
15            [Slide.]
16            Now, natalizumab was approved for
17    treatment of MS on November 23rd, 2004, after
18    priority review of one year of data from two
19    ongoing Phase III clinical trials.  Prior to
20    review, an accelerated approval recognized the
21    strength of both efficacy and safety data at one
22    year.
```

file:///C|/dummy/0307PERI.TXT

23

1        Approximately 7,000 patients received at

2    least one dose within the first three months after

3    approval.  We believe that the great demand for

4    this new product by highly informed patient and

5    physician groups is a clear demonstration of the

6    significant unmet need of MS patients for more and

7    better therapies.

8        In February of 2005, within a 24-hour

9    period, we identified one confirmed and one

10    possible case of progressive multifocal

11    leukoencephalopathy.  This occurred in MS clinical

12    trial patients who had received over two years of

13    natalizumab.

14        Within a week of identifying these

15    patients, we chose to withdraw natalizumab from the

16    market and stop all dosing both in the market and

17    in clinical trials.  We made this decision in

18    collaboration with the FDA.

19        Our purpose was simple.  We wanted to

20    minimize any additional risk to treated patients

21    while we undertook an extensive investigation to

22    understand the significance of these findings.

1         Short after natalizumab withdrawal, we
2    convened a meeting of PML and MS experts and
3    invited representatives of the FDA and the EMEA to
4    join us.  At this meeting, we reviewed the
5    pathobiology of PML and its possible relationship
6    to the effect of natalizumab.
7         Although no clear conclusions emerged, a
8    path forward was defined.  We agreed to rapidly
9    evaluate all trial patients for clinical and
10   radiologic evidence of PML and serologic evidence
11   of JC virus replication in plasma and cerebral
12   spinal fluid.
13        A protocol was devised in collaboration
14   with these experts and regulatory authorities
15   reviewed the protocol.  In addition, colleagues at
16   the Karolinska Institute provided matched control
17   and treatment-naive MS patient plasma and CSF
18   samples for JC virus testing, truly a wonderful
19   contribution to this effort.
20        These investigations confirmed that only
21   three patients had contracted PML.  Furthermore, no
22   evidence emerged to suggest that natalizumab

25

1    treatment routinely promoted JC virus replication

2    in blood or CSF, and just as importantly, in those

3    samples that we obtained from the Karolinska

4    Institute, we found no evidence that

5    treatment-naive MS patients have increased

6    incidence of JC virus replication in the blood or

7    CSF.

8            Although the riddle of PML is not solved,

9    we believe that our efforts enable us to define

10   appropriate use conditions for Tysabri while we

11   continue to assess its risks and benefits.

12           Most individuals diagnosed with MS suffer

13   a relentlessly progressive disease characterized by

14   unpredictable acute exacerbations, increasing

15   physical disability, cognitive impairment, and

16   often secondary neuropsychiatric complications.

17           The burden and disability of multiple

18   sclerosis is certainly similar in magnitude to that

19   of other autoimmune diseases, such as rheumatoid

20   arthritis, Crohn's disease, and severe psoriasis.

21           These disorders are effectively treated

22   with highly active immunomodulatory agents.  As we

1    all know, these drugs are commonly associated with

2    serious mechanism-based toxicities including

3    opportunistic infection and malignancy.

4              Patients and physicians have learned how

5    to use these medicines successfully and maximize

6    their efficacy and manage, but not eliminate, their

7    risks.

8              We believe data you will review today

9    clearly identify natalizumab as a highly effective

10   treatment for MS patients.  In fact, analysis of

11   two-year data from the Phase III program has

12   confirmed and extended the efficacy profile

13   originally described in the label at the end of one

14   year.

15             We now know that Tysabri can significantly

16   reduce the risk of disability progression in

17   addition to its sustained effect on relapse rate.

18             [Slide.]

19             We are now proposing the following usage

20   statement for the package insert.  Tysabri is

21   indicated only for the treatment of patients with

22   relapsing forms of multiple sclerosis to delay the

1    progression of physical disability and to reduce

2    the frequency of clinical exacerbations.

3            We believe that Tysabri should be used as

4    monotherapy in patients not immunocompromised.

5            Recognizing our responsibility to ensure

6    that patients and prescribers benefit from all our

7    current knowledge regarding risk and appropriate

8    use conditions for natalizumab, we have designed a

9    companion risk management and assessment program,

10    commonly called a RiskMAP.

11            The RiskMAP plan is intended to exclude

12    from treatment any MS patient with evidence of

13    immune dysfunction consistent with our current

14    hypothesis that risk of PML in Tysabri-treated

15    patients is increased by concomitant immune

16    compromise.

17            Further the RiskMAP establishes a

18    comprehensive pharmacovigilance program that will

19    enable us to proactively detect new safety signals

20    and rapidly inform patients, physicians, and the

21    FDA of any and all important new findings.  We will

22    present this program to you in detail today.

28

1          Biogen Idec and Elan Pharma are committed

2    to a continuing effort to better understand JC

3    virus pathobiology and PML.  For example, we are

4    examining the utility of various testing methods

5    for JC virus in blood and blood constituents.  Were

6    any of these strategies to prove useful in early

7    detection or in patient selection, we would include

8    them immediately in the RiskMAP.

9          It is our intention today to ensure you

10   that Biogen Idec and Elan, in collaboration with

11   the FDA and prescribing neurologists, can

12   effectively manage the use of this important new

13   drug for the treatment of patients with MS.

14          [Slide.]

15          This is our agenda.  Following me will be

16   Dr. Alfred Sandrock, who runs our clinical

17   development program for MS; Michael Panzara,

18   another of our clinical neurologists, will discuss

19   in detail the safety profile as we know it today

20   for natalizumab.  Then,  Carmen Bozic, who runs our

21   pharmacovigilance unit, will describe the RiskMAP

22   to you.

1          We are also fortunate to have with us Dr.

2     Rick Rudick, Director of the Mellen Center and

3     Chairman of the Division of Clinical Research at

4     the Cleveland Clinic Foundation, a well-known MS

5     neurologist, who will speak to the risk-benefits of

6     Tysabri.

7          [Slide.]

8          We are also pleased to have with us Dr.

9     David Clifford, Professor of Neurology and Medicine

10    at the Washington University School of Medicine in

11    St. Louis.

12         Dr. Clifford is an eminent clinical

13    neurologist and much of his practice is devoted to

14    taking care of patients with AIDS and immune

15    disorders, and the neurologic complications

16    thereof.

17         Dr. Clifford was a member of the

18    Independent Assessment Committee that reviewed all

19    the patients that had been treated in the

20    natalizumab trials, and was the senior author of

21    the recently published IAC report in The New

22    England Journal of Medicine.

1          Thank you very much for your time and

2    consideration.

3          Dr. Sandrock.

4          DR. KIEBURTZ:  Does anyone on the

5    committee have any questions of clarification,

6    ambiguity?

7          [No response.]

8          DR. KIEBURTZ:  Thank you.

9                    Efficacy Data

10         DR. SANDROCK:  Good morning, ladies and

11   gentlemen. My name is Al Sandrock, and I will be

12   reviewing the efficacy of natalizumab.  Before I do

13   that, I would like to provide a brief introduction

14   to multiple sclerosis.

15         [Slide.]

16         MS is a chronic neurological disease

17   affecting approximately 400,000 Americans.  It is a

18   disease of young adults, mostly women, and about 85

19   percent of patients begin with a relapsing form.

20         This form is characterized by

21   inflammation, predominantly of the white matter.

22   It is widely believed to have an autoimmune

1    etiology, and the consequences of this inflammation

2    include demyelination, axonal transection, and

3    eventually neurodegeneration.

4              [Slide.]

5              MS takes a heavy toll on patients,

6    progression of physical disability is a common

7    feature.  Natural history studies show that the

8    median time to requiring a cane or crutch to walk

9    half a city block is approximately 15 years, and

10   that the median time to requiring a wheelchair is

11   about 25 years.

12             During the relapsing-remitting stage of

13   the disease, unresolved relapses are a major

14   contributor to the progression of physical

15   disability.

16             Cognitive dysfunction is also highly

17   prevalent, occurring in approximately 50 percent of

18   patients.  It affects employment, activities of

19   daily living, and family and social contacts.

20             Although MS is not immediately

21   life-threatening, it is life-shortening.  Studies

22   show a 5- to 7-year decrease in life expectancy and

1    a 2- to 7-fold increase in the risk of suicide.

2    About half of MS patients die of causes related to

3    the disease.

4              [Slide.]

5              There are three principal outcome measures

6    utilized in MS clinical trials:  an assessment of

7    clinical relapses, an assessment of disability

8    progression, and MS lesions can be directly

9    visualized by magnetic resonance imaging.  I will

10   take you through each of these in the next few

11   slides.

12             [Slide.]

13             Relapses define MS during the

14   relapsing-remitting stage.  This green line shows a

15   clinical course in a typical patient with a

16   relapsing form of multiple sclerosis where

17   disability is plotted with respect to time.

18             Relapses occur suddenly and unpredictably,

19   and the neurologic deficits may last for weeks or

20   months.  Although patients may recover fully from

21   relapses, about 40 percent of the time relapses

22   result in residual disability.

1          Natural history studies have shown that

2     relapse frequency in the early stages of the

3     disease predicts future disability, thus, reducing

4     the frequency of relapse is an important treatment

5     goal in multiple sclerosis.

6          After 7 to 10 years, patients transition

7     to the secondary progressive stage of disease where

8     disability progression can occur gradually, even in

9     the absence of relapse.  Importantly, there are no

10    disease-modifying therapies known today to slow the

11    gradual progression of disability during the stage

12    of the illness.

13         [Slide.]

14         Disability is measured in clinical trials

15    by the use of the Expanded Disability Status Scale

16    or EDSS.  It is a 10-point scale divided into

17    half-point increments where zero is normal and 10

18    is death due to MS.

19         A 2-step change, which in most parts of

20    the scale is a 1-point change, is considered

21    clinically significant.

22         [Slide.]

1           The multiple sclerosis functional

2     composite score, or MSFC, is an alternative scale

3     that correlates with and supplements the EDSS.  It

4     is a composite score of ambulation, upper extremity

5     dexterity, and cognition.  In this score, lower

6     scores indicate worsening.

7           [Slide.]

8           MS lesions begin as gadolinium-enhancing

9     lesions, which correspond to areas of acute

10    inflammation, as shown by the perivascular

11    infiltrate of leukocytes in the lower left panel.

12          Although enhancing lesions are evanescent,

13    lasting for 1 to 2 months, they leave behind a scar

14    in the form of T2-hyperintense lesions, which

15    therefore corresponds to the familiar MS plaques,

16    as shown in the lower middle panel, which is a

17    section of cerebral cortex stained brown for myelin

18    and where the white region is the plaque.

19          Inflammation can be so intense so as to

20    destroy brain parenchyma, and when that occurs,

21    T1-hypointense lesions develop.  Non-enhancing

22    T1-hypointense lesions correspond to areas of

1  axonal transection, as shown in the lower right

2  panel, which is a high-power view in MS lesions

3  stained green for neurofilament and where the

4  arrows point to transected axons.

5           [Slide.]

6           Two general classes of disease-modifying

7  therapies have been approved for the treatment of

8  relapsing forms of multiple sclerosis in the United

9  States - interferon-beta and glatiramer acetate.

10          There are three forms of interferon-beta,

11 and they reduce the rate of relapse relative to

12 placebo by approximately one-third.  They also

13 reduce the progression of physical disability as

14 measured by the EDSS, the portion progressing at

15 two years, also by approximately one-third.

16          These drugs result in injection site

17 reactions or flu-like symptoms which are common

18 adverse events.  Depression has also been

19 associated with interferon use, and there are rare

20 cases of liver failure.

21          Glatiramer acetate also reduces the

22 frequency of relapses by approximately one-third,

1    and the Phase III trial of this agent failed to

2    show a significant effect on disability

3    progression.

4            Because it requires daily subcutaneous

5    injections, injection site reactions are common.

6    Lipoatrophy and acute systemic reactions are also

7    seen.

8            [Slide.]

9            An unmet need remains in MS because these

10   agents are partially effective.  The Phase III

11   trials of these agents show that most patients

12   experience disability progression while on the

13   drug.  About two-thirds of patients will have at

14   least one relapse within two years of starting

15   therapy, and about a quarter of patients worsen by

16   at least 1 point on the EDSS scale within two years

17   of treatment initiation.

18           Not surprisingly, adherence to therapy is

19   poor. Fifteen to 20 percent of patients discontinue

20   their therapy annually, and there is a cohort of

21   about 50,000 patients in this country who have

22   attempted one or more of these therapies, but have

1    quit and have chosen to remain untreated.

2            [Slide.]

3            In order to address the unmet need in

4    multiple sclerosis, Biogen Idec and Elan sought to

5    develop new therapies for MS, and as we did so, we

6    were mindful of the fact that inflammation occurs

7    early in the course of the disease.

8            Our therapeutic hypothesis, therefore, was

9    that if we could suppress inflammation during the

10   early stages of MS, we could significantly alter

11   the course of multiple sclerosis.

12           [Slide.]

13           The biology of inflammation has been

14   clarified over the past 15 or 20 years.  An

15   important early step is the adhesion of leukocytes

16   to the endothelial cell wall of blood vessels, and

17   this adhesion allows for the subsequent

18   trans-endothelial migration of these leukocytes

19   into inflamed tissue.

20           The molecular interaction of alpha-4

21   integrins, which are expressed on the surface of

22   leukocytes, with cell adhesion molecules, such as

1   VCAM, which is expressed on the surface of

2   endothelial cells, is an important molecular event

3   that allows for the firm adhesion of leukocytes to

4   endothelial cells.

5            [Slide.]

6            Natalizumab is a humanized monoclonal

7   antibody directed against the alpha-4 chain of both

8   alpha-4, beta 1, and alpha-4, beta 7 integrins.

9            By binding to the alpha-4 chain, it

10  interferes with the alpha-4 interaction with cell

11  adhesion molecules, thereby inhibiting the adhesion

12  of leukocytes to endothelial cells, and inhibiting

13  the migration of leukocytes into inflamed tissue.

14           Natalizumab has been studied in nearly

15  5,000 patients in the total clinical experience, of

16  which about 3,000 were on natalizumab.  The

17  majority of patients were in the multiple sclerosis

18  trials, about 2,700 patients, and 2,000 of these

19  patients were in the Phase III program, and for the

20  remainder of my talk, I am going to focus on the

21  data derived from those 2,000 patients in the Phase

22  III program.

1        As Dr. Panzara comes up to speak about

2   safety, he will also include data from the Crohn's

3   disease and RA programs.

4        [Slide.]

5        There were two, Phase III trials of

6   natalizumab in multiple sclerosis.  The first trial

7   was a monotherapy trial, Study 1801, which was a

8   randomized, double-blind trial enrolling largely

9   treatment-naive relapsing-remitting MS patients.

10       The patients were in the EDSS range of

11  zero to 5. All patients had to have at least 1

12  release in the year prior to entry.  Patients were

13  randomized to receive either natalizumab or placebo

14  in a 2:1 fashion.  942 patients were enrolled in

15  this trial.

16       The second trial was an add-on study,

17  1802.  This was also randomized and double-blinded.

18  It also enrolled relapsing-remitting MS patients,

19  but this time the patients had to have disease

20  activity while on interferon.  The same EDSS range

21  was used, and patients also had to have a relapse

22  in the year prior to entry, this time on

40

1    interferon.

2          Patients continued their interferon and

3    added either natalizumab or placebo in a 1:1

4    fashion.  1,171 patients enrolled in this trial.

5          [Slide.]

6          The study design was similar between these

7    two trials.  After a brief screening period,

8    patients were randomized to either natalizumab 300

9    mg I.V. once monthly or placebo I.V. once monthly,

10   and they were followed for 120 weeks, at which time

11   they were able to roll over into an open label

12   safety extension study of natalizumab.

13         Throughout the treatment period, clinical

14   evaluations, as denoted by the C's, were done every

15   3 months, and MRI's were done at baseline and

16   annually.  There were two sets of primary

17   endpoints, one at one year, and one at two years,

18   at the end of the trial.

19         The primary endpoint at one year was the

20   annualized relapse rate, and there were a number of

21   secondary endpoints.  At two years, the primary

22   endpoint was EDSS progression, and there were also

1    a number of secondary endpoints.  I will take you

2    through each of these primary and second endpoints

3    at both time points in the subsequent slides.

4              [Slide.]

5              I am going to focus on the data from the

6    monotherapy trial because, as Dr. Adelman pointed

7    out, we believe that natalizumab should be used as

8    monotherapy.

9              [Slide.]

10             First, the annualized relapse rate.  This

11   was the primary endpoint at one year.  Natalizumab

12   led to a 68 percent reduction in the rate of

13   relapse over that first year.  We confirmed this

14   effect at the end of the study, so that at the end

15   of the study, there was 68 percent reduction in the

16   frequency of relapses.

17             [Slide.]

18             We examined the risk of relapse by looking

19   at the cumulative probability of having a relapse

20   over the two-year period.  These are Kaplan-Meier

21   plots of the cumulative probability of relapse.

22             The hazard ratio indicates a 60 percent

1   reduction in the risk of relapse over the two-year

2   time period.  At the one-year mark, 60 percent of

3   placebo patients were free of relapse compared to

4   80 percent of natalizumab-treated patients.

5           [Slide.]

6           Time to EDSS progression was the primary

7   endpoint at two years.  Here, we are looking at the

8   cumulative probability of progressing over the

9   two-year period where progression was defined as a

10  two-step increase in the EDSS sustained for at

11  least three months.

12          At the end of the two-year period, 29

13  percent of placebo patients had progressed compared

14  to 17 percent of natalizumab-treated patients.  The

15  hazard ratio indicates a 42 percent reduction in

16  the risk of progressing over the two-year period.

17          [Slide.]

18          The Multiple Sclerosis Functional

19  Composite score indicated that natalizumab-treated

20  patients either had no change or perhaps a slight

21  increase in the score, which denotes improvement,

22  whereas, placebo patients worsened.

1    If we break the composite score down into

2    its three components, natalizumab showed a benefit

3    in all three components of ambulation, upper

4    extremity dexterity, and cognition.

5    [Slide.]

6    Turning now to the MRI endpoints, the

7    number of enhancing lesions provides an estimate of

8    the inflammation going on in the brain at the time

9    of the MRI scan.

10    On the one-year scan, there was a 92

11    percent reduction in the mean number of enhancing

12    lesions, and the same result was observed on the

13    Year 2 scan.

14    [Slide.]

15    The number of new or enlarging T2 lesions

16    provides an estimate of the accumulation of MS

17    plaques over the time period studied.  In the first

18    year, there was an 80 percent reduction in the mean

19    number of new or enlarging T2 lesions. Over the

20    two-year period, there was a similar reduction, 83

21    percent in the mean number of new or enlarging T2

22    lesions.

1          [Slide.]

2          This slide shows the distribution of the

3    number of new or enlarging T2 lesions over two

4    years.  If we look at the placebo group, which are

5    the white bars, distribution is skewed toward the

6    right, so that 68 percent of placebo patients had

7    at least three new or enlarging T2 lesions over the

8    two-year period.

9          In contrast, the blue bars indicate the

10   natalizumab group, which shows that the

11   distribution is skewed toward the left, so that 57

12   percent of natalizumab-treated patients had no new

13   or enlarging T2 lesions over the two-year time

14   period.

15         [Slide.]

16         T2 lesion volume is an estimate of the

17   total burden of disease in the brain, and the

18   change in T2 lesion volume is shown on this slide.

19         Over the first year, there was a decrease

20   in the volume in the natalizumab group of

21   approximately 1,300 cubic millimeters compared to

22   an increase of 741 cubic millimeters in the placebo

1    group.

2              A similar finding was shown over the full

3    two-year study period, a decrease of 900 cubic

4    millimeters compared to an increase of nearly 3,000

5    cubic millimeters in the placebo group.

6              [Slide.]

7              The number of new T1-hypointense lesions

8    is shown here.  The mean number shows a 74 percent

9    reduction in the mean number with natalizumab

10   compared to placebo over the first year, and a

11   similar finding was seen looking over the entire

12   two-year study period, a 76 percent reduction in

13   the mean number of new T1-hypointense lesions.

14             [Slide.]

15             We wondered whether the efficacy of

16   natalizumab was restricted to certain subgroups, so

17   we predefined a number of subgroups to look at.

18             This slide shows the relapse rate ratio

19   where the vertical blue line indicates a rate ratio

20   of 1, and points left to the 1 indicate a treatment

21   effect in favor of natalizumab.

22             Regardless of age, gender, disability

1   status at baseline, the relapse number in the year

2   prior to entry, presence or absence of enhancing

3   lesions at baseline, and less than or more than 9

4   T2 lesions at baseline, natalizumab appears to

5   provide a favorable benefit.

6         The only group in which the confidence

7   intervals overlap with 1 is a very small subgroup,

8   the number of patients in the less than 9 category

9   is quite small.

10        [Slide.]

11        Turning now briefly to the 1802 add-on

12   study, this study summarizes all of the clinical

13   measures of all the primary and secondary endpoints

14   of both the 1- and 2-year mark on the clinical

15   measures.

16        First, in terms of the relapse rate, there

17   was 53 to 55 percent reduction in the annualized

18   relapse rate over interferon alone.  There was a

19   decrease in EDSS progression, so that the risk was

20   decreased by 24 percent over the time period over

21   interferon alone.

22        The risk of relapse was decreased by 50

1    percent over interferon alone, and the MSFC also

2    showed a favorable benefit of combination therapy

3    compared to interferon monotherapy.

4            [Slide.]

5            This slide shows all of the MRI measures

6    employed as secondary endpoints in the 1802 study.

7    The drug had a substantial effect on all the MRI

8    measures that we looked at.

9            [Slide.]

10           So, in summary, efficacy was demonstrated

11   on all primary and secondary endpoints at both the

12   one- and two-year marks in both Phase III trials of

13   multiple sclerosis.

14           The magnitude of efficacy as monotherapy

15   is compelling.

16           The add-on study confirmed efficacy in

17   patients breaking through active treatment.

18           There was strong attenuation of

19   inflammation and accumulation of plaque burden as

20   seen on MRI scans, and the benefit was seen

21   consistently across subgroups.

22           At this time, I would like to introduce

file:///C|/dummy/0307PERI.TXT

48

1    Dr. Michael Panzara, who will present the safety of

2    natalizumab.

3                         Safety Data

4         DR. PANZARA:  Good morning, ladies and

5    gentlemen.  I am Dr. Michael Panzara, and I will

6    review for you today the safety of natalizumab.

7         [Slide.]

8              This slide provides an outline of my

9    presentation.  As has been discussed, natalizumab

10   was approved in November of 2004 for the treatment

11   of relapsing forms of multiple sclerosis based on

12   one-year data from the two ongoing Phase III

13   studies.

14             The studies are now complete and an

15   analysis of the safety database has yielded no

16   appreciable differences in most adverse events as

17   compared with the time of initial approval.

18             Therefore, I will only briefly review the

19   general safety of natalizumab.  The details of

20   these analyses are in your briefing document, and I

21   am pleased to answer any questions that you may

22   have about them.

file:///C|/dummy/0307PERI.TXT

49

1      The one thing that has changed since the

2    time of initial approval is infection.   Therefore,

3    the bulk of my presentation will focus on a review

4    of the many analyses undertaken to evaluate the

5    risk of infection in natalizumab-treated patients.

6         The final portion of my presentation will

7    focus on progressive multifocal

8    leukoencephalopathy, or PML, and the extensive

9    safety evaluations undertaken following

10   identification of PML in natalizumab-treated

11   patients.

12        [Slide.]

13        Most of my presentation will focus on the

14   placebo-controlled MS experience.   This included

15   1,617 patients who received natalizumab and 1,135

16   who received placebo.   There were also patients who

17   received natalizumab in open-label studies

18   amounting to over 2,300 MS patients and 3,800

19   patient years of exposure.

20        I will also call upon the experience in

21   Crohn's disease in which an additional 1,600

22   patients received natalizumab, amounting to 1,700

1    person years of exposure, and there were some

2    differences in the safety profile in this

3    population, which I will indicate throughout my

4    presentation.

5           All together, in the combined experience,

6    nearly 4,000 patients received natalizumab and

7    5,500 person years of exposure.  In addition, there

8    was a small rheumatoid arthritis experience, which

9    I will also speak of during my presentation.

10          [Slide.]

11          This slide provides a general overview of

12   the adverse events that occurred in the

13   double-blind, placebo-controlled trials of multiple

14   sclerosis.

15          Focusing on the first line, common adverse

16   events were balanced between the groups.

17   Similarly, serious adverse events were balanced,

18   and, indeed, there were more serious adverse events

19   on placebo than on natalizumab.  This is reflective

20   of more serious MS relapses in the placebo group as

21   compared with natalizumab.

22          Moving to the next line, when these

1    serious adverse events are removed, the MS-related

2    ones, the groups remained balanced.

3         Serious hypersensitivity reactions did

4    occur on natalizumab treatment at an incidence of

5    0.8 percent.  This is the same incidence that was

6    seen at the time of initial approval, and, indeed,

7    there were no serious hypersensitivity reactions

8    during the second year of the trial.

9         Moving to malignancies, 1.3 percent of

10   placebo-treated patients had a malignancy versus

11   0.7 percent of those on natalizumab.

12        There were three deaths on placebo versus

13   2 on natalizumab.  The deaths on natalizumab are

14   summarized on the next slide.

15        [Slide.]

16        The first patient was a patient who had a

17   history of malignant melanoma, who noticed a new

18   lesion at the time of his first or second infusion,

19   and the diagnosis was finally made after his fifth

20   infusion.

21        The next was a patient who had received 25

22   infusions of natalizumab, but died of alcohol

1    intoxication.

2              [Slide.]

3              In addition, there were four deaths that

4    occurred in the open-label MS experience.  The

5    first was one of the cases of PML that I will

6    describe in detail for you later in my

7    presentation.

8              There was one case each of a respiratory

9    distress in a pediatric MS patient, a patient who

10   had a seizure and arrhythmia, and one patient

11   suicide.  Each of these last three events occurred

12   at least five months after their last natalizumab

13   infusion.

14             [Slide.]

15             Turning to the Crohn's disease experience,

16   there were six deaths that occurred in Crohn's

17   disease clinical trials, both the

18   placebo-controlled trials and the open-label

19   trials.

20             The first was a patient who died of a

21   work-related asphyxiation.  The second was a

22   65-year-old man with a history of hypertension who

1    died of a myocardial infarction. The third was a

2    patient who developed peritonitis as a

3    postoperative complication of a Crohn's related

4    procedure.

5            The next three events were serious

6    opportunistic infections.  The first was the one

7    case of PML in a Crohn's disease patient.  The next

8    was a patient who developed pneumocystis carinii

9    pneumonia, and the third was a patient who

10   developed pulmonary aspergillosis.  I will describe

11   each of these last three events in detail during my

12   discussion of opportunistic infections.

13           [Slide.]

14           Finally, there were two deaths in

15   natalizumab-treated patients in the rheumatoid

16   arthritis experience.  The first was in a patient

17   who developed a renal stone and then developed E.

18   coli urosepsis that in the process of placing a

19   central line for antibiotic treatment, developed an

20   intraoperative pulmonary hemorrhage.

21           The final case was a woman with rheumatoid

22   lung, which was diagnosed on autopsy.

1            So, these slides summarize the total

2    number of deaths that occurred on natalizumab

3    treatment in the clinical development program.

4            [Slide.]

5            Now, I would like to turn to a discussion

6    of infections.

7            [Slide.]

8            I would like to begin by providing an

9    overview of the many analyses undertaken to

10   evaluate the risk of infection in

11   natalizumab-treated patients.  This will include a

12   discussion of common infections, as well as those

13   reported as serious.

14           Then, I will review the risk of infection

15   over time, in other words, were there an increasing

16   number of infections with increasing natalizumab

17   exposure.

18           Then, I will discuss an analysis of herpes

19   infections.  This is a relatively common viral

20   infection that we chose to study to evaluate

21   potential effects of natalizumab on cell-mediated

22   immunity.

1        Finally, I will review opportunistic

2   infections including PML.

3        [Slide.]

4        This slide shows the common infections

5   that occurred in the placebo-controlled trials of

6   multiple sclerosis, that occurred at an incidence

7   of 1 percent or greater than placebo on natalizumab

8   treatment.

9        Focusing on the first line, 74 percent of

10  patients in each group experienced an infection.

11  There were five infections that occurred more

12  frequently on natalizumab than placebo using this

13  low threshold of 1 percent.

14       The types of infections that developed are

15  quite typical of those seen in this population.

16  Similar to the incidence, the rate of infection was

17  balanced at 1.5 per person year in each group.

18       [Slide.]

19       This slide shows the serious infections

20  that occurred in the placebo-controlled trials of

21  multiple sclerosis.  The infections on this slide

22  are those that occurred at an incidence of 0.1

1    percent or greater in the natalizumab group.

2            The most common serious infections were

3    appendicitis, urinary tract infections, and

4    pneumonia with a maximal difference between the

5    groups of 0.1 percent.

6            On the middle of the slide, you can see

7    there were three reports of what was deemed a

8    serious viral infection. Each of these were

9    patients who developed nausea, vomiting, and fever.

10   The viral infection resolved spontaneously or with

11   hydration. All patients recovered and continued in

12   the study.

13           [Slide.]

14           Now, I would like to summarize the

15   post-marketing natalizumab experience for

16   infections. Approximately 7,000 patients received

17   one or more natalizumab infusions in the three

18   months that the drug was on the U.S. market.

19           Serious infections were reported in 16

20   patients, yielding reporting incidence of 0.2

21   percent. Pneumonia and urinary tract infections

22   were the most common infections reported.

1          There were two reports of serious herpes

2    infections that occurred in the post-marketing

3    period.  The first was a case of fatal herpes

4    encephalitis that occurred three months following a

5    single natalizumab infusion.

6          The second was a case of herpes simplex

7    meningitis that occurred within hours of a single

8    natalizumab infusion. This patient recovered fully.

9          There were no opportunistic infections

10   reported during this time including no reported

11   cases of PML.

12          [Slide.]

13          Now, turning to the risk of infection over

14   time. We set out to determine whether with

15   increasing natalizumab exposure, there would be an

16   increased risk of infection.

17          This slide is again from the double-blind,

18   placebo-controlled trials of multiple sclerosis.

19   The y axis shows the cumulative probability of an

20   infection, and the x axis shows the number of weeks

21   in the trial.

22          The Kaplan-Meier curves are nearly

1   superimposable. This indicates an equal risk of

2   infection over the 120-week dosing interval.

3   Likewise, the hazard ratio was 1, supporting this

4   conclusion.

5           Thus, with increasing natalizumab

6   exposure, there does not appear to be an increased

7   risk of infection.

8           [Slide.]

9           Now, turning to herpes infections.  As I

10  indicated, we chose to study herpes viral

11  infections as a marker of potential effects of

12  natalizumab on cell-mediated immunity.

13          These are latent DNA viruses in which

14  reactivation leads to the clinical manifestations

15  of disease, and these viruses have a particular

16  tropism for the nervous system. The high rate of

17  sporadic infection in these viruses makes it

18  amenable to study in the clinical trial setting.

19          [Slide.]

20          This table shows the incidence and rate of

21  herpes infections that occurred in the

22  placebo-controlled trials of multiple sclerosis.

file:///C|/dummy/0307PERI.TXT

59

1          Infections included in this table are

2     those reported as herpes simplex, herpes zoster,

3     cytomegalovirus, Epstein-Barr virus, or any

4     infection deemed as herpetic by the investigator.

5          7.2 percent of patients on natalizumab

6     experienced a herpes infection versus 6.1 percent

7     of those on placebo.

8          We chose to explore this further by

9     evaluating the incidence and rate of herpetic

10    infections in the monotherapy study, as well as

11    those in the combination study, and that is shown

12    on this slide.

13          [Slide.]

14          First, focusing on the monotherapy, 6

15    percent of patients on placebo versus 6.4 percent

16    of those on natalizumab experienced a herpetic

17    infection, and the rate was also balanced between

18    the groups.

19          In contrast, in combination therapy, 6.1

20    percent of those on placebo or Avonex alone

21    experienced a herpetic infection as opposed to 8.4

22    percent of those on natalizumab, and this is

1    reflected in the rate of 50 per 1,000 person years

2    versus 67 per 1,000 person years.

3          So, this suggests that although there may

4    be an increased risk of herpes infections that are

5    slight, it appears to be greater in those receiving

6    combination therapy.

7          So, to summarize, there was a slight

8    increase in herpes infections of 1.1 percent in

9    natalizumab-treated patients.  It appears that this

10   occurred primarily with combination treatment.

11   There are no serious or disseminated herpes

12   infections in the multiple sclerosis trials.  There

13   were the two cases of herpes infections in the

14   post-marketing experience that I already described

15   for you.

16          Although I didn't just show it, it is in

17   your briefing document that this observation in

18   Crohn's disease was similar.  There was an increase

19   of 0.5 percent on natalizumab-treated patients as

20   compared with placebo.

21          Five of these events were reported as

22   serious in the Crohn's disease trials.  Two of the

1  five had onset prior to the initiation of

2  natalizumab treatment, and all patients recovered

3  when appropriate treatment was initiated.

4          [Slide.]

5          Now, I would like to turn to a discussion

6  of opportunistic infections.

7          [Slide.]

8          PML did occur in natalizumab-treated

9  patients.  There were a total of three confirmed

10  cases of PML.  Two of these were in MS patients,

11  one of these was fatal.  Both patients were

12  receiving interferon-beta concurrently at the time

13  of diagnosis.

14          There was also one patient with PML in the

15  Crohn's disease studies which was also fatal.  This

16  patient was originally diagnosed as having an

17  astrocytoma, but later, a re-review of the

18  pathology by an independent neuropathologist

19  determined that the diagnosis was actually PML.

20  This patient had pre-existing lymphopenia due to

21  chronic immunosuppression use.

22          The exposure of natalizumab in these

1    patients ranged from 8 to 37 infusions and all of

2    these patients presented with behavioral changes.

3              [Slide.]

4              This table shows the incidence of

5    opportunistic infections in the placebo-controlled

6    experience, as well as the cumulative MS experience

7    for natalizumab.

8              Focusing on the righthand side of the

9    slide, in the blue shaded area, there were a total

10   of three patients who developed opportunistic

11   infections on natalizumab, yielding a rate of 0.8

12   per 1,000 person years.  Two of these were the

13   cases of PML that I have just described.

14             The only other opportunistic infection was

15   a patient who developed a cryptosporidial

16   gastroenteritis after 16 natalizumab infusions.

17   This patient recovered fully.

18             Thus, other than PML, there was only one

19   opportunistic infection in the MS experience.

20             [Slide.]

21             Turning to Crohn's disease, this slide

22   shows the incidence of opportunistic infections in

1    the placebo-controlled and cumulative experience in

2    Crohn's disease.

3         Again, focusing on the righthand portion

4    of the slide, there were five events that were

5    characterized as opportunistic in patients in the

6    Crohn's disease studies, yielding a rate of 2.9 per

7    1,000 person years.  The details of these cases are

8    shown in the next slide.

9         [Slide.]

10        Starting at the top of the slide, the

11   first was the one PML case that I have already

12   described.  The next two cases I have mentioned

13   when I reviewed the deaths on the natalizumab

14   treatment.

15        The first was a 69-year-old man who

16   developed pneumocystis carinii pneumonia following

17   34 natalizumab infusions in the setting of chronic

18   cirrhosis.

19        The next patient was a 63-year-old man who

20   developed pulmonary aspergillosis after a prolonged

21   hospitalization that resulted from a GI bleed in

22   the setting of chronic prednisolone and

1    nonsteroidal use.

2           The next patient is a 33-year-old woman

3    who developed CMV colitis following a single

4    natalizumab infusion in the setting of

5    azathioprine.  This patient recovered

6    spontaneously.

7           The final case was a 65-year-old woman who

8    developed a mycobacterium avium intracellulare

9    pneumonia following eight natalizumab infusions in

10   the setting of chronic prednisone use, in the

11   setting of staph aureus pneumonia. This patient

12   also recovered fully with treatment.

13          The next three events on the slide are not

14   considered opportunistic, but are somewhat atypical

15   and are considered for completeness.

16          The first is a 32-year-old man who

17   developed a lung abscess following 13 infusions of

18   natalizumab in the setting of azathioprine.  This

19   patient recovered fully with antibiotic treatment.

20          The next is a 62-year-old woman who

21   developed Burkholderia cepacia pneumonia, also

22   known as pseudomonas cepacia pneumonia, following

file:///C|/dummy/0307PERI.TXT

1    three natalizumab infusions in the setting of

2    tobacco use and congestive heart failure.  This

3    patient also recovered fully.

4           Finally, there is a 20-year-old man who

5    developed what is presumed to be tuberculosis

6    following 25 natalizumab infusions in the setting

7    of prednisone and azathioprine use. This developed

8    six months following his last natalizumab infusion.

9    Although the diagnosis has not been confirmed

10   either by PCR or by culture, the patient remains on

11   tuberculosis treatment.

12          [Slide.]

13          So, to summarize, natalizumab treatment is

14   associated with an increased risk of PML.  The

15   incidence estimate is 1 in 1,000 with broad

16   confidence intervals ranging from 0.2 per 1,000 to

17   2.8 per 1,000.

18          There may also be an increased risk of

19   other opportunistic infections.  There was one

20   non-PML infection in MS patients.  This is the

21   cryptosporidial diarrhea.

22          The remaining infections occurred in

1    Crohn's disease patient with pre-existing

2    comorbidity and immunocompromise.  This may be

3    reflective of any of these factors, and, indeed,

4    there was a slight increase in infection in general

5    in Crohn's disease patients.

6           [Slide.]

7           So, to summarize the safety of

8    natalizumab, adverse events and serious adverse

9    events were balanced between the groups.  The

10   hypersensitivity rate of 0.8 percent was consistent

11   with the approved labeling and there was no

12   increase in malignancy on natalizumab treatment.

13          There was no increase in the incidence or

14   rate of common or serious infections.

15          There may be a slight increase in herpes

16   infections on natalizumab treatment, and this

17   appears to be more prevalent in the combination

18   patients.

19          PML and other opportunistic infections did

20   occur on natalizumab treatment, and these were seen

21   mostly in Crohn's disease patients with significant

22   comorbidity or the use of immunomodulators or

1    immunosuppressants.

2         [Slide.]

3         Now, I would like to summarize PML.

4         [Slide.]

5         First, PML is a rare, progressive

6    infection of the central nervous system.  It is

7    often fatal within six months of diagnosis.

8         It is a lytic infection of

9    oligodendrocytes caused by the JC virus, which is a

10   human polyomavirus.

11        It is known to primarily affect

12   immunocompromised individuals and was first

13   described in the setting of hematological

14   malignancies.  It gained more prominence during the

15   era of HIV infections, and most recently it has

16   been described in the setting of organ

17   transplantation.

18        [Slide.]

19        The cause of PML is the JC virus.  This is

20   a double-stranded DNA virus that is believed to

21   infect the majority of individuals at an early age.

22   However, the reported seroprevalence ranges from 30

1    to 80 percent depending on the assays employed.

2            The sites of latency of the JC virus

3    include the kidney, the bone marrow, and lymphoid

4    tissues.

5            The pathogenesis of PML is really not

6    known, however, it likely involves a multi-step

7    process that involves the activation of the virus

8    from latency, a step of DNA rearrangement,

9    interactions with the immune system, and eventual

10   migration of the virus from sites of latency into

11   the central nervous system.

12           [Slide.]

13           The diagnosis of PML is based on a triad

14   of clinical, MRI, and laboratory findings.  First,

15   clinically, it is characterized by a subacute onset

16   of progressive neurological changes.  The symptoms

17   typically localize to the subcortical region, but

18   may also involve cerebellum.

19           On MRI, the lesions are T2-hyperintense

20   and are typically non-enhancing without mass

21   effect, and typically localized to the subcortical

22   region as do the symptoms.

1          Diagnosis requires confirmation of the

2     presence of JC virus in the central nervous system,

3     and this is done commonly now through the use of

4     PCR analysis of the spinal fluid looking for DNA

5     from the JC virus.

6          Although there are no pathognomonic

7     differences for multiple sclerosis, there are

8     features that help one differentiate between the

9     two.

10          First, in terms of the clinical

11     presentation, the tempo is different.  While PML

12     symptoms typically are subacute, those of MS are

13     typically more acute, evolving over hours to days.

14     Likewise, the location of the lesions are somewhat

15     different.

16          MS typically affects optic nerve or spinal

17     cord, although can affect other areas, while these

18     areas are almost never involved in the setting of

19     PML, particularly the optic nerve and spinal cord.

20          On MRI, although T2 lesions develop in MS,

21     they are typically associated with

22     gadolinium-enhancement, edema or mass effect, and

1    are more typically periventricular.

2            In addition, JC viral DNA is not detected

3    in the spinal fluid of MS patients.

4            There are currently no proven means for

5    monitoring or predicting PML onset.  A variety of

6    methods have been explored.  This includes serum,

7    plasma, buffy coat, in white cells and urine.  None

8    of these have proven to be predictive or

9    diagnostic.

10            [Slide.]

11            Unfortunately, there are no antiviral

12    treatments for PML.  It appears based on the

13    literature that immune reconstitution may be the

14    most effective treatment.

15            This comes from two lines of evidence.

16    First, is the HIV experience with highly active

17    antiretroviral treatments, or HAART.  The

18    literature shows that the introduction of HAART, at

19    the time of diagnosis reduces the mortality of PML

20    by half.

21            In addition, this literature has suggested

22    that mild symptoms at treatment initiation, so

1   early in the disease, is associated with an

2   improved prognosis.

3           The second line of evidence stems from

4   transplantation.  This literature has suggested

5   that a reduction of immunosuppression at the time

6   of clinical presentation of PML can improve

7   survival, and survival is reported in one-third of

8   patients in case series, although the experience is

9   small.

10          The data suggest that early recognition

11  and immune reconstitution may improve outcome.

12          [Slide.]

13          Now, I would like to review the extensive

14  safety evaluations undertaken following

15  identification of PML in natalizumab-treated

16  patients.

17          [Slide.]

18          Following the suspension of dosing on the

19  28th of February, we evaluated the patients from

20  the clinical trials of multiple sclerosis, Crohn's

21  disease, and rheumatoid arthritis.

22          The objectives of these evaluations were

1    3-fold.  First, to determine if additional patients

2    had undiagnosed PML or other atypical infections.

3    Next, to determine the true prevalence of JC viral

4    DNA in the CSF of MS patients.  There was a small

5    literature that said that JC viral DNA can be

6    detected in up to 10 percent of MS patients.  We

7    set out to determine if this was correct.

8            Finally, we set out to assess the utility

9    of plasma testing as a predictive test for PML.

10           [Slide.]

11           All patients were required to see their

12   neurologist as soon as possible following dose

13   suspension for a clinical evaluation and MRI.

14           We encouraged CSF collection for all

15   patients, but it was required for anyone for which

16   there was suspicion of PML.

17           We also collected plasma for exploratory

18   analyses, and we are fortunate to have CSF and

19   plasma control samples from the Karolinska

20   Institute.  These were from patients who were naive

21   to treatment and those who had other neurological

22   diseases.

1                The entire study was done in collaboration

2     with the NIH and was monitored by an independent

3     Adjudication Committee of experts in virology,

4     neuroradiology, and the neurology of HIV.  The role

5     of this committee was to determine whether there

6     are new cases of PML.

7                [Slide.]

8                Now, to the results.

9                [Slide.]

10                3,826 patients were eligible for

11     evaluation.  Ninety-one percent of the

12     natalizumab-treated patients participated in this

13     assessment.  We had very extensive follow-up even

14     on those who did not participate, and vital status

15     was confirmed in over 99 percent.

16                Following this detailed analysis, there

17     were no new cases of PML.

18                [Slide.]

19                Now, in addition to determining there were

20     no cases of PML, we learned a great deal about PML

21     diagnosis and monitoring.

22                First, regarding MRI, we had approximately

1    3,000 MRI scans that were reviewed by our central

2    reader centers. We found that MRI scan was very

3    useful to exclude the diagnosis of PML in the

4    setting of clinical change, in the setting of

5    patients with clinical symptoms.

6           We found that a single MRI scan was

7    usually sufficient to rule out the diagnosis,

8    although if there were ambiguous lesions, re-scan

9    was sometimes required.

10          When the MRI was nondiagnostic, spinal

11   fluid analysis was required.  We found during this

12   analysis that baseline brain MRI was very important

13   to facilitate this assessment.

14          [Slide.]

15          We analyzed nearly 800 spinal fluid

16   samples for the presence of JC viral DNA; 400 of

17   these were from natalizumab-treated patients.  An

18   additional 400 were the neurological controls from

19   the Karolinska Institute.

20          Following these analyses, no JC viral DNA

21   was detected in either natalizumab-treated patients

22   and those who had never seen the drug.

1          We also had spinal fluid samples from the

2     two MS patients who had developed PML, and JC virus

3     was detected in the spinal fluid of those two

4     patients.  Thus, this data confirms that CSF

5     testing is very specific for the diagnosis of PML.

6               [Slide.]

7               Finally, turning to the plasma analyses,

8     plasma was collected from 2,370 patients as an

9     exploratory analysis.  Five of these patients were

10    found to have detectable JC viral DNA in their

11    plasma, or 0.2 percent.

12              There were no clinical or radiographical

13    changes associated with this finding, and, indeed,

14    three of these patients had never received

15    natalizumab.

16              We also re-analyzed stored serum samples

17    from the three PML patients.  JC viral DNA was not

18    detected in two of three of these prior to symptom

19    onset.  The one patient with Crohn's disease had JC

20    virus detected about a month before clinical

21    symptoms.

22              So, this suggests the presence of JC virus

1   or viremia is not necessarily associated with PML,

2   but the absence of JC virus does not exclude the

3   diagnosis.

4           [Slide.]

5           So, in closing, although there are no

6   proven ways to monitor for PML, there are a few

7   options that we can consider.  These options extend

8   from the extensive evaluations over the past year,

9   opinions from consultants, and the existing

10  literature.

11          We believe that clinical vigilance by the

12  neurologists is the most important means of

13  screening.  In addition, we believe that the

14  monthly interaction between healthcare provider and

15  patients at the time of infusion affords a unique

16  opportunity to enhance this vigilance through the

17  introduction of questionnaires or checklists that

18  have a sufficiently low threshold to prompt

19  additional evaluations by the physician.

20          The three patients who developed PML in

21  our experience each presented with clinical signs

22  early in the course of the disease that were

1   recognized by the patient, physician, or family

2   members.

3            Previously, such changes would have been

4   viewed changes secondary to multiple sclerosis

5   rather than a rare disease like PML.  Now, with

6   what we know, any clinical change on natalizumab

7   will be viewed as PML until proven otherwise,

8   prompting a rapid dose suspension and additional

9   assessments.

10           Turning to JC viral DNA in the plasma, we

11  were hopeful about this, however, the sensitivity

12  and predictive value appear to be unclear.  Given

13  the presence of virus in patients without PML, and

14  the lack of patients with PML, what the results of

15  this test suggest are not clear. Therefore, we do

16  not believe we can recommend widescale use at this

17  time.

18           Regarding MRI, we found MRI to be quite

19  sensitive in the setting of new changes, but not

20  specific in MS, but helpful diagnostically.

21  However, given the time course of PML, which is

22  relatively short, we could think of no practical

1    scanning frequency which would allow its use as an

2    effective screening tool.

3            Finally, regarding spinal fluid, we found

4    spinal fluid to be very specific at the time of

5    diagnosis, however, the literature suggests that

6    spinal fluid tends to be negative in early disease,

7    even in the setting of clinical changes in MRI.

8    This, and the fact that this is an invasive test,

9    make it a poor screening tool.

10           So, these are the factors that we

11   considered when designing the risk management plan

12   that Dr. Bozic will now present to you.

13           Thank you.

14           DR. KIEBURTZ:  Any questions,

15   clarifications from the committee?  Dr. McArthur.

16           DR. McARTHUR:  Thank you for your

17   presentation.

18           I had a question about the performance

19   characteristics of the spinal fluid JCV-PCR.  You

20   have talked about the very low rate, well, the zero

21   rate of positivity.  What about positive controls

22   from biopsy-proven PML cases, either HIV-positive

1    or not?

2          DR. PANZARA:  These assays were run at the

3    NIH using a Gene Majors method, which has a

4    detection of 50 nanograms or 50 copies, I should

5    say, per ml.  So, it was the most sensitive assay

6    available, and positive controls were used.

7    Indeed, it was the same assay in which we detected

8    JC virus in the spinal fluid of the confirmed

9    cases.

10          DR. McARTHUR:  Were the positive controls

11    re-run in this assay, or were they essentially

12    historical controls?

13          DR. PANZARA:  No, they were positive

14    controls run at the time of the assay, at the time

15    of testing of these samples.

16          DR. KIEBURTZ:  Dr. Jung.

17          DR. JUNG:  I have a number of questions.

18          DR. KIEBURTZ:  Just now clarifications,

19    misunderstandings, misheards.  General questions,

20    we will get to.  I just don't want to interrupt the

21    sponsor too much.

22          DR. JUNG:  Headaches were mentioned as

1    occurring in 35 percent of patients receiving

2    Tysabri as opposed to 30 percent.  Was there any

3    concern that the presentation of headaches might

4    serve as a precursor for HSV?

5         DR. PANZARA:  Headache was the most common

6    infusion-related reaction.  We characterized any

7    event that occurred within two hours of infusion as

8    an infusion reaction.  Headache was the most common

9    event reported.  It was usually reported early in

10   the course of treatment, and then decreased over

11   time, but it was no precursor to an infection.  The

12   patients, the vast majority continued in the trial.

13        DR. RICAURTE:  Just following up on the

14   issue of spinal fluid, did you address the question

15   about high specificity in that sensitivity may be

16   compromised particularly early on?  I wondered if

17   you could say a few more words about the extent of

18   that and how that might or might not have

19   influenced the evaluation of all of the cases for

20   possible PML.

21        DR. PANZARA:  So, there is a sensitivity

22   of the spinal fluid.  Well, the levels of DNA that

1  are detectable by this method, according to all our

2  experts, is that which would be considered

3  clinically relevant.  Indeed, there was nothing

4  detected below this very low threshold.  So, we are

5  very confident that this assay, if there was JC

6  virus there, we would detect it.

7          DR. KIEBURTZ:  Can I ask one last

8  question?  When you were on your slide about

9  clinical, my attention lapsed for a moment when you

10 said under clinical vigilance, if there is any

11 clinical deterioration--what did you say?

12         DR. PANZARA:  So, currently, our

13 recommendation is clinical vigilance, and the risk

14 management program that Dr. Bozic will describe, we

15 will go through the steps that should be taken

16 following the identification of clinical change,

17 but basically, any clinical change should prompt an

18 evaluation by a physician and which may include

19 additional workup.

20         DR. KIEBURTZ:  Thanks.

21         Dr. Katz.

22         DR. KATZ:  I had a question for Dr.

1    Sandrock and I think a question or two for Dr.

2    Panzara, if that's okay.

3            The first question has to do with the

4    efficacy data.  You presented the data for relapse

5    rate or annualized relapse rate by baseline EDSS.

6    Do you have a presentation of the accumulation of

7    disability results by baseline EDSS as opposed to

8    just the relapse rate outcome?

9            DR. SANDROCK:  Yes, I believe it's 2-9,

10   display 2-9 in the briefing document that we

11   provided.  That provides the hazard ratio on

12   subgroups and it is broken down in the same levels

13   that we broke them down for the relapse rate ratio,

14   2-10, in fact.

15           May I have Slide 2-16, please.  Actually,

16   could I have displayed 2-10.

17           [Slide.]

18           So, this is the hazard ratio in the

19   various subgroups.  In the third set, there are the

20   hazard ratios based on the EDSS level zero to 1.5,

21   2 to 2.5, 3 to 3.5, and greater than and equal to

22   4.

file:///C|/dummy/0307PERI.TXT

1          DR. KIEBURTZ:  You had some follow-up?

2          DR. KATZ:  Yes.  For either one who has

3     the exposure data, what is the exposure, or do you

4     have a slide for the exposure?  I think you had

5     total person years and that sort of thing, but the

6     exposure for two years and three years, how many MS

7     patients have gotten the drug for two years, how

8     many have gotten it for three years?

9          DR. PANZARA:  I would direct you to

10     display 3-1 in your briefing document, but I do

11     have a slide of that.  That would be Slide 2-18.

12          [Slide.]

13          I direct your attention to the top portion

14     of the table where we have number exposed to

15     natalizumab.  I would like you to focus your

16     attention to the righthand side of the slide where

17     you can see approximately 1,400 patients have

18     received natalizumab for two or more years,

19     approximately 150 patients have received

20     natalizumab for three or more years.  The bulk of

21     that was in multiple sclerosis.

22          DR. KATZ:  So, in MS, 1,100 patients--

84

1              DR. PANZARA: 1,121.

2              DR. KATZ: Exposed for two years.

3              DR. PANZARA: Two years, and 111 for three

4  or more years.

5              DR. KATZ: Okay. And the two cases of PML

6  occurred at two years or greater?

7              DR. PANZARA: Yes, one patient had

8  received 29 natalizumab infusions, and one had

9  received 37.

10             DR. KATZ: The other question I had, had

11  to do with vital status. You said that you had

12  vital status for greater than 99 percent of the

13  patients, even though 91 percent participated in

14  the follow-up study.

15         Could you just talk a little bit more

16  about that? What do you mean by "vital status,"

17  just alive or dead, or do you have cause of death,

18  if there were deaths?

19             DR. PANZARA: There were no deaths. The

20  deaths that I described to you initially in my

21  presentation are some of those patients, you know,

22  they weren't eligible clearly. So, we had a total

1    of about 437 patients who chose not to participate

2    or did not participate in the assessment.

3              There were a variety of reasons for that.

4    The most common reason was most had received

5    placebo.  We had a large number of patients who

6    received placebo, had never received natalizumab,

7    and really didn't feel the need to come in and have

8    this assessment.

9              We had about another third of the patients

10   actively decline participation, so they had to sign

11   that they didn't want to participate, so their

12   vital status was confirmed.  A variety of other

13   sites, who didn't want to participate, but the

14   physician said no PML here, but I am not

15   participating, so there were several of those.

16             There were a few cases, about 60 who were

17   considered as quote, unquote, "lost to follow-up."

18   We actually went to each of their physicians and

19   had those physicians make contact with them, and we

20   found all patients except for 10.

21             DR. KIEBURTZ:  Dr. Couch.

22             DR. COUCH:  Yes, just one question about

1    the MRI scan.  The MRI scan is obviously one of the

2    good ways of trying to confirm the diagnosis.

3            Is this an appropriate way of trying to

4    look for early diagnosis through your IAC?  Were

5    you able to find that there were any ways in using

6    the MRI scan to try to determine early diagnosis,

7    so the immune system could be reconstituted early?

8            DR. PANZARA:  The requirement was that

9    everybody undergo an MRI scan, and what we found is

10   that if there was any patient who had clinical

11   symptoms that the physician was unsure of, that

12   could be MS, could be PML, they had the MRI scan

13   done.  They referred both the MRI scan and the

14   clinical exam to our independent Adjudication

15   Committee.

16           The expert neuroradiologist on that

17   committee and clinicians reviewed the history, and

18   then made recommendation.  In some cases, if the

19   MRI was ambiguous, to go on to an additional MRI,

20   approximately one to two months later, or a spinal

21   tap.  That was the diagnostic algorithm.

22           So, if there was any concern, they

file:///C|/dummy/0307PERI.TXT

87

1    underwent, first, MRI.  If there was still concern,

2    additional MRI and spinal tap was performed.  We

3    saw no signs on the scans that were reviewed.  We

4    were actively looking for the immune reconstitution

5    syndrome, and we did not see any scans that would

6    be suggestive of that.

7         DR. KIEBURTZ:  I know the committee has

8    further questions, but I am going to hold and let

9    the sponsor finish their presentations, please, and

10   we will credit you five minutes for our intervening

11   questions.

12              Risk Management Plan

13        DR. BOZIC:  Good morning, ladies and

14   gentlemen.  My name is Carmen Bozic and I am the

15   head of Drug Safety and Risk Management at Biogen

16   Idec.

17        So far this morning, you have heard this

18   Dr. Sandrock and Dr. Panzara present on the

19   efficacy and safety of natalizumab.  In this

20   presentation, I will focus on how we propose to

21   minimize the risk of PML and also what we plan to

22   do in order to better understand that risk.

1              [Slide.]

2              This is an outline of my presentation.

3    After I conclude with the risk management plan, I

4    will present our perspectives on the benefit-risk

5    profile of Tysabri.

6              [Slide.]

7              So, the Tysabri risk management plan was

8    developed based on FDA's guidance document on this

9    topic and based on our ongoing dialogue with the

10   FDA.

11             I would like to point out that the plan

12   that I will be presenting you today is an updated

13   version of the plan that you have in your briefing

14   document and represents an evolution in our

15   thinking and in consideration of several

16   discussions that we have had with the FDA on this

17   topic.

18             In developing this plan, we carefully

19   reviewed other existing risk management plans to

20   gain insights into the best approach for Tysabri.

21             We found that the approach to risk

22   management for drugs with serious risks can vary.

 1    For example, clozapine, which is used for severe

 2    schizophrenia, and has a risk of agranular cytosis,

 3    has a mandatory registry of all prescribing

 4    physicians and all treated patients.

 5            On the other hand, mitoxantrone, which

 6    many of you are familiar with, and which is

 7    indicated for progressive relapsing MS, and has a

 8    risk of cardiotoxicity and acute myelogenous

 9    leukemia, does not have a mandatory registry, and

10    while it has recommended monitoring of white cell

11    counts and cardiac functions, these are not

12    compulsory.

13            [Slide.]

14            Finally, and importantly, in developing

15    this plan, we sought extensive feedback from

16    neurologists, infusion nurses, and MS patients.  We

17    spoke to over 200 neurologists to review all the

18    safety findings and to get their input on how best

19    to minimize the risk of PML.

20            We also surveyed 225 patients and more

21    than 100 infusion nurses, and sites regarding the

22    feasibility of our proposal.  We had the advantage

1   of over 10 years of experience providing for the

2   needs of the MS community, and we understand the

3   complexities of the setting in which MS care is

4   delivered.

5           So, we considered the range of healthcare

6   practices and diverse locales in which MS patients

7   are treated from academic medical centers to

8   private practice clinics in both urban and in rural

9   settings where proximity to healthcare providers is

10  a major factor to consider.

11          Thus, the plan seeks to minimize the risk

12  of PML, but without creating unintended

13  consequences that may obstruct patient access to

14  Tysabri.

15          [Slide.]

16          So, our risk management plan has two sets

17  of goals, risk minimization goals and risk

18  assessment goals.

19          With respect to risk minimization, we want

20  to promote informed benefit-risk decisions

21  regarding the use of Tysabri in patients with

22  relapsing MS.  We also want to minimize the risk of

1     PML to the extent that this is possible based on

2     currently available data, and although data on this

3     are limited, we seek to potentially minimize death

4     and disability if PML occurs.

5            With respect to risk assessment, we want

6     to define more precisely the incidence and risk

7     factors for PML in Tysabri-treated patients, and we

8     want to assess the long-term safety of Tysabri in

9     the clinical practice setting.

10           An important point that I want to make on

11    this slide is that these two activities, risk

12    minimization and risk assessment, will go on in

13    parallel, and the data that we collect from our

14    risk assessment activities will inform our risk

15    minimization activities over time.

16           So, we will be continuously evaluating the

17    risk management plan and make refinements to the

18    plan, as appropriate, in order to achieve these

19    goals.

20           [Slide.]

21           Now, I am going to talk about the risk

22    minimization component of our plan.

1           [Slide.]

2           In designing our risk minimization

3     program, we took into consideration some very

4     important features about how MS patients are

5     treated and how Tysabri is administered.

6           First, Tysabri has a unique mode of

7     administration that is unlike any other drug with

8     risk management plans.

9           It is administered monthly by infusion in

10    the infusion center setting under the care and

11    supervision of a healthcare professional,

12    typically, an infusion nurse.  This affords a

13    monthly opportunity to reinforce the risk of PML

14    with the patient and to screen the patient for

15    potentially new neurological symptoms that might be

16    indicative of PML.

17          Secondly, the care of MS patients is

18    highly specialized.  We know that approximately

19    6,000 neurologists take care of over 90 percent of

20    MS patients in this country. What this means is we

21    can reach virtually all prescribers and teach them

22    about PML and about the diagnosis of PML if it

1    occurs.

2         Finally, neurologists, because PML is a

3    disease of the central nervous system, it stands to

4    reason that the neurologists are the best qualified

5    specialists to diagnose and manage PML if it

6    occurs, and it also means that they will have the

7    expertise to apply the educational tools that we

8    will give them about the diagnosis and management

9    of PML.

10        [Slide.]

11        Now, I will talk about the revised

12   labeling for Tysabri and then I will describe the

13   risk minimization system that we are proposing to

14   support the revised labeling.

15        [Slide.]

16        The new revised labeling for Tysabri will

17   feature a prominent boxed warning.  We are

18   recommending the use of the box, because this is

19   the highest level warning we can put into a drug

20   label.

21        In the box, we are stating that Tysabri is

22   associated with an increased risk of PML which

1    causes death or severe disability.

2          We are also actively warning against

3    concurrent use of Tysabri with immunosuppressants,

4    such as azathioprine, or immunomodulators, such as

5    beta-interferon.

6          We are stating in the box that Tysabri is

7    indicated only for the treatment of patient with

8    relapsing MS, because it is only in those patients

9    that the benefit has been proven.

10         Finally, we are highlighting the

11   importance of clinical vigilance as a means for

12   possibly early detection of PML, and we are

13   instructing healthcare professionals to be alert to

14   any signs or symptoms that might be suggestive of

15   PML, and if they find such symptoms, they should

16   immediately suspend dosing of Tysabri and begin an

17   evaluation, which would include a brain MRI, as

18   well as CSF testing for JC viral DNA.

19         [Slide.]

20         We are also including additional warnings

21   and contraindications in the labeling.  We are

22   stating that an MRI scan should be performed prior

1    to initiating Tysabri, because it may be helpful in

2    differentiating PML from MS symptoms in the patient

3    with new neurological symptoms.

4              We are also contraindicating the use of

5    Tysabri in patients who are immunocompromised,

6    including patients who are immunocompromised due to

7    underlying diseases, such as HIV, hematological

8    malignancies or transplantation, or patients who

9    are immunocompromised due to prior

10   immunosuppressant therapies.

11             [Slide.]

12             Now, I will talk about our risk

13   minimization system.

14             [Slide.]

15             A key feature of our program is that we

16   will require mandatory enrollment of all

17   prescribers and all Tysabri-treated patients into a

18   registry, called the Tysabri Registry.  All

19   prescribing physicians and patients must complete

20   and sign a mandatory enrollment form and send it to

21   Biogen Idec before initiating Tysabri therapy.

22             We also have a new controlled centralized

1  distribution system that will allow us to know the

2  location and number of all Tysabri vials that we

3  are shipping, and we will allow Tysabri to be used

4  and administered only in registered infusion

5  centers.

6      These are infusion centers that have been

7  trained on the appropriate use of Tysabri and the

8  risks and benefits of Tysabri, and which have

9  attested that they will comply with the risk

10 management requirements.

11      With this system, we can deliver

12 educational tools to all neurologists who are

13 prescribing Tysabri, all nurses who are

14 administering Tysabri, and all Tysabri-treated MS

15 patients.

16      In the next few slides, I will cover in

17 more detail the specific elements of our system.

18      [Slide.]

19      A key component of the enrollment form is

20 a patient-physician acknowledgment.  This records

21 that an informed benefit-risk decision has taken

22 place before the start of therapy.

1          On this form, the physicians will sign

2    that they are aware that PML is a risk with Tysabri

3    treatment and it can cause death or severe

4    disability, that they have discussed the risks and

5    benefits of Tysabri with their patient including

6    the risk of PML, and that they are prescribing

7    Tysabri for a patient who is appropriate for

8    Tysabri.  This is a patient with relapsing MS, not

9    in combination with any immunosuppressant or

10   immunomodulators, and not in a patient who is

11   immunocompromised.

12         On this acknowledgment, the patients will

13   sign that they have read the Medication Guide, they

14   have discussed the risks and benefits of Tysabri

15   with their physician, including the risk of PML,

16   and that they will report any new or worsening

17   neurological symptoms to their physician.

18         The signed patient-physician

19   acknowledgment on the enrollment form must be sent

20   to Biogen Idec as a prerequisite to starting

21   Tysabri treatment.

22         Now, I will speak about the requirements

file:///C|/dummy/0307PERI.TXT

1    that we have imposed on infusion centers.

2                [Slide.]

3                As I said before, Tysabri can be used only

4    in registered infusion centers.  These are centers

5    that have received educational training from our

6    personnel and have attested that they will follow

7    the risk management requirements.

8                These requirements are that they can dose

9    only patients who have been enrolled in the Tysabri

10   Registry, they must give a Medication Guide to

11   every patient before every dose, they must document

12   this in a Tysabri infusion log, and they must be

13   willing to be periodically audited by Biogen Idec

14   to ensure compliance with these requirements.

15               Another important component of these

16   requirements is verifying the completion of a

17   patient checklist before each dose in every

18   patient, and I will describe this checklist on the

19   next page.

20               [Slide.]

21               So, there are no proven monitoring

22   methodologies for the early detection of PML.  So,

1   in considering this challenge, we sought feedback

2   from many neurologists.

3        Based on this, we determined that the best

4   approach would be the monthly use of a

5   questionnaire to screen patients for new or

6   worsening neurological symptoms. If such symptoms

7   are detected, we are instructing the Tysabri dosing

8   be suspended immediately and that the patient be

9   evaluated by their neurologist.

10       The questionnaire will be administered to

11  each patient prior to each infusion.  It may be

12  administered either by the neurologist or his nurse

13  in the office, or by phone, or by the infusion

14  nurse in the infusion center setting.

15       We asked neurologists whether this

16  questionnaire could always be done in person in the

17  neurologist's office. Well, some neurologists liked

18  this approach, others told us that in many practice

19  settings, especially in rural areas, a requirement

20  for a monthly visit to the neurologist would be a

21  hardship for patients.

22       So, we felt that choices regarding the

1    mechanism for administering the questionnaire are

2    important because not every patient has a neurology

3    clinic nearby that they can visit on a monthly

4    basis.

5            Therefore, the use of this questionnaire

6    in the ways that I have described allows access to

7    therapy to patients in a variety of locales and

8    healthcare settings.

9            The patient checklist intent is to

10   reinforce the importance of clinical vigilance and

11   to facilitate a structured monthly interaction

12   between the patient and the healthcare

13   professional.

14           It is not meant to replace the

15   neurologist's judgment, and so we are instructing

16   the healthcare professional who administers this

17   checklist to have a very low threshold, to contact

18   the neurologist if there are any concerns that are

19   detected on this checklist.

20           The additional purpose of the checklist is

21   to reinforce the use of Tysabri as a monotherapy,

22   and not in immunocompromised patients.

```
 1              I will be happy to answer any questions
 2      about this checklist afterwards.
 3              [Slide.]
 4              So, now let me walk you through the
 5      controls that we have in our system.
 6              Before a patient and physician begin
 7      Tysabri treatment, they will have a discussion
 8      about the risks and benefits of Tysabri.  They will
 9      read and sign the patient-physician acknowledgment
10      on the enrollment form, and they will send it to
11      Biogen Idec.
12              Once we receive that form, we will verify
13      that the patient-physician acknowledgment has been
14      signed, and we will assign an authorization number
15      to that patient.  We will also match that patient
16      to a registered infusion center and will notify
17      that infusion center that this patient is eligible
18      for Tysabri treatment.
19              How does an infusion center become
20      registered? They have been trained by Biogen Idec
21      on the appropriate use of Tysabri and the risks and
22      benefits of Tysabri, and they have attested that
```

1    they will follow the requirements of the risk

2    management plan.

3           They are now known to our controlled

4    centralized distribution system, and we can begin

5    shipping Tysabri to such a registered infusion

6    center.  Now the patient can begin Tysabri

7    treatment.

8           So, clearly, as you can see, we have built

9    several controls into the system.  There is a

10   control at the patient and at the physician level

11   in terms of a mandatory enrollment into a registry.

12          There is a control at the infusion level

13   because only registered infusion centers can

14   administer Tysabri, and there is a control at the

15   distribution level because we will deliver Tysabri

16   only to registered infusion centers.

17          I should mention that we also evaluated

18   proposals to ship Tysabri one vial at a time for

19   each patient, and this is a relevant question,

20   because it is a question that has been posed to the

21   Advisory Committee.

22          We concluded that this would not enhance

1    the safety of the patients and would restrict

2    access to Tysabri, because it would create a

3    significant burden for infusion centers, especially

4    those located in hospitals and in academic centers.

5              [Slide.]

6              Now, I will turn to our risk assessment

7    plan.

8              [Slide.]

9              We have made a major commitment to further

10   study the safety of Tysabri in the post-marketing

11   setting.  Our major studies are the Tysabri

12   Registry and a Tysabri observational cohort study,

13   which I will describe in the next few slides.

14             We also have additional studies planned

15   that seek to understand the background rate of PML

16   in MS patients, the impact of Tysabri on immune

17   function, and the utility of various monitoring

18   methodologies, such as plasma viral load testing

19   and neurological questionnaires in clinical trials.

20             In the interest of time, I can't present

21   these during my presentation, but I could answer

22   any questions that you may have after the

1    presentation.

2            [Slide.]

3            So, the Tysabri Registry was designed to

4    determine more precisely the incidence and risk

5    factors for PML in Tysabri-treated patients and

6    also the risk factors and incidence of other

7    serious opportunistic infections.

8            Enrollment into this registry is mandatory

9    for all physicians and all patients.  We will be

10   instructing physicians to report any PML event to

11   Biogen Idec immediately, and in addition, we will

12   be querying every patient, every physician on every

13   patient every six months regarding the occurrence

14   of any PML, any other serious opportunistic

15   infection, any death of any cause, and any

16   discontinuation of Tysabri treatment.

17           If a patient is discontinued, they must

18   remain in the registry for a minimum of six months

19   after the last dose, so we can collect the final

20   set of data on this patient.

21           In addition, we will also collect all

22   spontaneously reported events that occur in this

1   registry.

2           [Slide.]

3           We will follow up patient deaths through

4   the National Death Index and collect death

5   certificates on any patient that has died as an

6   additional layer of diligence.

7           Noncompliance with the reporting of the

8   data to us will result in de-enrollment of the

9   physician and/or the patient.

10           So, this registry provides intense safety

11   surveillance and tracking of all patients that

12   exceeds routine pharmacovigilance activity.

13           [Slide.]

14           If a PML occurs in the registry, this is

15   what we are going to do.  We will thoroughly

16   collect all data related to this case including

17   results of clinical findings, source documentation

18   of MRI findings, and results of CSF testing from JC

19   viral DNA.

20           We will carefully analyze any PML case,

21   looking for potential risk factors including

22   underlying comorbidities or use of concurrent

1    therapies.

2        We will evaluate the case based on

3    predefined criteria for PML that we have developed

4    with PML experts, and if needed, we will seek

5    external advice on any indeterminate cases.

6        We will report the case in an expedited

7    fashion to the FDA, and because this registry will

8    give us a complete denominator of all

9    Tysabri-treated patients and complete ascertainment

10   of every PML case, we will be able to assess the

11   risk-benefit profile of Tysabri in an ongoing

12   fashion, and if there is a clinically significant

13   change to that risk-benefit profile, we can

14   implement rapid corrective actions.

15       [Slide.]

16       Now, I will turn to the Tysabri

17   Observational Cohort Study.

18       This study seeks to evaluate the long-term

19   safety of Tysabri in the clinical practice setting.

20       A subset of patients in the Tysabri

21   Registry will enroll into this voluntary

22   observational cohort study.

1          We will enroll 5,000 MS patients

2     worldwide, of which 3,000 will be enrolled in the

3     U.S., and follow them for five years.

4          The size and scope of this study is such

5     that it is powered to detect rare events occurring

6     with an incidence of 0.06 percent.

7          In this study, we will collect all serious

8     adverse events on all patients, as well as

9     concomitant immunomodulatory and immunosuppressant

10    therapies.

11         We will be able to assess the risk of

12    serious infections and long latency events, such as

13    malignancies.

14         Because we are collecting all serious

15    adverse events, we will be able to investigate any

16    potentially new safety signals that might arise in

17    the post-marketing setting.

18         [Slide.]

19         Now, I will turn to the evaluation of our

20    risk management plan.

21         [Slide.]

22         We have an evaluation plan that will

1    carefully monitor the success of our risk

2    management efforts.  It includes the analysis of

3    data derived from the Tysabri Registry, as well as

4    the results of surveys and audits.

5            We will share these data with the FDA

6    every three months, and if needed, based on these

7    data, we can implement rapid corrective actions to

8    the plan, and this may include revised labeling

9    and/or improvements in our risk minimization system

10   or educational tools.

11           So, we will be continuously evaluating the

12   success of our risk management efforts, and if we

13   need to, make enhancements to the plan.

14           [Slide.]

15           So, in summary, our risk management plan

16   seeks to inform and minimize the risk of PML.  We

17   are proposing mandatory registration of all

18   prescribing physicians and all treated patients.

19           We are proposing monthly screening of

20   patients in the infusion center setting through the

21   use of a patient checklist.  We have developed a

22   controlled, centralized distribution system that

file:///C|/dummy/0307PERJ.TXT

109

1   will allow us to know the location and number of

2   all vials shipped, and we are mandating the use of

3   Tysabri only in registered infusion centers that

4   have attested that they will follow the risk

5   management requirements.

6          We are also proposing an ongoing detailed

7   assessment of the PML risk, as well as the overall

8   safety of Tysabri.

9          We have an evaluation plan to monitor the

10  success of our efforts, and we have designed this

11  plan to ensure appropriate use of Tysabri without

12  unnecessary burden to physicians or barriers to

13  patient access.

14          [Slide.]

15          Now, in conclusion, based on the data that

16  you have heard this morning, based on the unmet

17  need in MS, based on the efficacy and safety of

18  Tysabri, and the risk management plan that we have

19  proposed, I will summarize our thoughts on the

20  overall benefit-risk profile of Tysabri.

21          [Slide.]

22          There is no question that MS is a

1   devastating, progressively disabling neurologic

2   disease with a very high unmet need.

3           Tysabri is a highly effective therapy with

4   a benefit that is consistent in a broad range of

5   subgroups.

6           PML is a rare but very serious risk of

7   Tysabri treatment.

8           We are proposing a comprehensive risk

9   management plan that seeks to minimize and to

10  further assess this risk.

11          Based on this, we believe that Tysabri has

12  a favorable benefit-risk profile that justifies its

13  reintroduction into the U.S. market.

14          [Slide.]

15          Our recommendation is that Tysabri be used

16  in the following way.  It should be used in

17  relapsing MS patients only as a monotherapy, not in

18  patients who are known to be immunocompromised,

19  only patients enrolled in the Tysabri Registry, and

20  only in patients who are fully informed about the

21  PML risk.

22          Based on Tysabri's benefit-risk profile

1  and the unmet need in MS, we believe that the use

2  of Tysabri is justified in the following patients:

3          These are relapsing MS patients who either

4  have disease activity on current therapy, or are

5  intolerant of current therapy, or have high disease

6  activity and our naive patients.

7          Now. we believe that most of Tysabri's use

8  will occur in these three categories of patients,

9  however, we also recognize that starting a

10  disease-modifying therapy for MS is a complex

11  decision, and so we think that Tysabri should also

12  be available to other relapsing MS patients that

13  may be deemed appropriate based on individual

14  benefit-risk assessments made by their physician

15  and by the patient.

16          Therefore, we are seeking indication for

17  use of Tysabri in patients with relapsing MS.

18          On behalf of Biogen Idec and Elan, I would

19  like to share with you that the needs of MS

20  patients and physicians have weighed heavily on us

21  as we contemplated the best path forward for

22  Tysabri, and we look forward to hearing the

1    Advisory Committee's views on this important

2    subject.

3             [Slide.]

4             I have the pleasure of introducing Dr.

5    Rudick, who is a neurologist at the Cleveland

6    Clinic, specializing in the treatment of multiple

7    sclerosis.  Dr. Rudick directs the Mellen Center,

8    where he conducts his research and sees patients

9    with MS referred from around the world.

10            He is also Director of the Division of

11   Clinical Research at his institution, and in that

12   capacity, he oversees clinical research programs at

13   the Cleveland Clinic, which includes over 1,000

14   clinical trials involving over 20,000 research

15   subjects.

16            For over 20 years, Dr. Rudick's research

17   has focused on clinical trials, clinical and

18   imaging outcome measures, and biologic markers of

19   the MS disease process.

20            He participated in the design of the 1801

21   and 1802 studies.  He was the coordinating

22   investigator and chair of the Advisory Committee

1   for the 1802 study, and is the lead author on the

2   recently published report of the 1802 study in The

3   New England Journal of Medicine.

4           We are pleased to have Dr. Rudick with us

5   today.

6                   Clinical Perspective

7           DR. RUDICK:  Good morning.  Thank you for

8   listening to my professional opinion about Tysabri

9   and multiple sclerosis.

10          I am going to make three points and I will

11  speak briefly.

12          First, I would like to point out from my

13  perspective the magnitude of the unmet need in the

14  MS field.

15          Secondly, I will explain why Tysabri is an

16  important new therapeutic option in MS.

17          Finally, I will give my views on what

18  constitutes responsible use of Tysabri.

19          I will speak about each of these in turn,

20  again, quite briefly.

21          My point about the unmet need is really

22  very simple.  Despite the approved

1    disease-modifying drugs that we have available, MS

2    remains in far too many patients a horrible

3    disease, and there is a very huge unmet need.

4            The available drugs are effective and we

5    are all very grateful to have these drugs, we

6    didn't have them 10 years ago, but they are far

7    from adequate.

8            The Phase III placebo-controlled clinical

9    trials have demonstrated that the current drugs are

10   one-third effective in reducing the relapse rate.

11           The effect of these drugs is so modest

12   that we endlessly debate at our MS meetings the

13   long-term relevance of the benefits of the current

14   drugs, but we have used these drugs long enough to

15   know they don't stop the progression of the

16   disease, and we have no debates about that at our

17   MS meetings.

18           In my experience during 10 years of using

19   the MS drugs, I have noticed that most patients

20   have relapses or eventually progression of their

21   disability despite their adherence to the

22   prescribed drugs.

1          Patients who seem stable clinically often

2    show silent MRI lesions and too often later enter a

3    stage of progressive disability, so the appearance

4    of stability early on with these drugs sometimes is

5    illusory.

6          These experiences are really not

7    surprising.  One only has to look at the Phase III

8    clinical trial data.  In addition to that, the

9    current drugs cause side effects that diminish

10   quality of life, and many patients simply

11   discontinue their use.

12         My clinic is filled with patients, MS

13   patients who report disease activity despite the

14   current drugs, patients similar to the ones who

15   entered the 1802 clinical trial.  In such patients,

16   our options include switching between the drugs or

17   using our drugs in combinations.

18         Switching is of little benefit in my

19   opinion given the modest differences, if any,

20   between our available drugs. Combining interferon

21   or glatiramer acetate with steroids, azathioprine,

22   or methotrexate might help, but there is no data to

1  support this approach, and there are questions

2  about safety.

3          Mitoxantrone is approved for relapsing

4  progressive MS, but has significant cardiac

5  toxicity, and there are cases of acute leukemia

6  that have been reported.

7          The bottom line is that approved therapies

8  don't come close to addressing our unmet need in

9  multiple sclerosis.  Many, maybe most, MS patients

10 need better options, and we need new therapeutic

11 products.

12         Now, let me explain why I think Tysabri is

13 an important new therapeutic option for patients

14 with MS.

15         The 1801 study, natalizumab versus

16 placebo, was the first Phase III

17 placebo-controlled, randomized clinical trial in MS

18 in almost a decade.

19         The robust clinical trial results met with

20 widespread excitement and enthusiasm by doctors and

21 patients who viewed Tysabri as a major therapeutic

22 advance, and you have heard that 7,000 patients

1　signed up for Tysabri within just a few months.

2　　　　　I believe there were three reasons for

3　this widespread view which I happen to share.

4　First, the beneficial effect on relapses, over a

5　two-third reduction, was double what we have seen

6　in all of the studies of the approved drugs.

7　　　　　Three independent randomized,

8　placebo-controlled Phase III studies of interferon

9　and a Phase III glatiramer acetate study, each

10　separately and individually showed about a

11　one-third reduction in relapses.

12　　　　　The difference observed in the Tysabri

13　monotherapy study was over a two-third reduction.

14　I am very well aware of the hazards and

15　uncertainties of comparing results across studies,

16　but in comparison with every other large Phase III

17　placebo-controlled trial, the two-third reduction

18　in relapse rate simply cannot be ignored.  It is a

19　striking result from my perspective.

20　　　　　Second, the 1802 add-on study enrolled

21　patients who had experienced disease activity while

22　using, and presumably gaining some benefit, from

1    standard therapy.

2             Addition of Tysabri to standard therapy in

3    these patients substantially reduced clinical and

4    MRI disease activity compared with the standard

5    therapy alone.  This indicates that Tysabri

6    provided substantial incremental benefit over

7    standard therapy alone.

8             Third, many patients simply don't perceive

9    benefits from current MS drugs or don't tolerate

10   them and have stopped therapy entirely.  These

11   patients need options that they will accept and

12   that they can tolerate.

13            Now, in this regard, in the Tysabri

14   clinical trials, we observed significant benefits

15   and validated patients self-reported quality of

16   life scales, including our pain and fatigue scales.

17   We have never previously observed such benefits in

18   MS studies in the past, and I found this extremely

19   encouraging.

20            Tysabri really looks like a major

21   therapeutic advance and the question then on

22   everyone's mind is does the benefit and the promise

1    that Tysabri will actually help people justify the

2    risk of PML, which is currently estimated at 1 in

3    1,000.

4         To answer this question, which is not an

5    easy question, I believe it's important to balance

6    benefits with the risk.

7         I estimated crudely the benefit that might

8    result in 1,000 patients treated for two years

9    compared with standard therapy.  Based on the

10   clinical trials, about 400 relapses would be

11   prevented in 1,000 patients if they used Tysabri as

12   opposed to standard therapy.  How many of these

13   patients would remain functional, how many would

14   remain independent, how many would remain employed,

15   and what would the long-term benefit be?

16        These estimates would really be quite

17   speculative, but the gains could very well be

18   substantial, and I believe gains, such as this,

19   have to be factored in to the overall assessment.

20        So, I have mentioned the magnitude of the

21   unmet need and explained why I think that Tysabri

22   is an important new option.  Let me explain what I

1    think about the responsible use of Tysabri.

2            First, I don't believe that Tysabri use

3    should be tied to a requirement that the risk of

4    PML be eliminated. From the data that I have seen,

5    I don't believe this is a realistic requirement,

6    but I do believe Tysabri should be used in

7    appropriate patients who are fully informed and

8    carefully monitored by an accessible neurologist.

9            I have subscribed during my career to a

10   basic tenet of the therapeutic relationship with my

11   patients.  I communicate with them, and we make

12   joint decisions about disease management.  We do

13   that together.

14           So, I asked my patients whether they would

15   want to take a new drug that might be twice as

16   effective as their standard therapy, but carries a

17   risk of 1 in 1,000 of a fatal brain infection.

18           My patients had very little difficulty,

19   surprisingly, answering that question.  They gave

20   prompt and fairly definitive answers.  Some said

21   they would welcome the chance to use a more

22   effective therapy even under those conditions, and

1    others said no, they wouldn't take it.

2            Every patient that I talked with seemed to

3    grasp the situation pretty easily.  They weighed

4    the options and they decided whether the benefit to

5    them was worth the risk to them in the context of

6    their disease state, their personal situation,

7    their value system, their family, and whatever

8    other factors were important to them.

9            I believe the neurologist has to decide

10   whether Tysabri is an appropriate option, but I

11   think the patient needs to be a full participant in

12   deciding in that situation whether to use the drug.

13           Now, if the use of Tysabri is appropriate

14   in a given patient, and the patient understands and

15   accepts the risk, and agrees to monitoring, I

16   believe treatment should proceed.

17           Let me sum up by just saying that Tysabri

18   offers the likelihood of significant benefits

19   because it is a therapeutic advance in a disease

20   with a major unmet need.  I believe it should be

21   available to for responsible use under the

22   conditions I outlined, because MS in many patients

122

1    is not adequately controlled on established

2    therapies.

3            There really is no good evidence-based

4    options for many of these patients, and

5    neurologists can and will, I believe, use Tysabri

6    responsibly.

7            I would just close by urging the panel to

8    recommend the release of Tysabri for clinical use,

9    along with some guidelines to promote its safe use,

10   and I appreciate your listening to my opinion.

11           Thank you.

12           DR. KIEBURTZ:  Thank you, Dr. Rudick.

13           We will now have a question period from

14   the Committee.  Just a couple of things.  We will

15   stop in 15 minutes.  Just to remind members and

16   consultants, I will read a little thing here that

17   this is about a transparent process for information

18   gathering and decision-making, which means outside

19   of the context of the public hearing, we shouldn't

20   speak with one another about our thoughts, or with

21   people outside the committee.

22           The intent of the committee is that those

1  deliberations happen in the public eye.  I mean we

2  can certainly talk with one another, and other

3  friends and colleagues, but the substance of the

4  meeting is to not be conducted outside of the

5  public hearing.

6          So, when we break after the questions,

7  that is the time to stop deliberating, and then

8  pick it up again when we join, and similarly, this

9  evening, right through to the end of the meeting.

10 So, just as a reminder about that.

11          Secondly, do remember that we won't be

12 able to answer everyone's questions in the context

13 of these 15 minutes.  I am sure the sponsor and

14 their representatives and the FDA will be here

15 throughout the day tomorrow.  When we have

16 questions, they will be ready to answer them at

17 that time, so don't think this is our last

18 opportunity to ask questions.

19          Questions from Committee to Sponsor

20          DR. KIEBURTZ:  Dr. Sacco, I cut you off.

21 You had a question when we last opened.

22          DR. SACCO:  I had a question for the

1   safety.  One of the slides, I think it was Slide

2   50, demonstrated a cumulative risk of any

3   infections, and I assume that was like any

4   infection, but no cumulative risk of some composite

5   of serious infections including the opportunistic

6   ones.

7           Do you have any slide, such as that, where

8   you would combine together some of the

9   opportunistic infections including some of the ones

10  you have mentioned on herpes, PML, and others?

11          DR. PANZARA:  Yes, we do.  That would be

12  Slide 14-33, please.

13          [Slide.]

14          This slide is similar to the common

15  infections.  This is all serious infections reported

16  in the placebo-controlled trials of multiple

17  sclerosis.  Again, the Kaplan-Meier curves

18  represent the cumulative probability of a serious

19  infection over the 120-week dosing interval.

20          As one can see, the curves are quite

21  similar, and similar to the common infections, the

22  hazard ratio was approximately 1, indicating an

1    equal risk.

2              DR. KIEBURTZ:  Dr. Hughes.

3              DR. M. HUGHES:  I had a question about the

4    rates of PML and other information that you might

5    have.

6              Obviously, the rate that is being

7    suggested of 1 in 1,000 person years of follow-up

8    is assuming that the risk is independent of the

9    duration of drug exposure, and it is notable that

10   the two events of PML in MS patients occurred two

11   or three years out.

12             So, playing the devil's advocate, the risk

13   could be actually substantially higher than the 1

14   in 1,000 if the risk accumulates over time.  I

15   wondered what information you had about changes in

16   PK or changes in immunologic status out through two

17   or three years.

18             DR. PANZARA:  Well, we calculated the rate

19   in a variety of ways, and we felt that given that

20   one of the cases that developed PML had 8

21   infusions, and the others had 20 to 30, that all

22   should be incorporated, but we also calculated the

1    rate in terms of patients who receive combination,

2    patients who had over two years of exposure.

3            The rate in all patients was about 0.5 per

4    1,000 patient years for PML in the whole

5    population.  It's about 0.6 if you look at the

6    patients who have had over two years, 0.65 to be

7    exact, so we have done that analysis.

8            In terms of immunological changes over two

9    years, we haven't done longer term immunological

10   studies at that time point, but part of what we are

11   planning to do in the post-marketing setting is to

12   do additional immunological testing, as Dr. Bozic

13   indicated.

14           Finally, in terms of the PK, we determined

15   that the concentration of drug in the serum of the

16   patients who developed PML were right at the median

17   for the overall population, so there did not appear

18   to be an increase in drug concentration.

19           DR. M. HUGHES:  Is the median changing

20   over time within the population?

21           DR. PANZARA:  No, the median remains

22   relatively constant throughout.  There is some

1    accumulation, but that levels off at about nine

2    months and remains constant.

3            DR. KIEBURTZ:  Dr. McArthur.

4            DR. McARTHUR:  What would be your

5    recommendations for intravenous methylprednisolone

6    for concurrent use of steroids?

7            DR. SANDROCK:  So, I.V. methylprednisolone

8    at a gram per day for three to five days was

9    allowed in the protocol for the treatment of

10   relapses, and we saw an increase in infections in

11   patients who were on steroids during the time that

12   they were treated, but the increase was similar in

13   both the placebo group and the natalizumab, so we

14   believe that the use of steroids for the treatment

15   of relapses is appropriate, intermittent steroids.

16           DR. McARTHUR:  So, in the risk management

17   plan, will there be any monitoring of the use of

18   steroids, any recommendations for the maximum

19   number of annual courses of steroids?

20           DR. SANDROCK:  Dr. Bozic.

21           DR. BOZIC:  We are warning against the use

22   of Tysabri with concurrent immunosuppressants, and

file:///C|/dummy/0307PERI.TXT

128

1   we would classify chronic oral steroids in that

2   category, so we don't want people to use Tysabri in

3   combination with chronic steroids or monthly pulse

4   steroids.  That would not be allowed.

5          DR. KIEBURTZ:  Just a quick comment to the

6   committee members.  If you want to speak, just put

7   your hand up.  Sohail and I will make eye contact

8   with you, and we have got you on the list, and I

9   will run down the list.

10         So, Dr. Goldstein.

11         DR. GOLDSTEIN:  I probably have 15 or 20

12  minutes worth of questions myself, but obviously, I

13  won't do that.

14         One thing I would like to sort of flesh

15  out a little bit.  We talked a lot about risk and

16  benefit, and it's risk for what and benefit for

17  what is the basic issue.

18         Now, we know that there are other

19  disease-modifying therapies, as Dr. Rudick had

20  carefully pointed out, so if you could translate

21  these data from hazard ratios into numbers needed

22  to treat as best you can, and I realize, you know,

1    again, that there is a big difficulty here.

2           We are taking trials that were done a

3    decade apart in different patient populations and

4    trying to extrapolate this, but how many people

5    would you need to treat to prevent one relapse over

6    two years with this drug as opposed to the

7    available other drugs?

8           How many people would you need to treat

9    over two years to prevent one patient from going on

10   to a clinical relapse?  How many people would you

11   need to treat over two years to prevent one patient

12   from reaching disability, because I think that's

13   the numbers that patients and we need to know as we

14   are trying to balance these risk and benefits?

15          DR. SANDROCK:  If I could show Slide

16   16-65.

17          [Slide.]

18          This kind of gets at what you would like,

19   I think. For every 1,000 patients treated with

20   natalizumab for two years compared to no treatment,

21   we estimate there will be 1,000 fewer relapses, 260

22   more patients remaining free of relapse, 120 more

1    patients remaining free of progression by 1 point

2    on the EDSS scale, 60 fewer hospitalizations due to

3    MS relapse, and 40 fewer patients requiring aids

4    for ambulation.

5         That is compared to a 0.1 percent

6    approximate risk of PML, and a 4 percent risk of

7    hypersensitivity reaction.

8         DR. GOLDSTEIN:  That is sort of getting

9    what I was getting at, but not quite.

10        DR. SANDROCK:  Okay.

11        DR. GOLDSTEIN:  What I want to know is not

12   compared to placebo, because the study,

13   unfortunately, was done compared to placebo, but we

14   are not offering it compared to placebo, we are

15   offering it compared to other established

16   therapies.

17        So, if you redid those numbers again and

18   change it around a little bit, how many people

19   would you need to treat to prevent 1 person from

20   going on to each one of those endpoints.  You may

21   not have the numbers now, but if you could come

22   back with them later, that's fine.

1          DR. SANDROCK:  Actually, I do have a slide
2    with the number in it to treat.
3          Okay.  We will have to get back to you.
4          DR. KIEBURTZ:  Dr. Porter.
5          DR. PORTER:  For Dr. Bozic, a very
6    practical question.  You talked briefly about the
7    patient who comes back to the clinic, who is
8    slightly ill, and then the patient was, in your
9    scenario, kind of assumed to possibly have PML.
10          Now, there is obviously perhaps only a
11    narrow overlap between the signs and symptoms of
12    PML and MS, but let's assume that this patient
13    comes in with an increase in confusion, just to
14    make the issue more difficult.
15          How are you going to instruct your
16    neurologist to deal with this issue when the
17    overlap is difficult between the relapse, which you
18    like to treat, and the PML, which is very unlikely,
19    but you would prefer not to treat with Tysabri?
20          DR. BOZIC:  We will have an extensive
21    continued medical education program directed at
22    physicians, and a core feature of that program will

1   be a PML diagnostic algorithm that will outline the

2   scenarios for the workup of a patient who

3   potentially might have PML.

4           The confirmation of a PML diagnosis must

5   rely on a triad of clinical findings, MRI findings,

6   and then documentation of JC viral DNA in the

7   central nervous system.

8           I think Dr. Panzara can speak a bit more

9   about the diagnostic algorithm.

10          DR. PANZARA:  As Dr. Bozic indicated, I

11  think we learned a great deal about making the

12  diagnosis.  I think what we are trying to do at

13  this stage is to have a sufficiently low threshold,

14  such that we are not trying to have the

15  determination of PML or MS immediately at the time

16  of infusion.  We are trying to find a change that

17  would prompt the workup using the tools to make the

18  diagnosis.

19          So, that has been our approach.  We want

20  to have a sufficiently low threshold to prompt

21  physician assessments and then the additional

22  components of the triad, such as MRI and spinal

133

1   fluid.

2           DR. PORTER:  This means that you might

3   treat a patient who actually has PML, and then make

4   the diagnosis later.

5           DR. PANZARA:  No, actually, we are asking

6   any change at all, not making a determination of

7   whether it's MS or PML, any suspicious change or

8   any change at all, for that matter, that would

9   prompt a physician assessment and an evaluation,

10  and if there is uncertainty about change or if

11  there is a neurological change, a physician should

12  have a very low threshold to do an MRI, and suspend

13  dosing is the first thing that must be done.

14          DR. SANDROCK:  Could I add to that?

15          DR. KIEBURTZ:  Yes.

16          DR. SANDROCK:  Our clinical trial data

17  indicate that the annualized relapse rate on

18  natalizumab treatment is 0.2, which translates to 1

19  relapse every five years.

20          So, it will happen, but as Dr. Panzara and

21  Bozic said, any new change should prompt an

22  evaluation with suspension of dosing.

1          MS. SITCOV:  I have just a two-part

2     question.

3          Is there a recommendation for assuming, if

4     this were approved, for how long someone should be

5     off one of the current MS disease, modifying

6     diseases?  That is number 1.

7          Number 2, of the 7,000 MS patients who

8     took Tysabri, I guess some may have only gotten 1

9     dose, were they given the Tysabri by a neurologist,

10    number 1, and is it possible that of those 7,000,

11    there was another case of PML that was not

12    reported?

13         DR. SANDROCK:  In terms of the washout

14    period from a current therapy to Tysabri, we are

15    suggesting a two-week washout period based on the

16    PK and the pharmacodynamic effects of these drugs,

17    a two-week washout period.

18         I think the second part of your question

19    referred to the 7,000 patients and whether or not

20    there were any cases of PML.

21         MS. SITCOV:  Unreported.

22         DR. SANDROCK:  Unreported.  Any suspicious

135

1    case was brought forward to the IAC, and we

2    evaluated a few post-marketing cases at the IAC

3    level, and they were excluded.

4              MS. SITCOV:  Right, but were those, the

5    7,000 that were prescribed, in all those cases,

6    would they have been prescribed by a neurologist or

7    sometimes by a general practitioner?

8              DR. SANDROCK:  We believe that the vast

9    majority--

10             MS. SITCOV:  Who would not be as familiar.

11             DR. SANDROCK:  The vast majority of

12   patients were prescribed by neurologists.

13             DR. PANZARA:  I would just like to add to

14   that, if I could, that upon the dose suspension,

15   anyone who prescribed natalizumab was sent a

16   Healthcare Provider letter immediately, outlining

17   the steps to be taken should they be suspicious for

18   PML, and that includes referral to the IAC, as well

19   as the clinical MRI, spinal fluid steps to be

20   taken, so we are quite confident that if there are

21   other cases out there, they would have been

22   referred.

1          MS. SITCOV:  So, that was all voluntary.

2          DR. PANZARA:  It was a voluntary request,

3     yes.

4          DR. KOSKI:  I would like to actually

5     expand on the question that was just asked.  In

6     terms of the prior therapy and selection of the

7     patients to go on Tysabri, obviously, I think you

8     are talking about one of the ABC drugs, but I would

9     like to also address the issue about other

10    cytotoxic drugs.

11          Obviously, the patient with Crohn's

12    disease had been off those drugs for eight months

13    before, and actually, although it was said that the

14    patient had lymphopenia at the time that the

15    patient came in with JC virus manifestations and

16    PML, did not have lymphocytopenia, so would you

17    handle patients on those two different types of

18    drugs differently?

19          DR. SANDROCK:  Yes, if a patient had been

20    on the cytotoxic drugs, such as cyclophosphamide,

21    the washout period would need to be longer, at

22    least a month, and we would also recommend taking a

1    white count prior to starting Tysabri.

2         So, I think the washout period is going to

3    depend a lot on the drug that they are washing out

4    from.

5         DR. KOSKI:  But I would say that in that

6    particular patient, neither of those measures would

7    have been adequate.

8         DR. SANDROCK:  Well, actually, a white

9    count and looking at the lymphocyte fraction,

10   probably would have excluded that patient.

11        DR. KIEBURTZ:  Dr. Couch.

12        DR. COUCH:  MS is a long-term disease with

13   significant survival rate over 20 and even 30

14   years.  Do you feel that you have a decent handle

15   on the possible genesis of malignancy by Tysabri

16   therapy, or can you give us any additional insight

17   on the potential for creating malignancy that is

18   inherent in this entire group of anti-immune drugs?

19   Can you give us any other insight about this?

20        DR. SANDROCK:  Well, the only data we have

21   are from our clinical trials right now, and we see

22   a balanced incidence of the malignancy.  It's a

1    drug that affects the immune system, cell-mediated

2    immunity.  It's possible that in the future, we

3    will see something, but so far we have not seen a

4    signal in terms of malignancy.

5              DR. KIEBURTZ:  Last question is Dr.

6    McArthur.

7              DR. SANDROCK:  By the way, I would like to

8    add that the observational cohort study will

9    provide a lot more information on rare events like

10   this over the long term.

11             DR. McARTHUR:  This is a question for Dr.

12   Bozic about the risk management plan, and apart

13   from optic neuritis, I can't think of any symptom

14   that would distinguish PML from multiple sclerosis.

15             So, one of my questions relates to the

16   emphasis on the vigilance and the administration of

17   the questionnaire prior to Tysabri, and for

18   patients who have emotionally, psychologically

19   bought into Tysabri, there is a strong emphasis on

20   not reporting symptoms, because patients will know

21   that if they report them, it might trigger

22   discontinuation of Tysabri.

1            So, in your focus groups and your

2    consideration, how have you incorporated that into

3    your plan?

4            DR. BOZIC:  In talking to many patients,

5    it is very clear that they are very concerned about

6    the risk of PML, and a primary goal of our risk

7    management efforts is to fully inform patients

8    about the risk of PML, not only prior to the start

9    of therapy, but to reinforce that information at

10   every dose.

11           So, the infusion centers must send out a

12   Medication Guide that describes the risk of PML at

13   every dose, and the patient checklist also

14   documents that the patient has read that Medication

15   Guide before every dose, so we are continuously

16   reinforcing the PML risk.

17           So, we think it's unlikely that a patient

18   will answer, you know, try and game the checklist,

19   if you will.

20           DR. KIEBURTZ:  I want to thank the sponsor

21   for their timely and lucid presentations and

22   answering our questions.  We are going to stop

1    questions for now.  I presume you will be available

2    as we deliberate tomorrow to answer further

3    questions as they arise.

4          We will break for 15 minutes and we will

5    start promptly in 15 minutes from right now.

6          [Break.]

7          DR. KIEBURTZ:  Our first speaker from the

8    FDA will be Dr. Susan McDermott giving the

9    background as a clinical reviewer.

10                   FDA Presentation

11               Background, Efficacy, and PML

12         DR. McDERMOTT:  Good morning.  Welcome to

13    Maryland.  My name is Susan McDermott.  I am a

14    neurologist and a clinical reviewer in the Division

15    of Neurology Products.

16         [Slide.]

17         Today, I am going to talk to you about

18    efficacy and PML that is associated with

19    natalizumab.

20         [Slide.]

21         This is an outline of my talk, and the

22    sponsor has provided much of the background

file:///C|/dummy/0307PERI.TXT

141

1   information regarding efficacy and safety, so we

2   thought it would be most helpful to the committee

3   if we just gave you our view of the data and filled

4   in some information where appropriate.

5           So, first, I am going to just speak

6   briefly about the regulatory background and then I

7   am going to touch on the pivotal trials, the

8   efficacy results, and then mention a word or two

9   about the antibodies.

10          Then, we will discuss the PML cases, and

11  we will also talk about the safety evaluations that

12  the sponsor has performed.

13          [Slide.]

14          So, first, the regulatory background.  The

15  first question we are asking the committee is:  Has

16  the company fulfilled their commitment to show a

17  sustained clinical benefit for two years, or at two

18  years?

19          So, I thought that it may be helpful to

20  you to talk just a little bit about the accelerated

21  approval and what that commitment was.

22          As you know, accelerated approval is

file:///C|/dummy/0307PERI.TXT

1    allowed under the FDA regulations, and there were

2    many factors that went into the approval, the main

3    one being that natalizumab effect at one year was

4    reasonably likely to predict the effect at two

5    years.

6           I also wanted to just point out that the

7    primary endpoints for MS therapy trials, what we

8    consider at the FDA what is appropriate from a

9    regulatory standpoint has to do with relapse rate

10   and disability accumulation.  Essentially, we

11   require sponsors to show an effect on relapse rate

12   or disability accumulation.

13          [Slide.]

14          So, we will move now to the efficacy.  As

15   you know, you have heard this presentation before,

16   so I am just going to go through this quickly.

17          Study 1801 was one of the big pivotal

18   trials. That was a monotherapy trial of natalizumab

19   versus placebo, and as you can see, the patients

20   were randomized in a 2:1 fashion, natalizumab to

21   placebo.

22          What I have on this slide is the sustained

1   disability progression, which was the primary

2   outcome at two years, and I also have the primary

3   outcome for the first year analysis.  That was the

4   annualized relapse rate.

5           What I should tell you upfront is that our

6   statistician, Dr. Sharon Yan, in particular, has

7   taken the raw data from the sponsor and has

8   analyzed, on her own, according to the protocol, to

9   look at the primary outcome and the top ranked

10  secondary outcome, annualized relapse rate, and her

11  analysis is consistent with the sponsor's analysis.

12          So, after they have given that exhaustive

13  detailed presentation, I can easily now say we

14  generally agree, so it makes my presentation much

15  easier.

16          So, what I have on this slide is the

17  absolute difference in sustained disability

18  progression, and you will recall on their slide,

19  they presented Kaplan-Meier curves showing a 42

20  percent reduction in risk of reaching sustained

21  disability at two years, and our analysis agrees

22  with that.

1           Also, annualized relapse rate, which was

2      the primary outcome at one year, and the top ranked

3      secondary outcome at two years, they found a

4      relative 68 percent reduction in relapse rate.  We

5      also found the same reduction.

6           [Slide.]

7           So, likewise, 1802, that's the combination

8      trial. You will remember all patients in this study

9      were on Avonex and had been on Avonex for at least

10     a year, however, they were continuing to have

11     breakthrough relapses on Avonex, and so these

12     patients were randomized 1:1 to receive natalizumab

13     plus Avonex, or placebo plus Avonex.

14          So, again, I have the primary outcome at

15     two years, as well as the primary outcome at one

16     year, which is also the top ranked secondary

17     outcome at two years, the annualized relapse rate.

18          Again, our analysis agrees with the

19     sponsor's analysis.  You may recall what they

20     found, in Study 1802, is a 24 percent reduction in

21     the risk of disability progression at the end of

22     two years, and in the relapse rate, they also found

145

1    a 55 percent relative reduction in relapse rate,

2    and our analysis agrees with that.  So, that was

3    relatively easy.

4           [Slide.]

5           Now, I am going to switch and just mention

6    a word about anti-natalizumab antibodies, and the

7    speaker to follow, Dr. Hughes, is going to speak

8    more about the antibodies.

9           But I wanted to say that in the pivotal

10   trials, the sponsor looked for evidence of

11   anti-natalizumab antibodies, and they found that 6

12   percent of patients developed persistent

13   antibodies, and what I mean by that, "persistently

14   positive antibodies," is that they tested positive

15   on at least two occasions.

16          So, an interesting finding, when they did

17   a subgroup analysis, is that patients who tested

18   persistently positive for these antibodies, there

19   was an association with less efficacy compared to

20   antibody-negative subjects.

21          [Slide.]

22          I am going to try to summarize now

1    efficacy, and I will start with relapse rate.  That

2    was the primary outcome at one year, and it was the

3    top ranked secondary outcome at two years, and you

4    will recall in Study 1801, that's the big

5    monotherapy study of natalizumab versus placebo,

6    there was a 68 percent relative decrease in

7    annualized relapse rate at two years.

8         In Study 1802, there was a 55 percent

9    relative decrease in annualized relapse rate at two

10   years.  The relapse rate also slightly decreased

11   during the second year.

12        One thing that our statisticians have done

13   is we looked at the relapse rate during the first

14   year, and compared it to the relapse rate during

15   the second year, meaning from day zero to the end

16   of Year 1 compared to the beginning of Year 2 to

17   the end of Year 2.

18        What we found is that the relapse rate

19   during the second year actually goes down a little

20   bit, but just by a few percentage points, but it

21   remains statistically compelling.

22        Also, I would say that the relapse rates

1    that you have heard, these relative decreases, 68

2    percent and 55 percent, have been estimated

3    approximately twice the treatment effect of other

4    approved therapies that are available now.

5    However, there are no head-to-head trials of

6    natalizumab versus those approved therapies.

7            So, the next, my disability progression, I

8    would like to have you recall that in Study 1801,

9    there was a 42 percent reduction in the risk of

10   sustained disability over two years, and in 1802,

11   the combination trial, we found a 24 percent

12   reduction in sustained disability progression over

13   two years.

14           The treatment effect in 1801 was larger,

15   but again, if you will recall, the populations were

16   slightly different.  The patients in 1802 had been

17   on Avonex for at least a year and had continued to

18   have breakthrough disease.

19           Now, add-on therapy.  One of the most

20   exciting potentials for natalizumab was the idea

21   that it could fulfill an unmet need for combination

22   therapy.  As you know, I think most of the

1    committee members know that the currently approved
2    MS drugs have not been shown to be effective using
3    combination.
4            So, we were initially excited to think
5    that natalizumab may show a benefit as a
6    combination drug. So, when you look at 1802, it
7    does win on the primary outcome, however, in one
8    sense, we have limited data, so if you will
9    remember the design of the study, all the patients
10   were on Avonex, and then they were randomized to
11   receive either natalizumab or placebo.
12           So, what we can say from that is we think
13   we know a little bit about what happens when you
14   add natalizumab to a patient who is on Avonex, but
15   we don't know the opposite of what happens to
16   patients who are on natalizumab and you add other
17   therapies.
18           Also, if you will recall, the study was
19   not really a factorial design. There was no
20   natalizumab-only arm, there was no placebo arm, so
21   it's difficult to draw a lot of conclusions about
22   add-on therapy. One thing we can say is that we

1    are not really certain that the benefit of

2    combination therapy is greater than the benefit

3    that you gain from monotherapy.

4    Finally, with immunogenicity, what I would

5    like to say is that there have been a small number

6    of patients in the pivotal trial, 6 percent, who

7    tested positive for anti-natalizumab antibodies,

8    and a subgroup analysis showed a lower efficacy in

9    these patients compared to those on placebo.

10    [Slide.]

11    So, now we are going to move on to PML.

12    In addition to the committee members, I know there

13    are a lot of people in the audience today, patients

14    with MS, some of whom have been on natalizumab, and

15    perhaps family members and friends of the three

16    patients that I am going to discuss.

17    I understand that this can be a very

18    difficult two days for you, particularly the

19    discussion of PML, and in medicine, when we

20    describe such tragedies, it can often appear very

21    cold and clinical, so I certainly don't intend it

22    to appear this way, and I apologize in advance

 1    about the sterile nature of my presentation, but

 2    let's begin.

 3            All committee members have received copies

 4    of the case reports, so I am just going to

 5    summarize these briefly and point out some of our

 6    thinking on these cases.

 7            The first case was a 46-year-old lady with

 8    relapsing-remitting MS who was in Study 1802, and

 9    as you will recall, 1802 is the combination therapy

10    trial.  So, she was on Avonex, and she also

11    received natalizumab.

12            She received a total of 37 infusions from

13    April 2002 through January 2005.

14            In November of 2004, her PML symptoms

15    began, and initially, they were thought to be

16    worsening MS.  This is one thing that I would like

17    to point out to you that caught our eye initially

18    as we began to go through the cases, keep in the

19    back of your mind, is how are neurologists, how are

20    physicians going to be able to discriminate MS

21    versus early PML.

22            So, I will move on.  The patient continued

1    to worsen.  In December 2004, she had MRI changes

2    that were atypical for MS.  She received two short

3    courses of steroids in December and January, and

4    then in February, the patient passed away.

5              She did have positive JC virus in her CSF,

6    and as you will recall from the sponsor's

7    presentation, when the retrospective analysis was

8    done on her blood, the serum was not positive for

9    JC virus prior to diagnosis.

10             [Slide.]

11             The second case is a 46-year-old gentleman

12   with relapsing-remitting MS, who was also in Study

13   1802, and he received a total of 28 doses of

14   natalizumab from October 2002 to December 2004.

15             In October 2004, he was found to have an

16   atypical frontal lesion on routine MRI.  This is

17   another thing I would like for you to keep in the

18   back of your mind that caught our eye as we were

19   going through these cases.

20             This is a patient who was asymptomatic and

21   had a funny lesion on his--or I should say an

22   atypical lesion on his routine MRI scan.  At that

1    time, PML was not thought of as a possibility.

2           Then, in November of 2004, subtle

3    behavioral changes were seen.  The patient

4    continued to worsen in December, and new MRI

5    lesions were seen consistent with PML. The

6    natalizumab was stopped in mid-December, and in

7    February of the next year, 2005, JC virus was found

8    in his serum, in his spinal fluid, and also in

9    brain tissue.  Avonex was stopped.

10          It is our understanding that the patient

11   continued to decline.  He was treated with

12   Cytarabene, and he survived, but he is now

13   disabled.

14          [Slide.]

15          The third case is probably the most

16   complicated case to think about.  This is a case of

17   a 60-year-old gentleman with Crohn's disease, and

18   he also passed away after taking a total of 8

19   natalizumab doses.

20          The subject was on natalizumab monotherapy

21   when his initial PML symptoms developed, and he had

22   a complicated history of intermittent concomitant

1    immunosuppressant use.

2            I will try to describe this to you

3    briefly.  You have the article in front of you, and

4    you may read through it tonight.  It's a little

5    confusing to follow the time course.

6            He started azathioprine in 1998.  You will

7    remember he had Crohn's disease.  He continued

8    azathioprine until late 2002.  This was eventually

9    stopped because of immunosuppression.  He had

10   refractory anemia, low platelets.

11           He started natalizumab in March of 2002,

12   and he received three doses at that time.  Those

13   three doses were given concomitantly with

14   azathioprine.  Then, the patient was randomized to

15   receive placebo, so for some time he received

16   placebo along with azathioprine.

17           He received placebo for approximately nine

18   months and then the azathioprine was stopped late

19   in the year of 2002, but he was still on placebo.

20   Then, natalizumab was restarted in February of

21   2003, and he received five doses from approximately

22   February to June of 2003.

1         He was admitted with symptoms in July, and

2    he declined physically, and eventually, he had a

3    brain biopsy that was diagnosed as astrocytoma.  As

4    you know, this patient was eventually found on

5    retrospective analysis to have PML.

6         When the company went back and examined

7    the pathology in the brain, they did find positive

8    JC virus in the brain pathology.  This patient is

9    also an interesting case study because he is the

10   only patient out of the three who, when they looked

11   back in time, at banked serum samples, they found

12   that his JC virus in his blood was positive in May

13   of 2003.  That is two months before he became

14   symptomatic, a low number of copies, but the number

15   increased in July.

16        [Slide.]

17        So, I am going to stop there with the

18   cases and I am going to talk about the safety

19   analysis that was done. The company has given you a

20   detailed description of the safety analysis that

21   was performed, and I should say, as a division, we

22   reviewed their analysis and we reviewed the results

1    under the IND, and were satisfied that they had

2    conducted an adequate review, and do not feel that

3    there are any lurking cases of PML that we have

4    missed.

5            One piece of information that we requested

6    that I thought I would share with you, this came in

7    under the IND. We asked them, of the patients, when

8    you went back, of all the folks who had received

9    natalizumab, that you went back and tested looking

10   for more cases, we wondered how many doses had

11   those people received.

12           So, this is just a breakdown, this chart,

13   and as you can tell, I have split it into the MS

14   safety trial and then Crohn's disease and

15   rheumatoid arthritis safety trial.

16           In the MS safety trial, you can see quite

17   a few of the patients had received, there were a

18   total of 1,869, and over half had received 24 or

19   more doses.

20           In the Crohn's disease and rheumatoid

21   arthritis trial, more patients had received less

22   than 12. The greatest percentage was less than 12

1    doses.

2            [Slide.]

3            I will summarize PML. As you know, there

4    are only three cases identified. Again, we find

5    that after review of their study, we think that

6    their analysis that was done was adequate, and we

7    don't think there are any other cases that we have

8    missed. We have not been able to identify

9    additional risk factors.

10           Most importantly, the relationship between

11   concomitant immunosuppression and PML is unclear.

12   I know that there has been a lot of talk in the

13   neurology community about decreasing the risk of

14   PML with monotherapy use, and as an agency, we do

15   not feel comfortable in saying that you are

16   decreasing your use with monotherapy, because we

17   feel as though we don't have enough information to

18   really tell patients that and give them that

19   confidence.

20           So, we are in quite a conundrum and we are

21   hoping that the committee will be able to help us.

22   As you delve into this, you realize that there are

157

1   only three cases, and it is hard to draw a lot of

2   conclusions when you only have three cases.

3           However, to get more data, you essentially

4   have to expose more patients to natalizumab, and so

5   how to do that, if we should do that and how we

6   should do that, that is really where we are seeking

7   your guidance.

8           I am going to stop here and I guess I will

9   take clarification questions and then Dr. Hughes

10  will come up to the microphone.

11          DR. KIEBURTZ:  Dr. McArthur.

12          DR. McARTHUR:  Dr. McDermott, in the first

13  case, the woman, the 46-year-old woman with

14  multiple sclerosis, the autopsy findings were

15  overwhelmingly consistent with PML, but were there

16  any autopsy findings of multiple sclerosis?

17          DR. McDERMOTT:  I have not seen the

18  autopsy report.  You may be alluding to an article

19  that was recently published that suggested that the

20  patient did not have MS, and I don't think that I

21  can comment on that.  I haven't seen the autopsy

22  report.  I don't have any basis to tell you one way

```
1    or another.

2           Let me go back.  I missed the most

3    important slide, my acknowledgment slide.  I

4    apologize to my colleagues.  The review team is a

5    very large team, and if I listed every person on

6    the review team, I would have to pass out

7    binoculars to the committee.

8           Our next speaker is Dr. Hughes, and she is

9    going to talk to you about safety.

10                        Safety

11          DR. A. HUGHES:  Hi.  Thank you very much.

12          [Slide.]

13          In this talk, I am going to discuss our

14   view of the major safety concerns associated with

15   natalizumab outside of PML.  My goal is to allow

16   you to consider natalizumab's risk-benefit profile

17   more fully as you consider the questions that we

18   have posed to you.

19          [Slide.]

20          I will focus here on just three major

21   safety issues.  First, infections, again, my

22   discussion is limited entirely to infections other
```

1    than PML.  Second, immunogenicity and

2    hypersensitivity reactions, which Dr. McDermott has

3    talked a little bit about in her presentation.

4    Third, carcinogenicity.

5            My focus on these three concerns is driven

6    both by the serious adverse events that were

7    observed in the clinical trial development program,

8    as well as by theoretical concerns based on

9    natalizumab's mechanism of action.  There is, of

10   course, an overlap between these two things, but

11   not a complete overlap.

12           In addition to discussing these three

13   major safety issues in the context of the

14   natalizumab clinical trial program, I will, if time

15   allows, briefly review serious adverse events that

16   were reported in the brief post-marketing interval.

17           [Slide.]

18           So, the first issue that I am going to

19   talk about is infections, and just as natalizumab

20   blocks the migration of leukocytes to sites of

21   inflammation in the central nervous system, it may

22   also impair the recruitment of lymphocytes and

1    monocytes to sites of infection.

2         You have heard a lot already about

3    natalizumab and infections from the sponsor.  I

4    will present data regarding infections in a

5    slightly different way than you saw it presented in

6    Dr. Panzara's presentation, that I think is also

7    useful to consider.

8         In clinical trial, cases that appear to

9    represent the same type of infection were often

10   categorized under numerous umbrella terms, and

11   these distinctions were often helpful, but

12   sometimes probably not clinically meaningful.

13        For example, an upper respiratory tract

14   infection might be classified as upper respiratory

15   tract infection not otherwise specified,

16   nasopharyngitis, or pharyngitis viral not otherwise

17   specified, to name just a few of the many terms

18   denoting upper respiratory tract infections.

19        So, I will consider cases of upper

20   respiratory tract infections together, as well as

21   cases of all lower respiratory tract infections

22   together, as well as all cases of gastroenteritis

1   and vaginal infections to give you a better

2   understanding, I hope, of the incidences of these

3   infections.

4           So, after this long preamble, in

5   placebo-controlled multiple sclerosis studies,

6   natalizumab and placebo-treated patients had

7   similar incidences of infections overall and

8   serious infections.

9           Incidences of upper respiratory tract

10  infections, which I just talked a lot about, were

11  similar, as you can see.  Incidences of urinary

12  tract infections, both overall and serious, were

13  similar in natalizumab and placebo-treated

14  patients, and this is a safety concern with data

15  through one year, but it wasn't borne out with the

16  two-year data.

17          Incidences of gastroenteritis were

18  similar.  That was another concern based on data

19  just through one year.

20          [Slide.]

21          Infections in which there was a slightly

22  greater degree of difference between natalizumab

1    and placebo-treated patients in incidence, as you

2    can see on this slide, were all lower respiratory

3    tract infections, 13.3 percent of

4    natalizumab-treated patients had infections

5    categorized as any type of lower respiratory tract

6    infections, compared to 12.2 percent of

7    placebo-treated patients.

8         0.4 percent of patients treated with

9    natalizumab had serious pneumonias, and this is

10   compared to 0.2 percent of placebo-treated

11   patients.

12        I would like to point out again that

13   natalizumab-treated patients had a slightly higher

14   incidence of herpes infections compared to

15   placebo-treated patients, 7 percent compared to

16   about 6 percent.

17        In terms of atypical infections--and I use

18   this term on purpose rather than opportunistic

19   infections--there was one case of cryptosporidial

20   gastroenteritis in the monotherapy Study 1801.

21        This case is interesting in that

22   cryptosporidial gastroenteritis can occur in

1   immunocompetent patients, but usually resolved in a

2   couple of weeks without treatment. This patient,

3   who was otherwise healthy, 31 years old, again not

4   on concomitant Avonex, developed diarrhea after the

5   17th natalizumab infusion, and it didn't resolve

6   for about 70 days.

7           There was also an acute CMV infection with

8   transaminitis in the open-label Study 1808. This,

9   though, is a typical presentation of an acute CMV

10  infection in an immunocompetent patient.

11          [Slide.]

12          Turning to Crohn's disease studies, there

13  was a similar incidence of serious infections in

14  placebo-controlled Crohn's disease studies, 2.5

15  percent versus 2.6 percent, but there was a

16  slightly increased incidence of infections overall

17  in the natalizumab-treated patients compared to the

18  placebo-treated patients, as you can see, 40

19  percent versus 36 percent.

20          As listed, the incidences of selected

21  infections on this slide, you can see that in the

22  Crohn's disease studies, there was an increased

1    incidence of upper respiratory tract infections,

2    but not lower respiratory tract infections in

3    natalizumab-treated patients.

4         On this slide, I would like to note that

5    herpes infections occurred in 1.6 percent of

6    natalizumab-treated patients compared to 1 percent

7    of placebo-treated patients.

8         I should point out here that the

9    placebo-controlled Crohn's disease studies were

10   much shorter. Patients received from just 1 to 3

11   natalizumab infusions.

12        There were two cases of serious viral

13   meningitis in natalizumab-treated patients in these

14   short-term, acute treatment, placebo-controlled

15   Crohn's disease trials, no cases in the

16   placebo-treated group.

17        These cases were fairly typical for viral

18   meningitis although they were serious adverse

19   events and the patients were hospitalized.

20        There were two serious UTIs in

21   natalizumab-treated patients, none in

22   placebo-treated patients in the placebo-controlled

1    Crohn's disease studies.  Again, this is

2    considering all UTIs together.

3             In the short-term, placebo-controlled

4    Crohn's disease studies, there was one serious CMV

5    infection, a case of CMV colitis.  The patient was

6    also receiving azathioprine.

7             [Slide.]

8             In long-term Crohn's disease studies, that

9    is where we saw the atypical infections, as the

10   sponsor noted. There were six serious atypical

11   lower respiratory tract infections, and I call

12   these infections atypical either because of the

13   passage it involved or because of the features of

14   the case, such as the pneumonia with lung abscess,

15   a pathogen was never identified in that case.

16            There was a case of pulmonary

17   aspergillosis, a case of pneumocystis pneumonia, a

18   case of varicella pneumonia, a case of

19   mycobacterium avium intracellulare complex

20   pneumonia, and a case of Burkholderia cepacia

21   infection, which is a concern in cystic fibrosis

22   patients, generally not seen or very, very rarely

1    seen in immunocompetent patients.

2            I should mention that of these six cases,

3    two of the patients were not on any

4    immunosuppressive medications or any other

5    immunomodulatory medications.  The rest of the

6    patients, though, were on corticosteroids or

7    azathioprine, or a combination of those two.

8            I would also like to note that these

9    infections occurred after varying numbers of

10   natalizumab infusions, ranging from 3 to 34, and

11   there was not a clear relationship between the

12   number of natalizumab infusions and the risk for

13   atypical infections although that is certainly

14   based on a very small number of cases or infections

15   overall, as the sponsor pointed out.

16           There was a case of possible tuberculosis

17   infection, which you heard about.  This is an

18   interesting case, and based on the information that

19   we have, I don't think is terribly compelling for

20   being a TB infection, although it is certainly

21   concerning with a product like natalizumab.

22           It was a patient who after receiving 22

1  infusions, two and a half months later--and I

2  should note he had a history of multiple prednisone

3  courses, and was also taking azathioprine and had

4  been on that drug for a year and a half--about two

5  and a half months after 22 natalizumab infusions,

6  he had surgery for Crohn's disease flare.

7         A couple of months later, he had an

8  ileostomy takedown, and at that time it was noted

9  that his peritoneum was studded with granulomas,

10  and the pathology revealed granulomatous

11  inflammation with confluent caseous necrosis, and,

12  of course, Crohn's disease is associated with

13  non-caseating granulomas, so it was thought to be

14  representative of a tuberculosis infection, but AFB

15  staining and PCR testing for mycobacterial DNA were

16  negative.

17         [Slide.]

18         In terms of immunogenicity, which is the

19  second major safety concern that I am going to turn

20  to, treatment with therapeutic proteins can lead to

21  the formation of antibodies against the product,

22  and that is why we considered this as a major

1    safety concern, and why the sponsor monitored

2    anti-natalizumab antibody formation every 12 weeks

3    in the Phase III multiple sclerosis studies and in

4    selected Crohn's disease studies, as well.

5            Ten percent of patients had a positive

6    antibody titer at least once.  I should mention

7    that anti-natalizumab antibody formation is of

8    great interest because it is associated with

9    potentially hypersensitivity reactions, decreased

10   efficacy, and potentially other adverse events.

11           So, getting back to the incidence

12   formation, 10 percent of patients has a positive

13   antibody titer at least once.  As Dr. McDermott

14   mentioned, 6 percent of those patients were

15   persistently positive, so they had at least two

16   positive antibody titers.

17           Four percent of patients were transiently

18   positive meaning they were positive once, or they

19   were positive on their last assessment.

20           The incidence of anti-natalizumab antibody

21   formation was higher in Study 1802.  It was 12

22   percent compared to Study 1801, and it was 9

1    percent.  Actually, I take back what I just said.

2    The patients who were positive on their last

3    assessment and weren't followed up again, I believe

4    those patients were characterized as being

5    persistently positive.

6            Now, there is a concern, a historical

7    concern with therapeutic proteins that

8    intermittent, irregular infusions may lead to a

9    higher incidence of antibody formation against the

10   product.  We don't have enough information from the

11   natalizumab trials about whether intermittent,

12   irregular infusions, so not monthly, could lead to

13   a higher incidence of antibody formation than was

14   seen generally, about 10 percent.

15           These was a study, Study 251, a Crohn's

16   disease study, in which patients were dosed when

17   they had flares, and that study has the potential

18   to give us some information about this issue, but

19   the numbers are really too small to draw any

20   conclusions about them.

21           [Slide.]

22           Anti-natalizumab antibody formation was

1    strongly associated with infusion reactions and

2    hypersensitivity reactions.

3            Infusion reactions occurred in 77 percent

4    of persistently antibody-positive patients.  Again,

5    infusion reactions were defined as adverse events

6    that occurred within two hours of the start of the

7    natalizumab infusion.

8            So, they occurred in 77 percent of

9    persistently positive antibody-positive patients

10   compared to 20 percent of antibody-negative

11   patients and 29 percent of transiently

12   antibody-positive patients.

13           So, the profile of the transiently

14   positive patients was actually very close to the

15   profile of the antibody-negative patients.  It was

16   really the persistently antibody-positive patients

17   that stood out in terms of the infusion reactions

18   and the increased multiple sclerosis relapses,

19   which I will talk about in the next slide.

20           Anaphylactic reactions very notably

21   occurred in 5.3 percent of antibody-positive

22   patients in the Studies 1801 and 1802, in which

file:///C|/dummy/0307PERI.TXT

1  anti-natalizumab antibody formation was assessed,

2  and it occurred in no patients who were

3  antibody-negative throughout these studies.

4        In the Crohn's disease studies, which

5  again were much shorter, anaphylactic reactions

6  occurred in 1.3 percent of antibody-positive

7  patients, and again in no antibody-negative

8  patients.

9        [Slide.]

10       Multiple sclerosis relapses and also

11 Crohn's disease exacerbations were reported more

12 frequently as adverse events in antibody-positive

13 patients compared both to transiently positive

14 patients and antibody-negative patients.

15       Again, this is just adverse events that

16 were reported, not relapse defined by any

17 meaningful criteria. Fifty-seven percent of

18 antibody-positive patients had adverse events of

19 multiple sclerosis relapse compared to 35 percent

20 of antibody-negative patients.

21       The incidence of infections,

22 interestingly, was lower in persistently

1    antibody-positive patients compared to

2    antibody-negative patients.

3            Overall, infections were reported in 69

4    percent of persistently antibody-positive patients

5    compared to 82 percent of antibody-negative

6    patients.  This pattern was seen for many of the

7    individual infections, as well.

8            Just to select herpes infections, which

9    are of concern to us, they were observed--and this

10   is simplex and zoster, all herpes infections--they

11   were observed in 2.7 percent of persistently

12   antibody-positive patients compared to 8.4 percent

13   of antibody-negative patients, and this is in the

14   two pivotal studies, 1801 and 1802.

15           [Slide.]

16           Just briefly to talk about the overall

17   population of patients, again not getting away from

18   antibody-positive versus antibody-negative

19   patients, anaphylactic reactions were observed in

20   multiple sclerosis placebo-controlled studies in

21   0.4 percent of patients treated with natalizumab

22   compared to 0.2 percent of patients treated with

1    placebo.

2            In the shorter Crohn's disease

3    placebo-controlled studies, there was one

4    anaphylactic reaction in a placebo-controlled

5    study.  In long-term studies, there was one

6    additional case of anaphylaxis.

7            This case is interesting.  The patient had

8    received four infusions in a prior study, had an

9    interval of 300 days before receiving his first

10   infusion in Crohn's Disease Study 251, and had an

11   anaphylactic reaction.  This is interesting to us

12   because of the theoretical possibility that the

13   antibody formation might be higher in patients who

14   are not dosed regularly.

15           I have talked a lot about or some about

16   anaphylactic reactions.  I should mention that skin

17   and subcutaneous tissue disorder reactions were

18   actually the most common hypersensitivity infusion

19   reactions in the multiple sclerosis studies.

20           They occurred in 4.6 percent of the

21   natalizumab-treated patients compared to 2.2

22   percent of the placebo-treated patients.  Of the

 1    reactions categorized under the broad umbrella of

 2    the skin and subcutaneous tissue disorder infusion

 3    reactions, urticaria was the most common, 1.6

 4    percent of patients in the MS studies who were

 5    treated with natalizumab had urticaria compared to

 6    0.3 percent of patients treated with placebo.

 7           Per protocol, those patients had to

 8    discontinue from the trial.

 9           There were a few delayed hypersensitivity

10    events. Events reported as serum sickness in

11    multiple sclerosis studies were actually balanced

12    in the natalizumab and placebo treated groups.

13    There was also, in the Crohn's disease studies, a

14    case reported as a Type 4 hypersensitivity

15    reaction, and there was one case of leukocytic

16    classic vasculitis.

17           Most hypersensitivity events occurred

18    during or immediately after the second infusion,

19    but some occurred later.  One case of anaphylaxis

20    occurred in association with the 13th infusion.

21           I should mention now, this wasn't observed

22    in the clinical trial setting, but in case I don't

1    have time to talk about it when I talk about

2    post-marketing events, there were some events

3    reported in the serious hypersensitivity events

4    reported in the post-marketing setting in

5    association with the first natalizumab infusion.

6    That was not observed in the clinical trial

7    setting.

8            [Slide.]

9            The third and final major safety issue I

10   am going to discuss today is carcinogenicity, and

11   that is a concern, more a theoretical concern at

12   this point.  Tumor immunosurveillance is mediated

13   by T-lymphocytes because natalizumab interferes

14   with their trafficking.  We are concerned that it

15   has the potential to increase the risk of cancer.

16           In the multiple sclerosis

17   placebo-controlled studies, malignancies were

18   balanced in natalizumab and placebo-treated

19   patients.  I have listed on this slide the types of

20   malignancies that were observed just in

21   natalizumab-treated patients.

22           You can see there were no cases of

1    leukemia or lymphoma, no particularly unusual types

2    or patterns of malignancies.  In Crohn's disease

3    studies, malignancies were more frequently reported

4    in the natalizumab group compared to the placebo

5    group, 0.6 percent versus 0.2 percent, but as you

6    will remember, the number of infusions the patients

7    received was small.  Biological plausibility I

8    think is quite low.

9             [Slide.]

10            I have listed again the types of neoplasms

11   observed in natalizumab-treated patients.  In the

12   Crohn's disease studies, I listed all neoplasms on

13   this slide rather than just malignancies.

14            I thought it was of note that a meningioma

15   and a craniopharyngioma were picked up during the

16   dose suspension safety evaluation study when all

17   patients were assessed to see if there were any

18   additional cases of PML.

19            Now, I have saved the most concerning case

20   potentially, I have listed it last.  There was one

21   case of a lymphoma, and this is the only case of a

22   leukemia or lymphoma that has been observed in all

1    the clinical trials, and basically, in all patients

2    treated with natalizumab, there were no leukemias

3    or lymphomas observed in the post-marketing

4    setting, the brief post-marketing setting.

5              [Slide.]

6              Just a little bit about this case.  It was

7    a 49-year-old man who had received six infusions of

8    natalizumab in the course of two Crohn's disease

9    studies, from September 2004 to February 2005.

10             On his screening examination in September

11   of 2004, it was noted that he had submandibular

12   lymphadenopathy. Subsequent examinations, though,

13   this lymphadenopathy wasn't noted.

14             He had a history of infliximab therapy.

15   He had received eight doses, and he was taking

16   6-mercaptopurine at the time that he was taking

17   natalizumab.

18             In August of 2005, he presented with

19   enlarging lymph nodes that were painful, and he was

20   diagnosed with a B-cell lymphoma.  He had a CT and

21   a biopsy that established this diagnosis.  The

22   histological type, though, is not known to us.  At

1    this point, clinical details beyond what I have

2    told you are pending on this case.

3            [Slide.]

4            I think that I have a minute to talk about

5    serious adverse events that were reported in the

6    post-marketing setting.

7            Primarily, I want to emphasize the two

8    cases of herpes central nervous system infections

9    that were reported. These are concerning to us

10   particularly because of our concerns about

11   cell-mediated immune compromise and because

12   consistently, although the incidence difference was

13   small, we observed an increase in herpes infections

14   in the placebo-controlled trials in

15   natalizumab-treated patients in both the MS and the

16   Crohn's disease trials.

17           So, there were two herpes central nervous

18   system infections.  One case of herpes, HSV-2

19   encephalitis, and the patient died.  It was a

20   patient with secondary progressive MS who had a

21   history of methotrexate therapy lifetime and

22   Novantrone therapy, actually had received a

1  lifetime maximum dose.  Had one infusion of

2  natalizumab, had viral symptoms.

3          Three months later, presented with

4  seizures, was diagnosed as HSV-2 encephalitis by

5  the appropriate CSF studies.  Acyclovir was

6  initiated, but the patient died the next day.  The

7  temporal relationship in this case is not typical

8  certainly given that there was a three-month

9  interval.

10          The temporal relationship in the second

11 case is also a little bit interesting.  This was a

12 patient, a healthier patient, not on any other

13 immunosuppressive medications, who was diagnosed

14 with herpes meningitis basically right after

15 receiving her first natalizumab infusion.

16          She had a history of migraine headaches,

17 received natalizumab dose I believe in the morning,

18 later that day had a headache, thought it was her

19 usual migraine, but it didn't get better with her

20 usual treatment.

21          Two days later she was admitted, diagnosed

22 with herpes meningitis, but she recovered and did

1    well with appropriate treatment.

2           In terms of the malignancies that were

3    reported in the post-marketing setting, again, no

4    leukemias and lymphomas, which is an important

5    point.  There was a case of ovarian cancer, a case

6    of endometrial cancer, three cases of skin cancer

7    including one case of melanoma.

8           Hypersensitivity reactions and infections

9    were the most commonly reported serious events, but

10   they don't shed any more light on natalizumab's

11   risk profile than the clinical trials did, so I am

12   not going to discuss those cases any further.

13           [Slide.]

14           I would like to summarize briefly the

15   three key safety issues starting with infections

16   other than progressive multifocal

17   leukoencephalopathy.

18           The types of infections that we observed

19   suggest the possibility of a compromise in

20   cell-mediated immunity. The herpes infections, the

21   lower respiratory tract infections that were

22   observed in both the multiple sclerosis trials,

1   although there weren't atypical pathogens, there

2   was an increased risk of all lower respiratory

3   tract infections and serious pneumonias, and, of

4   course, the atypical lower respiratory tract

5   infections that were observed in the Crohn's

6   disease trials are of concern to us, and the cases

7   of viral meningitis that were observed.

8          The role of concomitant medications and

9   intercurrent illnesses in the pathogenesis of these

10   infections is unclear, and, of course, that's the

11   huge and difficult question before us.

12          I would like to mention on the summary,

13   this summary slide, that the relative risk for

14   infections was similar with monotherapy and

15   combination therapy.  In the combination therapy

16   studies, patients tended to get more infections,

17   but it was balanced in the natalizumab and placebo

18   treatment groups.

19          As I mentioned, there was no clear

20   association between increasing numbers of

21   natalizumab infusions and the risk for infection.

22          [Slide.]

1          In terms of immunogenicity, antibody

2     formation to anti-natalizumab occurred in

3     approximately 10 percent of patients.  Persistently

4     positive antibodies were associated with infusion

5     reactions, hypersensitivity reactions, increased

6     multiple sclerosis relapses and Crohn's disease

7     exacerbations, and a decreased incidence of

8     infections supporting that natalizumab is

9     associated with an increased risk for infections.

10          Anaphylactic reactions occurred in 0.4

11    percent of natalizumab-treated patients with

12    multiple sclerosis overall and in 5 percent of

13    antibody-positive patients, a striking difference.

14          Hypersensitivity reactions were most

15    common with the second infusion, but may occur

16    much, much later.

17          [Slide.]

18          In terms of carcinogenicity, there was no

19    evidence of an increase in risk for malignancies in

20    the multiple sclerosis studies.  There was one

21    lymphoma observed in a patient who participated in

22    a long-term Crohn's disease trial.  It should be

1    noted he was also on 6-mercaptopurine and had a

2    history of infliximab therapy.  Those medications

3    are associated with an increased incidence of

4    malignancies themselves.

5         There have been no leukemias observed in

6    the clinical trial setting or the post-marketing

7    setting, but this is really the key point in terms

8    of carcinogenicity, and it's a fairly obvious one,

9    but I think it is worth making, that longer

10   exposures will be needed before the risk for

11   malignancies can be adequately assessed.

12        So, this is something that we are going to

13   have to keep our eye on in addition obviously, to

14   infections and hypersensitivity reactions if there

15   is market reintroduction of natalizumab.

16        [Slide.]

17        I would also like to acknowledge--I will

18   say Tysabri for the first time in the

19   presentation--the Tysabri Review Team.  Everyone

20   has contributed to my understanding of the safety

21   profile, and I would just like to acknowledge

22   everyone, and apologize to people I have left off

1    the slide.

2           And I would like to introduce our next

3    speaker, Dr. Diane Wysowski from the FDA's Office

4    of Drug Safety unless there are, first, points of

5    clarification for me.  I don't know if we have time

6    for that .

7           DR. KIEBURTZ:  Dr. Hughes.

8           DR. A. HUGHES:  Yes.

9           DR. M. HUGHES:  I have a question about

10   mortality. As I understand it, there are two

11   PML-related deaths, but I want to try and put that

12   in the context of other mortality that was seen in

13   the overall experience with this drug.

14          What I am not clear about is how many

15   total deaths are we talking about amongst

16   drug-exposed subjects, how many are related to

17   other infections, non-PML, and are any of the

18   deaths related or thought to be related to MS?

19          DR. A. HUGHES:  I would like to answer

20   this question, if I may, at my seat where I have my

21   notes.

22          In the development program overall, the

1    clinical trial development program, there are 17

2    deaths overall. Thirteen of them were on

3    natalizumab-treated patients, the rest obviously

4    were in placebo-treated patients.  Five of those

5    were in multiple sclerosis studies, six were in

6    Crohn's disease studies, and two were in the

7    rheumatoid arthritis studies.

8            In terms of causes of death, I can briefly

9    run through them.  There was one malignancy, a

10   melanoma.  There were four infections, the two

11   cases of PML, the case of pulmonary aspergillosis,

12   the case of pneumocystis pneumonia. There was also

13   a suicide.

14           There was an acute myocardial infarction

15   with left ventricular rupture, a case of accidental

16   carbon dioxide asphyxiation, respiratory distress

17   secondary to multiple sclerosis progression.  This

18   was in a 5-year-old girl who received natalizumab

19   in a compassionate use study.

20           There was a case of severe Crohn's disease

21   exacerbation with multi-organ system failure.

22   There was a case of respiratory failure due to the

1    procedural complication that occurred after a

2    central line insertion, and there was the case of

3    end-stage rheumatic pulmonary disease.

4         That was in the trials.  There were five

5    deaths in the post-marketing setting through the

6    safety cutoff date, one case of suicide, one case

7    of ovarian cancer, the case of herpes encephalitis,

8    a death due to a motor vehicle accident, and a

9    urinary tract infection in a very sick patient with

10   multiple sclerosis who had other medical problems,

11   and that case was actually reported by a family

12   member, and there aren't too many details about

13   that.

14        DR. SEJVAR:  Just a real quick question.

15   The cases of viral meningitis, were they

16   substantiated cases of viral meningitis, or was

17   there the possibility of aseptic meningitis from

18   the agent entertained?

19        DR. A. HUGHES:  I believe that they were

20   substantiated cases of viral meningitis although I

21   will have to look.  I will have to get back to you

22   on that tomorrow.

file:///C|/dummy/0307PERI.TXT

1      MS. SITCOV:  Are the number of deaths in

2  these studies, 1801 and 1802, separate from the

3  PML, are those high numbers for studies like this,

4  or are these conservative numbers?  I mean how many

5  people die from these kinds of studies?

6      DR. A. HUGHES:  Dr. Katz and others, and

7  Dr. Walton may be able to give a better perspective

8  on this than I can.  I think it's fairly typical,

9  but--do you have anything to add?

10     DR. WALTON:  We were not impressed that

11  the overall mortality rate was markedly different

12  than we might expect in MS studies.  Of course,

13  different studies use different populations, so it

14  is not possible to really compare the precise

15  mortality rates, so we tend to focus more on the

16  nature of the mortality, but the absolute rates did

17  not strike us as notably different.

18     MS. SITCOV:  So, you don't look at this

19  and say it's striking.

20     DR. WALTON:  No.

21     DR. A. HUGHES:  I think that the fact that

22  the deaths were not notably increased in

1    natalizumab-treated patients compared to

2    placebo-treated patients is informative, and not

3    for that question.

4                    Risk Minimization Action Plan

5              DR. WYSOWSKI:  Good morning.  My name is

6    Diane Wysowski and I am an epidemiologist in the

7    Division of Drug Risk Evaluation, Office of Drug

8    Safety, FDA.

9              I am here to review and discuss the

10   Tysabri Risk Minimization Action Plan submitted by

11   the company sponsors Biogen Idec and Elan.  The

12   information presented is based on our understanding

13   of several versions of the plan and on discussions

14   between the sponsors and the FDA.

15             Some of the changes in the plan came in

16   yesterday, and I will mention the changes that have

17   been made although my slides have not been updated.

18             [Slide.]

19             In this presentation, I will review the

20   main features of the plan including its goals, its

21   methods, the Tysabri Registry that is primarily for

22   PML surveillance and opportunistic infection

file:///C|/dummy/0307PERI.TXT

189

1  surveillance, and the Tysabri observational cohort

2  study, and I will present issues and questions

3  relating to each.

4          [Slide.]

5          First, I think it's worth considering the

6  sponsors' goals for the Risk Minimization Action

7  Plan.  They are:  To promote informed risk-benefit

8  decisions about Tysabri use in the treatment of

9  multiple sclerosis patients; to minimize the risk

10  of PML by contraindicating Tysabri in

11  immunocompromised patients, and by ensuring that

12  physicians know that Tysabri is contraindicated in

13  these patients; and to minimize the health

14  consequences of PML including disability, and death

15  through early diagnosis.

16          [Slide.]

17          The plan features the use of a Medication

18  Guide provided by doctors for patients to read

19  about Tysabri, the risk of PML, other safety

20  concerns that the patients should know, and

21  instructions on the importance of reporting new or

22  continuously worsening neurological symptoms

1    lasting over several days.

2            It requires mandatory enrollment of

3    prescribers and patients.

4            [Slide.]

5            The plan also requires a mandatory

6    Patient-Physician Acknowledgment Form, similar to

7    an informed consent form, that is to be completed

8    and signed by the patient and the physician.

9            The forms and the Tysabri prescription are

10   to be sent to Biogen Idec where the patient and

11   prescriber information are entered into the Tysabri

12   Registry.

13           [Slide.]

14           On the Patient-Physician Acknowledgment

15   Form, the prescribing doctor acknowledges and signs

16   that he or she has read the full prescribing

17   information, is aware of the risk of PML including

18   disability and death, has discussed the risks and

19   benefits of Tysabri with the patient, is

20   prescribing the product for relapsing multiple

21   sclerosis, confirms that the patient has no

22   contraindications including immunosuppression, has

1    told the patient to report any new or continuously

2    worsening neurological symptoms lasting over

3    several days, and is enrolling in the Tysabri

4    Registry.

5            [Slide.]

6            Similarly, the patient acknowledges and

7    signs that he or she has read the Medication Guide,

8    is aware of Tysabri's PML risk that includes

9    disability and death, has discussed the risks and

10   benefits with the doctor, understands the

11   importance of reporting to the doctor any new or

12   continuously worsening neurological symptoms, and

13   is enrolling in the Tysabri Registry.

14           [Slide.]

15           Following the receipt of the forms and the

16   prescription, the sponsors plan to enter the

17   patient and prescriber information into the Tysabri

18   Registry, match the patient to a registered

19   infusion center, notify the infusion center of

20   patient authorization to receive Tysabri, and

21   provide the infusion center with the patient

22   authorization number.

1          The plan does not require that the patient

2     be reassessed by the prescribing physician and

3     reauthorized at regular intervals to receive

4     Tysabri.

5          [Slide.]

6          Tysabri will be shipped from a centralized

7     distribution system consisting of one distributor,

8     and less than or equal to 12 specialty pharmacies.

9     It will be sent only after the shipping company has

10    received the patient authorization code from the

11    company sponsors.

12         [Slide.]

13         Tysabri will be administered only at

14    registered infusion centers that attest to

15    compliance with the risk management program.

16    Infusion centers can be a hospital clinic, a

17    stand-alone clinic, or a doctor's office.

18         Biogen Idec and Elan estimate that 2,000

19    infusion centers will be registered to administer

20    Tysabri.

21         [Slide.]

22         Before Tysabri is administered, the

1   infusion center nurse is to confirm that the doctor

2   and patient have been enrolled in the Tysabri

3   Registry.

4          Using the patient checklist, the nurse

5   also is to confirm that the patient has multiple

6   sclerosis, has a copy of the Medication Guide and

7   has read it, is not known to be immunocompromised

8   by HIV, hematological cancers, organ transplants,

9   and anti-neoplastic and immunosuppressive drugs,

10  and that the patient has not experienced any new or

11  continuously worsening neurological symptoms

12  lasting over several days.

13         The checklist provides the following

14  examples of the neurological symptoms that would

15  require a hold on Tysabri administration:  new or

16  sudden decline in the patient's thinking, eyesight,

17  balance, or strength.

18         Also, the nurse is to document Tysabri

19  administration on an infusion log.

20         [Slide.]

21         Although there is contraindication of

22  Tysabri, if the patient is immunocompromised, the

1  plan does not state whether Tysabri is

2  contraindicated with concomitant or recent use of

3  immunomodulators, such as interferon-beta, with the

4  systemic corticosteroids, such as

5  methylprednisolone, and with other steroid and

6  immune suppressant drugs.

7          [Slide.]

8          Currently, the patient checklist that the

9  infusion center nurse is to use to determine if the

10  patient is immunocompromised includes only a few

11  diseases and six drugs that can induce an

12  immunocompromised state.

13          The six drugs currently named on the

14  checklist are azathioprine, Cytoxan, methotrexate,

15  Novantrone, CellCept, and Rituxan, however, we note

16  that the sponsors' focus group composed of doctors,

17  patients, MS nurses, and infusion nurses, requested

18  that all drugs and diseases that could induce an

19  immunocompromised state be clearly spelled out.

20          [Slide.]

21          The sponsors also plan to provide ongoing

22  educational information for physicians and infusion

1  center nurses that will be delivered via mailings,

2  a website, a toll-free help line, and continuing

3  medical education programs.

4          They will conduct a survey of physician

5  prescribers and infusion center nurses about their

6  knowledge of Tysabri's PML risk and appropriate use

7  conditions.

8          [Slide.]

9          An important feature of the plan is the

10  Tysabri Registry whereby all patients who receive

11  Tysabri will be systematically followed for the

12  development of PML and to determine the PML

13  incidence rate.

14          Patients will also be followed for the

15  development of serious opportunistic infections.

16          The sponsors plan to ask prescribing

17  doctors every six months if the patient is

18  continuing on Tysabri and if the patient has PML.

19  They also will ask the physician if the patient has

20  developed any serious opportunistic infections and

21  if the patient has died from any cause.

22          The sponsors recently added that follow-up

1   patient deaths will be accomplished through the

2   National Death Index with collection of death

3   certificates from state health departments.

4          While the former version of the plan did

5   not specify the length of patient follow-up after

6   Tysabri discontinuation, the sponsors now state

7   that the patient will remain in the registry for a

8   minimum of six months after the last dose of

9   Tysabri.

10         They also state that noncompliance with

11  the requirements for patient follow-up would result

12  in de-enrollment of the patient to receive Tysabri.

13         The plan does not specify if the Tysabri

14  Registry will contain a dosing history for all

15  individuals who receive the drug in the clinical

16  trials and in the previous post-marketing period.

17         Adding dosing history to the Tysabri

18  Registry would enable the prescriber, the patient,

19  the infusion nurse, and the registry to track the

20  cumulative number of doses the patient has

21  received, and would be important for clinical and

22  risk assessment purposes.

1          [Slide.]

2          The sponsors plan special assessment of

3    suspected PML cases for early diagnosis of PML.

4    This would include administering a PML specific

5    questionnaire, obtaining clinical details, and

6    confirming the diagnosis based on an MRI and

7    cerebrospinal fluid, JC virus testing.

8          For uncertain diagnoses, they plan to

9    submit the data to an external PML expert.  The

10   sponsors will report confirmed cases to FDA within

11   15 days of receipt.  On a quarterly basis, they

12   plan to provide to FDA the PML incidence rate and a

13   qualitative analysis of risk factors.

14         [Slide.]

15         We have the following questions for the

16   Advisory Committee which are simplified versions of

17   the questions they will be asked to answer.

18         To maximize the benefit and minimize the

19   risk of Tysabri, should there be restriction of

20   Tysabri by MS disability severity?  Should there be

21   restriction of Tysabri to patients who experience

22   failure of other MS therapies?

1                    [Slide.]

2                    To minimize the risk of PML, should

3        Tysabri be contraindicated with concomitant or

4        recent use of the immune modulator drugs, systemic

5        corticosteroids, and immune suppressant drugs?

6                    [Slide.]

7                    Regarding patient assessment, should

8        prescribing physicians reassess and reauthorize

9        patients on a periodic basis to receive Tysabri?

10       If so, how frequently should this be done?

11                   Along these lines, should the assessment

12       of neurological symptoms and patient

13       immunocompromise before Tysabri administration be

14       performed by an infusion center nurse or by a

15       doctor?  Is this an assessment that a nurse should

16       make?

17                   Should the patient checklist include a

18       longer, more comprehensive list of diseases and

19       drugs that are known to induce an immunocompromised

20       state?

21                   [Slide.]

22                   Concerning tracking of Tysabri use, should

1    there be one-to-one patient to vial distribution,

2    such that each vial is associated with an

3    individual patient for tight control of Tysabri

4    distribution and tracking?

5              [Slide.]

6              Concerning follow-up of patients, would

7    patient follow-up be aided by collection in

8    real-time of Tysabri administration,

9    discontinuation, and reasons for discontinuation?

10             As mentioned earlier, the sponsors

11   recently added follow-up of patient deaths through

12   the National Death Index and collection of death

13   certificates from the state health departments.

14             This should aid collection of information

15   on patients who have discontinued Tysabri and are

16   lost to follow-up.  However, we note that the

17   National Death Index has an important limitation in

18   that there is a lag time in getting deaths into the

19   National Death Index.

20             [Slide.]

21             For the Tysabri observational cohort

22   study, Biogen Idec and Elan plan to enroll 5,000 MS

1    patients from the Tysabri Registry in the United

2    States and Europe, including 3,000 U.S. patients.

3    They will follow patients for up to five years

4    after the Tysabri start date.

5         The companies plan to assess the incidence

6    and nature of all serious adverse events including

7    serious infections and malignancies.  The study

8    will also help them investigate potential signals

9    of unanticipated adverse events.

10        The study will collect information on

11   concomitant immunomodulator and immunosuppressant

12   therapies.

13        [Slide.]

14        We have the following comments about this

15   study. Regarding ascertainment of deaths and

16   causes, we think that the National Death Index

17   should help identify deaths in the cohort, and this

18   will be especially useful for patients who have

19   discontinued Tysabri use or are lost to follow-up.

20        Following the NDI search, death

21   certificates would need to be collected from state

22   health departments.

1        We believe that inclusion of all patients

2   in the Tysabri Registry would provide complete

3   ascertainment and avoid selection bias.  If not all

4   patients are included, the subset of patients to be

5   included in the observational cohort study should

6   be selected based on statistical survey sampling

7   procedures.

8        The lack of a non-exposed MS control group

9   could pose problems in the interpretation of

10   etiology.  If the companies need to rely on

11   population controls, the outcomes of interest may

12   not be available from population databases.

13        Also, the study does not specify if

14   previous Tysabri exposure accumulated in the

15   clinical trial and in the previous post-marketing

16   period would be counted towards the five-year

17   follow-up time.

18        Further, is five years sufficient time for

19   follow-up?

20        [Slide.]

21        The most important issues and questions

22   concerning the Tysabri Risk Minimization Action

202

1  Plan that I raised above have been rephrased as

2  questions for the Advisory Committee.

3         If the committee votes to have Tysabri

4  reintroduced to the United States market, we

5  believe that the issues and questions outlined in

6  this presentation should be carefully considered by

7  the committee in an effort to maximize the benefits

8  of Tysabri, while minimizing its PML risk.

9         [Slide.]

10        Finally, I want to acknowledge my

11 colleagues in the FDA's Office of Drug Safety who

12 participated in the review of this Risk

13 Minimization Action Plan.

14        Thank you.

15        DR. KIEBURTZ:  Thank you, Dr. Wysowski.

16        Questions from the committee?  Dr.

17 Goldstein.

18            Questions from Committee to FDA

19        DR. GOLDSTEIN:  Dr. Hughes, you went

20 through all these individual numbers.  Have you

21 synthesized these, can you give us like what the

22 total rate is or frequency is of serious and

1  opportunistic infections combined in treatment

2  versus control, because we have seen all of these

3  things in pieces, and I don't know what the unique

4  rates are?

5          DR. A. HUGHES:  I can give you an idea, I

6  believe, of serious infections.  Well, I believe

7  that serious infections in the multiple sclerosis

8  and Crohn's disease studies were on the slides.  I

9  am not sure if this is exactly answering your

10  question.

11         But in the multiple sclerosis

12  placebo-controlled studies, 2.4 percent of the

13  natalizumab-treated patients had serious infections

14  categorized as serious, compared to 2.3 percent of

15  placebo-treated patients.

16         Again, in the MS studies, there was only

17  that one atypical infection, the cryptosporidial

18  gastroenteritis, and then in the placebo-controlled

19  Crohn's disease studies, again, very short, just 1

20  to 3 infusions, serious infections occurred in 2.5

21  percent of natalizumab-treated patients and 2.6

22  percent of the placebo-treated patients.

1          So, that is overall.  I could give you, if

2    you are interested later, if there are any specific

3    serious infections that you are interested in, I

4    could give you the incidence differences.

5          DR. GOLDSTEIN:  What I was interested in

6    is what the combined rate was of opportunistic and

7    serious infections, for example, the herpes that we

8    are concerned about, other viral infections

9    combined, and they may balance out, and that's

10   fine.  I am just not sure what the numbers are.

11         MS. A. HUGHES:  In terms of the herpes

12   infections, that's in the multiple sclerosis

13   placebo-controlled studies, it was about 7 percent

14   versus 6 percent, natalizumab versus placebo.  In

15   the Crohn's disease placebo-controlled studies, it

16   was 1.6 percent versus 1.0 percent, and this is all

17   herpes infections.

18         In terms of the opportunistic infections,

19   there were--it sort of depends on your definition

20   of opportunistic--there were those 7, I considered

21   7 atypical infections, the 6 lower respiratory

22   tract infections and the extra pulmonary TB

1    infection may or may not actually be tuberculosis.

2    Those all occurred in the long-term Crohn's disease

3    trials.

4              There was just the case of CMV colitis in

5    the placebo-controlled trial.  That was the only

6    one.  And in the long-term Crohn's disease trials,

7    there were approximately 1,500 patients, so that's,

8    you know, 7 divided by 1,500.  Is that helpful?  It

9    doesn't look like it.

10             DR. GOLDSTEIN:  Again, you just went down

11   the list again.  I just wanted to know what the

12   bottom line total number was in the two groups.

13   Maybe you can calculate it for me afterwards and

14   give it to us later.

15             MS. A. HUGHES:  That might be more

16   efficient.

17             DR. GOLDSTEIN:  That would be helpful.

18             MS. A. HUGHES:  Thanks.

19             DR. GOLDSTEIN:  Sorry.

20             DR. KIEBURTZ:  Any further questions?

21             DR. M. HUGHES:  I don't know if it's good

22   sense in these sorts of programs if there is any

1    potential for off-label use in a RiskMAP program.

2            DR. KIEBURTZ:  Again, in the risk

3    minimization program?

4            DR. M. HUGHES:  Well, as I understand it,

5    the physician has to sign that their patient has

6    relapsing- remitting MS, so if they are telling the

7    truth, it would exclude all patients without.

8            DR. WALTON:  It also depends upon how

9    tightly written the RiskMAP is.

10           DR. COUCH:  Will this RiskMAP program need

11   to go through human subjects or be, for instance,

12   in academic centers or in private centers?  Is

13   there going to be any anticipated need for doing

14   that?

15           Secondly, from a legal standpoint, will

16   the procedure of discussion with the patients who

17   are signing the appropriate forms take care of the

18   legal aspect of it, or is there an anticipation

19   that the judicial aspect of this, somebody can

20   always come back and say, well, my client developed

21   PML and you are still going to be at risk

22   regardless of what papers you signed.

1          DR. TEMPLE:  This is not an investigation.

2     We will fight to the death to insist on that.  It

3     is part of how to use the drug safely, and you

4     can't opt out of it, and will not go to IRBs.

5          DR. KIEBURTZ:  So, it's not a research

6     tool.

7          DR. TEMPLE:  It is not a research tool.

8     We religiously won't learn anything from it, and I

9     am not sure we can comment on the law.

10         DR. KIEBURTZ:  Issues of legal tort

11    issues.

12         DR. TEMPLE:  Can I make one comment that

13    came up previously?  How you write one of these

14    things can determine how possible it is to use a

15    drug off label, and that is one of the things you

16    are going to be asked.

17         For example, the doctor could sign

18    something that says I know this drug is indicated

19    only for MS.  Well, fine, you can know that and

20    still prescribe it for something else. He could

21    also be asked to say my patient has MS.  That's a

22    different level of assurance, and those are the

1    very things that you need to think about when you

2    think about what to write.

3            DR. WYSOWSKI:  I just had a comment about

4    off-label use.  If you track the vials and link

5    them to a patient, you are less likely to have

6    off-label use I think, because otherwise, you might

7    have some stockpiling in the infusion center, in

8    the doctor's office, or whatever, and then with

9    that, unless that excess gets sent back to the

10   company, then, there is always that possibility

11   that it could be used off label.

12           But that is one point for the committee to

13   consider is about tying the vial to the patient.

14           DR. KIEBURTZ:  Dr. McArthur.

15           DR. McARTHUR:  Could I ask you, Dr.

16   Wysowski, have you reviewed the checklists that

17   have been mentioned several times?  I don't see

18   them in the documentation.

19           DR. WYSOWSKI:  Right.  I have looked at

20   the checklist, and as I mentioned in my

21   presentation, there are only a few diseases that

22   are on that checklist, and six drugs, and I think

file:///C|/dummy/0307PERI.TXT

209

1    it's important for the committee to consider

2    whether there might be a more comprehensive list of

3    immunosuppressive drugs and diseases.

4            DR. McARTHUR:  How about the checklist for

5    new or continuing neurological symptoms?

6            DR. WYSOWSKI:  They are very nonspecific,

7    change in eyesight, change in balance, new or

8    sudden change in eyesight, balance, strength, and

9    thinking.  So, you know, I am not a neurologist.  I

10   would assume that that might produce a large number

11   of potentially false positive suspected PML cases.

12           DR. KIEBURTZ:  Dr. Sejvar.

13           DR. SEJVAR:  Just to clarify for myself,

14   so the idea of the use of the NDI would be to

15   cross-reference these folks and do annual

16   cross-referencing with all-cause, all death causes?

17           DR. WYSOWSKI:  I am sorry.  Could you

18   repeat the question?

19           DR. SEJVAR:  The use of the National Death

20   Index, basically, you would be performing annual

21   cross-referencing of these enrolled or registered

22   patients with the all cause of death data, is that

1   correct?

2          DR. WYSOWSKI:  Right.  That is my

3   understanding.

4          DR. TEMPLE:  That would be for people they

5   can't find in the ways they are going about finding

6   them, right, or not?

7          DR. WYSOWSKI:  In think initially, what

8   you do is you run the index, you know, and compare

9   it with all the cohort patients, and then later on,

10  you know, subsequently, you would just include the

11  ones that you can't find or that have been

12  discontinued on Tysabri and lost to follow-up.

13         But there is that lag period, so it's

14  not--I don't know exactly--can you speak to that,

15  the lag period, do you know what it is now?

16         DR. SEJVAR:  We do similar assessment for

17  CJD, and it's about anywhere between two and three

18  years.

19         DR. KIEBURTZ:  Ms. Sitcov, please.

20         MS. SITCOV:  I am wondering, it sounds

21  like if this drug gets approved, PML is a

22  possibility in terms of occurrence, but I am

1   wondering what sort of adverse reactions, both

2   qualitative and quantitative, if Tysabri gets

3   approved, would cause Tysabri to be removed from

4   the market.

5           DR. WALTON:  Are you asking for a nature

6   of events or a frequency?

7           MS. SITCOV:  Well, I guess what has to

8   happen if Tysabri gets approved, do 20 people have

9   to die from PML, or what has to happen?

10          DR. KIEBURTZ:  That may be a tomorrow

11  question.

12          MS. SITCOV:  Okay.

13          DR. KIEBURTZ:  Dr. McArthur.

14          DR. McARTHUR:  Could I ask Dr. McDermott

15  the experience with other risk management or

16  minimization programs, you mentioned clozapine, or

17  maybe it wasn't you?

18          DR. McDERMOTT:  That wasn't me.

19          DR. WYSOWSKI:  Claudia Kawolski [ph], who

20  is the Scientific Coordinator for Risk Management

21  Plans, could probably speak about, you know, what

22  has happened with our--

1          DR. McARTHUR:  Well, that was the

2     question, what have we learned from the clozapine

3     mandatory registration that we could apply to

4     Tysabri.

5          DR. WYSOWSKI:   Gerald Dal Pan, our office

6     director--

7          DR. TEMPLE:  Well, Rusty can add.  We can

8     say a few things about clozapine.  Of course, each

9     one of these is unique.  For clozapine, you have to

10    bring in a white count from the week before in

11    order to get the next dose.

12          The result is that agranular cytosis is

13    discovered much earlier than it ever was before,

14    and the mortality from the agranular cytosis that

15    is indeed seen is much lower than people expected,

16    a couple of percent instead of the 10 percent that

17    was anticipated.

18          In addition, the registry assures that no

19    one who gets a white count problem ever gets the

20    drug again.  The registry has been used by all of

21    the generic makers, as well as the original maker,

22    and so on.

1          Now, to be fair, and not to overstate it,
2     it's a fairly simple question that is being asked.
3     It is just about white count, relatively simple,
4     not so complicated. It's a simple lab test.
5          But I would say we feel quite good about
6     that. There has been a gradual rollback of how
7     frequently you have to have the test after you have
8     been on the drug for a certain number of years,
9     your chance of getting it decreases, so the
10    frequency has dropped back.
11         There are other similar ones.  There is a
12    similar program for a drug called bosentan for
13    pulmonary hypertension that Doug knows more about
14    than I do.  That one is designed to prevent
15    pregnancy, so you have to bring in your pregnancy
16    test and your test of liver function, because those
17    are the two things you are worried about there.
18         There have been some pregnancies.  That is
19    not good, we think fewer than otherwise, and there
20    hasn't been a fatality due to liver disease yet, a
21    relatively low use drug, but each one sort of has
22    to be looked at.

1          They vary in stringency, they vary in how

2     much you have to say and do.  Each one is sort of

3     targeted, and that is why a lot of the questions

4     tomorrow are going to be about how to target this

5     one.

6          DR. KIEBURTZ:  About the clozapine one,

7     too, it was modified.  I think that is another

8     important thing.  It existed and then was modified

9     based on the initial results of that.

10          DR. TEMPLE:  Yes, absolutely.  The

11     frequency of testing is modified if you have been

12     on it, I forget, more than six months, more than a

13     year, or whatever, based on observed data.

14          DR. KATZ:  It is not just the frequency,

15     but the criteria that serve for deciding what to do

16     have actually altered it, as well, so many things

17     about it have been changed over time based on the

18     data that has been accruing.

19          DR. KIEBURTZ:  Last question.

20          DR. JUNG:  I think it is clear that

21     neurologists use drugs off label frequently as part

22     of our practice. Given the fact that there is a

1  change in the indication to remitting-relapsing MS,

2  do you think that there is any need to clarify the

3  diagnosis of remitting-relapsing MS?

4          That seems fairly elementary, but if the

5  drug is released, will there be pressure on

6  physicians by their patients to expand the

7  definition of remitting-relapsing to patients with

8  primary progressive or secondary progressive? All

9  of us who take care of MS patients know that there

10  is a lot of overlap there, and how do we clarify

11  that?

12          DR. KIEBURTZ:  I think that is a question

13  to us to discuss tomorrow quite specifically in

14  terms of the nature of the severity and the

15  characteristic of the patients.

16          It looks like I said the last question,

17  but I will take two more from Dr. Goldstein and

18  then Dr. DeKosky, and then we will stop for lunch.

19          DR. GOLDSTEIN:  Thanks.  This may also be

20  some information that needs to be gathered for us

21  for tomorrow, but in the background information,

22  one of the things that was talked about is the

1    dropout rate on other established therapies of 15

2    to 20 percent dropout rate.

3          What I was interested in is what the

4    dropout rate was in this clinical trial for people

5    who were enrolled in the clinical trial as compared

6    to the dropout rates in the other clinical trials

7    where these other therapies have been used.  Are we

8    expecting a difference, or are the dropout rates

9    going to be similar to one another?

10          The second thing again may require some

11    looking into is one of the things that we are being

12    asked to do is, well, what group, if it is going to

13    be restricted, should we consider, and one is

14    treatment failures.

15          So, what definition is going to be used

16    for treatment failure, and is there any data aside

17    from this combined data that we know about from

18    1802 that switching the patient to this drug as

19    compared to a different immunomodulatory drug

20    results in further improvement.

21          DR. KIEBURTZ:  Again, I think we are

22    edging into tomorrow.

1          DR. GOLDSTEIN:  No, this is for tomorrow,

2     but they may need to get some data together to be

3     able to address those, so I wanted to ask them now

4     for tomorrow.

5          DR. KIEBURTZ:  Thank you.

6          DR. WALTON:  If I may respond in part to

7     your first question about the dropout rates.  I am

8     sure it is in here somewhere, although I cannot

9     find the page in the briefing document, but in the

10    natalizumab studies, the dropout rates were

11    relatively small.

12         There was very good follow-up on almost

13    all patients, but that is not really I think the

14    question that you are trying to get at.  The

15    question is what will be the experience in clinical

16    practice.

17         I would be very wary about trying to reach

18    insight into that question based upon the clinical

19    trials.  Clinical trials are so different, such

20    different circumstances than clinical practice is.

21         It is clear to us from the clinical trials

22    with the beta-interferons that there was a much

1    better sustained compliance, sustained use within

2    the clinical trials for the beta-interferons than

3    is reported to be the experience in clinical

4    practice.

5         So, based on that, I would be very wary

6    about trying to reach conclusions about what the

7    clinical practice experience in the future will be.

8         DR. GOLDSTEIN:  That is exactly what I was

9    trying to get, and probably dropout rate wasn't

10   maybe the best term to use.  What I meant is drug

11   treatment discontinuation rates, and as you

12   correctly point out, looking at clinical practice

13   compared to clinical trials are looking at apples

14   and oranges, but again, as part of the background

15   information, we were told that 15 to 20 percent of

16   MS patients stopped these interferons or whatever

17   during their clinical care.

18        So, the question was within the clinical

19   trials that were done for these drugs, what was the

20   drug discontinuation rate in those trials compared

21   to this.  That way, we at least have apples and

22   apples to look at.

 1              DR. KIEBURTZ:  Dr. DeKosky.

 2              DR. DeKOSKY:  This may also be for

 3    tomorrow, but the issue of who gets this drug and

 4    how we define relapsing-remitting would also have

 5    to deal with a first episode of likely MS with or

 6    without a clinical history, as Dr. Jung talked

 7    about, of episodes that did not reach the attention

 8    of a physician, but were part of the history, as

 9    well as initial optic neuritis and suspicion that

10    there are other lesions in CNS, and whether that

11    would meet the criteria for relapsing-remitting.

12              DR. KIEBURTZ:  Thank you.

13              Russ, you get the final word.

14              DR. KATZ:  Maybe to address Dr.

15    Goldstein's second question, if I understood it,

16    which was what do we know about if you switch from

17    one interferon to another interferon, what is the

18    response compared to if you switch from an

19    interferon to Tysabri, somebody can correct me if I

20    am wrong, but I don't think there is any reliable

21    data that speaks to that question.

22              DR. WALTON:  We have no data about that

220

1    sort of a crossover.

2            DR. KIEBURTZ:  That concludes this

3    morning.  I would remind open public hearing

4    speakers to check in at the desk if you intend to

5    speak.  We will start the open public hearing

6    promptly at 1 o'clock.

7            Let me just remind folks there will be a

8    set period of time, so that it is fair and

9    equitable.  It looks like committee members can

10   leave their things here.

11           [Whereupon, at 12:05 p.m., the proceedings

12   were recessed, to be resumed at 1:00 p.m.]

221

```
 1          A F T E R N O O N   P R O C E E D I N G S

 2                                          [1:00 p.m.]

 3          DR. KIEBURTZ:  The schedule for this

 4   afternoon is slightly more flexible in the sense

 5   that we will take the break if and when it seems

 6   appropriate, the one of the few things I get to

 7   decide today.

 8          Just to remind people that there are two

 9   forms of public comment, individual and group.

10   Individuals have three minutes to speak, groups

11   have five minutes to speak. When your time is up,

12   someone somewhere in this room will turn off your

13   microphone, so when the three minutes is up, you

14   are done.

15          This may seem overly restrictive and

16   harsh, but there are a number of people who are

17   scheduled to speak, and it only strikes me as fair

18   and equitable that everyone gets the same amount of

19   time to speak, and I believe people knew about this

20   in advance.  So, we will stick with that plan.

21          Before the beginning of the open public

22   hearing I need to read the following.
```

1            Both the Food and Drug Administration and

2       the public believe in a transparent process for

3       information gathering and decision-making.  To

4       ensure such transparency at the open public hearing

5       session of the Advisory Committee meeting, the FDA

6       believes that it is important to understand the

7       context of an individual's presentation.

8            For this reason, the FDA encourages you,

9       the open public hearing speaker, at the beginning

10      of your written or oral statement, to advise the

11      committee of any financial relationship that you

12      may have with the sponsor, its product, and, if

13      known, its direct competitors.

14           For example, this financial information

15      may include the sponsor's payment of your travel,

16      lodging, or other expenses in connection with your

17      attendance at the meeting.

18           Likewise, the FDA encourages you at the

19      beginning of your statement to advise the committee

20      if you do not have any such financial

21      relationships.  If you choose not to address the

22      issue of financial relationships at the beginning

1    of your statement, it will not preclude you from

2    speaking.

3            That's the end of that.  We will now

4    commence with the open public hearing, which is in

5    a particular order of speakers as per the slide.

6            The first is Jason Mark.

7                    Open Public Hearing

8            MR. MARK:  Good afternoon.  My name is

9    Jason Mark. Both myself and Alex McDonald, the next

10   designated speaker, will be ceding our time to

11   representatives of the family of Anita Smith.

12           MS. SMITH:  Thank you for the opportunity

13   to speak to you today.  My name is Beth.  Anita

14   Smith was my mother.

15           I am here with my brother Jason and my

16   father Walt.  My father prepared his statement to

17   read to you, however, this is a very emotional,

18   difficult time for him, and he has asked me to read

19   his statement on his behalf.

20           I am here to briefly tell you about my

21   wife, Anita Smith.  Many of you have read about

22   Anita in medical journals and newspaper articles.

1    Anita died from PML caused by Tysabri.  Tysabri was

2    withdrawn from the market because of Anita's death.

3    I lost my wife, my best friend in the whole world

4    because of this drug.  My children lost a mother

5    they loved, who loved them dearly.

6                Before she took Tysabri, Anita worked full

7    time.  She was an active, fully functioning person.

8    She was not disabled, she did not appear ill.

9    Anita was basically fine.

10                Beginning in 2000, Anita was prescribed

11    Avonex.  It cost us $1,000 a month.  In 2002, we

12    were told that if we participated in a study, Anita

13    would receive Avonex and another drug, Tysabri,

14    that we wouldn't have to pay for any of the

15    treatment or medications.

16                We were told that Biogen would pick up the

17    tab for us.  We were never told that Tysabri could

18    result in Anita's death.  If we knew this, we would

19    have happily stayed away from the study.

20                I understand that this meeting is to

21    determine whether Tysabri should come back onto the

22    market and whether clinical trials of Tysabri

1  should be permitted to resume beyond what has

2  already been permitted.

3      I am here with Dr. Gregory Shoukimas from

4  Boston who can speak to you about my wife's medical

5  history better than I can.  The one thing he cannot

6  describe for you is how broken my family's heart is

7  over ever having Tysabri enter our lives.

8      I ask that Dr. Shoukimas speak to you now.

9      DR. SHOUKIMAS:  Good afternoon.  My name

10  is Dr. Gregory Shoukimas.  I am a neuroradiologist

11  and have been practicing for 20 years, and I am

12  here at the request of the Smith family.  I am not

13  sponsored by Biogen, and I am not sponsored by any

14  competitors.

15      I am here to address primarily the issue

16  of the raw data, that is, the individual data that

17  a patient presents with and was enrolled in the

18  study, the Tysabri study.  That is, how did Anita

19  Smith present clinically, what was her

20  symptomatology, what was her physical examination,

21  and what tests aided in making the diagnosis of

22  multiple sclerosis.

1          In the talks that you have heard this

2     morning, it is assumed that Anita Smith had

3     remitting-relapsing multiple sclerosis, and that

4     has been called into question.  I have no time to

5     go into the details of her physical examination,

6     but suffice as to say that her clinical

7     symptomatology was benign, relatively benign, was

8     not disabling, and certainly did not contribute to

9     her disability scores.

10         Her physical examinations for the most

11    part were normal.  She showed very minimal signs of

12    decreased leg strength, spasticity, and slight

13    hyperreflexia.

14         In December of 2001, her physical

15    examination was entirely normal.  She had reported

16    to her neurologist she was doing well, and she had

17    normal muscle strength in all major muscle groups,

18    but despite all this clinical information that was

19    available, she was being considered by her

20    neurologist for the Antegren or Tysabri study,

21    which she was told would be starting shortly, that

22    is, within three or four months.

1        I had the fortune of talking with the

2    Smith family for about an hour, and it was related

3    to me by Mr. Smith and his daughter, Beth, that

4    from the time of her visit to enrollment in the

5    study, that is, the time of her first visit to the

6    neurologist to enroll in the study, she thought of

7    her problem as an annoyance.

8        She worked, carried the laundry up and

9    down stairs, clearly not indicative of a disabled

10   patient.  She didn't get worse, and she didn't get

11   better.  There was some indication that she had

12   visual problems, but this was never tested formally

13   with electrophysiology tests to confirm that she

14   had optic neuritis.

15       Her magnetic resonance imaging study in

16   1999, which I have reviewed, showed some

17   nonspecific white matter changes, and, in fact,

18   given her previous history of migraine, may have

19   reflected previous migraine.  The changes were

20   nonspecific, and while demyelination was considered

21   criteria for this, for the diagnosis of MS was not

22   fulfilled.

1          She had a cerebrospinal fluid analysis,

2     which was normal, including IgG assessment,

3     oligoclonal bands were nonexistent, and had one

4     lymphocyte, which is nonspecific.

5          Electrophysiology studies were not

6     performed especially visual, evoked potentials,

7     which would have been helpful in making the

8     diagnosis of optic neuritis.

9          Her clinical examination, as briefly, very

10    briefly detailed, but more fully talked about by

11    Dr. Godec later today, showed that she did not

12    really have two clinically symptomatic attacks and

13    that her objective lesions were not clearly

14    defined.

15         So, the question really is did Anita Smith

16    have multiple sclerosis.  The talks again have

17    assumed that she had relapsing-remitting disease,

18    but, in fact, this was not ever clearly

19    established.  If, in fact, it was present at all,

20    it was mild and stable with minimal neurological

21    manifestations, and any objective tests that might

22    have been helpful were ignored.

1          These are the MRI scans, which were not

2     available when the New England Journal of Medicine

3     published its clinical pathological study detailing

4     the effects of MS on Mrs. Smith, and the Tysabri

5     results and the progressive multifocal

6     leukoencephalopathy which ensued.

7          These were the lesions that were described

8     as 9 lesions.  These are two illustrative MRs.

9     There is a lesion back here.  These are not very

10    typical of MS.  They are nonspecific findings.

11          These are two patients that have MS,

12    similar in presentation, a little bit more severe,

13    more objectively defined disease, but these MR

14    scans are clearly contributory.  There are some

15    lesions in the periventricular white matter, close

16    to the cephalo-junction region.  In the Annals of

17    Neurology 2001, the McDonald criteria were

18    published, and clearly defined how MRs should be

19    interpreted with respect to MS.  The MR scan that

20    Mrs. Smith underwent did not meet that criteria.

21          After her enrollment with two potent

22    immunosuppressant and modified immunomodified

1   drugs, she was a minimally symptomatic patient

2   whose diagnosis was questionable, and yet she was

3   given the drugs, and progressive multifocal

4   leukoencephalopathy ensued, causing her demise.

5        The enrollment of Anita Smith into a

6   clinical trial of these two drugs is almost

7   incomprehensible and certainly raises grave ethical

8   concerns about Biogen Idec's process of enrollment.

9        The FDA has already decided that new

10  clinical trials can proceed with Tysabri.  As we

11  examine the enrollment process for Anita Smith, we

12  must question and examine the serious concerns that

13  Biogen Idec is incapable of proceeding in a safe

14  manner with future clinical trials. Obviously, they

15  admitted, enrolled Mrs. Smith into this trial.

16       Anita Smith's enrollment process may

17  represent a systematic approach to enrollment of

18  questionable patients. Therefore, if the enrollment

19  process is put into question, then the study

20  findings that Biogen Idec has publicized widely in

21  recent reports must also be put into question.

22       Anita Smith's death has caused close

1    examination in the literature.  Her autopsy report

2    was published in the New England Journal of

3    Medicine in 2005, and the results of that autopsy

4    report indicate that she did not have any

5    histopathological evidence of MS.  In fact, the

6    report showed widely disseminated PML and evidence

7    of possible vasculitis.

8            The enrollment MRI I obtained on court

9    order was not available to the New England Journal

10   of Medicine at the time that the report was made

11   regarding her clinical history and ultimate demise.

12           The British Medical Journal and Lancet

13   have recently published articles also questioning

14   whether or not, in fact, Anita Smith had MS, and

15   the possibility that this drug will be continued to

16   be used in patients who may not be suitable

17   candidates for its use given the possibility of

18   mortality.

19           Why Anita Smith's case is so important to

20   the panel today, the panel must question, as many

21   other experts have, the serious implications of how

22   and why Anita Smith was enrolled and possibly how

```
 1    other patients were enrolled as well, especially

 2    since new clinical trials by Biogen Idec are

 3    anticipated and possible approval of Tysabri for

 4    clinical use is anticipated.

 5            Thank you.

 6            MS. CASANOVA:  My name is Lisa Casanova.

 7    My trip here is not sponsored by anyone.  I am

 8    speaking only for myself.

 9            I was a participant in the Phase III and

10    open-label trials of Tysabri for Crohn's disease,

11    which I have had for 20 years, since I was 7 years

12    old.

13            I know that this committee is not

14    considering bringing back Tysabri for the treatment

15    of Crohn's, but the benefits I got were so great,

16    and I believe that this is so important, that I am

17    here to ask you to bring this drug back on the

18    market for the people it can help.

19            Before I went into the trial, I was facing

20    a major surgery to remove part of my large

21    intestine that has been damaged beyond repair by

22    this disease.  Tysabri allowed me to delay that
```

233

1    major surgery for almost three years.  For a

2    Crohn's patient, that is a long time.

3              It allowed me to live with less pain, it

4    improved my quality of life.  I went into the

5    Tysabri trial to test an unknown drug with unknown

6    risks, because I firmly believe that that is the

7    only way we are going to see progress.

8              I thought the risks were worth it, and my

9    heart goes out to the people who suffered as a

10   result of their choice to participate, but I still

11   believe those things.  I am willing to take the

12   risks and I can only imagine how much more willing

13   these MS patients are who have such a terrible

14   disease and so few choices.

15             I understand the place that they are in.

16   When you live with life-long debilitating disease,

17   all of your choices are tradeoffs.  No one can tell

18   you, you just need to do this one thing, and

19   everything is going to be okay.

20             Right now I control my disease with drugs

21   that put me at risk of lymphoma, of infections, of

22   liver damage.  My other options carry similar risks

234

1    with them.

2              For us, it is a series of tradeoffs

3    between drugs, surgeries, between the quality of

4    life that we want to have for ourselves, and the

5    chances that we are willing to take to get that

6    quality of life.  That is the reality that we live

7    with every single day of our lives, and it is not a

8    reality that is ever going to be made better by

9    having fewer options.

10             I know that this drug is not going to come

11   back for Crohn's patients.  When it comes to real

12   therapeutic progress, our day hasn't come yet, but

13   I am always hopeful that it will, and in the

14   meantime, I believe that you need to do the right

15   thing and bring this drug back to the market for

16   the people it can help.

17             Thank you.

18             MS. CLARK:  Thank you for listening to my

19   personal experience with Tysabri.  My name is

20   Pamela Clark, and I have had MS for 10 years.  I

21   have progressed from relapsing-remitting to

22   secondary progressive.

1          My mother and I traveled here from Phoenix
2    and Salt Lake City respectively.  We paid for our
3    own ticket, and we are not sponsored by any
4    organization.

5          It was important that my mom be here,
6    because she has two daughters with multiple
7    sclerosis, and she was the one who held my hand
8    during my first Tysabri infusion.  In the weeks
9    after the infusion, she witnessed the improvement
10   in my gait and my energy level.  We were ecstatic
11   and we were filled with hope.

12         You see, she fought her own battle with
13   cancer 15 years ago, using then risky and then
14   experimental drugs.  Today, she is cancer-free and
15   those experimental drugs are widely used by people
16   with cancer every day.  As a family, we understand
17   the risks of using experimental drugs, but we also
18   understand the risk of doing nothing.

19         The risk of doing nothing for me is too
20   great.  The risk of doing nothing, which for me
21   means continuing to take ineffective drugs, is too
22   high for me to ignore.  I must fight for the right

1   to have the opportunity to live life to its

2   fullest.  I owe it to myself and I owe it to my

3   family.

4          I attend a MS physical therapy group three

5   days a week.  It is comforting to be among people

6   who have the same affliction, and they understand

7   my struggles completely.  It is not comforting,

8   however, to watch my friend's health falter and

9   fail.  It is not comforting, however, to watch my

10  friend, who walked in on a cane last year, roll in

11  in a wheelchair.

12         This disease and its symptoms are

13  progressive and they will not wait for anyone's

14  approval.  The drug they take do not stop or even

15  slow the progression of MS.  Finding an effective

16  treatment seemed hopeless.  That was I felt

17  hopeless until I found Tysabri last January or

18  January of 2005.

19         In January of 2005, I had two infusions of

20  Tysabri and I got better, not miraculous jump up

21  and run a race better, but I did walk to the duck

22  pond with my two, five-year-old boys.  I did stand

1    up and cook dinner, stand up long enough to cook

2    dinner, and I did smile more often.  That is what

3    hope does.  That is what Tysabri did for me.

4              On the issue of risk management that you

5    have been talking about this morning with Tysabri,

6    I received monthly Solu-Medrol infusions at the

7    infusion clinic in my neurologist's office, and

8    there, Julie and Martha, who I know from being

9    there monthly, every month, they sit down with me,

10   and they have a questionnaire already, and they

11   say, "What are your symptoms like?  What have

12   changed?"

13             This new reporting mechanism will be no

14   different for them, and I know that they will

15   gladly do it.

16             The cost of getting here is high for me,

17   both the cost of our travel expenses and the cost

18   to my health.  The stress--.

19             DR. HUGHES:  Thank you for allowing me to

20   speak. My name is Chris Hughes.  I am a

21   board-certified neurologist, and I have been in

22   private practice for 12 years.

1          Within the past year, I have signed

2     consulting agreements with Biogen, Berlex, Serono,

3     and Teva, but I am here today at my own expense to

4     state that in my opinion, the current state of

5     therapeutics for multiple sclerosis is remarkable,

6     and the future with new drugs in development is

7     even more encouraging.

8          Through the 1990s, beta-interferon and

9     Copaxone were FDA-approved for the treatment of MS.

10    We now have over 10 years of experience with both

11    of these agents, and numerous studies demonstrating

12    their safety and efficacy in slowing the

13    progression of the disease.

14         We are just now learning from new studies

15    that early initiation of these established

16    therapies further improves their effectiveness.

17    Today, with the use of these medications, the

18    severely affected multiple sclerosis patient is

19    still part of our clinic, but make up a smaller

20    percentage than they did in the past.

21         Yes, interferons and Copaxone have

22    revolutionized the state of our MS patients for the

 1    better.  Further, we hope that combining these two

 2    agents proves synergistic and studies addressing

 3    this subject are planned.  Further, the higher dose

 4    interferons and study of this are also underway.

 5         For interferons and Copaxone, in my

 6    opinion, the best is yet to come, and for those

 7    patients with aggressive disease, we have another

 8    FDA-approved drug, obviously Novantrone, which is a

 9    highly effective agent.

10         Regarding Tysabri, in the initial New

11    England Journal report, investigators identified 4

12    out of 142 patients that had serious side effects

13    related to Tysabri, one of which was anaphylactoid,

14    a state that most community neurologists are not

15    well equipped to treat in an office setting.

16         Since its withdrawal, I have attended many

17    scientific meetings in which the issue of Tysabri

18    and PML has been discussed.  Many of us fear that

19    with the reduced immune cell migration effect of

20    this drug, longer exposures to Tysabri could

21    exponentially increase the risk of opportunistic

22    infection or latent virus reactivation, and I have

1    seen no data to reassure that concern.

2         So, in summary, beta-interferons,

3    Copaxone, and Novantrone are highly effective

4    agents.  High-dose interferons and combined therapy

5    hold additional promise for new agents, and also we

6    have new medications in development.

7         In this context, I would argue that there

8    is no crisis in MS therapeutics, and therefore no

9    need to rush back to the market a drug that has

10   serious proven hazards given the lack of safety

11   data in longer term use.

12        I would urge further study of Tysabri and

13   its relationship to PML.  Only with longer term

14   safety data can neurologists feel comfortable using

15   this drug in the future.

16        MS. LADD:  Mr. Chairman and members of the

17   Advisory Committee, thank you for the opportunity

18   to address the pending biologics license

19   application for Tysabri.  My name is Virginia Ladd,

20   and I speak as President and Executive Director of

21   AARDA, the American Autoimmune Related Diseases

22   Association.

```
 1              AARDA maintains strict and transparent
 2    guidelines for commercial contributions.  Neither I
 3    nor AARDA have received financial relationship or
 4    funding from the sponsors of Tysabri, Biogen Idec,
 5    or Elan Pharmaceuticals, nor does AARDA endorse any
 6    product or services.
 7              AARDA is the only national voluntary
 8    health agency advocating for all of the more than
 9    22 million Americans afflicted with 100 autoimmune
10    diseases.  We do this through education and
11    research and patient services.
12              On behalf of AARDA and its members, I
13    thank this committee for its critically important
14    work.  Tysabri is an important new therapy for
15    multiple sclerosis.  FDA's decision on this
16    application will directly affect hundreds of
17    thousands of MS patients nationwide and have
18    important implications for patients with other
19    autoimmune diseases.
20              That is why we are pleased that FDA
21    emphasized last year that it places particular
22    importance upon patients' views of Tysabri.
```

```
 1              AARDA urges the committee to keep the

 2   question of patient choice uppermost in mind as it

 3   proceeds with its important work.  The potential

 4   reintroduction of Tysabri to market with

 5   appropriate safeguards would enable fully informed

 6   patients to make reasoned decisions about their own

 7   health care.

 8              FDA made this point forcefully when the

 9   Agency explained its decision to permit the market

10   reintroduction of Lotronex in 2002, quote,

11   "Physicians are essential in determining the

12   benefits and managing the risks of an individual

13   patient for whom the drug is prescribed.

14   Ultimately, the patient, once informed, is the

15   definitive decisionmaker concerning the

16   benefit-risk balance."

17              Our members have made clear that decisions

18   like Tysabri should only be made when the

19   decisionmakers understand fully that patients with

20   chronic diseases may view the balance of risk and

21   benefits differently from physicians, regulators,

22   and other stakeholders, not simply because they are
```

243

1    not informed or because they cannot fully

2    understand the issue at hand, for a patient with a

3    chronic illness, the potential value of a therapy

4    that allows him or her to leave their wheelchair

5    behind or go back to work may make that patient

6    willing to take risks that would be unacceptable to

7    someone else.

8            Just as the generalization cannot be made

9    that no one drug will be effective for everyone,

10   neither can it be said that a drug will have the

11   same safety issues in all treated individuals.

12   With the right information and advice of their

13   caregivers, it would be a grievous mistake to

14   underestimate the capacity of MS patients to

15   recognize, understand, assess, and assume the risk

16   or the potential benefits of a product like

17   Tysabri.

18           This is not a novel point, but it bears

19   emphasis in this proceedings.  I have submitted for

20   the record, AARDA's position paper, "A greater Need

21   for Patient Voice and Choice," that addresses the

22   vital importance of patients participation in the

1    clinical, as well as the regulatory, decisions that

2    determine the therapeutic choices available that

3    determine our health and our quality of life.

4         AARDA believes that Tysabri's

5    effectiveness is well established and it is a very

6    important as a first in class novel therapy for MS.

7    We believe that Tysabri's market experience,

8    clinical investigation, and reports from patients

9    and providers demonstrate its important clinical

10   benefits.

11        Effective new therapies are few and far

12   between for autoimmune diseases generally and

13   specifically with MS. Therapeutic regimes for

14   autoimmune diseases are clinical juggling acts of

15   multiple medications that must constantly be fine

16   tuned to avoid and manage relapse and flare-ups.

17        The availability of novel, new therapies

18   is critically important to our members.

19        Finally, AARDA recognizes that FDA has

20   been under intense public and congressional

21   scrutiny in relation to post-market safety of drugs

22   and biologic products, but we urge the committee

1    and FDA to act strictly on science, clinical

2    evidence, and availability of appropriate labeling,

3    risk management controls, and post-market studies

4    in deciding whether Tysabri should be returned to

5    the market.

6            MS. CANAVAN:  Hello.  My name is Emily

7    Canavan.  I have no financial ties with any

8    pharmaceutical company, and no one contacted me to

9    come here today.

10           I am 27 years old and I was diagnosed with

11   MS in 2003.  My mother was diagnosed in 1999.  I

12   was 24 years old when my life as I knew it ended.

13   It was a life where I was a hiker, an athlete, a

14   teacher, and an adventure traveler.

15           My health has declined rapidly.  For

16   someone like me, time is precious.  I have never

17   experienced any real period of remission and no

18   medications have stopped or slowed my MS from

19   progressing.

20           I cannot convey to you how difficult it is

21   to watch my friends travel, work, and excel while I

22   am held hostage by multiple sclerosis.  In 2002, I

246

1    received a Master's Degree and teaching students

2    with emotional and behavioral disabilities.

3            During the 2001-2002 school year, I taught

4    every day, had class four nights a week, and at 23,

5    I had found something I loved and I was good at.

6    After graduation, I began teaching fifth grade.

7    Four months later, I had to go out on disability.

8    By then I had daily headaches so bad that I could

9    not get out of bed.

10           My mother had been diagnosed with MS four

11   years before, but I kept telling myself I am just

12   stressed out, this is not MS.  I clung to this

13   statement as hard as I could, but in the next six

14   months I developed painful muscle cramps, constant

15   urinary problems, tingling, cognitive problems, and

16   my mobility became very limited.

17           Some days it's two steps, and some days

18   it's two blocks.  These new symptoms and an

19   ever-growing number of lesions on my brain finally

20   confirmed the diagnosis of MS. To add insult to

21   injury, last year I was diagnosed with ulcerative

22   colitis.  Colitis and Crohn's disease both involve

1    inflammation in the intestines, and Tysabri during

2    trials gave many Crohn's patients an improved

3    quality of life.

4            Less than a year after leaving my job, I

5    had to move out of the city and closer to my

6    family, because I need help so often.  My headaches

7    continue to be debilitating and other symptoms

8    persist.  I have had to adjust to using an electric

9    scooter.  I have to consider how to transport it,

10   investigate each location's accessibility, and deal

11   with the reality that when you are in your 20's and

12   on a scooter, people are going to stare.

13           I have exhausted most MS treatments

14   already.  AVCRs, IVIG, methotrexate, Solu-Medrol,

15   LDN.  I am not currently on any MS treatment drug.

16   I had one dose of Tysabri the week it was taken off

17   the market.  I am reluctant to take strong

18   chemotherapy drugs because of the risk of

19   infertility, but that's the point.  Every patient

20   has to weigh the benefits and risks of every

21   medication.

22           I haven't been willing to risk

1    infertility, but if nothing else helps, that risk

2    will become worth it to me. All medications have

3    risks, even over-the-counter medications can be

4    deadly if taken inappropriately or by people with

5    certain conditions.

6          I will be extremely disappointed if

7    Tysabri doesn't help me, however, I will be glad I

8    came to this hearing because it will help so many

9    people whose lives have been turned upsidedown by

10   MS.  It may help me, it may help my mother.

11         DR. STUART:  My name is Bill Stuart.  I am

12   the Medical Director at the MS Center of Atlanta,

13   which is a foundation-run public charity center.

14   We see over 100 patients with MS a day, five days a

15   week.

16         I have been in neurology practice for 36

17   years. The last 16 years I have done almost

18   exclusively MS, so I have an intimacy with this

19   disease that I would like to share with you.

20         That is, that it is a disease.  When my

21   center was at the Shepherd Center, which is a large

22   spinal cord treatment center in Atlanta, one of the

249

1    things that became apparent to me is that spinal

2    cord injury patients and MS patients with

3    comparable disabilities function differently.

4         The MS patients never took advantage of

5    the therapeutic recreational facilities, whereas,

6    the other group did.  They had vigor, they had

7    interest, and it dawned on me that MS is more than

8    just a disability, it is also an illness, and it is

9    the illness part we don't measure very well.

10        In my observations through the years, I

11   think that the reasons people leave active life

12   because of MS are largely due to cognitive change,

13   excessive fatigue, pain, sleep disorders, bladder

14   and bowel issues, and sexual dysfunction.

15        The second point I would like to make has

16   to do with how we would enter a person into the

17   study, relapsing-remitting has been proposed.  I

18   would suggest that that will create a number of

19   problems.  First of all, recordkeeping will be

20   fudged.  Every patient will have

21   relapsing-remitting disease if the doctor treating

22   the patient desires to try Tysabri.

```
 1              I would suggest that you consider a term
 2      called "worsening MS," and work at trying to define
 3      what worsening MS is.
 4              The third issue is a socioeconomic issue.
 5      In our center, the actual day-to-day medical care
 6      of the MS patient is in the red.  If we add onerous
 7      risk management type efforts to this in the
 8      opportunity to give Tysabri, we won't be able to
 9      use the drug, it will be impossible, because it
10      will drive our losses even higher.  The losses now
11      are overset by contributions and other collateral
12      revenue streams.
13              I think that the Biogen plan for
14      monitoring patients was quite a reasonable plan,
15      and I would favor that you endorse that.
16              Finally, there is a crisis in MS care, and
17      it has to do with compliance.  We currently have
18      compliance rates that are terrible.  We have as
19      many patients going off of the medicines that we
20      have today as are going on them, so that we are a
21      steady state in trying to treat these patients, and
22      that steady state is well below where we should be.
```

251

1          Thank you very much.

2          MS. COOKSEY:  My name is Christy Cooksey.

3     I have traveled here from Coos Bay, Oregon, to

4     represent my mother, Janet Russell, in Klamath

5     Falls, Oregon, who is too disabled to make the trip

6     due to her MS disability.

7          I would like to disclose that I have no

8     financial interest in either Biogen or Elan, nor

9     have I received any financial support from either

10    company.

11         My mom has written a letter to this

12    committee, which you all have in your packets, and

13    I hope that you will read it.  You will hear her

14    words, but I would like to describe to you what it

15    is like to watch your mom be destroyed by this

16    horrible disease.

17         My mom is my hero.  She is one of the

18    strongest people that I know.  She jokes about her

19    disability saying things like "I'm going to be the

20    first disabled stunt woman," referring to her

21    constant falling.

22         My mom is my best friend and I have been

 1    devastated having to watch her quality of life

 2    diminish so rapidly.  Her inability to travel has

 3    impacted our entire family.  I currently live four

 4    and a half hours away from my mother.  For my mom

 5    to travel to visit me and my two children, it takes

 6    her two days as she has to stop halfway to rest.

 7            If she were to attempt the trip in one

 8    day, she would be so fatigued the next day, all she

 9    would do is to sleep to recover.

10            I have witnessed many of my mom's symptoms

11    and also her sometimes horrible reactions to at

12    least three different, quote "treatments" she has

13    been on.  These include flu-like symptoms,

14    uncontrollable shaking, injection site reactions,

15    and possible bone loss.

16            At one point, she experienced a total loss

17    of control of her legs and an actual increase in

18    her relapses while on these treatments.  Tysabri

19    has been her miracle, and she needed it back a year

20    ago.

21            With only one infusion, her muscle spasms

22    all but disappeared, allowing her to walk without

 1   her walker, and without falling.  She was less

 2   fatigued, her cognitive abilities improved, her

 3   speech was less slurred, and her beautiful singing

 4   voice, which she lost in 1999 due to her MS, was

 5   finally coming back.

 6          On a follow-up visit with her neurologist,

 7   he saw her improvements and stated, quote, "If you

 8   think the first infusion helped, just wait until

 9   you get the second or third."  She never got the

10   chance to get her second.

11          The MS community has a tremendous unmet

12   medical need for effective treatments for this

13   horrible disease. Every day my mom suffers the risk

14   and the reality of her disability progressing.

15   This is a much greater risk than Tysabri if it was

16   used in compliance with the risk management plan.

17          My mother is more than willing to

18   participate in any form of risk management program

19   approved by this committee.  My mom and our family,

20   along with her neurologist, want to have a choice

21   in which treatment is most appropriate for her to

22   slow, stop, or possibly reverse the progression of

1    her disease.

2            MS. LYONS:  I don't own stock in Elan, I

3    don't own stock in Biogen Idec.  I occasionally

4    speak for Biogen Idec as part of a voluntary group.

5            I am K.T. Lyons, and I am an MS survivor.

6    I am one of those who was first diagnosed by a

7    general practitioner, just kind of had an idea that

8    I might have MS from my on and off symptoms, and

9    his idea was since I have had these on and off

10   symptoms for more than eight years, why didn't we

11   just watch it.

12           So, indeed, that is what we did.  I

13   continued my job in a Fortune 500 company, and I

14   continued running two miles a day until that one

15   day in 1977 when I woke up, blind in one eye,

16   completely unable to speak, and having great

17   difficulty in breathing.

18           I was hospitalized and finally a

19   neurologist was called in, and they came in with

20   the permanent diagnosis that I did have MS.  So, I

21   had steroids for my eye and some physical therapy,

22   and I was put on an interferon and sent home.

1        I am one of those who had sickness and

2    depression on the interferon, but nonetheless, I

3    continued with my life.  My disease continued to

4    worsen, so they tried IVIG, they tried another

5    interferon, and then finally, they tried

6    Novantrone.  None of this worked, and I continued

7    to have relapses more often and more often.

8        Finally, just to try to improve the other

9    part of my wellness, I began an involvement with

10    the Bureau of Vocational Rehabilitation, and found

11    out there might be a way that I would go back to

12    work.

13        They enabled me to start my own business,

14    which I did start, and got on my way to at least

15    beginning to feel better.  Then, in 2005, the level

16    playing field that I thought I had gotten onto

17    changed again.

18        I am in severe pain and have difficulty

19    talking all the time from a little known symptom of

20    MS called trigeminal neuralgia, and I take a drug

21    for that, that is an anti-seizure drug, and the

22    drug had built up in my system way too much, and I

1    went unconscious.

2            I remained unconscious in the hospital for

3    more than nine hours, because the combination of my

4    MS lesion and the tegretol had placed me in such a

5    dangerous position.  When the hospitalist came in

6    and when the neurologist came in--.

7            MS. LAWSON:  I would like to disclose that

8    I have received remuneration in the past from

9    Biogen Idec.  My expenses associated with this open

10   public hearing are being paid through personal and

11   private funds.

12           Thank you very much for this opportunity

13   to speak with all of you.  My name is Sonda Lawson.

14   I am a licensed counselor and director of MS

15   Clinical Research and Services at the Michigan

16   Institute for Neurological Disorders MS Center.

17           MIND has a comprehensive MS care facility

18   servicing over 2,000 MS patients.  I am speaking to

19   you today from both a personal and a professional

20   perspective.

21           I was diagnosed with MS 10 years ago, but

22   have really been living with the disease for over

1    15 years now. Although outwardly no one would know

2    that I have MS, there isn't a day that goes by that

3    I don't have some reminder whether it's residual

4    visual deficit from multiple bouts of optic

5    neuritis, bladder issues, numbness, weakness,

6    clumsiness, or seeing how my MRI continues to

7    worsen.

8             Although I try not to live my life

9    wondering what could happen to me, the reality is

10   that in the back of my mind, I do fear that today

11   or tomorrow the disease could manifest into

12   something very significant.

13            It is very real because the threat is

14   present and looming on a daily basis.  I watch this

15   disease slowly or aggressively destroy people's

16   lives.

17            When I was diagnosed, the images that were

18   portrayed were those of essentially a wheelchair

19   sentence, and Dr. Kevorkian was helping MS patients

20   commit suicide because they couldn't bear to live

21   as essentially vegetables.

22            I distinctly remember all the literature

1   indicated that a cure was 5 to 10 years away.

2   Well, here we are now, 10 years later, and we are

3   not even close to a cure.

4           I started working in MS Research in 1999

5   in an effort to help in any way that I could find

6   more options for our patients in the fight to end

7   the devastating effects of this illness.

8           Over the last four-plus years, I have had

9   the unique opportunity to serve as the research

10  coordinator in four different Tysabri clinical

11  trials with a cumulative total of 56 patients.

12          In addition, I personally received four

13  doses of Tysabri, and after taking injections for

14  over 10 years now felt so liberated to not undergo

15  the myriad of side effects and dosing regimen

16  involved with injections.

17          For the first time, I felt more in control

18  of my illness, and so the impact it had on my

19  emotional and physical wellbeing was profound.  My

20  experience is not unique.  Virtually, every one of

21  our patients is eager to resume taking Tysabri.

22          Although Tysabri doesn't represent the

1    answer, it represents better preservation until we

2    can find the answer. Unfortunately, no matter how

3    the data is tweaked, the current approved

4    medications used to treat MS today are only about

5    30 percent effective.

6           Tysabri has been shown to be far more

7    efficacious than any of the current options.  Yes,

8    there is a risk, but if you look at the biologic

9    pipeline, are we ever really going to take away the

10   element of risk.

11          Furthermore, having MS is our biggest

12   risk.  I understand we live in a litigious society.

13   The FDA, pharmaceutical companies, and physicians

14   are appropriately concerned about patients overall

15   safety.

16          As a research coordinator, I have reviewed

17   the new safety measures and consent documentation

18   required from each candidate that will receive

19   Tysabri in the reinfusion trial.

20          Furthermore, I can speak at least on

21   behalf of our facility.  There will be a treatment

22   algorithm that we will follow in order to minimize

 1   and manage the risk to the extent that we can.

 2           Thus, I am confident those that wish to

 3   receive this therapy will be well informed of the

 4   potential risks, and as their healthcare provider,

 5   we will be hypervigilant when it comes to

 6   monitoring our patients and managing their care.

 7           In conclusion, I sit before all of you

 8   today as a clinician and a patient of MS.  I am in

 9   the unique position of intimately knowing the risks

10   and benefits of this disease and its medications.

11   We live in a world where many neurologists view the

12   treatment of this disease as one that should be

13   without risk because MS is not terminal, but rather

14   a manageable disability.

15           So, I ask you how can any physician,

16   pharmaceutical company, or governmental

17   organization determine my/our disability as

18   acceptable or manageable?  We, as patients, should

19   be able to decide.

20           My final note that I leave with you today

21   is an analogy I often use in regards to MS.  Any of

22   us can get hit by a bus.  The difference is those

1    of us affected with MS see the bus coming.  The bus

2    for us represents disability, and it's imperative

3    that we have as many choices as possible to slow

4    the bus down.

5            I truly believe that Tysabri represents a

6    better alternative to slowing the bus down.

7    Tysabri may not be for everyone, but it is another

8    option to add to our armamentarium.

9            Thank you.

10           MS. CROOKS:  Good afternoon.  My name is

11   Barbara Crooks and I am here to defend Tysabri, and

12   I have not been paid by anyone to be here.

13           Life is all about tradeoffs.  I was

14   diagnosed with MS eight years ago, and at that time

15   I was a very active 40-year-old, married, mother of

16   two, who had a very fulfilling job as a registered

17   MRI technologist, working in the neuro field for

18   over 25 years.

19           I have a wonderful family who all had

20   their input as to what I should talk to you about

21   today.  My father wanted you to know that I was

22   district champion in hurdles in high school.  I ran

```
 1   cross country in college, survived a 50-mile bike

 2   race, did hours of aerobics, weight training, and

 3   probably walked 473,000 miles in my neighborhood.

 4           I played basketball with my son and rode

 5   horses with my daughter, and then the MS monster

 6   hit.  I have traded my active lifestyle for a life

 7   of isolation in my home as you can see by the way I

 8   walk.

 9           Throughout the years, I have struggled

10   just to keep my legs under me going from one

11   FDA-approved drug to another.  I have been on

12   hundreds of steroids - Avonex, then, I doubled

13   Avonex, which after relapsing again, I traded

14   double-dose Avonex with single-dose Avonex and

15   Copaxone, only to relapse again.

16           I then traded that combination for Avonex

17   with Mitoxantrone, and most recently I had to trade

18   Tysabri for Imuran.  All of these drugs with their

19   side effects of flu symptoms, nausea, and weakness

20   only helped temporarily.

21           This, combined with my underlying MS

22   symptoms of back pain, hip pain, right foot drop,
```

263

1  balance, and vision issues, and fatigue contributed
2  to the decline of my wonderful life and the loss of
3  my job.  My patients walked better than I did.
4          Then, there was Tysabri, absolutely the
5  easiest and the only positive treatment that I have
6  ever taken.  With the one-hour injection time and
7  only slight nausea, I was able to return home
8  feeling great, slept great, woke the next day with
9  no pain.
10          This shocking discovery led to improved
11  walking and mobility for the first time in over a
12  year.  Had I been able to continue the Tysabri
13  treatment, I believe that I would have been
14  protected from further attacks and given the
15  improved quality of life that I strived for.
16          After my third dose, Tysabri was pulled
17  from the market.  While I understood the decision,
18  I told my husband, Dave, that I would sign a waiver
19  to continue the drug even with the risk of PML.
20  Naturally, my comment upset him, fearing of losing
21  his wife of 24 years.
22          As a Christian, I am not afraid of dying,

264

1    but I am afraid of living as a burden to those I

2    love.  Soon afterwards while running a couple

3    errands, he was struck by my difficulty in

4    performing simple, everyday tasks, which are taken

5    for granted by the average person.

6           This realization led him to understand why

7    I would risk taking this drug in order to regain

8    the basic quality of life that I crave.  The

9    technicalities of how Tysabri binds with the

10   potentially damaging immune cells from the

11   bloodstream and interferes with crossing the

12   blood-brain barrier can be left to all the experts

13   in that area.

14           I am coming to you humbly, as a wife, a

15   mother, a daughter, sister, sister-in-law, and a

16   friend--.

17           MR. LORE:  My name is Steve Lore and I

18   have no financial interest in whatever outcome

19   comes about because of today's hearing.

20           I was diagnosed with MS in 2001, not a

21   great year for the country, and not a great year

22   for me.  But after diagnosis, I went through a

265

1    whole regimen of treatments  I did the ABCs, Rebif,

2    Avonex, Copaxone, and all without really much

3    improvement in the disease.

4              So, my doctor then put me on Solu-Medrol,

5    and then we tried different things, IVIG.  We have

6    finally, most recently, done Novantrone and

7    Retuxan.  Now, those are drugs that have potential

8    side effects that are not very good, but they are

9    just potential side effects, just like with

10   Tysabri.  PML is a potential side effect, and I

11   choose to take that risk of that side effect,

12   because I had one dose of Tysabri, and with that

13   one dose, I felt like my life had been given back

14   to me.

15             I felt so much better after just one dose,

16   and it was pulled before I got the second dose.

17   Who knows what would have happened had I had two or

18   three doses.  Hopefully, I will get a chance to do

19   that before very long.

20             It all comes down to a risk versus

21   benefits, and I think the benefit of having it out

22   there for people to have the choice to take it,

1  because the choices are very limited in scope.

2  There are not that many choices out there, so this

3  was a huge advance for the treatment of a very

4  debilitating disease.  It is like looking down a

5  well.  If you fall into the well, you are not going

6  to get out of it very easily, and MS is like that.

7  It is not a disease that has many ups.

8          There are not many high points in the

9  disease of multiple sclerosis.  It's all of

10  aggression that gets worse and worse and worse,

11  and, you know, hope is a great thing, and I felt

12  that with Tysabri, there was hope.

13          Thank you.

14          MS. BLOOM:  My name is Cheryl Bloom and I

15  live in Idaho, and I am disclosing that I own 300

16  shares of Elan stock, and I am here on my own.

17          "But you look so good."  That is what

18  people tell me all the time, but I don't feel good.

19  On a daily basis, I fight fatigue, dizziness,

20  spasticity, permanent numbness, and pain.  I was

21  once an aerobatic pilot.

22          Since my diagnosis of MS in March of 2001,

file:///C|/dummy/0307PERI.TXT

267

1   at the age of 48, my life altered drastically.  I

2   am here today to talk to you about how my life

3   changed for a few short months when I had the

4   choice to have Tysabri infusions in early 2005.

5          I have a very active case of

6   relapsing-remitting MS in which I have

7   exacerbations every three months.  None of the

8   current disease-modifying drugs nor therapies have

9   done anything to slow down this exacerbation rate.

10          I have been on Betaseron, Betaseron

11   combined with methotrexate, and Copaxone.  To

12   control these exacerbations, I must have

13   I.V.-administered Solu-Medrol for a minimum of

14   three days.  The long-term adverse effects of

15   Solu-Medrol are not reversible.

16          If you add up all of the three-day

17   Solu-Medrol infusions I have had over the past five

18   years, that is a lot of steroid damage to my body.

19   The short-term side effects of infused Solu-Medrol

20   are life altering for me.

21          I cannot work, nor perform such simple

22   daily tasks as cooking dinner for my husband due to

1   debilitating fatigue.  It takes almost two weeks

2   for my life to get back to my normal after an

3   exacerbation and I.V. Solu-Medrol.

4         When my neurologist recommended that I try

5   Tysabri, I was ready to try anything.  The first

6   two infusions in January and February 2005 went

7   very well with no side effects.  Amazingly, I felt

8   like a normal person again, like a person without

9   MS.

10        I was scheduled for the third infusion on

11   March 3rd, 2005.  Unfortunately, I was unable to

12   have this infusion because Tysabri was pulled from

13   the market, but the effects of the drug were enough

14   that I had no exacerbations for five months.

15        Tysabri is the most effective

16   disease-modifying treatment currently known for

17   relapsing-remitting MS, and people with MS should

18   have the choice of Tysabri available to us as long

19   as we have all the information known about the

20   potential risks and benefits.

21        Every drug carries risks of side effects,

22   even Zantac, a drug to which I had an acute

269

1   anaphylactic reaction.  People with MS have a right
2   to decide what risks are acceptable to us for an
3   effective treatment as long as information about
4   the risks is not concealed.
5           I assure you I will adhere to every
6   element of any risk management plan implemented.
7   Please do not make us wait any longer for Tysabri.
8           MR. BARRON:  Hi.  I am Mike Barron.  I am
9   48 years old.  I proudly served my country as a
10  nuclear engine room supervisor aboard the
11  nuclear-guided missile cruiser USS Texas, CGN39.
12          I was honorably discharged from the U.S.
13  Navy and began a civilian career in the nuclear
14  electrical generation industry.  In December of
15  1985, I developed severe optic neuritis of my right
16  eye, but continued to qualify until I received my
17  nuclear reactor operator's license for Pala Verde
18  nuclear generating stations Units 1, 2, and 3.
19          I safely and effectively operated all 13
20  nuclear plants until I suffered another major
21  exacerbation and was officially diagnosed with
22  multiple sclerosis on February 28th, 1995.

1      In mid-1995, I was found medically

2  disabled by MS and placed on Social Security and

3  private pension.  My specialist prescribed me

4  interferons for over nine years. During that time,

5  I found out about Antegren as a MS drug showing

6  great promise.

7      Because of my belief in that new hope for

8  my MS, I took a small position in Elan stock in

9  2002.  In late 2003, I began having severe

10  abdominal lower extremity spasticity attacks as

11  very painful charley horses.

12      After studying the drug with the help of

13  my doctor, I began preparation for getting my first

14  dose.  In October of 2004, I quit Betaseron without

15  telling my doctor because I felt it was making me

16  sicker, and it wouldn't interfere with the Tysabri.

17      On January 5th, I received my first

18  Tysabri infusion.  I received my second infusion on

19  February 4th.  I started feeling so good about

20  myself, I started doing more things around our

21  home.  I started taking walks with my wife again.

22  I started feeling so good about myself, I couldn't

1    feel like I had MS anymore basically.  It was going

2    away.

3          Not only was I feeling better, I was

4    sleeping better at night. then, on February 28th,

5    2005, they took my Tysabri away.  I decided to get

6    actively involved to find out why my Tysabri was

7    taken away.

8          I even volunteered and became a non-paid

9    Biogen MS patient advocate, and after contacting

10   the FDA and figuring out what needed to be done to

11   improve the patient feedback to the FDA, I quit my

12   Biogen patient advocacy, which leads me to why I am

13   here today.

14         I want to let you know that I am fully

15   capable and willing, with the help of my chosen

16   professional, to engage the possible risk of 1 in

17   1,000 in order to achieve a much higher quality of

18   life for me and my wife.

19         I truly believe that Tysabri is the cure

20   for the active component of my dynamic MS.  I would

21   really like to become productive again and give up

22   my 24/7, 365-day job as an MS patient and get a

1    working man's job to pay taxes again.

2          Thank you.

3          MR. RICHERT:  Thank you for the

4    opportunity to speak at this hearing.  My name is

5    Dr. John Richert and I serve as the Vice President

6    for Research and Clinical Programs at the National

7    Multiple Sclerosis Society.

8          Prior to assuming this position one year

9    ago, I was on the faculty at Georgetown University

10   Medical Center, where I served as an investigator

11   in the Sentinel trial of Avonex plus Tysabri.  I

12   currently serve on the Data and Safety Monitoring

13   Boards for the Phase III trials of Novartis' FTY720

14   and Acorda's Fampridine.

15         The mission of the Society is to end the

16   devastating effects of multiple sclerosis.  It is

17   essential that people with MS have more choices for

18   safe and effective treatments.  We are grateful to

19   the FDA for granting expedited review of this

20   application.

21         Determining the relative risks and

22   benefits for Tysabri is a complicated matter.  Data

file:///C|/dummy/0307PERI.TXT

1    are being considered by the Advisory Panel that

2    have not generally been in the public domain.

3    There are also issues of risk for which there are

4    no answers at this time.

5         The National MS Society has pursued all

6    possible avenues to assure that the FDA brings

7    together the expertise required to evaluate all of

8    the data and to come to the best possible decision.

9         In this effort, we submitted a recommended

10   list of potential panelists who, in our opinion,

11   bring to the table a comprehensive and balanced

12   understanding of the issues associated with the

13   return of Tysabri to the market.  We also provided

14   recommendations on clinical and scientific experts,

15   as well as people with MS, to speak at this open

16   public hearing.

17        In order to assure that the FDA heard from

18   every interested individual, we dedicated a

19   month-long front-page link from our website to the

20   FDA comment page.  We also provided information on

21   submitting testimony and participating in the

22   hearings in person.

1          In December 2005, we commissioned an

2     online survey of a random sample of over 800 people

3     with MS, with particular emphasis on determining

4     the amount of risk that they would be willing to

5     accept and still take this drug.

6          The study was coordinated by International

7     Communications Research with Harris Interactive

8     Online and has a margin of error of plus or minus

9     3.4 percent.

10          We have made the results of this survey

11     available to the FDA. Of those who had heard of

12     Tysabri, approximately 25 percent had a positive

13     impression of the drug, 25 percent had a negative

14     impression, and approximately 33 percent expressed

15     a neutral opinion, wishing to have more information

16     before making up their minds.

17          Twenty-six respondents had received

18     Tysabri during its period of availability. Of

19     these, approximately 76 percent wished to receive

20     it again, 12 percent did not wish to receive it

21     again, and 12 percent were undecided.

22          Among all survey respondents,

1    approximately one-third wished to have Tysabri

2    available and half wished to have more information

3    before making a decision.

4            In this survey, questions about acceptable

5    degrees of risk were phrased in a manner such as:

6    Would you wish to take this drug if the risk of

7    dying from PML within 3 years is one in a thousand,

8    or it's 1 percent, or 10 percent, and so on, right

9    up to a 100 percent risk of dying from PML.

10           The responses were spread relatively

11   evenly throughout the range, without a cutoff at

12   any particular degree of risk.

13           We have been extremely fortunate that the

14   approved disease modifying agents for MS have been

15   extraordinarily safe.  Similar degrees of safety

16   are not seen among the medications available for

17   treatment of most other autoimmune diseases.

18           Medications approved by the FDA for use in

19   the treatment of rheumatoid arthritis, Crohn's

20   disease, systemic lupus erythematosus, psoriasis,

21   and ulcerative colitis, include those with degrees

22   of known risk that include fatalities.   These

1  medications include Enbrel, Humira, Kineret,

2  Remicade, methotrexate, azathioprine, and Celebrex.

3         Patients suffering from these autoimmune

4  diseases, along with their physicians, are learning

5  to weigh the potential risks and benefits when

6  making their treatment decisions.  It is likely

7  that our frame of reference for MS drugs will need

8  to change to be more in line with the toxicity

9  risks that are recognized in the treatment of other

10  autoimmune diseases.  The risks of the medications

11  will need to be weighed against the risk of doing

12  nothing.

13         If, after the safety review is complete,

14  the FDA recommends Tysabri's return to the market,

15  we will applaud the addition of this treatment to

16  our arsenal.

17         If the FDA does not approve Tysabri's

18  return to the market, or if it does so with

19  significant restrictions, we will work tirelessly

20  to find ways to satisfy the safety concerns so that

21  more effective treatments can be readily available

22  for the benefit of people with MS.

1          Thank you.

2          DR. KIEBURTZ:  We have videos now.

3          MS. ROBERTS:  Good afternoon, ladies and

4    gentlemen.  Thank you for allowing my videotaped

5    testimony today.  I had planned on being there in

6    person, however, due to a recent exacerbation of my

7    MS symptoms, I am no longer able to travel, and for

8    the same reason, please excuse my slurred speech.

9          My name is Lauren Roberts.  I am 51 and I

10   live in California.  I have been living with MS for

11   30 years.  As a long-time MS patient, I can tell

12   you that there is a tremendous unmet medical need

13   when it comes to MS therapies, because what is

14   available to us today is ineffective for a large

15   population of people with MS like me.

16          My MS started out 30 years ago being

17   fairly mild with only numb hands and a slight drop

18   foot on the right, and I was able to remain a

19   productive member of society working as a certified

20   paralegal for 26 years.  I enjoyed hiking, camping,

21   dancing, swimming, et cetera.

22          However, in 2001, I had to retire due to

1  the worsening of my cognitive problems, and in the

2  past two years, my disability has progressed very

3  rapidly.  MS has taken away my ability to work,

4  destroyed my finances, destroyed my health, and is

5  rapidly destroying my ability to remain

6  independent.

7         Since the worsening of my MS, I have been

8  on Avonex, Copaxone, oral and I.V. steroids.

9  Novantrone was not an option for various reasons.

10  I actually got worse on these therapies.  None of

11  them stopped my attacks, and now I have an overall

12  decline in strength and coordination.  Only Tysabri

13  stopped my attacks and gave me hope with the

14  improvement in my symptoms.

15         The issue here is having the option of a

16  choice, which we currently do not have without

17  Tysabri.  The FDA's over-caution is not warranted

18  here.  It is only hindering our hopes of a recovery

19  and a future.

20         Regarding PML, most well-informed patients

21  know that Tysabri is safe as a monoclonal therapy,

22  and we have taken steps to clear our bodies of

1    medications in anticipation of Tysabri's return.

2         As a Tysabri patient, I would be more than

3    willing to undergo regular medical testing

4    including MRIs and a regular blood test to minimize

5    any possible risk of PML. These are our bodies and

6    our lives, and the unmet medical needs of the MS

7    patients are staggering.  There is a much greater

8    risk presented by not having Tysabri available to

9    us as a choice.

10        Give us back the right to make our own

11   fully informed choice and give us back the tools to

12   do so.  Put Tysabri back in the arsenal of

13   therapies to choose from.

14        I gratefully thank you for this

15   opportunity to address the AC panel.  I pray that

16   you never have to experience this dreadful

17   debilitating disease called multiple sclerosis.  Do

18   the right thing and give us Tysabri back now until

19   something better comes along.

20        Thank you.

21        MS. FUQUAY:  My name is Carol Keller

22   Fuquay.  I have had primary progressive MS for over

280

1    30 years.  It is the most severe form of the

2    disease, and there are no disease-modifying drugs

3    at all to treat it.

4            I am speaking to you on video because it

5    is difficult for me to travel.  I have been in a

6    wheelchair since 1995, and in 2001, I lost function

7    in my right hand. My disease was moving quickly,

8    and in 2004, I became a full-fledged quadriplegic.

9            I had two Tysabri infusions when the drug

10   was available, and I feel that it helped me.  I can

11   still speak and swallow, and I hope Tysabri will be

12   available soon, so that I have the best possible

13   chance to retain these valuable functions.

14           Please bring Tysabri back, so that it will

15   be available for all who need it.

16           Thank you for your valuable time.

17           MR. RICHARDSON:  My name is Charlie

18   Richardson. For full disclosure, I have absolutely

19   no financial interest in any pharmaceutical company

20   including the ones involved here.

21           I was diagnosed in 1988.  I have had a

22   relapsing and progressive course ever since then.

1    I have been in a wheelchair for about three years.

2    I am sort of a classic non-responder.  I have gone

3    through therapy with all the popular drugs.

4         Betaseron treatments produced nothing but

5    bad side reactions, spiking liver enzymes and

6    continued relapses.  Avonex, the persistent flu

7    symptoms and chemical depression was too much to

8    handle, even with single dose and double dose both

9    tried.

10        Mitoxantrone, and multiple steroid

11   treatments have given me incredible osteoporosis

12   that I now have to treat with parathyroid hormone

13   injections.  I tried IVIG and it gave me an

14   anaphylactic reaction on the second dose.

15        Nothing has stopped the relapsing and the

16   progression.

17        I may be stable today, but as you can see,

18   I am a Kurtzke 8, I don't want to become a Kurtzke

19   9, and what I would like to do is to have all the

20   options on the table. Let my neurologist and I

21   decide what the risk and benefit ratios are.  It

22   may turn out that Tysabri has limits to its

282

1  duration of use where recommendation is to get one

2  dose a year.  More experience is necessary in order

3  to be able to determine that.

4        MS is not a monolithic disease.  I would

5  like to advocate with the people, the researchers

6  that are here, that there is some effort being made

7  to determine what the subgroups are and responders

8  and non-responders to MS drugs.

9        I believe that as a biostatistician that

10  you can certainly stratify by HLA markers and by

11  MRI type whether you have T1-hypointense gadolinium

12  enhancing lesions.  You certainly ought to be able

13  to stratify the data in order to be able to get

14  more information about which patient subgroups

15  respond to these drugs and which ones don't.

16        In my biostatistic lectures, I often say

17  and teach that, quote, "Given enough opportunity,

18  uncommon things happen commonly, but not

19  specifically."

20        There is 1 in 1,000 chance of developing

21  MS.  After winning that lottery, I am fully

22  prepared to be one of the 999 out of the 1,000

1    patients who don't develop PML when taking Tysabri.

2            Thank you for your consideration.

3            MS. KUTLER:  My name is Alison Kutler.  I

4    am not sponsored by any organization.  I was

5    diagnosed with MS almost 12 years ago at the age of

6    23.  I have relapsing-remitting MS, which manifests

7    in intermittent exacerbations and a wide array of

8    baseline symptoms which have increased

9    significantly over time.

10           I am an attorney at a large law firm,

11   which sometimes requires long hours.  I also

12   exercise intensely six days per week, and I am an

13   avid tennis player.  I maintain an active social

14   life and travel frequently for both business and

15   pleasure, and I serve on the board and work daily

16   to expand a national nonprofit organization which

17   provides recreational opportunities to severely

18   disabled children.

19           My days begin at 5:00 a.m. and oftentimes

20   run well into the evening as I try to balance the

21   many things on my plate.  I participated in the

22   Tysabri combination trial.  As you are aware, the

1    first phase was complete after 26 months, and the

2    second phase was open-label with the option to

3    discontinue Avonex, which I did.

4            I was on Tysabri alone for five months

5    before the drug was withdrawn.  I started taking

6    interferons nine years ago and have remained on the

7    therapy without any breaks beyond the five months

8    of the clinical trial.

9            Although I am a big believer in the

10   interferons positive impact in limiting my

11   exacerbations and slowing my disease progression,

12   it has resulted in a significant decrease in my

13   quality of life as I have severe side effects which

14   last for 48 hours each week.

15           The challenges presented by being sick two

16   days out of every week, but continuing to lead an

17   active and productive life are great.  Imagine

18   having one chance at a meeting with a member of

19   Congress to advocate your client's position with a

20   burning fever, or attending your father's surprise

21   65th birthday party with a headache so bad you

22   cannot even see straight, or playing a big doubles

1    match with aches and chills throughout your body.

2         During the five months that I was on

3    Tysabri alone, I felt terrific.  My baseline

4    symptoms all but disappeared, and I did not have

5    any exacerbations, and I had two days of each week

6    returned to my life.

7         I also had the comfort of knowing that I

8    was on a drug that is profoundly more effective

9    than any of the other medicines available.  It was

10   an amazing five months in all respects.

11        I would like to commend the FDA for its

12   quick action and would urge the committee to make

13   the recommendation to bring Tysabri back to the

14   marketplace.  I believe that patients, in

15   conjunction with their doctor, should be given the

16   opportunity to conduct a risk-benefit analysis for

17   their individual situation.

18        I have closely reviewed the available data

19   over the past year, as well as the recently

20   released reports in the New England Journal of

21   medicine, which clearly suggest to me that Tysabri

22   is an incredibly effective drug and the risk is

1    manageable at this time.

2            There will be a growing body of knowledge

3    regarding the drug's effectiveness and the

4    potential causes of PML, and my ongoing

5    decision-making process will continue to take this

6    new information into account.

7            I would also urge the committee to make

8    Tysabri available to newly diagnosed patients and

9    others, such as myself, who have worked hard over

10   time to limit disease progression.  I think it

11   would be the absolute wrong approach to make

12   Tysabri only available as a last resort to patients

13   who have not had success with other treatments and

14   who have more severe progression.

15           The best advantage to Tysabri is that it

16   may be able to slow disease progression to prevent

17   thousands of patients from developing more severe

18   and debilitating cases of MS that will diminish

19   their abilities to be healthy and productive

20   members of society.

21           Thank you for the opportunity to testify.

22           MRS. MILLER:  Good afternoon.  Thank you

file:///C|/dummy/0307PERI.TXT

287

1    for allowing us to speak today.  Neither my husband

2    nor I have any financial interest in, nor have we

3    received any financial help in being here.

4            My name is Karen Miller.  I have multiple

5    sclerosis.  What you should also know about me is

6    that I do not take risks easily.  I floss daily, I

7    buy products with the Consumer Reports Seal of

8    Approval.  I intentionally overpay my estimated

9    taxes.  I drink milk only after double-checking the

10   sell by date.  And I want to take Tysabri again.

11           I would prefer not to risk coming here to

12   speak publicly.  I would prefer not to risk being

13   in a drug trial with--and I quote from the standard

14   consent form--"Risk including the possibility of

15   death and side effects not currently known."

16           I would prefer not to risk having PML.

17   So, why, in order to speak here for two and a half

18   minutes, would I spend three days resting, have my

19   husband work on my muscles and tendons from 3:00

20   a.m. to 7:00 a.m. this morning, and risk the next

21   weeks bedridden?

22           Why, on November 4th, 1997, did I consent

1    to be the 32nd human being to participate in the

2    early Phase II trial for what was then called the

3    Antegren?

4             Why, on February 28th, 2005, did I spend

5    $15,000 from my savings to buy bottles of a drug

6    that was being removed from the market?

7             So, why would I take Tysabri and why would

8    I be here today?  To help the medical science of

9    multiple sclerosis, to aid the MS population, to

10   have a chance to teach legal ethics again, to take

11   a shower without anybody nearby in case I fall, to

12   swallow confident that I will not choke on my own

13   saliva, to read and to remember, to feel my niece's

14   hug.

15            Yes, there is risk, but with the medical

16   information from my wise and caring neurologist,

17   Dr. William Sheremata, and with the support of my

18   husband and family, with prayer, I took Tysabri in

19   1997 and again in 2004, 2005, and I will do

20   everything I possibly can for those who want to,

21   and for myself, to have the chance to take it

22   again.

1          Off Tysabri, on a good day, I am a 5.5 on

2    the disability scale, on my crutches for about 10

3    feet, facing chemotherapy.

4          On Tysabri, it's a whole new day.  I am a

5    1.5 on the EDSS scale.  I have been on my bike for

6    10 miles facing the road ahead.

7          MR. MILLER:  My name is David Miller.  For

8    the last eight years I have looked at Tysabri

9    through three different lenses:  as a former

10   business executive, now as a pastor, a theologian,

11   and a Professor of Business Ethics at Yale Divinity

12   School and Yale School of Management, and most

13   importantly, as the husband and caregiver of a

14   woman with MS.

15         As a former business person, I want

16   companies to develop and make a good profit.  As a

17   pastor, a theologian, and an ethicist, I raise

18   questions of justice, compassion, and integrity.

19         Finally, as a husband of 26 years, and now

20   a caregiver, every day my wife is without Tysabri I

21   see her ability to function running out like sand

22   granules in an hourglass.  Without Tysabri, she is

290

1    at greater risk of ending up in a wheelchair and
2    becoming a cognitive shell of the women she once
3    was.  This is real risk.
4          I have this image.  I enter an
5    old-fashioned bank and walk up to the counter.
6    Behind the inch-thick bullet glass stands a doctor
7    in a white lab coat.  In front of him is a small
8    glass vial of Tysabri.  The doctor does nothing. I
9    shout, asking for the Tysabri.  "I will pay
10   anything," I weep.  He does nothing.  I am not sure
11   if he can hear me.  I pound against the glass,
12   trying to get it to break to get at the vial.  Of
13   course, the glass window is bulletproof and the
14   shield easily withstands my blows.  But finally,
15   the doctor moves and reaches for the vial, and the
16   question is will be break through the glass barrier
17   or will he turn away.
18         Let me show you another piece of glass,
19   this small, triangle glass was once part of the
20   North Tower of the World Trade Center in New York.
21   I had the privilege to serve as a chaplain at
22   Ground Zero for nine months.

1          Early one morning as we left the pit to go

2     to the morgue, a fireman gave this chard of glass,

3     this once clear, strong, impenetrable glass.

4     Imagine people like you and me, that morning

5     peacefully looking out their window, out that

6     glass.  Suddenly the planes hit and this glass

7     shattered as did their lives.

8          I am reminded by these images that nothing

9     in life is fully safe or 100 percent risk-free.

10    Not the bulletproof windows in an old bank, not the

11    impenetrable glass from the North Tower, and not

12    even exciting new advances in medicine.

13         Too often all we do is sweep up the broken

14    glass of our life, but today, you, you have the

15    rare privilege to break through a barrier for the

16    good, and restore thereby the shattered chards of

17    our lives - not just for my wife, but also for the

18    countless others impacted by this invidious

19    disease.

20         Please return Tysabri to the market.

21         I thank you.

22         MS. SALES:  Hi.  My name is Barbara Sales.

file:///C|/dummy/0307PERI.TXT

292

1    I am from Raleigh, North Carolina.  I have no

2    affiliation with any company.  I am here on my own

3    behalf.

4         I was diagnosed with relapsed-remitting MS

5    in March of 2000.  I am a pediatric nurse and was

6    able to work until February of 2003.  At that

7    point, my most significant symptoms were extreme

8    fatigue and migraine headaches for three years.

9         I had tried numerous prescription and

10   over-the-counter medications with no relief.  I

11   even went as far as having Botox injections and

12   sinus surgery.  I participated in a double-blind

13   drug study starting August 25th, 2003, and

14   continued on Tysabri with my daily injections of

15   Copaxone until the Tysabri was taken off the

16   market.  My last dose was on February 21st, 2005.

17        I found out I was on the Tysabri during

18   the study, after the drug was pulled from the

19   market.  I had done very well on the Tysabri with

20   no side effects or exacerbations.

21        From August 25th, 2003, until February

22   21st, 2005, while I was on the Tysabri, I had an

1    average of 5.3 headaches per month over 19 months

2    compared to daily headaches before that, and the

3    fatigue was noticeably improved.

4         Since stopping the Tysabri, there has been

5    an increase in my headaches and fatigue.  The

6    headaches have increased to 6.6 per month, and I

7    now have daily headaches continuously since

8    December of 2005.

9         I am hopeful that all we learn from new

10   medications, there will be a cure in my lifetime,

11   and I am requesting that Tysabri be brought back on

12   the market and let the patient and their physician

13   decide if this drug is the drug of choice in

14   treating their MS.

15        Thank you.

16        MS. SMITH:  Good afternoon.  My name is

17   Heather Smith.  I am 36 years old and live in

18   Indiana.  I was diagnosed with MS in 1998.  In full

19   disclosure, I bought 100 shares of Biogen stock

20   after realizing that Tysabri was a miracle drug.  I

21   also provide my views as an MS patient to Biogen on

22   an advisory panel as a volunteer.

1          Today, you will hear requests, such as

2    please return Tysabri to MS patients, let patients

3    evaluate their own risk versus quality of life.

4          I, too, am motivated by these requests and

5    bring them to you as my own, but as I sit here,

6    because I cannot stand for the duration of my

7    allotted time, I am motivated by other requests

8    that I hear every day, requests, such as "You dance

9    with me, mamma", "You chase me now, mamma", "You

10   carry me, please."

11         These requests from my son, Ezra, that I

12   cannot fulfill are the key to my risk-benefit

13   equation.  In the five short years since my

14   diagnosis, I became disabled.  I struggle to walk

15   with the help of a walker.  I am constantly

16   fatigued and I am incontinent.

17         I have taken Avonex and Rebif while

18   watching my disease progress.  These drugs were

19   obviously failing me, yet, out of fear and lack of

20   alternatives, I continued these shots, waiting for

21   a new choice.

22         That choice came in January of '05, when I

1    received my first infusion of Tysabri.  After only
2    one dose, I felt that Tysabri was a miracle for me.
3    I was able to make outings on my own.  My mobility
4    drastically improved, and I transitioned from my
5    walker back to using a cane.
6          The best reward was that I had more energy
7    to spend with my son.  By my second infusion, in
8    February of '05, I started to focus on my future.
9    I no longer had to budget my energy and choose
10   between playing with Ezra or taking a shower.  I
11   could freely enjoy each moment of his life with a
12   renewed hope.
13         On March 1st of '05, my hopes vanished and
14   my MS has continued to progress.  Interferons were
15   not helping me, so I began taking Copaxone.  I am
16   no longer able to drive, I cannot go anywhere
17   unassisted.
18         With all this considered, my risk-benefit
19   analysis is quite clear.  I know Tysabri worked for
20   me when all other MS drugs failed.  Each MS patient
21   has the right to make an informed choice and create
22   their own risk-benefit analysis.  Each patient will

1   have a different equation and a different answer at

2   different stages of their life.

3           It is easy for me to see that five years

4   ago, I would not have taken Tysabri.  I would have,

5   however, lived with a greater peace of mind knowing

6   that there was another choice available for me when

7   I was ready and my need for benefits outweighed the

8   risks.

9           I may never be able to carry my son, Ezra,

10  or chase him, or dance with him, but he deserves a

11  mom that is as healthy as possible.  Each day

12  without Tysabri is a day without hope, a day closer

13  to my permanent disability.

14          DR. WADE:  Good afternoon.  I would like

15  to thank the committee for allowing me to speak

16  today.  I have a consulting agreement and speak on

17  a speakers program for Biogen Idec.  I speak for

18  Serono.  I speak for the makers of Copaxone, Teva,

19  and I also speak for Berlex.

20          I have approximately 150 MS patients that

21  I follow in my office.  In the fall of '05, I began

22  to treat MS patients with Tysabri and treated about

1    15 patients.  My patients found the medicine very,

2    very effective.  I have one patient that found she

3    was able to get up and clean her house for the

4    first time in four years.  She can't take any of

5    the interferons, she has depression, and she has

6    skin reactions to Copaxone therapy.

7            With the withdrawal of this medication

8    from the market, there was a significant amount of

9    despair in my patients.  They again had to live

10   more with the fear of the next exacerbation, about

11   getting worse on this disease.

12           I live with the same fear.  I had optic

13   neuritis when I was in college.  I developed

14   intranuclear ophthalmic plegia, had double vision

15   in medical school, and was diagnosed with multiple

16   sclerosis.

17           I was treated a little bit of low-dose

18   prednisone, but it didn't do much, but I did

19   recover enough to complete medical school and

20   started internal medicine training. During that

21   time, I had a significant exacerbation where I

22   couldn't walk for a month.  I was home in bed.

298

1       I recovered, finished my medicine

2   training, and went on to training in Neurology.  In

3   Neurology, I had another significant exacerbation

4   and back home in bed, but took intravenous

5   Solu-Medrol and got better in a week.

6       I completed my training and started in

7   practice in Hartford, Connecticut in 1990.  I have

8   had several exacerbations over the time.  One in

9   the mid-1990s left me so that it wasn't all better.

10  I finally took my head out of the sand and said I

11  might as well take one of these medicines.

12      I took a daily injection medication

13  because it seemed easiest.  I found after taking

14  that medicine for about a year and a half I had

15  another attack, and at the end of the month, there

16  was about 10 doses left in the refrigerator,

17  because taking a shot every day reminds me I am

18  sick every day, and I try to deny being sick.

19      I switched to weekly interferon injections

20  and have taken that medicine on a regular basis.  I

21  have had one attack in the past four years.

22      Unfortunately, I have flu-like reactions

1    for two to three days after every injection.  I am

2    still not feeling well today.  I take the

3    injections on Sunday.

4            When Tysabri came out, I took three doses

5    of the medication and then it was withdrawn from

6    the market.  I am back on weekly interferon

7    therapy, back having flu-like reactions.  My

8    patients and I live in fear of the next attack,

9    live in fear of losing my ability to help my

10   patients, to be with my family.

11           I understand there is a risk to taking

12   Tysabri, but there is a real risk to not taking it,

13   having more attacks, and getting worse and worse

14   and worse and worse.

15           I have a great deal of empathy for all the

16   patients that have spoken here today.  I understand

17   how they feel.  I am asking this committee to allow

18   me to treat my patients with this very, very

19   effective therapy.

20           Thank you.

21           MS. GREENFIELD:  My name is Audrey

22   Greenfield and I am 49 years old.  I have no ties,

1   financial or otherwise, to either Elan or Biogen

2   Idec.

3           I was the girl who had everything - ivy

4   league education, successful career as a real

5   estate partner in a prestigious law firm, beautiful

6   family, and multiple sclerosis.

7           This insidious disease that progresses

8   daily has robbed me of almost everything I once

9   had.  Even my choice for treatment has been taken

10  away from me.  I am appearing here today as my own

11  advocate to have my right of choice restored to me.

12          I have always been proactive when it came

13  to deciding on a course of treatment for my MS.  I

14  have tried all available treatments - Novantrone,

15  Cytoxan, cladribine, methotrexate, steroids, IVIG,

16  the ABC drugs, and Rebif.

17          With each of these treatments, my doctor

18  required me to have monthly blood tests, periodic

19  liver and kidney function tests, EKGs, and MRIs.

20  Unfortunately, the side effects with each treatment

21  were debilitating, and for what. There was not one

22  bit of improvement in my level of disability or in

1    the progression of my disease.

2             Then, I heard about Tysabri.  I discussed

3    it with my doctor, who said the drug was well

4    tolerated in clinical trials.  In January 2005, my

5    health insurance provider pre-approved payment for

6    12 treatments of Tysabri.  I had my first and only

7    infusion in February 2005.  Then, the drug was

8    pulled from the market.

9             I had no adverse reactions or side

10   effects.  I was even able to ride the bus home on

11   my own after treatment. That alone was a huge step

12   forward for me in this disease.

13            It has been over a year now and I haven't

14   had any treatments of any kind because nothing has

15   worked for me.  I feel as if I am losing my battle

16   against MS.  I have no other options.  Without

17   Tysabri I don't even have hope.

18            I have no illusions.  Tysabri was never

19   marketed or hailed as a cure for MS, however, the

20   clinical trials proved conclusively that the drug

21   halted the progression of the disease and, in some

22   cases, lessened the degree of disability.

```
 1              It is wrong to think that MS is not a

 2      life-threatening disease.  My quality of life is

 3      threatened every day that I go without a treatment

 4      that I deserve.

 5              My daughter is graduating from high school

 6      in June.  Before I know it, she will be getting

 7      married.

 8              I would like the chance to halt the

 9      progression of my disease and walk down the aisle

10      with her.  Please allow me the chance to see if

11      Tysabri can make my dream come true.

12              MR. FRANKLIN:  Good afternoon and thank

13      you for the very important work you are doing on

14      this subject today.

15              I am Doug Franklin.  I am the President

16      and CEO of the Multiple Sclerosis Association of

17      America.

18              We were founded in 1970.  For 35 years, we

19      have had only one goal, and that is to help people

20      deal with this dreaded disease.  All of our efforts

21      are aimed at the patient and their care partners.

22      That is all we do.
```

```
 1              Our mission is to enrich the quality of
 2      life for individuals with MS.  We receive funding
 3      support for some of our services in public
 4      education outreach from pharmaceutical companies.
 5      We support the FDA position that all currently
 6      approved MS drugs have value for MS patients.
 7              We speak to all of our patients about all
 8      of the therapies.  Informed consumer consent is our
 9      objective.  The funding we receive from
10      pharmaceutical companies makes up less than 10
11      percent of our total funding.  We receive no
12      government funding.  The remaining 90 percent comes
13      from the public through donations, through gifts,
14      through special event fund-raising.
15              We remain a strong neutral advocate for
16      patient education, and we are very pleased to be
17      able to be here today to respond, to be able to
18      share our views on the reintroduction of the drug
19      Tysabri.
20              When I say "we," I am speaking for MSAA.
21      I am speaking for the charity, our Healthcare
22      Advisory Council, our board of directors, and in
```

```
 1   particular, our Chief Medical Officer, Dr. Jack

 2   Burkes, who had to leave today.

 3           Dr. Burkes is a clinical Professor of

 4   Medicine, of Neurology, at the University of

 5   Nevada, School of Medicine. He is also a member of

 6   the Medical Advisory Board of the National MS

 7   Society.  He has edited two textbooks on multiple

 8   sclerosis, and in the 1970s, he established the

 9   Rocky Mountain MS Center in Colorado, one of the

10   nation's first comprehensive MS centers.

11           His input into this brief today represents

12   MSAA's thoughts.  He believes people's lives are at

13   stake and he has been serving MS patients for more

14   than 30 years.

15           We all know this drug was approved for the

16   treatment of relapsing-remitting MS and released

17   into the marketplace in November of 2004.  In our

18   winter edition of our quarterly newsletter, The

19   Motivator, Dr. Burkes had the following to say in

20   the Ask the Doctor section.

21           He said discussing the role of Tysabri

22   with your doctor is an excellent idea.  Only one
```

1    year data is available on adding Tysabri to Avonex

2    and no data is available for combining Tysabri with

3    Betaseron, Copaxone, or Rebif.

4         Tysabri plus Avonex was more effective

5    than Avonex plus placebo at one year in a group of

6    patients on Avonex who were having attacks or new

7    MRI activity.  In my opinion, this is a very

8    selected group of patients, may not be relevant to

9    Copaxone or high-dosed interferons.  More studies

10   are needed before the effectiveness and/or

11   potential complications of combination therapy

12   using Tysabri are known.

13        Two months later, the drug was voluntarily

14   suspended, and based on reports of the dramatic

15   events that we are all well aware of, including the

16   events in Anita Smith's death.

17        The MSAA welcomes the development of newer

18   and more effective medications to treat MS, but we

19   believe great care must be exercised when bringing

20   a new drug with potential serious side effects to

21   market.

22        In our experience, most of our MS patients

1  do very well on currently available medications

2  with minimal side effects in the long run

3  especially if started on treatment early in their

4  disease course.

5          As a charity, we struggle with the concept

6  of a possible black box warning label sufficing as

7  a caution to physicians and patients.  Caveat

8  emptor, buyer beware seems to run contrary to sound

9  medical treatment based on first do no harm

10  principles.

11          We strongly believe that patient safety

12  must be a primary consideration as the FDA proceeds

13  with the process of analyzing all of the available

14  data.  If Tysabri is reintroduced, precautions

15  should be taken to protect the patient until

16  long-term safety can be evaluated.

17          These include strong scientifically-based

18  protocols to ensure the patient's understanding of

19  the treatments versus the risk-benefits.  This can

20  be problematic.

21          Can this be assured if more than 50

22  percent of patients have cognitive dysfunction,

307

1    which includes reduced executive function, which

2    may make it difficult to completely understand the

3    consequences of decisions?

4         Two issues predominant are patients'

5    perspectives on Tysabri, the relative strength of

6    the drug over current treatments and toxicity.

7    Many patients are convinced that Tysabri is twice

8    as effective as any other treatment available

9    today.

10        For example, a website

11   mspatientsforchoice.org has developed a positive

12   portrait of the benefits of Tysabri over currently

13   available treatments.  Does the FDA agree with

14   these conclusions?  This type of information will

15   likely become accepted by MS patients who are

16   always looking for the cure.

17        We need the FDA's position on relative

18   efficacy.  Who more credible than the FDA to

19   address these issues?

20        Also, the MS patient's risk of PML are

21   perceived as rare.  Counter to this, we hear

22   concerns of 1 in 1,000 death rates associated with

1    this.  What is the truth?  Are there potential

2    risks other than PML, cancers or infections? Can

3    PML be detected before damaging the brain?  Dr.

4    Burkes insists that by the time PML is detected,

5    every single cell in the brain has been affected.

6              MS. CANAVAN:  Hello.  My name is Marcy

7    Canavan.  I have no ties, financial or otherwise,

8    to any drug company.

9              I led a pretty charmed life up until a few

10   years ago.  Then, one day MS hit me with a bang.

11   Within two months of the initial attack, I couldn't

12   walk across my yard.  In less than a year I was

13   using a scooter, retired on disability, and drove

14   my car with hand controls.

15             I have taken Solu-Medrol many, many times,

16   Betaseron, Copaxone, methotrexate, and finally,

17   Novantrone. That was the only drug that helped.

18   The fast downhill spiral stopped, and I actually

19   improved, but I have exhausted my lifetime limit.

20             The downhill spiral is starting again.  I

21   risked congestive heart failure and leukemia to

22   take the Novantrone.  Before the Novantrone, aside

1    from the physical problems, I had very serious

2    cognitive difficulties.  I stopped reading anything

3    because by sentence two, I couldn't remember what

4    sentence one said anymore.

5           My memory disappeared.  I found myself

6    forgetting where I was, where I was going, and how

7    to get where I had been on decades.  I can't tell

8    you how many times I just sat on the beltway lost.

9    Simple words eluded me.  My IQ dropped 25 points,

10   and that was before I hit bottom.

11          My reason for being here today is simple.

12   I have no treatment options left, and at the rate I

13   am losing ground again, in a few years, my life

14   won't be worth living.

15          I am willing to take a chance on a drug

16   that shows as much promise as Tysabri, and

17   according to the data you have in front of you, it

18   is much safer than the one I have already taken

19   anyway.

20          When I was a kid, I had my life saved

21   twice by drugs, once when I had blood poisoning and

22   once with pneumonia.  Those same two drugs almost

310

 1     killed me as an adult, when I had full-blown

 2     anaphylactic shock attacks after taking them.

 3            Am I mad because the FDA approved a drug

 4     that nearly killed me?  No.  If you hadn't approved

 5     them, I wouldn't be here at all today anyway.

 6            The risk of death is not a reason to deny

 7     a desperately needed drug.  What you have to do is

 8     weigh the risk of the death against the need for

 9     the drug.

10            I want to see my grandson grow up.  I

11     would rather be able to enjoy things now and take a

12     chance that I won't live that long than miss

13     enjoying life and live to be 100. Quality is

14     important, and it is more important than quantity.

15     That applies to lots of things, but especially to

16     life.

17            I ask you to approve Tysabri for me, for

18     the other people here, but even more for my

19     daughter, Emily, who has already spoken to you

20     today.  Compared to her, I still lead a charmed

21     life.  I was 46 when MS hit me.  She was 24.  All

22     of her plans and hopes for a life are in shambles

1    thanks to MS.

2           Several days a week, she is in bed all day

3    because of intractable pain.  She has all the same

4    problems I do, and she is only 27 years old.  I had

5    a normal life for 25 years after finishing school.

6    She had a normal one for 4 months.  I want Tysabri

7    badly, but for my baby, I want it desperately.

8           You have the power to give her a chance,

9    and I would ask you to do it.  When you make your

10   decision, please think about how you would feel if

11   Emily was your child.

12          DR. KIEBURTZ:  I thank all the speakers

13   who have spoken so far.  We are going to take a

14   15-minute break before we go on with the rest of

15   the speakers.

16          We will reconvene right at 3 o'clock.

17          [Break.]

18          DR. KIEBURTZ:  We will begin the open

19   public hearing now, please.

20          MR. CROYDON:  Good afternoon.  My name is

21   Stan Croydon.  No one has paid for me to be here

22   today, and I have no financial interests in any

 1    drug companies.  They, however, have a whole lot of

 2    my money and a big interest in me keeping using

 3    their medications.

 4          Before I left home this morning, my wife

 5    said to me, "Why are you speaking today?  You never

 6    took that drug." I said, "You are right, but if

 7    someday I or my doctors think I should be taking

 8    it, I want that option.  I want people to know that

 9    we are the ones who ought to making the decisions

10    on the pros and cons of medication."

11          I have had multiple sclerosis symptoms

12    since 1967. For the mathematically challenged, that

13    is 39 years, but it took me eight years to get an

14    accurate diagnosis.  Then, it was one made by a

15    psychiatrist who I was seeing.  I had gone to my

16    regular doctor one visit, and said give me the

17    names of a good psychiatrist and a good

18    neurologist.  One of those two has to have the

19    answer to what is wrong with me.

20          Guess what.  He gave me the name of his

21    psychiatrist.

22          Well, back in 1975, steroids were about

```
 1   the only thing available to help a person with MS,

 2   and when I took mine for the first time, I felt

 3   like I was walking around with my finger plugged

 4   into a light socket.  I also began to worry that I

 5   might wind up pumping iron or even worse by the

 6   time I got finished taking those drugs.  Ever since

 7   I have tried to avoid those.

 8           It was a decade ago I first learned how to

 9   give myself a daily subcutaneous shot of Copaxone,

10   but when my insurance company looked at the fine

11   print of what my doctor had written, they realize I

12   had the wrong kind of MS to be taking that drug.

13           Consequently, I had to switch to Avonex

14   three months later, and instead of giving me those

15   shots, I decided to let the nurses at work give me

16   my weekly intramuscular injections for the next

17   seven years.

18           Today, I am using Rebif at the

19   recommendation of another MS patient who is a nurse

20   and an expert in her field.  She saw improvement in

21   her condition after taking that subcutaneous

22   medication, and my doctor concurred with my
```

1    decision to change.

2           I like to think of myself as a well

3    educated medication consumer.  I ask my doctor

4    plenty of questions about the course of my MS, ask

5    for an MRI if I feel I need it, and he thinks I am

6    getting better, and if I hear about new therapies,

7    I go and investigate them.

8           I even read the sheets you get at the

9    pharmacy that come with your medications.  I have

10   been doing that ever since one neurologist

11   prescribed an antidepressant for me when I told him

12   I was depressed.  I called him back three days

13   later and said, "I have stopped your drug."  I

14   said, "When I first came to see you, I was

15   depressed, now, I am impotent, and frankly, I would

16   rather be depressed."

17          [Laughter.]

18          MS. TIBURTIUS:  Good afternoon.  My name

19   is Bartira.  I was diagnosed with a mass in March

20   2001.  I was on the Tysabri starting combination

21   with Avonex for 28 months.  In the past, I did some

22   educational programs coordinated by Biogen.  The

1    company paid for my expenses and my time.  I spoke

2    about my experience with MS, not about Biogen

3    drugs.  Biogen did not encourage or pay for me to

4    be here today.

5          I am a language teacher and I need to be

6    alert all the time, but four years ago, I had two

7    very bad relapses that put me in the hospital.  I

8    had all the symptoms in the book including loss of

9    vision, and the worst of all, I had cognition

10   problem.

11         I can handle everything even a wheelchair,

12   if I have to, but I cannot handle to lose the

13   ability of thinking, and I had some very bad

14   cognition problem.

15         I was switching letters, I had difficulty

16   remembering simple words.  I was getting lost in

17   conversation.  I used to wake up in the morning and

18   not having a clue where I was.  I was spacing out.

19   I didn't know if I was dreaming or it was a

20   reality.  I was confused between where reality and

21   a dream.  I was like a nightmare.

22         When I start on the Tysabri study, it was

 1   a double-blinded study, but it seems the first

 2   infusion, I was so sure that I was getting the real

 3   thing, not the placebo because the way I was

 4   feeling.  Little by little I started to feel

 5   healthier and healthier.

 6        The fatigue was gone, I had my brain back

 7   100 percent, but a couple months ago, I started to

 8   have problems again.  The fatigue is back, my left

 9   arm is numb, my face is numb, and again sometimes I

10   cannot remember simple words.

11        I am very scared.  I am a teacher.  I

12   cannot afford to lose the ability of thinking

13   again.  I don't want to go back there.  I want to

14   be able to walk, to speak, eat and drink, and the

15   most important, I want to be able to think.  I want

16   to know when I am dreaming or when I am awake.

17        I do understand that there is a small risk

18   with Tysabri, but the risk that I am willing to

19   take.  If someone tells me that Tysabri is going to

20   take 10 years off of my life, but I will have the

21   quality of life I had a year ago when I was in the

22   study, I would take it.

```
 1   financial or otherwise, to either Elan or Biogen

 2   Idec.

 3            I was the girl who had everything - ivy

 4   league education, successful career as a real

 5   estate partner in a prestigious law firm, beautiful

 6   family, and multiple sclerosis.

 7            This insidious disease that progresses

 8   daily has robbed me of almost everything I once

 9   had.  Even my choice for treatment has been taken

10   away from me.  I am appearing here today as my own

11   advocate to have my right of choice restored to me.

12            I have always been proactive when it came

13   to deciding on a course of treatment for my MS.  I

14   have tried all available treatments - Novantrone,

15   Cytoxan, cladribine, methotrexate, steroids, IVIG,

16   the ABC drugs, and Rebif.

17            With each of these treatments, my doctor

18   required me to have monthly blood tests, periodic

19   liver and kidney function tests, EKGs, and MRIs.

20   Unfortunately, the side effects with each treatment

21   were debilitating, and for what. There was not one

22   bit of improvement in my level of disability or in
```

1    the progression of my disease.

2              Then, I heard about Tysabri.  I discussed

3    it with my doctor, who said the drug was well

4    tolerated in clinical trials.  In January 2005, my

5    health insurance provider pre-approved payment for

6    12 treatments of Tysabri.  I had my first and only

7    infusion in February 2005.  Then, the drug was

8    pulled from the market.

9              I had no adverse reactions or side

10   effects.  I was even able to ride the bus home on

11   my own after treatment. That alone was a huge step

12   forward for me in this disease.

13             It has been over a year now and I haven't

14   had any treatments of any kind because nothing has

15   worked for me.  I feel as if I am losing my battle

16   against MS.  I have no other options.  Without

17   Tysabri I don't even have hope.

18             I have no illusions.  Tysabri was never

19   marketed or hailed as a cure for MS, however, the

20   clinical trials proved conclusively that the drug

21   halted the progression of the disease and, in some

22   cases, lessened the degree of disability.

1          It is wrong to think that MS is not a

2    life-threatening disease.  My quality of life is

3    threatened every day that I go without a treatment

4    that I deserve.

5          My daughter is graduating from high school

6    in June.  Before I know it, she will be getting

7    married.

8          I would like the chance to halt the

9    progression of my disease and walk down the aisle

10   with her.  Please allow me the chance to see if

11   Tysabri can make my dream come true.

12         MR. FRANKLIN:  Good afternoon and thank

13   you for the very important work you are doing on

14   this subject today.

15         I am Doug Franklin.  I am the President

16   and CEO of the Multiple Sclerosis Association of

17   America.

18         We were founded in 1970.  For 35 years, we

19   have had only one goal, and that is to help people

20   deal with this dreaded disease.  All of our efforts

21   are aimed at the patient and their care partners.

22   That is all we do.

303

1        Our mission is to enrich the quality of

2    life for individuals with MS.  We receive funding

3    support for some of our services in public

4    education outreach from pharmaceutical companies.

5    We support the FDA position that all currently

6    approved MS drugs have value for MS patients.

7        We speak to all of our patients about all

8    of the therapies.  Informed consumer consent is our

9    objective.  The funding we receive from

10   pharmaceutical companies makes up less than 10

11   percent of our total funding.  We receive no

12   government funding.  The remaining 90 percent comes

13   from the public through donations, through gifts,

14   through special event fund-raising.

15       We remain a strong neutral advocate for

16   patient education, and we are very pleased to be

17   able to be here today to respond, to be able to

18   share our views on the reintroduction of the drug

19   Tysabri.

20       When I say "we," I am speaking for MSAA.

21   I am speaking for the charity, our Healthcare

22   Advisory Council, our board of directors, and in

```
1    particular, our Chief Medical Officer, Dr. Jack
2    Burkes, who had to leave today.
3            Dr. Burkes is a clinical Professor of
4    Medicine, of Neurology, at the University of
5    Nevada, School of Medicine. He is also a member of
6    the Medical Advisory Board of the National MS
7    Society.  He has edited two textbooks on multiple
8    sclerosis, and in the 1970s, he established the
9    Rocky Mountain MS Center in Colorado, one of the
10   nation's first comprehensive MS centers.
11           His input into this brief today represents
12   MSAA's thoughts.  He believes people's lives are at
13   stake and he has been serving MS patients for more
14   than 30 years.
15           We all know this drug was approved for the
16   treatment of relapsing-remitting MS and released
17   into the marketplace in November of 2004.  In our
18   winter edition of our quarterly newsletter, The
19   Motivator, Dr. Burkes had the following to say in
20   the Ask the Doctor section.
21           He said discussing the role of Tysabri
22   with your doctor is an excellent idea.  Only one
```

1    year data is available on adding Tysabri to Avonex

2    and no data is available for combining Tysabri with

3    Betaseron, Copaxone, or Rebif.

4              Tysabri plus Avonex was more effective

5    than Avonex plus placebo at one year in a group of

6    patients on Avonex who were having attacks or new

7    MRI activity.  In my opinion, this is a very

8    selected group of patients, may not be relevant to

9    Copaxone or high-dosed interferons.  More studies

10   are needed before the effectiveness and/or

11   potential complications of combination therapy

12   using Tysabri are known.

13             Two months later, the drug was voluntarily

14   suspended, and based on reports of the dramatic

15   events that we are all well aware of, including the

16   events in Anita Smith's death.

17             The MSAA welcomes the development of newer

18   and more effective medications to treat MS, but we

19   believe great care must be exercised when bringing

20   a new drug with potential serious side effects to

21   market.

22             In our experience, most of our MS patients

306

1    do very well on currently available medications

2    with minimal side effects in the long run

3    especially if started on treatment early in their

4    disease course.

5         As a charity, we struggle with the concept

6    of a possible black box warning label sufficing as

7    a caution to physicians and patients.  Caveat

8    emptor, buyer beware seems to run contrary to sound

9    medical treatment based on first do no harm

10   principles.

11        We strongly believe that patient safety

12   must be a primary consideration as the FDA proceeds

13   with the process of analyzing all of the available

14   data.  If Tysabri is reintroduced, precautions

15   should be taken to protect the patient until

16   long-term safety can be evaluated.

17        These include strong scientifically-based

18   protocols to ensure the patient's understanding of

19   the treatments versus the risk-benefits.  This can

20   be problematic.

21        Can this be assured if more than 50

22   percent of patients have cognitive dysfunction,

1    which includes reduced executive function, which

2    may make it difficult to completely understand the

3    consequences of decisions?

4            Two issues predominant are patients'

5    perspectives on Tysabri, the relative strength of

6    the drug over current treatments and toxicity.

7    Many patients are convinced that Tysabri is twice

8    as effective as any other treatment available

9    today.

10           For example, a website

11   mspatientsforchoice.org has developed a positive

12   portrait of the benefits of Tysabri over currently

13   available treatments.  Does the FDA agree with

14   these conclusions?  This type of information will

15   likely become accepted by MS patients who are

16   always looking for the cure.

17           We need the FDA's position on relative

18   efficacy.  Who more credible than the FDA to

19   address these issues?

20           Also, the MS patient's risk of PML are

21   perceived as rare.  Counter to this, we hear

22   concerns of 1 in 1,000 death rates associated with

 1    this.  What is the truth?  Are there potential

 2    risks other than PML, cancers or infections? Can

 3    PML be detected before damaging the brain?  Dr.

 4    Burkes insists that by the time PML is detected,

 5    every single cell in the brain has been affected.

 6            MS. CANAVAN:  Hello.  My name is Marcy

 7    Canavan.  I have no ties, financial or otherwise,

 8    to any drug company.

 9            I led a pretty charmed life up until a few

10    years ago.  Then, one day MS hit me with a bang.

11    Within two months of the initial attack, I couldn't

12    walk across my yard.  In less than a year I was

13    using a scooter, retired on disability, and drove

14    my car with hand controls.

15            I have taken Solu-Medrol many, many times,

16    Betaseron, Copaxone, methotrexate, and finally,

17    Novantrone. That was the only drug that helped.

18    The fast downhill spiral stopped, and I actually

19    improved, but I have exhausted my lifetime limit.

20            The downhill spiral is starting again.  I

21    risked congestive heart failure and leukemia to

22    take the Novantrone.  Before the Novantrone, aside

     1    from the physical problems, I had very serious

     2    cognitive difficulties.  I stopped reading anything

     3    because by sentence two, I couldn't remember what

     4    sentence one said anymore.

     5           My memory disappeared.  I found myself

     6    forgetting where I was, where I was going, and how

     7    to get where I had been on decades.  I can't tell

     8    you how many times I just sat on the beltway lost.

     9    Simple words eluded me.  My IQ dropped 25 points,

    10    and that was before I hit bottom.

    11           My reason for being here today is simple.

    12    I have no treatment options left, and at the rate I

    13    am losing ground again, in a few years, my life

    14    won't be worth living.

    15           I am willing to take a chance on a drug

    16    that shows as much promise as Tysabri, and

    17    according to the data you have in front of you, it

    18    is much safer than the one I have already taken

    19    anyway.

    20           When I was a kid, I had my life saved

    21    twice by drugs, once when I had blood poisoning and

    22    once with pneumonia.  Those same two drugs almost

1 killed me as an adult, when I had full-blown

2 anaphylactic shock attacks after taking them.

3   Am I mad because the FDA approved a drug

4 that nearly killed me?  No.  If you hadn't approved

5 them, I wouldn't be here at all today anyway.

6   The risk of death is not a reason to deny

7 a desperately needed drug.  What you have to do is

8 weigh the risk of the death against the need for

9 the drug.

10   I want to see my grandson grow up.  I

11 would rather be able to enjoy things now and take a

12 chance that I won't live that long than miss

13 enjoying life and live to be 100. Quality is

14 important, and it is more important than quantity.

15 That applies to lots of things, but especially to

16 life.

17   I ask you to approve Tysabri for me, for

18 the other people here, but even more for my

19 daughter, Emily, who has already spoken to you

20 today.  Compared to her, I still lead a charmed

21 life.  I was 46 when MS hit me.  She was 24.  All

22 of her plans and hopes for a life are in shambles

311

1    thanks to MS.

2              Several days a week, she is in bed all day

3    because of intractable pain.  She has all the same

4    problems I do, and she is only 27 years old.  I had

5    a normal life for 25 years after finishing school.

6    She had a normal one for 4 months.  I want Tysabri

7    badly, but for my baby, I want it desperately.

8              You have the power to give her a chance,

9    and I would ask you to do it.  When you make your

10   decision, please think about how you would feel if

11   Emily was your child.

12             DR. KIEBURTZ:  I thank all the speakers

13   who have spoken so far.  We are going to take a

14   15-minute break before we go on with the rest of

15   the speakers.

16             We will reconvene right at 3 o'clock.

17             [Break.]

18             DR. KIEBURTZ:  We will begin the open

19   public hearing now, please.

20             MR. CROYDON:  Good afternoon.  My name is

21   Stan Croydon.  No one has paid for me to be here

22   today, and I have no financial interests in any

1    drug companies.  They, however, have a whole lot of
2    my money and a big interest in me keeping using
3    their medications.
4            Before I left home this morning, my wife
5    said to me, "Why are you speaking today?  You never
6    took that drug." I said, "You are right, but if
7    someday I or my doctors think I should be taking
8    it, I want that option.  I want people to know that
9    we are the ones who ought to making the decisions
10   on the pros and cons of medication."
11           I have had multiple sclerosis symptoms
12   since 1967. For the mathematically challenged, that
13   is 39 years, but it took me eight years to get an
14   accurate diagnosis.  Then, it was one made by a
15   psychiatrist who I was seeing.  I had gone to my
16   regular doctor one visit, and said give me the
17   names of a good psychiatrist and a good
18   neurologist.  One of those two has to have the
19   answer to what is wrong with me.
20           Guess what.  He gave me the name of his
21   psychiatrist.
22           Well, back in 1975, steroids were about

313

```
1    the only thing available to help a person with MS,
2    and when I took mine for the first time, I felt
3    like I was walking around with my finger plugged
4    into a light socket.  I also began to worry that I
5    might wind up pumping iron or even worse by the
6    time I got finished taking those drugs.  Ever since
7    I have tried to avoid those.
8           It was a decade ago I first learned how to
9    give myself a daily subcutaneous shot of Copaxone,
10   but when my insurance company looked at the fine
11   print of what my doctor had written, they realize I
12   had the wrong kind of MS to be taking that drug.
13          Consequently, I had to switch to Avonex
14   three months later, and instead of giving me those
15   shots, I decided to let the nurses at work give me
16   my weekly intramuscular injections for the next
17   seven years.
18          Today, I am using Rebif at the
19   recommendation of another MS patient who is a nurse
20   and an expert in her field.  She saw improvement in
21   her condition after taking that subcutaneous
22   medication, and my doctor concurred with my
```

314

1     decision to change.

2          I like to think of myself as a well

3     educated medication consumer.  I ask my doctor

4     plenty of questions about the course of my MS, ask

5     for an MRI if I feel I need it, and he thinks I am

6     getting better, and if I hear about new therapies,

7     I go and investigate them.

8          I even read the sheets you get at the

9     pharmacy that come with your medications.  I have

10    been doing that ever since one neurologist

11    prescribed an antidepressant for me when I told him

12    I was depressed.  I called him back three days

13    later and said, "I have stopped your drug."  I

14    said, "When I first came to see you, I was

15    depressed, now, I am impotent, and frankly, I would

16    rather be depressed."

17          [Laughter.]

18          MS. TIBURTIUS:  Good afternoon.  My name

19    is Bartira.  I was diagnosed with a mass in March

20    2001.  I was on the Tysabri starting combination

21    with Avonex for 28 months.  In the past, I did some

22    educational programs coordinated by Biogen.  The

1    company paid for my expenses and my time.  I spoke

2    about my experience with MS, not about Biogen

3    drugs.  Biogen did not encourage or pay for me to

4    be here today.

5            I am a language teacher and I need to be

6    alert all the time, but four years ago, I had two

7    very bad relapses that put me in the hospital.  I

8    had all the symptoms in the book including loss of

9    vision, and the worst of all, I had cognition

10   problem.

11           I can handle everything even a wheelchair,

12   if I have to, but I cannot handle to lose the

13   ability of thinking, and I had some very bad

14   cognition problem.

15           I was switching letters, I had difficulty

16   remembering simple words.  I was getting lost in

17   conversation.  I used to wake up in the morning and

18   not having a clue where I was.  I was spacing out.

19   I didn't know if I was dreaming or it was a

20   reality.  I was confused between where reality and

21   a dream.  I was like a nightmare.

22           When I start on the Tysabri study, it was

1   a double-blinded study, but it seems the first

2   infusion, I was so sure that I was getting the real

3   thing, not the placebo because the way I was

4   feeling.  Little by little I started to feel

5   healthier and healthier.

6         The fatigue was gone, I had my brain back

7   100 percent, but a couple months ago, I started to

8   have problems again.  The fatigue is back, my left

9   arm is numb, my face is numb, and again sometimes I

10   cannot remember simple words.

11         I am very scared.  I am a teacher.  I

12   cannot afford to lose the ability of thinking

13   again.  I don't want to go back there.  I want to

14   be able to walk, to speak, eat and drink, and the

15   most important, I want to be able to think.  I want

16   to know when I am dreaming or when I am awake.

17         I do understand that there is a small risk

18   with Tysabri, but the risk that I am willing to

19   take.  If someone tells me that Tysabri is going to

20   take 10 years off of my life, but I will have the

21   quality of life I had a year ago when I was in the

22   study, I would take it.

1    financial or otherwise, to either Elan or Biogen

2    Idec.

3           I was the girl who had everything - ivy

4    league education, successful career as a real

5    estate partner in a prestigious law firm, beautiful

6    family, and multiple sclerosis.

7           This insidious disease that progresses

8    daily has robbed me of almost everything I once

9    had.  Even my choice for treatment has been taken

10   away from me.  I am appearing here today as my own

11   advocate to have my right of choice restored to me.

12          I have always been proactive when it came

13   to deciding on a course of treatment for my MS.  I

14   have tried all available treatments - Novantrone,

15   Cytoxan, cladribine, methotrexate, steroids, IVIG,

16   the ABC drugs, and Rebif.

17          With each of these treatments, my doctor

18   required me to have monthly blood tests, periodic

19   liver and kidney function tests, EKGs, and MRIs.

20   Unfortunately, the side effects with each treatment

21   were debilitating, and for what. There was not one

22   bit of improvement in my level of disability or in

1  the progression of my disease.

2       Then, I heard about Tysabri.  I discussed

3  it with my doctor, who said the drug was well

4  tolerated in clinical trials.  In January 2005, my

5  health insurance provider pre-approved payment for

6  12 treatments of Tysabri.  I had my first and only

7  infusion in February 2005.  Then, the drug was

8  pulled from the market.

9       I had no adverse reactions or side

10  effects.  I was even able to ride the bus home on

11  my own after treatment. That alone was a huge step

12  forward for me in this disease.

13       It has been over a year now and I haven't

14  had any treatments of any kind because nothing has

15  worked for me.  I feel as if I am losing my battle

16  against MS.  I have no other options.  Without

17  Tysabri I don't even have hope.

18       I have no illusions.  Tysabri was never

19  marketed or hailed as a cure for MS, however, the

20  clinical trials proved conclusively that the drug

21  halted the progression of the disease and, in some

22  cases, lessened the degree of disability.

 1              It is wrong to think that MS is not a

 2       life-threatening disease.  My quality of life is

 3       threatened every day that I go without a treatment

 4       that I deserve.

 5              My daughter is graduating from high school

 6       in June.  Before I know it, she will be getting

 7       married.

 8              I would like the chance to halt the

 9       progression of my disease and walk down the aisle

10       with her.  Please allow me the chance to see if

11       Tysabri can make my dream come true.

12              MR. FRANKLIN:  Good afternoon and thank

13       you for the very important work you are doing on

14       this subject today.

15              I am Doug Franklin.  I am the President

16       and CEO of the Multiple Sclerosis Association of

17       America.

18              We were founded in 1970.  For 35 years, we

19       have had only one goal, and that is to help people

20       deal with this dreaded disease.  All of our efforts

21       are aimed at the patient and their care partners.

22       That is all we do.

303

```
 1          Our mission is to enrich the quality of
 2   life for individuals with MS.  We receive funding
 3   support for some of our services in public
 4   education outreach from pharmaceutical companies.
 5   We support the FDA position that all currently
 6   approved MS drugs have value for MS patients.
 7          We speak to all of our patients about all
 8   of the therapies.  Informed consumer consent is our
 9   objective.  The funding we receive from
10   pharmaceutical companies makes up less than 10
11   percent of our total funding.  We receive no
12   government funding.  The remaining 90 percent comes
13   from the public through donations, through gifts,
14   through special event fund-raising.
15          We remain a strong neutral advocate for
16   patient education, and we are very pleased to be
17   able to be here today to respond, to be able to
18   share our views on the reintroduction of the drug
19   Tysabri.
20          When I say "we," I am speaking for MSAA.
21   I am speaking for the charity, our Healthcare
22   Advisory Council, our board of directors, and in
```

1    particular, our Chief Medical Officer, Dr. Jack

2    Burkes, who had to leave today.

3           Dr. Burkes is a clinical Professor of

4    Medicine, of Neurology, at the University of

5    Nevada, School of Medicine. He is also a member of

6    the Medical Advisory Board of the National MS

7    Society.  He has edited two textbooks on multiple

8    sclerosis, and in the 1970s, he established the

9    Rocky Mountain MS Center in Colorado, one of the

10   nation's first comprehensive MS centers.

11          His input into this brief today represents

12   MSAA's thoughts.  He believes people's lives are at

13   stake and he has been serving MS patients for more

14   than 30 years.

15          We all know this drug was approved for the

16   treatment of relapsing-remitting MS and released

17   into the marketplace in November of 2004.  In our

18   winter edition of our quarterly newsletter, The

19   Motivator, Dr. Burkes had the following to say in

20   the Ask the Doctor section.

21          He said discussing the role of Tysabri

22   with your doctor is an excellent idea.  Only one

305

1    year data is available on adding Tysabri to Avonex

2    and no data is available for combining Tysabri with

3    Betaseron, Copaxone, or Rebif.

4            Tysabri plus Avonex was more effective

5    than Avonex plus placebo at one year in a group of

6    patients on Avonex who were having attacks or new

7    MRI activity.  In my opinion, this is a very

8    selected group of patients, may not be relevant to

9    Copaxone or high-dosed interferons.  More studies

10   are needed before the effectiveness and/or

11   potential complications of combination therapy

12   using Tysabri are known.

13           Two months later, the drug was voluntarily

14   suspended, and based on reports of the dramatic

15   events that we are all well aware of, including the

16   events in Anita Smith's death.

17           The MSAA welcomes the development of newer

18   and more effective medications to treat MS, but we

19   believe great care must be exercised when bringing

20   a new drug with potential serious side effects to

21   market.

22           In our experience, most of our MS patients

1    do very well on currently available medications

2    with minimal side effects in the long run

3    especially if started on treatment early in their

4    disease course.

5         As a charity, we struggle with the concept

6    of a possible black box warning label sufficing as

7    a caution to physicians and patients.  Caveat

8    emptor, buyer beware seems to run contrary to sound

9    medical treatment based on first do no harm

10   principles.

11        We strongly believe that patient safety

12   must be a primary consideration as the FDA proceeds

13   with the process of analyzing all of the available

14   data.  If Tysabri is reintroduced, precautions

15   should be taken to protect the patient until

16   long-term safety can be evaluated.

17        These include strong scientifically-based

18   protocols to ensure the patient's understanding of

19   the treatments versus the risk-benefits.  This can

20   be problematic.

21        Can this be assured if more than 50

22   percent of patients have cognitive dysfunction,

```
 1    which includes reduced executive function, which
 2    may make it difficult to completely understand the
 3    consequences of decisions?
 4            Two issues predominant are patients'
 5    perspectives on Tysabri, the relative strength of
 6    the drug over current treatments and toxicity.
 7    Many patients are convinced that Tysabri is twice
 8    as effective as any other treatment available
 9    today.
10            For example, a website
11    mspatientsforchoice.org has developed a positive
12    portrait of the benefits of Tysabri over currently
13    available treatments.  Does the FDA agree with
14    these conclusions?  This type of information will
15    likely become accepted by MS patients who are
16    always looking for the cure.
17            We need the FDA's position on relative
18    efficacy.  Who more credible than the FDA to
19    address these issues?
20            Also, the MS patient's risk of PML are
21    perceived as rare.  Counter to this, we hear
22    concerns of 1 in 1,000 death rates associated with
```

308

```
 1   this.  What is the truth?  Are there potential
 2   risks other than PML, cancers or infections? Can
 3   PML be detected before damaging the brain?  Dr.
 4   Burkes insists that by the time PML is detected,
 5   every single cell in the brain has been affected.
 6           MS. CANAVAN:  Hello.  My name is Marcy
 7   Canavan.  I have no ties, financial or otherwise,
 8   to any drug company.
 9           I led a pretty charmed life up until a few
10   years ago.  Then, one day MS hit me with a bang.
11   Within two months of the initial attack, I couldn't
12   walk across my yard.  In less than a year I was
13   using a scooter, retired on disability, and drove
14   my car with hand controls.
15           I have taken Solu-Medrol many, many times,
16   Betaseron, Copaxone, methotrexate, and finally,
17   Novantrone. That was the only drug that helped.
18   The fast downhill spiral stopped, and I actually
19   improved, but I have exhausted my lifetime limit.
20           The downhill spiral is starting again.   I
21   risked congestive heart failure and leukemia to
22   take the Novantrone.  Before the Novantrone, aside
```

309

1    from the physical problems, I had very serious

2    cognitive difficulties.  I stopped reading anything

3    because by sentence two, I couldn't remember what

4    sentence one said anymore.

5           My memory disappeared.  I found myself

6    forgetting where I was, where I was going, and how

7    to get where I had been on decades.  I can't tell

8    you how many times I just sat on the beltway lost.

9    Simple words eluded me.  My IQ dropped 25 points,

10   and that was before I hit bottom.

11          My reason for being here today is simple.

12   I have no treatment options left, and at the rate I

13   am losing ground again, in a few years, my life

14   won't be worth living.

15          I am willing to take a chance on a drug

16   that shows as much promise as Tysabri, and

17   according to the data you have in front of you, it

18   is much safer than the one I have already taken

19   anyway.

20          When I was a kid, I had my life saved

21   twice by drugs, once when I had blood poisoning and

22   once with pneumonia.  Those same two drugs almost

```
1    killed me as an adult, when I had full-blown

2    anaphylactic shock attacks after taking them.

3          Am I mad because the FDA approved a drug

4    that nearly killed me?  No.  If you hadn't approved

5    them, I wouldn't be here at all today anyway.

6          The risk of death is not a reason to deny

7    a desperately needed drug.  What you have to do is

8    weigh the risk of the death against the need for

9    the drug.

10          I want to see my grandson grow up.  I

11   would rather be able to enjoy things now and take a

12   chance that I won't live that long than miss

13   enjoying life and live to be 100. Quality is

14   important, and it is more important than quantity.

15   That applies to lots of things, but especially to

16   life.

17          I ask you to approve Tysabri for me, for

18   the other people here, but even more for my

19   daughter, Emily, who has already spoken to you

20   today.  Compared to her, I still lead a charmed

21   life.  I was 46 when MS hit me.  She was 24.  All

22   of her plans and hopes for a life are in shambles
```

1    thanks to MS.

2          Several days a week, she is in bed all day

3    because of intractable pain.  She has all the same

4    problems I do, and she is only 27 years old.  I had

5    a normal life for 25 years after finishing school.

6    She had a normal one for 4 months.  I want Tysabri

7    badly, but for my baby, I want it desperately.

8          You have the power to give her a chance,

9    and I would ask you to do it.  When you make your

10   decision, please think about how you would feel if

11   Emily was your child.

12         DR. KIEBURTZ:  I thank all the speakers

13   who have spoken so far.  We are going to take a

14   15-minute break before we go on with the rest of

15   the speakers.

16         We will reconvene right at 3 o'clock.

17         [Break.]

18         DR. KIEBURTZ:  We will begin the open

19   public hearing now, please.

20         MR. CROYDON:  Good afternoon.  My name is

21   Stan Croydon.  No one has paid for me to be here

22   today, and I have no financial interests in any

1    drug companies.  They, however, have a whole lot of

2    my money and a big interest in me keeping using

3    their medications.

4         Before I left home this morning, my wife

5    said to me, "Why are you speaking today?  You never

6    took that drug." I said, "You are right, but if

7    someday I or my doctors think I should be taking

8    it, I want that option.  I want people to know that

9    we are the ones who ought to making the decisions

10   on the pros and cons of medication."

11        I have had multiple sclerosis symptoms

12   since 1967. For the mathematically challenged, that

13   is 39 years, but it took me eight years to get an

14   accurate diagnosis.  Then, it was one made by a

15   psychiatrist who I was seeing.  I had gone to my

16   regular doctor one visit, and said give me the

17   names of a good psychiatrist and a good

18   neurologist.  One of those two has to have the

19   answer to what is wrong with me.

20        Guess what.  He gave me the name of his

21   psychiatrist.

22        Well, back in 1975, steroids were about

```
 1   the only thing available to help a person with MS,

 2   and when I took mine for the first time, I felt

 3   like I was walking around with my finger plugged

 4   into a light socket.  I also began to worry that I

 5   might wind up pumping iron or even worse by the

 6   time I got finished taking those drugs.  Ever since

 7   I have tried to avoid those.

 8            It was a decade ago I first learned how to

 9   give myself a daily subcutaneous shot of Copaxone,

10   but when my insurance company looked at the fine

11   print of what my doctor had written, they realize I

12   had the wrong kind of MS to be taking that drug.

13            Consequently, I had to switch to Avonex

14   three months later, and instead of giving me those

15   shots, I decided to let the nurses at work give me

16   my weekly intramuscular injections for the next

17   seven years.

18            Today, I am using Rebif at the

19   recommendation of another MS patient who is a nurse

20   and an expert in her field.  She saw improvement in

21   her condition after taking that subcutaneous

22   medication, and my doctor concurred with my
```

314

1    decision to change.

2            I like to think of myself as a well

3    educated medication consumer.  I ask my doctor

4    plenty of questions about the course of my MS, ask

5    for an MRI if I feel I need it, and he thinks I am

6    getting better, and if I hear about new therapies,

7    I go and investigate them.

8            I even read the sheets you get at the

9    pharmacy that come with your medications.  I have

10   been doing that ever since one neurologist

11   prescribed an antidepressant for me when I told him

12   I was depressed.  I called him back three days

13   later and said, "I have stopped your drug."  I

14   said, "When I first came to see you, I was

15   depressed, now, I am impotent, and frankly, I would

16   rather be depressed."

17           [Laughter.]

18           MS. TIBURTIUS:  Good afternoon.  My name

19   is Bartira.  I was diagnosed with a mass in March

20   2001.  I was on the Tysabri starting combination

21   with Avonex for 28 months.  In the past, I did some

22   educational programs coordinated by Biogen.  The

1   company paid for my expenses and my time.  I spoke

2   about my experience with MS, not about Biogen

3   drugs.  Biogen did not encourage or pay for me to

4   be here today.

5           I am a language teacher and I need to be

6   alert all the time, but four years ago, I had two

7   very bad relapses that put me in the hospital.  I

8   had all the symptoms in the book including loss of

9   vision, and the worst of all, I had cognition

10  problem.

11          I can handle everything even a wheelchair,

12  if I have to, but I cannot handle to lose the

13  ability of thinking, and I had some very bad

14  cognition problem.

15          I was switching letters, I had difficulty

16  remembering simple words.  I was getting lost in

17  conversation.  I used to wake up in the morning and

18  not having a clue where I was.  I was spacing out.

19  I didn't know if I was dreaming or it was a

20  reality.  I was confused between where reality and

21  a dream.  I was like a nightmare.

22          When I start on the Tysabri study, it was

316

1    a double-blinded study, but it seems the first

2    infusion, I was so sure that I was getting the real

3    thing, not the placebo because the way I was

4    feeling.  Little by little I started to feel

5    healthier and healthier.

6          The fatigue was gone, I had my brain back

7    100 percent, but a couple months ago, I started to

8    have problems again.  The fatigue is back, my left

9    arm is numb, my face is numb, and again sometimes I

10   cannot remember simple words.

11         I am very scared.  I am a teacher.  I

12   cannot afford to lose the ability of thinking

13   again.  I don't want to go back there.  I want to

14   be able to walk, to speak, eat and drink, and the

15   most important, I want to be able to think.  I want

16   to know when I am dreaming or when I am awake.

17         I do understand that there is a small risk

18   with Tysabri, but the risk that I am willing to

19   take.  If someone tells me that Tysabri is going to

20   take 10 years off of my life, but I will have the

21   quality of life I had a year ago when I was in the

22   study, I would take it.

```
 1              If I have Tysabri back, I will have life.
 2      If I don't, I don't even know if I am going to have
 3      a future.
 4              Thank you for listening.
 5              DR. GODEC:  I am Dr. Mark Godec, a
 6      physician in private practice in the Washington,
 7      D.C. area.  I have no financial interest in Biogen
 8      and Elan, and I have not received financial support
 9      from any competing companies.
10              I would like to thank the committee for
11      the opportunity to speak today.
12              Anita Smith was a healthy, active woman
13      until her final months and untimely death from PML
14      arising from Tysabri therapy.  She was the wife of
15      Walter Smith and the mother of two children.
16              She worked daily in her family's business
17      and lived a full life without restriction or
18      disability.  At the request of Walter Smith, I
19      reviewed Anita Smith's medical records.  She was in
20      good health until June 1999, when she developed
21      minimal neurological symptoms that were eventually
22      attributed to multiple sclerosis.
```

1          However, the medical evaluation that led

2     to the diagnosis of MS was incomplete and produced

3     results that were not diagnostic of MS.  At most,

4     only her presenting episode provided objective

5     clinical evidence of a CNS lesion that might be due

6     to MS.

7          An MRI of her brain revealed only a small

8     number of nonspecific lesions that did not enhance

9     with gadolinium. Her CSF never showed oligoclonal

10    bands that are characteristic of MS.

11         EP studies were not performed and she was

12    not evaluated by a neuro-ophthalmologist.  Her

13    symptoms were mild and her EDSS score remained

14    between zero and 2, indicating that she had no

15    significant disability.  At most, she should have

16    been considered to have possible MS.

17         Despite a questionable diagnosis of MS,

18    Biogen and Elan enrolled Ms. Smith into the

19    Sentinel study in April 2002.  It is likely Biogen

20    and Elan offered substantial monetary awards to

21    physicians for each patient they enrolled in the

22    study.

```
1              Biogen and Elan reported in the New
2      England Journal of Medicine that Ms. Smith's
3      enrollment MRI showed nine lesions consistent with
4      MS to justify her enrollment in the study.  This
5      enrollment MRI actually shows only four or five
6      nonspecific lesions per Dr. Greg Shoukimas, who you
7      heard earlier today.
8              In November 2004, Ms. Smith developed much
9      more serious neurological signs and symptoms.
10     Tysabri was eventually discontinued, but her
11     condition continued to deteriorate.
12             Anita Smith tragically died on February
13     24th, 2005, from PML at the age of 46.
14     Neuropathological examination of her brain and
15     spinal cord revealed only PML lesions, and no MS
16     plaques, verifying that she did not have MS.
17             Had Biogen and Elan not inappropriately
18     enrolled her in the Sentinel study, she would be
19     alive today.
20             Ms. Smith's case dramatically demonstrates
21     the danger of Tysabri therapy.  As a physician, I
22     would like to see effective and safe drugs
```

1    available to all MS patients. Unfortunately,

2    Tysabri is not the miracle drug for MS that

3    everyone is hoping for.  Returning Tysabri to the

4    market will only put more people's lives in

5    jeopardy.

6            I strongly encourage this committee to

7    carefully consider the risk that Tysabri poses to

8    the public.  Despite the recent clearance Tysabri

9    received for human clinical trials, I strongly

10   believe that Biogen and Elan should be required to

11   conduct additional animal studies to fully define

12   Tysabri's safety before it is again given to

13   humans.

14           Thank you very much.

15           MS. ROGERS:  Hello.  Thank you for the

16   opportunity to testify before you today.  My name

17   is Martha Rogers and I just turned 53 years old.  I

18   am a wife, a mother of two teenage daughters, and a

19   teacher working 30 hours a week, and I have MS.

20           I was once asked to speak about Avonex and

21   was paid $300, but I am here today on my own to

22   speak about my experiences with Tysabri.  My world

321

```
 1    as I knew it changed two years ago, when I was 50,
 2    and initially diagnosed with MS.
 3            At that time, I was happy, working full
 4    time, getting into shape and feeling great.  Every
 5    day was a joy to live, and I was thankful.  I was
 6    diagnosed in February 2004, after an attack of
 7    optic neuritis, which my doctor first thought was a
 8    brain tumor.
 9            An MRI showed my condition to be multiple
10    sclerosis.  My neurologist allowed me to choose
11    Avonex, because I felt that that was the best
12    disease-altering drug for me.  At that time, I was
13    also encouraged about the news of future release of
14    Tysabri.  I think they called it Antegren at that
15    time.
16            My first relapse occurred in the spring of
17    2004.  I was one of the very first patients in the
18    Norfolk area to receive an infusion of Tysabri in
19    January 2005.  I was so excited about going on this
20    drug, and I knew it was so important that I was
21    able to get two local TV stations to film me
22    getting my infusion.
```

322

1          I received two infusions and felt

2     fantastic within 24 hours of my infusion.  I knew

3     the drug was working.  I knew that I could face any

4     obstacle with this disease as long as I had my

5     Tysabri.  My fatigue went away, I felt steadier on

6     my feet, and my concentration improved.

7          Since February 2005, when the drug was

8     pulled from the market, my MS has progressed and I

9     have had three more relapses.  My symptoms have

10    returned and I have gone on steroid therapy.  I

11    have had to adjust my life in many ways in order to

12    manage the various symptoms of this devastating and

13    unpredictable disease.

14         My particular symptoms include balance and

15    gait issues, constant fatigue, memory and

16    concentration problems, impaired vision, and

17    depression.  I have also had to cut back on my

18    hours at work, which has been causing my family

19    financial difficulties.

20         The progression of my disease has consumed

21    my thoughts, challenging me to overcome my anger of

22    having MS.

1    I urge you to consider the results, the

2    clinical results proving that Tysabri can have a

3    profound ability to stop MS.  I believe that this

4    drug can prevent my disease from getting any worse.

5    It's all about maintaining a quality of life.

6    I believe Tysabri is the best drug

7    available today for people like me.

8    Thank you.

9    MR. KELLER:  Thank you for your time

10    today.  I have received no financial support or

11    interest in any of these pharmaceutical companies

12    in question today or competitors.

13    My name is Larry Keller and I would like

14    to tell you about my sister, Carol Keller Fuquay.

15    For about 30 years, Carol has had MS, the most

16    progressive kind of MS.  We witnessed her testimony

17    during the second video here earlier before the

18    break.

19    Being her younger brother, I have always

20    looked up to Carol as the model of success.  She

21    completed her Bachelor's Degree after only three

22    years of study, followed with a Master's in

324

```
 1   computer science, and became one of the first

 2   female project engineers at Hewlett-Packard in the

 3   early 1970s.

 4           Carol has always been at the forefront of

 5   technology, has been blessed with a supportive

 6   family, but at the point in her business and family

 7   careers, where she should have been most active,

 8   she noticed the muscles in her legs weren't

 9   responding the way she expected.  Yes, she was

10   experiencing the onset of MS.

11           The reason I tell you this story is that

12   my sister, after having poured her energies into a

13   successful career, redirected them to find out

14   everything she could about this debilitating

15   disease.  At that time, no one even knew the cause

16   of MS.

17           Over the next three decades, she learned

18   everything she could about the current research

19   into the disease, she came to know many of the

20   nation's leading MS researchers, neurologists, and

21   immunologists.

22           She learned, as they discovered, the
```

325

 1    causes of the disease, but the cure remained

 2    elusive.  Over the last 15 years, she tried every

 3    imaginable treatment, even a hyperbaric chamber,

 4    all in an effort to arrest the progression of her

 5    MS.  None of these were truly successful.

 6            Over time, she lost the use of her legs,

 7    then, her right arm and hand, then, finally, her

 8    left.  If only she could stabilize the progression

 9    of her MS.  She fears the next step is that she

10    will lose the ability to speak and swallow.  You

11    can imagine her long-term prognosis.

12            However, during this slow decline, she

13    decided to share this knowledge she acquired on MS

14    and help others who have been unable to converse

15    with those at the forefront of research.  She

16    decided to offer this knowledge in a book, which

17    she published last year, "Understanding MS Builds

18    Hope."  You can imagine the difficulty she had

19    trying to put this together in the condition that

20    you witnessed on the video.

21            During her research, she became aware of

22    the clinical trials of Tysabri, and once it was

1    approved for use in late 2004, she was able to

2    receive two treatments prior to the drug's removal.

3    As Carol has always been a close monitor of her

4    condition, she noticed that during the year of

5    2005, she experienced no progression of her MS.

6         This is quite exceptional since she had

7    had the most severe and progressive form.  Tysabri

8    works for my sister.  It has arrested the

9    progression of her disease.

10        Consider Carol's case, consider her

11   condition, consider her prognosis.  Tysabri is the

12   only hope she has.

13        I ask, as my sister asks, for the

14   committee to recommend that Tysabri be returned to

15   the market.  How fitting an end to my sister's book

16   that not only does understanding MS build hope, but

17   that there is real hope that we have a cure for

18   this disease.

19        Thank you.

20        DR. SMITH:  Hello.  I am David Smith,

21   Rochester, New York.  I am a board-certified

22   neurologist and neuro-ophthalmologist.  I have a

1  private practice and care for several hundred

2  active MS patients.

3         I would like to speak from my own

4  experience to you today.  I diagnosed my wife's MS

5  15 years ago.

6         When I go to the meetings, it seems like

7  the discussion always revolves around the relative

8  merits of the ABCR drugs, neutralizing antibodies,

9  and things like that.  When I am in the office, I

10  am saying to a young lady, look, in order to

11  preserve your quality of life, we have to arrest

12  your MS, and I am thinking in my own mind that

13  those ABCR drugs that we have are only about 30

14  percent effective.

15         Now, there is a spectrum to severity in

16  MS.  There are aggressive cases and there are mild

17  cases.  In my own experience, if you take one of

18  the milder cases and put them on any one of the

19  ABCR drugs, they arrest, and those people go on and

20  live happily ever after.

21         But most people, I would say about 80

22  percent will break through and continue to

328

1   progress.  What that means is that it is just a

2   matter of a few years before those people go into a

3   wheelchair.

4           So, our goal in treating

5   relapsing-remitting MS must be to arrest, not to

6   slow the disease.  What I am suggesting is that the

7   much higher efficacy of Tysabri will allow us to

8   arrest many more of those aggressive cases that get

9   away from us now.  So, the benefit-to-risk ratio

10  here becomes enormous.  Do you see what I mean?

11          We have never had a benefit-to-risk ratio

12  in a drug like this before.  I was talking to my

13  wife, Mary, about four years ago.  She was having a

14  crescendo pattern of attacks, three attacks a year,

15  and she was on steroids all the time.  I said,

16  well, there is this new drug called CellCept out.

17  She couldn't tolerate Imuran because of

18  hepatotoxicity.  I said it looks like it ought to

19  work better than Imuran and safer.

20          So, she says, well, what do I have to

21  lose?  And I read her the riot act - lymphoma,

22  leukemia, sepsis, all kinds of weird infections.

file:///C|/dummy/0307PERI.TXT

329

1    She says what do I have to lose, I am going into a

2    wheelchair now, and at that time, she was talking

3    to me about the ways that she would take her life

4    if she went into a wheelchair.

5         Mary hasn't had one attack since on the

6    CellCept. That is four years without an attack.

7         Thank you.

8         MR. BURROUGHS:  I am Frank Burroughs,

9    President of the Abigail Alliance for Better Access

10   to Developmental Drugs.  We don't take any money

11   from the pharmaceutical industry.  We represent

12   patients who are fighting for their lives.

13        The Abigail Alliance paid my expenses to

14   be here today.

15        Before I get to my talk, I just had one

16   comment, and that is I am a little confused.  Was

17   Speaker No. 32 a patient advocate?

18        Today's issue is yet another example that

19   patients are not being put first in the drug

20   development process.  By the way, I am sitting

21   sideways because I can't turn my back on MS

22   patients.

1          This slide illustrates that there is a 100

2     percent chance that multiple sclerosis patients

3     will perish with the ship.  Out of what are now

4     thousands of patients treated in trials with

5     Tysabri, there are still only three confirmed cases

6     of PML.

7          The reports vary a bit, but there is

8     one-tenth of 1 percent chance one of the lifeboats

9     will sink, one of the lifeboats.  Tysabri never

10    should have been taken off the market.  It was a

11    severe overreaction to the drug safety hysteria

12    caused by the Vioxx issues, and the overreaction by

13    the FDA, also, the media, the FDA Advisory

14    Committees, and certain politicians played a role.

15         Many thousands of MS patients have

16    progressed and become more disabled as a result of

17    the overreaction to these mostly false and

18    ill-considered magnifications of drug safety

19    concerns.

20         The FDA Advisory Committees have regressed

21    from a stance that was already too cautious into an

22    extreme harm the many to protect the very few

1    posture, that simply must be reversed.

2             The people who run the current system must

3    realize that it should be the individual patient's

4    decision as to whether or not they get a new

5    therapy, such as Tysabri, having the current

6    information about known risks/benefits.

7             The patients, in consultation with their

8    physicians, should have greater control over how

9    they fight for their lives.  Ask Parkinson's

10   patient Robert Suthers.  Robert and others will tell

11   you that MS, Parkinson's, and other illnesses can

12   be a living death.

13             Let me share a huge catastrophe.  Please

14   listen to this.  It was in Fortune magazine last

15   month.  Let me share a huge catastrophe due to the

16   current system of overreaction due to our current

17   antiquated method of statistical analysis.

18             Launched in 1998, RotoShield was a

19   lifeboat for millions of children.  It was

20   virtually 100 percent effective in preventing

21   rotovirus, a deadly diarrhea-causing virus that

22   leads to 600,000 deaths worldwide a year, mostly in

1    developing countries.

2            Because there was a 2 chance in 10,000

3    that there was a bowel obstruction, the drug was

4    pulled off the market at the urging of the FDA and

5    the Center for Disease Control. The result of that

6    was that there was not a new--Wyeth dropped the

7    vaccine--there was not another vaccine on the

8    market for six years, and 3.6 million children died

9    worldwide.

10           This is what happens when government,

11   individuals get in the way of the rights of

12   patients and overreact to statistics.  What's so

13   incredible about the rotovirus was that they found

14   there was a statistical error.  We have seen that

15   over and over again.

16           Here is vivid proof of what I am saying

17   today, and the Abigail Alliance has been saying for

18   over five years.  Every drug the Abigail Alliance

19   has pushed for earlier access to is now approved by

20   the FDA.  In this case, we have one, like Iressa,

21   one that has been pulled back, that needs to be

22   brought forward.

1           Let me leave you with four things that are

2    so important.  FDA and others must understand

3    patients need to be put first.  There is a

4    difference between an MS patient, a cancer patient,

5    Parkinson patients, and somebody with an allergy or

6    arthritis.  Contrary to what an FDA Associate

7    Commissioner said to me in a meeting, there is

8    clinical pressures involved in this.

9           Thank you very much.

10          MR. MILTON:  My name is Clive Milton.  I

11   represent my wife who has had MS for eight years,

12   cannot be here today.  She was part of the Phase

13   III placebo-controlled, double-blind study for

14   Tysabri in the Affirm group.

15          My wife had a very serious side effect,

16   which could probably have been avoided had a series

17   of simple allergy tests been performed prior to

18   acceptance in the study.

19          We discovered after she was unblinded from

20   the study, and without much help from Yale

21   University School of Medicine or Biogen, that she

22   was allergic to polysorbate 80, an ingredient that

1    is used in the delivery solution.

2            She is now hypersensitive to anything that

3    contains polysorbate, and she has been suffering

4    from intense itching, severe rash over her arms,

5    back, and scalp, which results in bleeding and loss

6    of sleep, loss of work, and quality of life for the

7    past three years since she was involved in the

8    study.

9            There is no cure to this type of

10   hypersensitivity and no one knows the effect of the

11   additional illness on her MS.

12           No one at the Yale University School of

13   Medicine or Biogen cared to investigate or help her

14   once she was unblinded from the study.  Where was

15   the protection, care, and treatment that Biogen,

16   Yale University School of Medicine, and New Haven

17   Hospital, and the IRB promised to give her?

18           I have several questions.  Why has the FDA

19   allowed polysorbate 80 to be used in an I.V.

20   solution especially as it is not recommended as an

21   injectable by at least one of the manufacturers?

22           Polysorbate is also used in Avonex, also

1    made by Biogen, and as a result, my wife cannot use

2    this or any other MS medication that may contain

3    esters of any kind because of the likelihood of

4    serious adverse reactions.

5            All the information issued by the FDA and

6    Biogen seems to be looking at the study drug

7    Tysabri alone or with Avonex, but could it be

8    possible that the culprit that forced the closure

9    of the Sentinel study two weeks before the

10   conclusion of the Phase III stage, and the issues

11   found in the Affirm study is not caused by either

12   drug?  Has any testing or research been conducted

13   to rule out the possibility that one or more of the

14   constituent components used in the delivery

15   solution may be the problem?

16           Why did Biogen get to review its own data

17   when Tysabri was removed from the market?  There

18   appears to be a slight conflict of interest here.

19   The FDA should mandate the use of an independent

20   body to review such data to avoid potential

21   cover-ups or bias in reporting and findings.

22           MR. KAHN:  I have made many public

1   presentations during my 30-year career as a General

2   Electric executive, and in the last 20 years, as an

3   active participant in my local community.  Not one

4   of these presentations was as important to me

5   personally as this one is today.

6           I am here in my role as the father of a

7   daughter whose life is at stake.  Without access to

8   Tysabri, her quality of life is rapidly declining.

9           I do not have a relationship or financial

10  interest with any company involved in this issue,

11  nor have I accepted any financial help from any

12  interested party.  I am here solely as a father.

13          In 1996, I went with my daughter for the

14  first time in 30 years to a doctor.  When the

15  neurologist told us that she had MS, I had to ask

16  him what MS was, because I knew so little about the

17  disease.

18          In nine years, I have learned a

19  considerable amount about MS.  I have educated

20  myself through research, listened to dozens of MS

21  doctors, attended over 100 MS meetings with expert

22  speakers, I met with many other MS sufferers and

1    caregivers.  I have learned much about MS from

2    riding the roller coaster of the disease along with

3    my daughter.

4            Eight year ago, I accompanied my daughter

5    as she walked with great difficulty into a single

6    infusion, early Phase II trial for Tysabri, and I

7    was heartened when I saw her walk briskly as she

8    left the infusion trial.

9            When my daughter took Tysabri, she had MS,

10   but she was remarkably stronger and had an improved

11   quality of life. My daughter is unable to tolerate

12   the other standard therapies, and therefore, she

13   has no other viable treatment option.

14           When Tysabri has been unavailable, I have

15   witnessed her painful suffering and have helped to

16   move her stuck toes, feet, arms, and fingers, and

17   helped her eat and walk just as I did when she was

18   a baby.  Certainly, I do not need to tell you there

19   is not a cure for MS.  If there were, we would not

20   be here today.  Until there is a cure, patients

21   have to choose what treatments, if any, to take to

22   try to alleviate the symptoms and to stem the

1   course of their diseases.

2           If there were an effective drug that was

3   risk-free, then, we would also not need to be here

4   today.  I understand that your role as the FDA

5   Advisory Committee is to ascertain the benefits and

6   risks of a drug, and to communicate that valuable

7   information to doctors.

8           This then allows the patients to receive

9   information and advice tailored to their individual

10  needs from their doctors, and in my daughter's

11  case, with her permission, it enables me to be a

12  more informed member of her consultation team.

13          Finally, in my role as a father, I beg you

14  to allow those suffering from MS, and their

15  doctors, the freedom to decide whether or not to

16  use Tysabri.

17          Thank you.

18          MR. CALFEE:  I am John Calfee, an

19  economist at the American Enterprise Institute in

20  Washington, D.C., an independent research

21  organization that receives contributions from many

22  sources including pharmaceutical firms.  My views

1  are my own and do not necessarily represent those

2  of my employer or anyone else.

3         I wish to summarize the results of a

4  telephone survey of a representative sample of

5  patients who see neurologists for treatment of

6  relapsing-remitting MS.

7         The survey was sponsored by Biogen Idec.

8  I received compensation for designing and launching

9  the survey, but have not been compensated for

10 analyzing the results, for writing the paper I

11 submitted for the record, or for appearing at these

12 hearings.  Biogen Idec did not see my paper, did

13 not review it until after it had been submitted to

14 FDA.

15        Survey participants were recruited by

16 neurologists who appeared on the American Medical

17 Association's master list, which includes non-AMA

18 members.  The survey was conducted by Roper Public

19 Affairs.

20        Briefly, here is what we found:

21        Respondents suffered substantial

22 disability.  Fifty-nine percent said fatigue was a

file:///C|/dummy/0307PERI.TXT

340

1    major problem, 10 percent use a wheelchair half or

2    more of the time, one-fourth always or nearly

3    always use a cane, crutch, or other support, and

4    two-thirds require support at least occasionally.

5              Only 20 percent had not suffered relapses

6    in the previous year.  Half had suffered one or

7    more relapses, and a quarter had suffered three or

8    more.

9              Ninety-seven percent of patients were

10   currently on drug therapy.  Half had switched

11   drugs, one-third had switched at least twice.

12   Ninety-five percent or more thought it was very

13   important to have new drugs that reduce the

14   frequency of relapse and retard progression in

15   disability.

16             We specifically asked about balancing

17   risks and benefits, but we did so without referring

18   to Tysabri.  Approximately 55 percent said they

19   would definitely or probably use a drug that

20   significantly reduces frequency of relapse or

21   retards progression in disability even if the drug

22   involves a 1 in 1,000 chance of a fatal side

```
1    effect. One-third said they would definitely or
2    probably use such a drug with a 1 in 500 chance of
3    a fatal side effect.
4            We also found that willingness to tolerate
5    risk was largely unrelated to disability levels.
6            Several questions asked about the roles of
7    patients, their neurologists, and the FDA.
8    Seventy-two percent had seen their neurologist at
9    least four times in the previous two years.
10   Sixty-three percent said they talk about side
11   effect more than half the time.
12           Seventy-nine percent said that they and
13   their physician were equally involved in drug
14   decisions.  Fifty-four percent agreed that the FDA
15   should tightly control drugs with safety concerns,
16   but 71 percent said that once the FDA has provided
17   a warning, patients should be free to decide with
18   their physician whether to use such drugs.
19           Finally, almost all patients said they
20   would be willing to visit their neurologist more
21   often in order to use risky drugs.
22           Thank you.
```

1          MR. TRIEDMAN:  Thank you for the
2    opportunity to comment on Tysabri.  My name is
3    Steven Triedman.  I am from Providence, Rhode
4    Island, and my wife and I flew down today
5    specifically for this hearing.
6          We have a relapsing-remitting course of
7    MS.  I have the physical effects, and she gets to
8    deal with everything else.
9          MS is an insidious disease that affects
10    not only we, the patients, but our families, our
11    friends, and everybody else.  I have no ties to any
12    drug companies although I am a very good customer.
13          I participated in the Sentinel study and
14    was on both Tysabri and Avonex for over two years,
15    and I continued after that.  I lived a normal life
16    to the point that if I didn't tell someone that I
17    had MS, they didn't know.  I have had MS for 11
18    years this month.  I didn't relapse and I didn't
19    have any adverse effects.
20          Since I have been off Tysabri, it has been
21    a difficult year.  I have had numerous relapses and
22    have switched drugs as we try and deal with each

1    step, and I have also had steroids on a regular

2    basis.

3            I am a graphic designer, so my work, it

4    has been difficult at times because of my motor

5    skills and some cognitive issues.  This is a

6    disease that for 10 years, we have been hearing

7    about drugs, we haven't seen any new drugs besides

8    the ABC drugs, so this, to us, is a breakthrough

9    drug, and for someone with MS, four years is an

10   eternity.  It could be four years, it could be six

11   years until we see another new drug.

12           I have a lot of experience with MS, as

13   well as access to exceptional information

14   professional resources. When I was diagnosed with

15   MS, my uncle was a recently retired, very prominent

16   neurologist, and I have numerous friends, doctors,

17   and relatives in the field, and I receive

18   superlative care I think from my MS team in Boston.

19   In fact, selfishly, when I saw my doctor here, I

20   said to my wife, "I think he came for me."

21           They are very proactive in the research.

22   They believe in this drug, so I believe in this

1   drug.  In addition, I chair the board of the MS

2   Society and serve as representative on the national

3   board, so I have been to the meetings, I have seen

4   all of the drug things.  I have not seen anything

5   nor heard anything like Tysabri.

6           I was on the drug for more than two years.

7   I will continue on the drug if I can get it, and I

8   would like, and I wish the committee would

9   recommend, that it be approved, because I think

10  people that have MS need that opportunity.

11          It's a personal decision whether you go on

12  the drug or not, but for those that have been on

13  the drug, and it has been successful, it's a

14  decision I think they would make.

15          Thank you very much.

16          DR. MOSADDEGH:  We are looking for our

17  last public hearing speaker, George Grafas, if he's

18  in the audience.  Mr. George Grafas.

19          DR. KIEBURTZ:  While we are waiting, if he

20  appears.  I just wanted to thank all the open

21  public hearing speakers for their frank and

22  heartfelt comments.  I don't want anyone to think

1    that by limiting time, we somehow limit the

2    importance of your comments.

3            The committee is very grateful to everyone

4    who made so much effort to come here and to speak.

5    It helps us inform our deliberations of tomorrow.

6    I apologize to those who couldn't finish their

7    comments in the time frame allotted.

8            We have some time that remains on the

9    agenda, especially while we are waiting for our

10   last speaker.  So, if the committee at this time

11   has questions they want to address to the sponsor

12   or to the FDA, that were left over from the

13   morning, we can take some time to do that.

14           Except for the one last speaker, we will

15   not entertain any other comments in terms of an

16   open public hearing, and we will not begin

17   deliberations today, as I alluded to at the

18   beginning of the day.

19           Does anyone on the committee have a

20   question that they would like to address to either

21   the sponsor or the FDA at this point?  Dr. Couch.

22                     Questions from the Committee

1          DR. COUCH:  Is the panel going to receive

2    the most updated form of the RiskMAP study?  There

3    were some comments made about the slides were

4    slightly inaccurate, there were some additional

5    data.  Are we going to get the very latest version

6    of that by tomorrow morning?

7          DR. WALTON:  The RiskMAP has been in

8    discussions between the company and the agency, and

9    what you heard were some of the intended changes,

10   but there was not a completely coherent rewritten

11   form of it.  So, I think that we have given you the

12   information about the initial plan and the key

13   questions that we hope for you to be able to

14   comment on.

15         DR. KIEBURTZ:  It will be our job to, in

16   the absence of a concrete document, present what we

17   think our opinions are.  Dr. Temple.

18         DR. TEMPLE:  I actually just wondered

19   whether there was a copy of the latest version of

20   the checklist, which, unless I missed it, I

21   couldn't find anywhere.  Dr. Wysowski referred to

22   having it, so she must have seen it, but I am sure

1   that would be at least of some help to the

2   committee.

3           DR. BOZIC:  I can present it in slide

4   format.

5           DR. TEMPLE:  Well, let me ask the

6   committee, do you want to see it now or do you want

7   to see that tomorrow?

8           DR. KIEBURTZ:  You can see it tomorrow.  I

9   see a consensus nodding.

10          DR. KATZ:  Is it possible to get hard

11  copies for the committee just to look at this

12  evening?

13          DR. BOZIC:  Yes, we can, yes.

14          DR. KIEBURTZ:  Dr. McArthur.

15          DR. McARTHUR:  I would like to go back to

16  the pathological examination of Patient 1.  I would

17  like to ask Biogen to comment on some of the

18  questions that are being raised.  I initially asked

19  the question this morning and I would like to know

20  if there was an independent examination of the

21  pathology from the first patient.

22          DR. PANZARA:  Well, Biogen Idec was not

348

1    involved in that autopsy in any way.  It was

2    actually done by Dr. DeMasters.  The full

3    description of the autopsy findings were presented

4    in the New England Journal of Medicine, and the

5    level of description in there is our understanding

6    of the pathology.

7         DR. McARTHUR:  It would seem to me

8    absolutely critical since we are talking about

9    decisions based on three cases of PML, only two of

10   which were in patients with multiple sclerosis, and

11   only one of which had autopsy confirmation, that we

12   need to know as much as possible about the

13   pathological findings.

14        I am frankly surprised with your answer.

15        DR. PANZARA:  Again, part of the process

16   following the diagnosis in that patient was that

17   the autopsy was performed at the University of

18   Colorado where the patient was seen.  Biogen Idec

19   was not actually permitted access to that

20   information until after the publication of the

21   articles in the New England Journal of Medicine.

22        Since then, the autopsy material has been

349

1    provided to Dr. Gene Major at NIH, who has

2    performed, to my knowledge, some testing on it, and

3    has confirmed the presence of JC virus by in-situ

4    hybridization, so that the diagnosis in Gene

5    Major's opinion confirms the diagnosis of PML.

6         DR. McARTHUR:  That's not the question.

7    The question is whether the patient had multiple

8    sclerosis, since our entire, or at least a lot of

9    our discussion today is on whether that case, that

10   patient had multiple sclerosis.  I am not disputing

11   the fact that the patient had PML.  I am raising

12   the question as to whether the patient had multiple

13   sclerosis.

14        DR. PANZARA:  It is our understanding of

15   the pathology report that they could not find an MS

16   plaque in the autopsy of the brain.  We do not know

17   to what level the spinal cord was evaluated for the

18   presence of MS plaques.

19        I should say that, as you saw the MRI

20   during the open hearing, the PML developed in the

21   region of the T2-hyperintense lesions that were

22   seen on that MRI.  Thus, the autopsy, as presented

1    in the New England Journal, states that they could

2    not find it, but they conceded that the PML could

3    have occurred in the region of MS lesions, and

4    thus, could have obscured it.

5          DR. McARTHUR:  Not to be argumentative,

6    but we saw four or five tiny white matter

7    hyperintensities.  The PML lesion was almost a

8    panhemispheric lesion, so I think it's impossible

9    to say where that lesion initially began.

10          DR. PANZARA:  No, I agree with you on that

11    point.  I just mean to suggest that that was a

12    panhemispheric lesion that developed for PML, and

13    that if there were MS lesions there, they could

14    have been obscured by the PML lesion itself.  That

15    is again from the pathology report and from the

16    pathologists at Colorado, who have indicated that

17    fact to us.

18          DR. McARTHUR:  So, the obvious next step

19    is to examine optic nerve and spinal cord in that

20    case.

21          DR. PANZARA:  Again, my understanding is

22    of the autopsy that was performed, they did not

351

 1   find lesions in the--again, this is from the New

 2   England Journal of Medicine--in the optic nerve or

 3   the spinal cord, but we don't know what level of

 4   analysis was done in terms of number of sections,

 5   et cetera, in the spinal cord.

 6            DR. KIEBURTZ:  Dr. Goldstein.

 7            DR. GOLDSTEIN:  We are going to be talking

 8   tomorrow about I guess the risk minimization plan

 9   and the early patient identification.  But assuming

10   that the system as was described is completely

11   effective, what data are there that early detection

12   alters PML would alter the disease course?

13            We are putting a lot on detecting these

14   cases early and stopping the infusion.  How do we

15   know that that is going to alter the disease course

16   in any way?

17            DR. PANZARA:  The best data that exists is

18   currently in the HIV experience, but it is not

19   exactly analogous.  The other experience is in

20   transplantation, and the series in transplantation

21   have been small.

22            There are typically case series of 25, 10

352

```
 1    to 25 patients, and then a long list of case

 2    reports.  That data suggests that when the

 3    immunosuppressant therapies are discontinued, there

 4    can be an improval in survival.

 5            Again, the types of agents used there,

 6    obviously not natalizumab, but agents such as

 7    azathioprine, cyclosporine, in those circumstances,

 8    based on the case series that have been done, about

 9    a third of patients survive, and those that did

10    survive, it was nearly uniformly they had a

11    decrease in their immunosuppression.

12            That is really the only literature that

13    exists in this area.

14            DR. KIEBURTZ:  Dr. Ricaurte?

15            DR. RICAURTE:  I was just going to take up

16    on the point that Dr. McArthur raised.  Regardless

17    of what the outcome is, the issue seems to be did

18    the patient have or not MS, and was she

19    appropriately enrolled in the study, so the

20    question I have is what will be done in the future,

21    or was there something that should have been done

22    in the past to guard against that, or do things
```

1 have to be changed in order to preclude an error,

2 if it was an error, in the future.

3          Just comment on the issue of enrollment

4 and ensuring that appropriate patients are

5 selected.

6          DR. PANZARA:  You are referring to the

7 risk management program, or in clinical trials, in

8 what area specifically is your question regarding?

9          DR. RICAURTE:  Well, we don't know what

10 the outcome of this is.  In the most liberal form,

11 I suppose it would be suppose it is approved to go

12 on the market, how do we, as a committee, gain

13 assurance that the drug will be appropriately used

14 in patients, appropriate patients.

15          DR. PANZARA:  I am going to turn that over

16 to Dr. Sandrock.

17          DR. SANDROCK:  We rely on our sites to

18 make the diagnosis.  With our advisory committee

19 and with the FDA, we write protocols.  The protocol

20 required that the patients had relapsing MS for the

21 McDonald criteria.

22          We also require that patients have cranial

354

1    MRIs consistent with MS, and we rely on our

2    investigators, and we go out and we make sure that

3    the investigators are qualified, and we rely on our

4    investigators to make the diagnosis and enroll

5    patients according to the protocol.

6         That patient had, in her history, had an

7    episode of acute visual loss with documented loss

8    in visual acuity in one eye.  She had an episode of

9    myelopathy with spasticity in the lowest

10   extremities.  She met clinical criteria for

11   multiple sclerosis, and she met the protocol

12   requirements.

13        DR. RICAURTE:  Although they were vague,

14   the history, as I read it, because she also had a

15   long history of migraine.

16        DR. SANDROCK:  Yes, she did.

17        DR. KIEBURTZ:  Let me take a little

18   prerogative.

19        I think it is inevitable that individuals

20   are misdiagnosed with neurologic diseases.  We will

21   have to factor in, in our decision-making, which,

22   of course, won't happen until tomorrow, that there

355

1    will be some finite level of misdiagnosis.  It is

2    human and unavoidable.

3           I think that is something we will have to

4    talk about, how to minimize the chance of that

5    happening.  I am not asserting whether it happened

6    in this circumstance or not.

7           MS. SITCOV:  I was just going to ask,

8    would you concede that it is possible that she was

9    misdiagnosed and that she was inappropriately put

10   in the study?

11          DR. SANDROCK:  Ma'am, I did not see the

12   patient, and I don't like to second guess my

13   colleagues, who actually saw the patient, examined

14   the patient, found neurologic findings that were

15   objective, and MS is a clinical diagnosis.  It is

16   not made by MRI scans.  It is made by qualified

17   neurologists.  In this case, this was a

18   board-certified neurologist who saw the patient,

19   took the history, did the examination, and I don't

20   like to second guess my colleagues.

21          MS. SITCOV:  Well, could you ask the

22   neurologist who diagnosed the patient?  I don't

356

1    mean call him up right now, but at some point, find

2    out the reasons for his diagnosis?

3              DR. SANDROCK:  If you are asking me to do

4    so, I will.

5              MS. SITCOV:  Thank you.

6              DR. KIEBURTZ:  Other questions for the

7    sponsor or the FDA at this point?

8              [No response.]

9              DR. KIEBURTZ:  This meeting is adjourned

10   until 8 o'clock tomorrow morning.

11             [Whereupon, the proceedings were adjourned

12   at 4:00 p.m., to resume at 8:00 a.m., Wednesday,

13   March 8, 2006.]

14                        - - -

# EXHIBIT 2

DEPARTMENT OF HEALTH AND HUMAN SERVICES

FOOD AND DRUG ADMINISTRATION

CENTER FOR DRUG EVALUATION AND RESEARCH


PERIPHERAL AND CENTRAL NERVOUS SYSTEM DRUGS

ADVISORY COMMITTEE

Volume II


Wednesday, March 8, 2006


Holiday Inn Gaithersburg
The Ballrooms
2 Montgomery Village Avenue
Gaithersburg, Maryland

                              PARTICIPANTS

Karl Kieburtz, M.D., M.P.H., Chair
Sohail Mosaddegh, RPh., Pharm.D., Acting Exec. Sec.

COMMITTEE MEMBERS (VOTING)

James R. Couch, Jr., M.D., Ph.D., F.A.C.P.
Steven T. DeKosky, M.D.
Larry B. Goldstein, M.D.
Michael D. Hughes, Ph.D.
Lily K.F. Jung, M.D., M.M.M.   (Consumer
Representative)
Ralph L. Sacco, M.D., M.S.

COMMITTEE MEMBER (Non-Voting)

Roger Porter, M.D.   (Industry Representative)

TEMPORARY CONSULTANTS (Voting)

Carol Koski, M.D.
Justin C. McArthur, M.D.
George Ricaurte, M.D., Ph.D.
James Sejvar, M.D.
Cynthia Sitcov   (Patient Representative)

FDA PARTICIPANTS

Russell Katz, M.D.
Marc Walton, Ph.D., M.D.
Susan McDermott, M.D.
Alice Hughes, M.D.
Robert Temple, M.D.
Gerald Dal Pan, M.D., MHS
John Jenkins, M.D.
Diane Wysowski, M.D.

3

C O N T E N T S

                                                    PAGE

Call to Order and Introductions
        Karl Kieburtz, M.D., M.P.H.                  4

Conflict of Interest Statement:
        Sohail Mosaddegh, RPh., Pharm.D.             9

Committee Discussion                                12

Response to FDA Questions and
    Committee Discussion                            56

P R O C E E D I N G S

Call to Order and Introductions

DR. KIEBURTZ:  Good morning.  I think we
will get started.

Just a few reminders to the committee, as
well as the observers.  The open public hearing is
over, so the committee members essentially are
going to discuss among themselves, that is, the
voting and non-voting members of the committee,
discuss among themselves the questions that have
been proposed to us.

Please, everyone bear in mind that we can
specifically ask questions both to the sponsor and
to the FDA about additional analyses.  In fact, we
have some information and follow-up on questions
that were posed to both yesterday, so we will get
to that shortly.

Just general format, remember it's a
discussion, but it is a structured discussion, and
I think it will facilitate things if people do not
jump in.  Let me recognize you, so that we can go
in somewhat of an orderly fashion.

If you feel your point will be diminished by waiting, try to look even more urgent towards me or something, but otherwise, try to go in a structured fashion and, for better or worse, I am the one who gets to structure it, so if you don't like it, you can let me know on the break.

Regarding the questions, just bear in mind that in the preamble there, FDA also encourages the Advisory Committee to discuss any other issues that the members believe are relevant to the current submission.

If you do not believe the current questions adequately cover the issues we need to be covering, I would like to know about that earlier rather than later, and I would propose that you tell me that, and then also, to help sharpen your thinking, put in a question, similar to these questions, so if you think there is an issue that hasn't been addressed by the question, write out another question and then just give it to me.

With that preamble, before we commence properly, we need to once again introduce ourselves

and have the reading of the Conflict of Interest
Statement.

      So, why don't we go clockwise again,
please.

      DR. JENKINS:  Good morning.  I am John
Jenkins.  I am the Director of the Office of New
Drugs in the Center for Drug Evaluation and
Research at FDA.

      DR. TEMPLE:  I am Bob Temple.  I am
Director of the Office of Drug Evaluation I.

      DR. KATZ:  I am Russ Katz, Director of the
Division of Neurology Products.

      DR. WALTON:  Marc Walton.  I am the Deputy
Director of the Division of Neurology Products.

      DR. McDERMOTT:  I am Susan McDermott.  I
am a clinical reviewer in the Division of Neurology
Products.

      DR. A. HUGHES:  I am Alice Hughes.  I am a
clinical safety reviewer in the Division of
Neurology Products at the FDA>

      DR. DAL PAN:  I am Gerald Dal Pan, the
Director of the Office of Drug Safety at FDA.

DR. M. HUGHES:  I am Michael Hughes.  I am a committee member.  I am Professor of Biostatistics at Harvard University.

DR. COUCH:  I am James Couch.  I am a committee member.  I am Professor and Chair of Neurology, University of Oklahoma Medical School.

DR. MOSADDEGH:  I am Sohail Mosaddegh.  I am the Acting Executive Secretary for the PCNS Advisory Committee.

DR. KIEBURTZ:  I am Karl Kieburtz.  I am Professor of Neurology at the University of Rochester and chairing this Advisory Committee.

DR. McARTHUR:  I am Justin McArthur.  I am Professor of Neurology at Johns Hopkins University.

MS. SITCOV:  I am Cynthia Sitcov.  I am the Patient Representative.  I have been diagnosed with MS for almost 31 years.

DR. JUNG:  I am Lily Jung.  I am a neurologist with the Swedish Neuroscience Institute and Clinical Associate Professor at the University of Washington.  I am the Consumer Representative on this committee.

DR. SACCO:  Ralph Sacco.  I am a member of the committee, Professor of Neurology and Epidemiology at Columbia University.

DR. RICAURTE:  I am George Ricaurte.  I am Associate Professor of Neurology at Johns Hopkins University.

DR. SEJVAR:  Jim Sejvar, neurologist and medical epidemiologist with the Centers for Disease Control.

DR. DeKOSKY:  Steven DeKosky, Professor and Chair of the Department of Neurology at the University of Pittsburgh.

DR. GOLDSTEIN:  Larry Goldstein, Professor of Medicine and Director of the Stroke Center at Duke.

DR. KOSKI:  Carol E. Koski, Professor of Neurology, University of Maryland School of Medicine.

DR. PORTER:  Roger Porter, Adjunct Professor of Neurology, University of Pennsylvania, Adjunct Professor of Pharmacology at USUHS.  I am the non-voting pharma member.

9

Conflict of Interest Statement

DR. MOSADDEGH: The following announcement addresses the issue of conflict of interest and is made part of the record to preclude even the appearance of such at this meeting.

Based on the submitted agenda and all financial interests reported by the committee's participants, it has been determined that all interests in firms regulated by the Center for Drug Evaluation and Research present no potential for an appearance of a conflict of interest at this meeting with the following exceptions.

In accordance with 18 U.S.C. Section 208(b)(3), the following participants have been granted full waivers:

Dr. Steven DeKosky for unrelated consulting and speakers bureau activities for a competing firm for which he receives less than $10,001 per year, and for unrelated activities in a visiting professor program for a university which receives support from a competing firm for which he receives less than $10,001 per year;

Dr. Karl Kieburtz for consulting on unrelated matters for the sponsor and three competitors. He receives between $10,001 and $50,000 per year from the sponsor and less than $10,001 per year per firm from the competitors;

Dr. Ralph Sacco for consulting on unrelated matters for a competitor for which he receives less than $10,001 per year;

Dr. Larry Goldstein for serving on an advisory board and steering committee for a competitor regarding unrelated issues for which he receives from $10,001 to $50,000 per year and for consulting on unrelated matters for a competitor for which he receives less than $10,001 per year;

Dr. Lily Jung for serving on a speakers bureau for the sponsor for which she receives from $10,001 to $50,000 per year and for serving on speakers bureau for two competitors for which she receives less than $10,001 per year per firm.

A copy of the waiver statements may be obtained by submitting a written request to the Agency's Freedom of Information Office, Room 12A-30

of the Parklawn Building.

We would also like to note that Dr. Roger J. Porter has been invited to participate as an industry representative acting on behalf of regulated industry.  Dr. Porter's role on this committee is to represent industry interests in general, and not any one particular company.  Dr. Porter is a retired employee of Wyeth Research.

In the event that the discussions involve any other products or firms not already on the agenda for which an FDA participant has a financial interest, the participants are aware of the need to exclude themselves from such involvement and their exclusion will be noted for the record.

With respect to all other participants, we ask in the interest of fairness that they address any current or previous financial involvement with any firm whose product they may wish to comment upon.

Thank you.

DR. KIEBURTZ:  Any updates from the committee members on the Conflict of Interest

Statement?

        [No response.]

                Committee Discussion

        DR. KIEBURTZ:  I just want to sort of
housekeepingwise deal with three things that were
brought up yesterday.  One is receiving copies of
the checklists.  Each of the members of the
committee should have gotten that.  If you don't,
let us know and we will distribute it.  We won't
discuss that right now, but I just want to make
sure you have it.

        Then, there were two other questions.  I
believe Dr. Goldstein brought up both of them.  One
was about integrating or summing across infections.
Folks from Biogen Idec, there was a slide that was
proposed to look at that, I think it's 16-91.

        DR. PANZARA:  Thank you, Mr. Chairman.  It
is Slide 16-91.

        [Slide.]

        This is a summary slide of the data we did
share with you yesterday except that now it's all,
as requested, compiled into a single slide.  This

file:///C|/dummy/0308PERI.TXT

13

is the placebo-controlled experience in the middle
portion, but on the far right side of the slide, in
the shaded portion, is the cumulative experience.
It includes all open label, as well as
placebo-controlled.

Focusing on the top line was the overall
infection rate.  Again, it was 74 percent in each
group, and the cumulative exposure, there was
additional exposure, the incidence is 65.6 percent,
herpes infections 6.1 versus 7.2. Again I shared
that with you yesterday, the cumulative is 6.1.

Now, the way this is set up is you have
the overall infections, the herpes and the serious
infections are a subset of that overall infection,
and those rates are given.  Again, serious
infections were balanced and remained a similar
rate in the extended experience.

Then, underneath serious infections, you
have the subsets of serious herpes infections and
opportunistic infections, and then under
opportunistic infections, you have the subset of
patients who developed PML.

So, that is how the data is rolled up into our overall serious and overall infection rates, and I call your attention to the bottom of the slide where we have done the same for malignancies at 1.3 percent on placebo versus 0.7 percent on natalizumab, with a cumulative incidence of 0.7 percent, and the deaths. Those are the same deaths that I outlined for you in detail yesterday.

DR. KIEBURTZ: Thank you.

Another question was on the prevalence, the numbers, the treatment discontinuations in various randomized studies of interventions for MS. I can't remember who actually asked that question. I am sure the record will tell us. But Dr. Walton has prepared some information to give us sort of the scope of that.

DR. WALTON: We have a slide also. Sohail has the table that could be passed out for the committee, but Dr. Goldstein had asked for what the treatment discontinuations were in various prior experience.

[Slide.]

That slide and table that is going around gives some of our prior experience over the course of more than the past 10 years in studies from a variety of different sponsors in multiple sclerosis.

Obviously, longer studies tended to have somewhat larger treatment discontinuations, just as kept occurring during the course of this study.

The lower part of the table, there are both the treatment discontinuations that were designated as being related to an adverse event and also those that were designated as listed just patient decision or patient choice, which may be relevant to the question that Dr. Goldstein was asking, which was I think trying to infer what treatment discontinuation in clinical practice might be, so patient choice might fall into that, as well.

The bottom box listed two natalizumab studies that we heard about here yesterday.

DR. KIEBURTZ: Thank you. So, I think that sort of cleans up some of the housekeeping

from yesterday.

        Does anyone think that they are going to
be drafting an additional question to the questions
that were already proposed by the FDA?  Just so I
know.  You don't have to tell what it is.

        DR. GOLDSTEIN:  We may be able to
integrate it in part of the other discussion, but
it gets to the issue of what patients and
physicians should be told about not only what we
know, but what we don't know as part of that
informed consent process.  We may be able to
integrate that into part of the other discussions.

        DR. KIEBURTZ:  Let's see how that goes.

        Dr. McArthur?

        DR. McARTHUR:  Do you want to know what
the question is now, or just that I am composing
it?

        DR. KIEBURTZ:  Just that you are composing
it.  It sounds like you are.  Just so I can plan,
just because we have quite a list of questions
before us.

        Before we address the questions, are there

any additional clarifications from the sponsor or
the FDA that anyone wishes to ask at this point?
Dr. McArthur or Ms. Sitcov, either way.

        MS. SITCOV:  Perhaps this question is
better asked of the FDA.  When Dr. Richert spoke
yesterday, one of the things that struck me is that
the current drugs that have been available for MS
don't really have a fatality rate connected to
them, or morbidity, I guess, is how it would be
termed, but the 1 in 1,000 figure that exists now
for this drug, how, when you compare drugs for
other autoimmune diseases, such as rheumatoid
arthritis, or Crohn's disease, or lupus, where does
1 in 1,000 come out in comparison with those kinds
of drugs, because for the current MS drugs, we
don't see those kinds of numbers.

        DR. WALTON:  I would say for some of the
more recent products for things like rheumatoid
arthritis, which have been the TNF antagonist
products, those do have serious side effect risks
associated with them.

        Probably amongst the most prominent are

two categories.  One is infectious risk and one is
concerns about malignancy.  On the malignancy side,
it is very difficult to figure out what the drug
associated risk is, because there is a strong
impression that malignancies are higher in the
rheumatoid arthritis population than in the general
population, but it is very difficult to figure out
exactly what that background rate is because most
of the rheumatoid arthritis patients are on other
forms of immunosuppressive drugs, so distinguishing
between the true background rate and their drug
associated rate for the other drugs is confusing.

So, consequently, the data we have on
malignancy rates in people being treated with the
TNF antagonists becomes difficult to interpret.  We
do believe that there is some drug associated
increased risk, and those products have warnings
related to that, but we don't have a good
quantitative number for that.

With regards to infectious disease risks,
again, we have some good numbers that I do not
recall offhand, that are certainly higher than 1 in

19

1,000 for bacterial type infections, and those are
in the label, and those were things that we saw in
controlled clinical studies and can have a good
estimate for.

Of course, for those, for bacterial
infections, we have antibiotics that can treat
those if picked up early, so a good surveillance of
patients can help ameliorate those risks for the
sake of prompt treatment.

There are less common infections like
tuberculosis that we have seen with those products.
Again, we have an approach that we have confidence
decreases those risks - the testing for TB prior to
initiating the TNF blockers, and again surveillance
to institute treatment, to be suspicious for the
development of TB and institute treatment.

They are a little bit different in terms
of the nature of the risk.

DR. KIEBURTZ: Let me just make sure.  I
don't want to start edging in to discussing the
questions yet. This is getting clarifications of
material that was presented yesterday.  That is

what we are doing right now.

Dr. McArthur.

DR. McARTHUR:  My question is for the
sponsor, and it relates to the issue of certainty
of diagnosis and identifying patients with multiple
sclerosis who might be most likely to respond to
the drug in question.

So, has an analysis been done or are you
able to present an analysis of treatment response
in terms of relapse frequency or changes in MRI
images for patients who entered the trials 1801,
1802, with contrast-enhancing lesions?  So, is
there a subgroup analysis of just that patients?

DR. SANDROCK:  We have done that,
stratified patients based on the presence or
absence of enhancing lesions at baseline.  Could I
have the slide that shows that, the relapse rate
ratio, please?  Yes.  Could I have Slide 422.

[Slide.]

This is the annualized rate ratio where
the vertical line is a ratio of 1 and points to the
left of 1, indicate a treatment effect in favor of

natalizumab.

        Patients with zero enhancing lesions and
at least 1 enhancing lesion are shown here.  The
confidence intervals do overlap in both groups.
You see a substantial treatment effect.  Even the
patients with less than 1, or even patients without
lesions have a rate ratio that looks like it's a
little left of 0.5, indicating a greater than 50
percent decrease in the frequency of relapses.

        Does that answer your question?

        DR. McARTHUR:  Thank you.  Just remind us,
if you can, what proportion of patients at baseline
had contrast-enhancing lesions?

        DR. SANDROCK:  It's about 49 percent, as I
recall, in this trial.

        DR. KIEBURTZ:  Dr. Sandrock, while you are
up there, can I ask you a couple of other
questions.

        The actual cumulative probability of
relapse by two years in 1801?

        DR. SANDROCK:  Yes.  It's from my core
presentation, the risk of relapse, the Kaplan-Meier

plots.

DR. KIEBURTZ:  The numbers are called out at Year 1.

DR. SANDROCK:  The reason for that is that that was a prespecified secondary endpoint, the proportion of relapse-free patients.  It was not a prespecified endpoint at either time.  I restricted my talk to all the prespecified primary and secondary endpoints.

Could I have Slides 24, please.

[Slide.]

I don't know if the statisticians could give us the actual numbers, but extrapolating from the curve, it looks like about 60 percent of patients had a relapse in the placebo group compared to about 30 percent in the natalizumab group, something like that.

DR. KIEBURTZ:  So, for the context of our future discussion, let's use those as round numbers, 30 and 60 percent of two years risk of relapse in 1801.

DR. SANDROCK:  It looks like it's about

right.

DR. KIEBURTZ:  That's fine.  Can I ask you another question?  The rate ratios are hazard ratios for relapse and for progression of disability by EDSS stage.  You showed us that yesterday, the subgroup analysis.

Could you just show us those again for both endpoints?

DR. SANDROCK:  Sure.  Could we have I guess it would be display 2-9 and 2-10 from the briefing document.

DR. KIEBURTZ:  To the other committee members who have questions, I realize I have jumped the agenda, but I figured since Dr. Sandrock was there, I would just--

[Slide.]

DR. SANDROCK:  So, this is display 2-9 in your brief document.  The third segment are the EDSS scores at baseline -  zero to 1, 2 to 2.5, 3 to 3.5, and greater than or equal to 4, and the relapse rate ratios are shown there.

DR. KIEBURTZ:  Could I just clarify, the
numbers in parentheses following the greater than
stage 4, 37 and 79, so there were maybe 120
subjects in the trial who had an EDSS score of 4 or
higher.

DR. SANDROCK:  Yes, that's exactly right.

DR. KIEBURTZ:  Thank you.

DR. SANDROCK:  The next slide 247 shows
the hazard ratio.

[Slide.]

This is the hazard ratio based on the
cumulative probability of progressing by two steps
on the EDSS scale, again, the same divisions on
EDSS, and you can see the hazard ratios there.

DR. KIEBURTZ:  Thank you.

Go ahead, Dr. McArthur.

DR. McARTHUR:  Would that particular
slide, which is 217, it looks like individuals, you
have a relatively small number of T2 lesions.
There is no treatment benefit.

DR. SANDROCK:  Well, it's a very small
subgroup, 15 patients in the placebo group, 29 in

file:///C|/dummy/0308PERI.TXT

25

the natalizumab group.  The confidence intervals go
virtually across the entire screen.

On this relatively insensitive endpoint,
the number of events must have been very small, so
it would be hard to conclude one way or the other I
would think.

DR. McARTHUR:  I think that the point I am
trying to make is again how do we identify which
patients should or should not receive this agent.

DR. SANDROCK:  I understand.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  I had a point of
clarification.  I vaguely recall--and I wanted to
check whether this was right--that there was an
adverse event discussed yesterday in a child?

DR. SANDROCK:  Yes.

DR. M. HUGHES:  The question then is how
much pediatric data do we have, and is pediatric
use being considered as part of the RiskMAP.

DR. SANDROCK:  The child you are referring
to was a single patient IND.  This was a little
girl about 1 1/2 years old, who had a fulminant

inflammatory disease of the white matter, that was later biopsied and found to be consistent with multiple sclerosis.

She has been tried on interferon, high-dose interferon, cytotoxic agents, and she was declining, and we were asked to provide natalizumab on a compassionate use basis. We did so. She seemed to initially respond, and then she seemed to worsen again. The natalizumab was discontinued, and she eventually expired.

Other than that, we have not done a formal study of natalizumab in pediatric MS patients, and we are not seeking an indication for pediatric MS.

DR. KIEBURTZ: Dr. Sacco.

DR. SACCO: I have a question for the FDA, I am not sure which person. Not being an MS expert, it is important for me to understand, for MS patients, other potential therapies, and we have heard about a lot of them, and you have given us some numbers this morning on discontinuation rates.

There is one, though, that is mentioned, that does have some toxicity, and I just want to

understand a little bit more from the FDA's
perspective something about I guess it's Novantrone
or mitoxantrone that has the cardiac toxicity.

What is that about, the risk of toxicity,
and does that have a specific labeling, and how
that was dealt with?  I know that's a complicated
question.  It just helps me to put into perspective
other MS drugs that have been I assume approved
with possible other kinds of toxicities other than
infection.

DR. KATZ:  Novantrone was approved for a
different form of MS, for progressive forms of MS,
and not relapsing-remitting, and it had been known,
based on its prior use in the form of cancer, that
it had a cumulative cardiac toxicity,
cardiomyopathy basically, although it has recently
been determined that cases of heart failure can
occur even if there are one or several doses, and
the original labeling said that you shouldn't get
over, I think it was--I forget--140 or 120
mg/M-squared cumulative dose, and patients were
supposed to have been followed.

28

After they achieved I think 100 initially, they were supposed to have cardiac evaluation, but that labeling has now been changed to require, essentially require cardiac monitoring prior to each dose.

When it was approved, it was approved with a requirement for the sponsor to follow a certain number of patients, several hundred patients, I think, to monitor to see actually what the incidence of this cardiomyopathy was in MS patients.

Then, it was also approved with a requirement for the sponsor to do a study to look at, in a real world setting, whether or not these studies were actually being done according to labeling.  At least preliminary evidence from that study suggested that the protocol for the cardiac monitoring wasn't really being followed terribly well, although we didn't have very much data at this point, because it takes time for patients to get to that cumulative dose, but again the labeling has been changed to ask for cardiac monitoring

before each dose, because cardiomyopathy can occur
with far less than 120 mg/M-squared.

DR. SACCO:  I guess what I am trying to
understand is it wasn't maybe a RiskMAP, but the
sponsor proposed certain things that would be done,
and from what you are implying, some things were
done and some things weren't done.

I just wanted then to follow up with when
there is toxicity in a drug, and there is proposed
labeling as well as plans to follow up, how
compliant, how accurate, how responsive are both
the sponsor and the FDA in interpreting and acting
on that follow-up data?

DR. KATZ:  Well, I think it depends on the
nature of the agreements.  If I recall, in the
Novantrone case, there wasn't a mandatory
enrollment of the sort that the sponsor is
proposing now here, so that not every patient who
was prescribed Novantrone was enrolled into a
registry, followed forward prospectively.  It was
handled quite differently.

You are asking how likely is such a

registry to be successful, is that the question?

DR. SACCO:  Well, let's stick to just
Novantrone, and you just implied that there were
some cardiac echoes done, but you implied that the
preliminary--in other words, I didn't have a sense
from you that that was a robust interaction between
the FDA and the sponsor in the monitoring of the
cardiotoxicity with this drug, unless I
misinterpreted what you said.

DR. KATZ:  It was quite a robust
interaction in terms of agreeing to what sorts of
monitoring ought to be done, or what sort of
labeling would be required.  Clearly, we had a
great deal of negotiations about the labeling.

DR. SACCO:  Before, but then the
follow-up.

DR. KATZ:  Again, there were two studies,
as I recall, required for Novantrone.  One is for
the sponsors to actually enroll, I think it was
several hundred patients, and monitor, and another
study was to just look at sort of the real world
and what actually was happening.

        We got periodic updates on both of these

studies, so there was quite a--I would say, to use

your word--robust interaction in terms of

follow-up, but again, in terms of the total use of

the product once it was approved for progressive

MS, there was not the sort of required registration

of every single patient before the drug was

released, but, no, we got, and continue to get,

periodic updates on both of these studies.

        But again, at least initially, when the

toxicity was considered to have been exclusively

related to a cumulative effect, with very early

exposure, there was very little data, because there

was no requirement to do the testing until much

later.

        DR. KIEBURTZ:  Let me just remind the

committee--and then we are going to have Dr. Temple

speak--that I really want to focus right now on

clarifications of things that were presented

yesterday, and we are getting ahead of ourselves,

because a lot of these things we are talking about,

we are going to come back to, and I really don't

want to do it twice today.

        Dr. Temple.

        DR. TEMPLE:  I just want to note a
complexity.  Novantrone is an anticancer drug.
It's available for the treatment of cancer.  When
you get a novel use, it's not so easy to put a
special treatment regimen, because people can
readily avoid it and just use the other drug.  We
have encountered that in other settings.

        I guess the other thing I would say is we
are becoming, and have been becoming, as is
indicated in some guidance we have written,
increasingly conscious of the need to look at the
impact of the risk management programs that we
have, and you saw some of that here.

        A perfectly good question is what are you
going to do now that you are discovering that
people aren't doing that, and there are things you
can do.  You can give patient labeling.  Most
cancer drugs don't have patient labeling, but there
could be a so-called "Med Guide" made available,
and we need to think about all of those things, and

that is what we do.

        But I would say there is an increased

level of consciousness of the need to not just put

something in place, but to see how it's going, and

the guidance we put out makes that point.

        DR. KIEBURTZ:  Dr. Goldstein.

        DR. GOLDSTEIN:  One of the questions that

I had asked yesterday that must have fallen off

your list was I asked for the numbers needed to

treat data, and I asked for three things really.

        It was numbers needed to treat to prevent

one relapse over two years, to prevent progression

of disability, and to prevent one of the major

clinical endpoints, and I asked for it in two ways,

one based on the control data from the 1801 trial,

and then if you presumed a one-third response rate

in the placebo group in that trial, since there was

no head-to-head comparisons and we are told that

there should be about a third response rate in the

placebo group, what those numbers would work out

to, and presumably also with the confidence

intervals around those.

DR. KIEBURTZ:  The sponsor may have an
answer, but my back of the envelope number needed
to treat two years, that is why the 30 versus 60
gives you a number needed to treat of about 3, and
EDSS progression number needed to treat is about 8.

DR. GOLDSTEIN:  From the numbers that we
had from the FDA table on page 2 of their
presentation is a slide, Slide 5.  Just looking at
the 1801 efficacy analysis, looking at the numbers
of patients reaching a sustained disability
progression, it actually works out to--if you go
through all the math, it works out to a 1.2 percent
absolute reduction that is not statistically
significant assuming a one-third response rate in
the controls, but I am not a statistician, you
know, I did this on my calculator.  That is why I
want somebody who does know how to do these numbers
to do them.

DR. KIEBURTZ:  Dr. Sandrock.

DR. SANDROCK:  Could I have Slide 16-79,
please.

[Slide.]

Our statisticians did this calculation last night, and here are numbers. This is based on the 1801 monotherapy trial. Based on the annualized relapse rate, I put the actual annualized rates from the two treatment groups, the relative treatment effect, the absolute difference, and NNT is 1, so 1 patient is needed to be treated to prevent one relapse.

If you look at the proportion of patients relapsing, the NNT is 4, so 4 patients needed to be treated to prevent 1 patient from relapsing.

Based on the proportion progression, our calculations indicate 9 patients need to be treated to prevent 1 patient from progressing on the EDSS scale.

DR. GOLDSTEIN: And if you assume a response rate in the control group, because the control group here is placebo, but we are not comparing this to placebo anymore, we active treatments that work, that reduce the rates about a third.

DR. SANDROCK: So, we did that by

looking--could I have Slide 16-80, please.

[Slide.]

So, this now looks at the added benefit of natalizumab compared to patients who are only on Avonex from the 1802 trial.  Again, the absolute numbers are listed here.

So, 2 patients needed to be treated in order to get  a benefit of natalizumab compared to just being treated with interferon, 5 need to be treated to prevent 1 patient from relapsing compared to just treating with interferon, one of the current available therapies, and 17 need to be treated to prevent 1 patient from relapsing compared to just staying on the interferon.

DR. KIEBURTZ:  I don't think we want to speculate too much about--these are the data from the two trials that are at hand, extrapolating outside of them would be difficult.

Dr. Porter.

DR. PORTER:  You are going to discuss this checklist later in detail?

DR. KIEBURTZ:  Yes.

DR. PORTER:  I will pass then.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  Again, this is a question for the company, and I suspect there is a rather simple answer for this, but the censoring data, let's just look in 1801.  By week 108, was 9 percent in the placebo and a little over 7 percent in the Tysabri.

Then, when you talk about the total number of patients that were censored, it is listed as 73 and 83 percent.  I suspect there is a very simple answer.

DR. SANDROCK:  On the EDDS scale, two years is the bare minimum required to show enough evidence to show power. If patients haven't progressed by the end of the two years, they are censored.  In every single MS trial that has ever been done, the vast majority of patients do not progress by two steps, sustained for three to six months.

So, in every other MS trial that has looked at disability progression, the majority of patients don't progress, and therefore, they are

censored by the Kaplan-Meier methodology.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  Many of the anti-immune drugs
that are currently available were mentioned
yesterday - azathioprine, methotrexate, Cytoxan,
CellCept, I don't remember cyclosporine being
mentioned.

Do we know anything about, just in
general, what is the malignancy rate and the
serious infection rate for these drugs across the
board, or can that information be made available
sometime during the day, so that we could compare
what we are talking about to these other drugs that
were mentioned as possible alternatives to using
Tysabri?

DR. WALTON:  I think it would be very
difficult for the sake that those products have not
been approved for use in multiple sclerosis, so we
don't have good studies, and data on them from
other uses would include some very different ways
of using the drugs, so I would be very reluctant to
extrapolate those adverse event rates to use in

multiple sclerosis in whatever physicians are using
them off label.

       DR. KIEBURTZ:  Dr. Jung.

       DR. JUNG:  From the practical standpoint,
however,, since MS patients are using those drugs
off label, it would be useful to be able to compare
what few numbers we do have, accurate or not,
compared to what is known about Tysabri, number
one.  Number two, going back to Dr. Sacco's
question, what is the number, do we know that the
number of AML that has been diagnosed with the use
of mitoxantrone in the setting of MS treatment?

       DR. KATZ:  As far as leukemia, it is a
couple of patients, I think, in MS.  There are
probably people here who can better speak to that,
but there is one or two cases I think reported, but
I don't recall exactly.  I suppose we can try and
get that information.

       DR. JUNG:  Based upon how many numbers
treated.

       DR. KIEBURTZ:  Dr. Rudick, can you speak
to that?

40

DR. RUDICK:  I don't have the exact numbers in front of me, but at the European MS meeting, there was a report of some 18 cases or so from France with AML, who used mitoxantrone.

Anecdotally, I had a patient that just went in the hospital with acute leukemia from mitoxantrone, so I don't know that we have the numbers, but it is clearly more than one or two cases.

DR. KIEBURTZ:  As usual, we want evidence where we don't necessarily have it, but anything we could accumulate by this afternoon, I suppose, about any evidence or reports regard AML might be of use.

Dr. Temple.

DR. TEMPLE:  Just for something like mitoxantrone, the cardiac problems depend on how long you use it, but what it does is very familiar from daunorubicin and doxorubicin. It is part of cancer chemotherapy.  It is unquestionably lethal if you keep going in the face of deteriorating cardiac function, so it is very hard to put a

comparable number on it, because it is dose related and all that.

DR. KIEBURTZ:  I have a question for Dr. Bozic about yesterday's presentation.  Slide 94, about the registry, the last bullet.  I just want to make sure I understood that correctly.

So, it is proposed in the registry that all spontaneously reported events would be collected as part of the registry.

DR. BOZIC:  That would be standard practice in safety surveillance that we collect all adverse events, so I wanted to make it explicit that, of course, in this mandatory registry, we would collect all adverse events and include those in the analyses.

DR. KIEBURTZ:  And adverse events as defined in standard TCP, worsening of pre-existing conditions.

DR. BOZIC:  So, any report that a physician would call in to us, or a patient would call in to us, either spontaneously or in the course of, for example, a contact that we make with

the physician.

      Let me give you an example.  Every six
months we are going to be contacting physicians to
tell us about whether any of their patients has had
PML or another serious opportunistic infection, or
whether the patient has died, or whether they
discontinued Tysabri.

      In the course of some of those contacts,
we may get additional information on other adverse
events.  So, of course, I just wanted to make
explicit that we will collect all adverse events.

      DR. KIEBURTZ:  Let me put a finer point on
my question.  So, the bullet before it says
physicians are queried on every patient every six
months.

      DR. BOZIC:  Yes.

      DR. KIEBURTZ:  So, they are going to be
asked about these things.

      DR. BOZIC:  Yes.

      DR. KIEBURTZ:  Are they going to be asked
to report at that time all adverse events?

      DR. BOZIC:  No.  No, they won't be asked

to report all adverse events.  The question will be
specifically targeted around the occurrence of PML,
any other serious opportunistic infection, any
death, and any discontinuation, so it is a very
targeted tracking system to evaluate further the
events of high interest, the PML and the other
opportunistic infections.

        DR. KIEBURTZ:  So, that bullet that says,
"Collect all spontaneously reported adverse
events," means if somebody calls you, you will keep
track of it.

        DR. BOZIC:  Absolutely, and that is
standard practice in post-marketing safety.

        DR. KIEBURTZ:  I got it.  Slide 97, the
frequency of evaluation in the proposed
observational cohort study?

        DR. BOZIC:  Yes.  In that study, we will
be contacting physicians every six months to report
all serious adverse events, as well as all
concomitant immunomodulatory or immunosuppressant
therapies, and any discontinuations, as well.

        So, in that study, in addition to

collecting the PML, the serious opportunistic infections, and deaths and discontinuations, we will collect all other serious adverse events, as well.

DR. KIEBURTZ:  You use the same verb there, thought, "collect," but in this, you are asking the physicians to make a--

DR. BOZIC:  We are actively soliciting.

DR. KIEBURTZ:  Actively looking for all SAs.

DR. BOZIC:  Yes, exactly, much like in a clinical trial, for example.

DR. KIEBURTZ:  Sorry to come back to this, but you said you will contact the physicians for this information. What is the proposed frequency with which the physicians will have an in-person evaluation of the patient in order to fulfill the obligations of the cohort study?

DR. BOZIC:  So, because this is an observational study, the frequency of contact between the physician and the patient will be according to whatever the labeling says. Okay?

file:///C|/dummy/0308PERI.TXT

45

Now, part of the purpose of both this study and the Tysabri Registry is that this six-month contact with the doctor is intended to be a prompt for the physician to, you know, ascertain the status of the patient, because this is a study, it's a non-interventional study, so the frequencies of contact between the doctor and the patient would be according to whatever the labeling would say on that matter.

DR. KIEBURTZ:  So, let me just restate that another way.

The cohort isn't proposing any more frequent contact than what is mandated by the label.

DR. BOZIC:  Exactly.

DR. KIEBURTZ:  Okay.  Thank you.

Dr. Sejvar.

DR. SEJVAR:  Just a quick question for the sponsor just for my clarification.

There really hasn't been a lot of pharmacokinetic and pharmacodynamic information presented to us, but had basically hematopoietic

46

factors been looked at long term, and are there
plans to continue those assessments?

      DR. SANDROCK:  We did look at
hematopoietic factors in the Phase III trial for
two years.  There is a transient slight decrease in
the hemoglobin.  It does seem to go back to normal.

      In terms of, I don't know, when you said
"hematopoietic," whether you meant immune cells, as
well.  Yes, we are planning to do an immune function
study, vaccination study, for example.

      DR. KIEBURTZ:  Dr. Sacco, then, Dr.
DeKosky.

      DR. DeKOSKY:  Back to I think Dr. Bozic
regarding the risk management plan, on Slide 96, I
guess, because I have asked the FDA a little bit, I
ask the company a little bit, the last bullet, you
say, "Ongoing assessment of benefit-risk," and I
just want to get a better handle about what kind of
ongoing assessment and what kind of possibly
qualitative or quantitative rules you would use to
make any alterations in decisions?

      DR. BOZIC:  I believe the question you are

asking is in the Tysabri Registry, we say that we
will assess the benefit-risk profile of Tysabri in
an ongoing fashion.  What we mean by that is
because we will have a complete denominator of all
Tysabri-treated patients and complete ascertainment
of every PML case, we can track the rate over time
of the event, the PML event.

In addition, because we will know all
relevant information about that case, we will know
the outcome of the case, and we are going to
carefully investigate all aspects of the case,
looking for potential risk factors, for example,
underlying comorbidities or concomitant therapies
that might have contributed to the development of
the case.

So, that is what I mean by an "ongoing
assessment of benefit-risk."  I just want to point
out this is very, very different from the usual
post-marketing setting of most drugs, where we
generally don't know completely how many people
have been exposed.  We usually don't know
completely how many cases have occurred due to

under-reporting.  So, we have severe limitations
typically in the post-marketing setting.

So, this registry is dramatically
different from what usually happens when a drug
gets introduced in the marketplace, because we will
know all prescribers and every single patient and
every single case.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  This may be a question for
Dr. Sandrock as a follow-up to Dr. Sejvar's
question.

The discontinuation of a drug to go into a
trial with or into treatment with Tysabri was a
two-week plan, I think, and it was based on the PK.

So, the PK, I presume is purely in terms
of clearance of the medication or detectable levels
of the medication, and my question was about other
effects, not necessarily hematopoietic, but other
systemic effects that probably would outlast the PK
change and whether that is accounted for in those
two weeks, as well, or whether there is reason to
wait longer.

DR. SANDROCK:  Actually, it is based on the PK and the pharmacodynamic effect, so we can measure biological responses to interferon by looking at interferon-inducible genes or their gene products, and some of those inducible responses can persist for approximately one week, so that is why we recommended the two weeks.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  Dr. Sandrock, sorry to have you jump up and down, but could you go back over the thinking about the collection of serum specimens?  In some of the cases that were presented yesterday, serum JCV-PCR did become positive before the onset of PML symptoms.

I realize that you don't have all of the sensitivity, specificity, performance characteristics pinned down, but why not attempt to collect serial serum samples as part of the RiskMAP program?

DR. SANDROCK:  I may ask Dr. Panzara to supplement my answer, but the bottom line is that we have extensive data from our safety evaluation.

We felt that the sensitivity and the positive
predictive value are so low that we could not
recommend widespread use.

      We chose instead to study this in our
re-dosing trial to understand more about how often
you get positive. Since we don't understand the
meaningfulness of a positive result, since people
who weren't even on Tysabri got positive responses,
and we have seen it in HIV and other places where
people become positive, and they don't get PML, we
wondered how disruptive this would be in the
practice to have a positive results, what is the
meaningfulness of that.

      So, if Dr. Clifford or Dr. Panzara would
like to come up and comment further, because we did
develop these plans based on expertise from people
like Dr. Clifford.

      DR. KIEBURTZ:  So, the speaker is Dr.
David Clifford, who was introduced yesterday in the
sponsor's presentation.

      DR. CLIFFORD:  Right.  I am obviously a
member of the Independent Adjudication Committee

that was trying to look at the experience of the
population exposed to natalizumab and the relation
of that exposure to possible markers for PML or the
risk of PML.

Our main obligation was really to seek out
cases that we could definitely identify as PML
cases, and as we reported last week in the New
England Journal, there were no cases with really
quite an extensive effort to identify them both
through many CSF analyses and MR analysis, and
careful review of the clinical evaluations of the
patients.

We know that this JC virus is present in
normal people, in a majority probably of normal
adults, and that, in fact, there is replication and
shedding of this virus certainly in the urine of
most normal adults at as much as 30 percent of the
time.

We are also aware that it is present in
the serum, the plasma specimens when carefully
measured. Frankly, we decided ahead of time that
this was a measure that we couldn't factor into

file:///C|/dummy/0308PERI.TXT

diagnosis of PML at all based on the experience of many cases followed over time with a high risk of PML, who have circulating plasma JC and never develop the disease.

Frankly, I was quite surprised that there were so few cases of circulating JC virus in the population surveyed, and the fact that with the commercial survey that we were able to do, the large, more than 2,000 samples, that a majority of those had circulating virus in those never exposed to natalizumab, made us believe that the signal was, at this point, quite a weak signal, and that we scientifically could not interpret it.

It would require a very large study to probe that more deeply, to have a scientific basis to say that this was a risk factor for future development of PML.

I think it remains a fascinating problem, and I do hope that I can work with the company and probing further any other ways that we could identify risk from that circulating virus, or their rearrangements or other things that could predict

it, but at this point, really, I think the
interpretation of that is so difficult that we
really wouldn't know what to tell a patient in whom
we found positive circulating JC DNA.

DR. McARTHUR:  Just as a follow-up, I
accept what you say, but I guess my question or
point was why not collect a serum specimen from
individuals who would go on to receive Tysabri even
if you are not using those results individually in
those patients to decide anything, because I think
I agree with you, you can't tell anybody anything
sensible at this stage, but if there were a crop of
PML cases down the road, those banked specimens--

DR. CLIFFORD:  Samples banks would be a
very rational thing to be able to look at to
identify risk patterns if they exist.

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  Since we are talking about
blood, something else came to mind that I want to
get clarification on.

We heard yesterday about hypersensitivity
reactions, some of them being serious, some of them

not, but up to possibly 10 percent.  In the risk
management plan and in some of this blood
collection, I didn't see much mention of how that
falls in, whether you collect blood for checking
for antibodies and whether antibody positivity
affects continued use of the medication.

        Maybe I missed it, but if somebody can
just clarify that.

        DR. KIEBURTZ:  Can I change that question
around a little for you?  Do you currently plan to
be screening for neutralizing antibodies as part of
the registry or the cohort?

        DR. SANDROCK:  I just wanted to clarify
one thing, the rate of hypersensitivity reactions.
Could I have the slide on hypersensitivity
reactions, please, Slide 8-12, please.

        [Slide.]

        Actually, the incidence of
hypersensitivity reactions in the 1801 monotherapy
trial was 4 percent.  So, there were 25 reactions,
25 patients with 27 hypersensitivity reactions, so
a couple of patients had them twice.

Fifteen reactions occurred on the second infusion, and the incidence of serious hypersensitivity reactions was 1.3 percent.

So, this is the rate in the monotherapy situation. In the combination trial, it was lower, but we think this is the rate that is applicable since we believe Tysabri should be used an monotherapy.

DR. PANZARA:  The only thing I would add to that is that the rate of 0.8 percent you saw yesterday was the placebo-controlled experience, so was the overall experience, hence, the 1.3 versus the 0.8, and it was actually very similar to the anaphylactic, anaphylactoid rate that you see on the bottom of the slide.

I would also like to say that there will be a commercial test available for the testing of the neutralizing antibodies, and it is recommended that anybody in which there is a suspicion of diminished efficacy or, as was described yesterday by FDA, the occurrence of certain adverse events, such as flushing and other things that would make

file:///C|/dummy/0308PERI.TXT

56

physicians suspicious that person may have

neutralizing antibodies, we would recommend

testing, and if the test is positive, the patient

should not receive natalizumab.

       DR. KIEBURTZ:  Thank you.  That answers my

question.

       Well, hopefully, stretching helps before

running, because that's what we did for the last

hour, so I would like to turn our attention to the

questions, and thank you to the sponsor for being

responsive to our questions.

     Response to FDA Questions and Committee Discussion

       DR. KIEBURTZ:  The first two questions are

has Biogen demonstrated efficacy on the reduced

frequency of relapses through two years and

fulfilled the commitment made under the Accelerate

Approval conditions to verify the sustained

clinical benefit.

       Is there anyone who feels that the answer

to this is no?

       [No response.]

       DR. KIEBURTZ:  So, everyone unanimously

agree that they have met that condition, they have

fulfilled the commitment?  Okay.

Question 2.  Has Biogen demonstrated

efficacy on reduced accumulation of physical

disability?

Any discussion about that?

DR. RICAURTE:  I have a question in that

regard. This is to the Agency.

There was a comment made about--this has

to do with progression to disability--that between

the screening exam and the enrollment, there had

been variability in terms of the score obtained on

the EDSS and how that complicated matters.

I guess the question is:  How did that

variability between screening and enrollment

compare relative to the treatment of that?  I am

just trying to get a sense of how much is natural

variability, how much is the treatment, how does

that compare, and why, just to expand on the

comments that were made in the written statements

here on the Agency's analysis.

DR. WALTON:  Okay, let's see.  Some

answers and not exactly necessarily in the way that
you have asked them.

The screening and the official baseline
exam, as I understand, were done by the treatment
and the evaluating physicians, they were done by
different physicians, so that is a portion of the
variability.

Another portion of it is we know from all
of the multiple sclerosis studies that we have
done, that there is a variability from time to
time, from evaluation to evaluation, even with the
same patient and the same physician in the EDSS.

That variability is a portion of the
assessment that went into the determination that we
have to have a full point, a full 1 point EDSS
change to, and sustained over some number of months
in order to be able to confidently regarded as a
meaningful, reliably assessed change.

So, that variability is something we see
in every study.  In terms of the impact, if one
uses the screening exam instead of the baseline,
you have some patients who shifted down between the

two, and therefore are a new progression that were
not previously deemed a progression in a few
patients that shifted up, and they lose their
designation as a progresser.

It does make a little bit of difference in
the exact numbers, you know, for each group, the
exact percentage who are deemed progressers.  It is
a little bit larger fraction of exactly which
patients get deemed progressers, but the net effect
is that the treatment effect remains, and the
precise, the point estimate shifts slightly one way
or the other in each arm, but there still remains a
clear-cut treatment effect between the groups.

Have I answered?

DR. RICAURTE:  Yes.  The second thing
would be just I don't use this scale, I am not
familiar with it, but just to get a sense of
clinically, what does this mean, a change in 1
point, 1.5 points.  I am looking at the scale, but
it is kind of hard to get a sense.

So, relative to the variability that one
can see depending on the examiner, depending on

time, how robust is this treatment effect, and what
does it translate into clinically?

DR. WALTON:  I think I will break your
question into two parts.  One is how robust is the
treatment effect. Our analyses convince us that the
treatment effect is robust in the sense of various
ways of looking at it, some of which have been
shared with you in these documents, and other ways
that we have tried to tease apart what is
occurring, that are just too arcane to try and fill
into the briefing document.  We do believe that the
treatment effect is robust to analysis.

The other part of your question, though,
is I think what is the meaning of this change, and
for that, the EDSS scale is not a linear scale in
the sense of every interval along it has the same
meaning to the patient.  At the very lowest end of
it, a 1-point change is really translated more as a
reliably determined change in clinical signs that
one can reliably and reproducibly determine on the
patient.  That is at the very lowest end of it.

As you move up, it really does become a

disability or impairment scale that will take into
account upper limb function, real impairments that
are meaningful, perceptible to the patients in
upper limb function, as well as lower limb
function, as well as a bladder function.

As you get into sort of the middle range
and higher, the scale really shifts into some
significant amounts of impairment in ambulatory
ability and becomes very big changes in that, but
experience has seen that for this scale, it needs
to be that large a change in steps in order to be
confident that it is reliably a real change in the
patient's condition, and not part of their
day-to-day, week-to-week variability of function
related to a constant disease state.

Does that help?

DR. KIEBURTZ:  I would just throw in
there, I am not sure, we could probably spend the
better part of today and tomorrow arguing about a
clinical equivalent of EDSS scale, and not to close
it off, but I think the general consensus is that
this definition of disability progression is

acceptable, if not universally acknowledged.

So, back to Question 2. Does anyone feel that Biogen has failed to demonstrate efficacy on reduced accumulation of physical disability as defined in the protocol?

[No response.]

DR. KIEBURTZ: Then, we are all in unanimous agreement that they have. I believe there is 12 voting members, so I would say, we didn't take a formal vote, but it's unanimous.

DR. KATZ: We don't need a formal vote on this question.

DR. KIEBURTZ: Thank you.

DR. WALTON: There is one question for which we do want a formal vote, but the others you need not impose that.

DR. KIEBURTZ: Just for the context, just bear in mind, Dr. Sandrock put up a slide with numbers needed to treat, so rather than 60-30, the percentages of people who had a relapse by two years was 54 percent and 28 percent, so roughly speaking, about half the people in placebo did not

have a relapse, and about 75 percent in the
treatment group did not have a relapse.

Roughly, a quarter of the people in
placebo had disability progression, I will a third,
and half of that did in the treated group. So,
these are minority events. Most people didn't have
the events. Most people in these studies did not
have a relapse and did not have disability
progression.

The frequency of relapse is about twice
that of disability progression, but still I guess
54 percent is technically a majority, but just to
frame up the events.

On to No. 3. Outside of PML, are there
safety-related issues associated with the use that
you consider to be important considerations in
making a risk-benefit assessment including
non-infectious disease risks and non-PML infectious
disease risks?

So, non-infectious disease risks, those
would include the things we have heard about,
malignancies, hypersensitivity reactions, and so

forth.  There are important other safety-related
issues that we should be thinking about.

          Dr. Koski.

          DR. KOSKI:  Well, I think when you look at
the numbers of patients relatively in the placebo
arm and the Tysabri arm, I don't think that it
comes out to be very prominent, at least in these
two groups, over the period of time that we looked
at, but still think it's a consideration when we
are talking about patients that are likely, if this
drug is approved, to be on it for really long
periods of time, much beyond the two-year period.

          So, I think over time, cumulatively, they
may be an issue, any anytime you have increased
risk of herpes, eventually, you know, I would
anticipate that we might see like B-cell lymphomas
in the CNS.

          DR. KIEBURTZ:  So, are you speaking to
(b), the non-PML infectious disease risk?

          DR. KOSKI:  Right.

          DR. KIEBURTZ:  Dr. Sacco.

          DR. SACCO:  I guess I would go back to

65

just the hypersensitivity risk.  I mean I think there is some, and I think, to me, it is something that is possibly preventable given the antibody detection.

So, under (a), I guess the question is whether hypersensitivity would fit there or not. There were some that were anaphylactoid, and we saw some of the numbers, but is that important?  To me, it is.

DR. KIEBURTZ:  I will just voice my opinion on this.  I think the development of neutralizing antibodies is probably an important event for two things.  One, it certainly seems to be a signal for risk of a hypersensitivity reaction, and also seems to be a strong signal of a population that has decreased benefit.

So, when we start considering risk-benefit ratios, it may be favorable in the non-antibody-positive population, but I think we have seen evidence to make us wonder whether it remains favorable in the antibody-positive population.  I believe what we just heard from

sponsor is they would promote, they would suggest
or have proposed clinically-based testing for
antibodies based on the occurrence of side effects,
and not recommending any further treatment in those
who are found to be persistently antibody-positive,
if I heard that correctly.  I see nods, so I think
I summarized it accurately.

So, I would say to the Agency I think that
is a concern.

Dr. Koski.

DR. KOSKI:  I would just point that, you
know, currently, in treatment of MS with the
interferon products, there is a known rate of
positive antibodies that actually evolve most
frequently after about a 6-month period.

Currently, there are I think evolving
recommendations in the field to handle this,
because it is realized that when you have these
neutralizing antibodies in a specific or consistent
fashion, that the drug is not as effective, and at
that point, you either change to one of the other
drugs that has less of an incidence of antibody, or

to something like glatiramer.

DR. KIEBURTZ:  Unless I have misunderstood
things, one slight difference here is it looks
like--and maybe Dr. McDermott could, or Hughes--I
think the development of antibodies was sort of
paradoxically quite early on, because it is
associated with hypersensitivity reactions, which
occurred early on also, so a little bit different
than others is that this seems to be a relatively
early phenomenon.

DR. A. HUGHES:  One of the
difficulties--and the sponsor may be able to talk
about this a little bit more--but antibody
formation was assessed every 12 weeks, and I
believe the median time for anti-natalizumab and
antibody formation was 12 weeks, but we are not
exactly sure in that interval when the formation is
occurring.  I do think it is quite early.

DR. KIEBURTZ:  Any other questions on
Question 3?

Dr. Sejvar.

DR. SEJVAR:  I am sorry, I just wanted to

clarify with the sponsor, the apparent decrease in
response to the product would also prompt looking
at the antibody, as well, right?

      DR. SANDROCK:  Yes.

      DR. KIEBURTZ:  I think maybe we can
incorporate our recommendations on testing, timing,
and triggers when we talk about the risk management
plan.

      Dr. Jung.

      DR. JUNG:  Do we have any information
about the severity of the anaphylactic reactions
which occur?  I believe previously, when the drug
was marketed, that the feeling was that the
anaphylactic or anaphylactoid reactions were
relatively mild and treatable with just the use of
Benadryl.

      DR. PANZARA:  So, in the clinical trial
setting, in the slide I showed you earlier, we have
a total of five patients in monotherapy study who
had serious systemic hypersensitivity reactions.

      We pre-defined these as any event that was
urticaria with associated systemic symptoms, mostly

respiratory symptoms.  Out of those five patients,
there was no cardiopulmonary compromise in any of
those patients. Actually, all of them were treated
with Benadryl and corticosteroids.  One of them
received epinephrine, but not in the setting of a
blood pressure abnormality.  All maintained
oxygenation throughout.  All recovered fully.

In the later stage, open-label study,
there was one case of anaphylactic shock where the
patient did have a lowered blood pressure.  Other
than that, that is the total numbers we have.

DR. KIEBURTZ:  Thank you, Dr. Panzara.

Dr. Couch.

DR. COUCH:  Just one comment that is
self-evident, but I think should be on the record,
and that is, we are dealing with a disease that is
very chronic and may have a survival of between 20
and 30 years, even 40 years, so we are trying to
extrapolate from 2- to maybe 3-year experience, to
something that we have no idea of what it was going
to be like in the future.

The 10 years, maybe 15 years of experience

with the interferons has certainly shown that the
field changes, and we really just cannot predict
what is going to happen 10 or 15 years from now.

        DR. KIEBURTZ:  I think the data we have
largely is confined to 2 and 3 years of follow-up
with large numbers of people, and we do not know
whether there will be accumulating risk or
declining risk with further follow-up, but we are
going to make our recommendations based on the
observations we have, but your point is well taken.

        So, let me summarize.  I forgot I am
supposed to summarize for the record what we
decided on 1, 2, and 3.

        So, 1 is that Biogen has demonstrated the
efficacy on reduced relapse rate and have fulfilled
their commitment for the Accelerate Approval of
showing a sustained benefit at 2 years.

        No. 2 is that they have demonstrated
efficacy on the primary 2-year endpoint, which is
reduced accumulation of physical disability.

        No. 3 is that our safety issues of concern
revolve around the unknown likelihood of non-PML

infectious disease causes, which potentially have a

signal in this period of observation, particularly

herpetic and serious infections, and secondly, the

development of neutralizing antibodies and their

possible association with hypersensitivity

reactions and decreased efficacy are the safety

concerns outside of PML.

Dr. Katz.

DR. KATZ:  I think what we meant in this

question is whether or not the committee felt that

there was anything besides PML that we have seen in

the data so far that would preclude approval.

So, I think people should sort of think

about it in those terms, and if you think you have

the answer to that question, fine, I think we do.

DR. KIEBURTZ:  Does anyone feel there is

any safety issues aside from PML that would

preclude reintroduction to the market?  Dr.

McArthur.

DR. McARTHUR:  I think Dr. Sacco's point

is a good one.  If regular screening for

neutralizing antibodies is incorporated into a

safety plan, that would reduce hypersensitivity

reactions or could reduce hypersensitivity

reactions, and could reduce exposure to

non-responders.

       DR. KIEBURTZ:  So, that is manageable, not

a doesn't preclude.

       Dr. DeKosky?

       DR. DeKOSKY:  Dr. Hughes, I thought I saw

a 6 percent rate--I couldn't find it when I looked

back in my notes--on the number of subjects with

neutralizing antibodies, that showed up at the

first 12-week assessment essentially.

       Was there an increasing prevalence of

antibody as they tracked through their two years of

exposure, or if you are going to make them, do you

make them early, so that this is or is not a

potentially increased risk for long-term

administration of the drug?

       DR. A. HUGHES:  Generally, if you are

going to make them, you make them early.  I think

that 90 percent of patients who became

antibody-positive did so in that initial 12-week

interval.  Yes, it was a 6 percent persistently

antibody-positive incidence, and 4 percent

transient positivity.  I think we know a lot less

about what that means.

DR. DeKOSKY:  There was no evidence that

they tracked consistently with a percent or two

over the two years of the study in increasing

numbers.

DR. A. HUGHES:  No, there was no evidence

of that.  I should, though, note again that there

were some serious hypersensitivity reactions that

occurred further out than would be expected.  There

was one associated with the 13th infusion, but most

did occur in association with the second infusion,

as would be expected.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  Dr. Hughes?  Sorry.

DR. A. HUGHES:  I think Dr. Walton wanted

me to clarify that not all hypersensitivity

reactions were associated with anti-natalizumab

antibodies, but all anaphylactic reactions were.

DR. DeKOSKY:  My issue had actually more

to do with the risk over time and abatement of
clinical response, not so much necessarily the
hypersensitivity reaction in terms of approval
beyond what we know about what happens with the
biological effects of the drug.  Thank you.

DR. A. HUGHES:  It doesn't seem to be
cumulative based on what we know.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  Dr. Hughes, the first
measurement was at 12 weeks, so we really don't
know about early antibody formation and whether one
could detect that neutralizing antibody signal at 3
weeks, 4 weeks, 6 weeks, allowing for an early
detection of people at higher risk. There seems to
be a 10-fold higher risk of hypersensitivity
reactions in neutralizing antibody-positive
patients.

DR. A. HUGHES:  That's right, the first
assessment, that's exactly right.

DR. KIEBURTZ:  Question 4 is essentially
does the committee believe that the risk of PML is
limited to patients exposed to a second

immunosuppressive agent, that is, do you think the

risk is entirely mitigated by giving the drug as

monotherapy.  That's how I read that question.

Is there anyone who would say yes to that?

[No response.]

DR. KIEBURTZ:  We unanimously answer this

one no, that is, the committee believes that there

is a treatment-associated risk of PML even when

given as monotherapy.  None of the observed cases,

I mean I think we all understand that none of the

observed cases happened in that situation, and it

is possible that the co-administration of secondary

immunosuppressive agents increases the risk, and it

is, in fact, possible that it may only exist in

those individuals, but we don't know that yet.

That would be my comment.

Dr. Koski.

DR. KOSKI:  I would just go back and point

out that the one case in the patient with Crohn's

disease was largely on monotherapy.  I know that,

you know, it was pointed out that we did not have a

lymphocyte, a total lymphocyte count on that

particular patient, but he had been off concomitant

immunosuppressive therapy for eight months.

DR. KIEBURTZ:  Any further discussion on

this question?  Dr. Hughes.

DR. M. HUGHES:  Just a comment for other

studies that might be relevant here.  It would be

interesting to look at the extent of

immunosuppression across subjects on monotherapy

compared with those on combination therapy.

DR. KIEBURTZ:  Do you have a proposed

measure of immunosuppression in mind?

DR. M. HUGHES:  Not especially, no.

DR. KIEBURTZ:  A point well taken.  I

didn't know if you had an operational plan.

Dr. Sejvar.

DR. SEJVAR:  I mean looking specifically

at CD counts would be I think very helpful.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  In terms of I think maybe

screening patients, one could do some skin testing

for common antigens, and I think that is something

that we usually use for patients who are going to

undergo immunosuppression, because we really want
to already know whether they are in such a
condition.

DR. KIEBURTZ:  I think these are good
points.  I am sure we are going to come back to
this topic when we define who might be appropriate
patients for this treatment.

I would like to move on to Question 5.

I believe this question is--I will ask if
I am framing this properly--I believe what we are
being asked is do we feel there a study or studies
which must be conducted prior to allow remarketing
of the agent, that is, do we feel there is
something that must be done before we can vote on
Question 7.

Dr. Porter.

DR. PORTER:  I would just point out that
remarketing is not really remarketing in the
ordinary sense where the drug is just put into the
pharmacy shelves.  I mean this is remarketing under
a very, very controlled circumstance, so
remarketing here has a special meaning.

DR. KIEBURTZ:  A point well taken.

Dr. Goldstein.

DR. GOLDSTEIN:  Question 5 may be out of order, because I think maybe what we should do is come back to that once we have sort of gone through some of the other questions.  I think the way you answer that question depends upon for whom, under what circumstances, and we may need to have that discussion first.

DR. KIEBURTZ:  I see your point, but I would say this.  I think to frame it like the adverse experience question is if you know right now that you don't think we should return the drug--allow the possibility to return to marketing for anyone until certain studies are done, then, we should know about that now.

Presumably, if you feel that it's not the case, that is only so if we clearly define in whom, for how long, et cetera, and under what circumstances.

Dr. Walton.

DR. WALTON:  I think that is exactly

right.  The intent of the question was do we have

such insufficient information that it's impossible

for you to discuss the way the questions, or are

you prepared to discuss them.

      DR. KIEBURTZ:  Are we discussed the later

questions?  Is anyone opposed?

      [No response.]

      DR. KIEBURTZ:  I will take that as we feel

that there are sufficient data to move forward.  Of

course, all of us think that there will be more

data that need to be generated to help refine these

questions.  That is part of the point of the

registry, and that is part of the point of the

cohort, and there may be other studies we would

suggest in our discussion although that isn't a

specific question that has been posed to us.

      So, we are willing to move on.

      So, the technical answer to Question 5,

are there additional data that you recommend to

obtain prior to determining whether to return to

the marketplace, the answer is no with the caveat

that we are going to specify clearly under what

circumstances we think it should be potentially reintroduced.

Is that sufficient discussion?  Okay. Well, that's 5 of 11 questions, if anyone is keeping count.

Question 6.  There are multiple parts to this question.  I think we are getting down to the nub of some of the issues.  If we return to commercial distribution, are there specific subsets of relapsing MS populations for whom you would consider use reasonable or, on the contrary, inappropriate?

Then, we have examples, and I don't think we should feel constrained by these particular examples.  These were just examples, people who have tried other therapies, people with a certain level of disability needs to be required or have to be below a certain level of disability, whether they have to have tried other treatments, whether they have to have failed other treatments, whether they had to have intolerable side effects from other treatments, whether it should be given with

other treatments.

Now, we have heard from the sponsor, I
believe, so (e) is kind of moot in the sense that I
believe the proposal is for it to be administered
only as monotherapy, and we could consider whether
we feel differently, so it is not entirely moot,
but we should bear in mind that the sponsor is not
proposing at this time that it be co-administered
with any other available MS therapy.

There may be other ways of categorizing or
characterizing patients who we think are most
appropriate for treatment.

Dr. Walton.

DR. WALTON:  In spite of the fact that
monotherapy is the proposal, I think it would
remain useful just to understand whether or not the
committee concurs with that or not.

DR. KIEBURTZ:  Yes.

DR. TEMPLE:  And it has implications for
the patient agreement, for example.  At present,
the patient agreement doesn't say I am not taking
anything else, maybe it could.

DR. KIEBURTZ: Understand.

Dr. Koski.

DR. KOSKI: This is actually a question that I am relatively conflicted about, and the reason is as follows. You know, what we are beginning to realize is that the earlier the treatment that you get, the more you prevent disability and presumably the brain atrophy which is the long-term manifestation of the primary progressive or the secondary progressive phase.

So, on the other hand, if you have a patient that is very mild, there is a percentage of them that actually--you know, that you really do not see progress. I will see that that is the minor percentage. On the other hand, if you have a patient who is having a series of attacks, two a year, and has clearly evidence of enhancing lesions on MRI, I think that that is the type of patient that you most likely want to put on monotherapy relatively early in their clinical course.

Additionally, I think the other things that we also talked about is people who were not

able to tolerate some of the ABC drugs and were

continuing to have attacks and the same types of

enhancing lesions.  Again, this is the type of

person that you really want to have on it.

　　　　DR. KIEBURTZ:  I think we can think about

defining populations in several ways.  One is there

are particular characteristics of their disease,

that is, do they have relapsing-remitting MS.

Another aspect is do they have a certain level of

disability, and then there is a separate question

about how their drugs have been managed beforehand.

　　　　I mean there are several kind of

conceptual ways of categorizing people, and I think

we should consider many of them, and you discussed

two of them.

　　　　Dr. DeKosky.

　　　　DR. DeKOSKY:  While we are on this topic,

one of the things that I wanted to clarify was the

role of steroid infusion during the course of being

on the medication.  If I remember correctly, the

proposal was that high-dose methylprednisolone in

the course of a relapse during therapy would be

allowed, and the question of how to manage that,

whether it is considered a second kind of

immunotherapy, how many times one might do that

through the course of this, and how we would track

it is an issue that I think relates to this

discussion.

DR. KIEBURTZ:  Okay.  Dr. Porter.

DR. PORTER:  I have been holding back on

this question, which I asked yesterday, but I think

now that we are talking about treatment, we have to

know how they are going to great, and I think that

is an integral part of deciding whether or not they

will treat in those areas.

What I am referring to actually the last

part of the little questionnaire.  For example, are

you currently experiencing any continuously

worsening symptoms that have persisted over several

days - eyesight, balance, or strength?

If the patient answers yes, they cannot

receive Tysabri.  Now, I think we need to walk

through this, what this means logically, because

this has a huge impact on what kind of therapy the

patient is going to get, because the patient will
appear in the doctor's office with an acute
exacerbation of MS relatively frequently.

Now, they gave us figures that it won't
happen that often, but if you listen to the
audience, it happens pretty frequently especially
in this population.

Now, the assumption here is that this
might not be MS.  I mean that is the assumption
because we are not going to give Tysabri.  The
assumption is this has a chance of being PML, which
who can say it is not.  We discussed this yesterday
and there is a huge overlap of symptoms.

So, I think we need clarity on how we are
going to treat patients, are we only going to treat
patients with Tysabri between exacerbations, and if
a patient does have an exacerbation, are we going
to treat them as if they might PML, or are we going
to watch them to see if PML looks like it develops,
or are we going to wait to see if this exacerbation
begins to look more like an MS event, and then
treat with Tysabri.

I think this issue here is very muddy, and
I would like to hear the sponsor address it.

DR. KIEBURTZ:  I hear your point.  I think
part of that discussion needs to happen later, that
is, how do we actually--

DR. PORTER:  My argument is that if you
are making decisions about who is going to be
treated, you have to know how the treatment is
going to be administered, but then I will yield to
the Chair at this point.

DR. KIEBURTZ:  I would say the base case
of what we should be thinking about, that it is
going to be administered monthly, and not in the
setting of an acute exacerbation.  So, it can't be
administered when there is an acute exacerbation.

DR. PORTER:  Does that mean that every
acute exacerbation will then be looked at as a
possible PML event?

DR. KIEBURTZ:  That's a separate question.
That is what I want to talk about later.

DR. PORTER:  Okay.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  I would like to condense these questions into my own thoughts especially as somebody who treats many patients with multiple sclerosis, the data that was have suggests that patients with a disability up to an EDSS of 5, we have data on that.  We don't have data beyond that, but I think the reality is that there is no trend suggesting there is a safety issue in treating patients who have exacerbating or relapsing disease and higher levels of disability should not receive this agent.

The second point as to who should receive this agent, individuals absolutely, definitely have to have confirmed multiple sclerosis, and I think the only criteria that we have that are objectifiable are MRI criteria.

The third, I would suggest that individuals should try other agents first.  There is obviously a decade's worth of experience with other agents.  We know the safety profile of those agents well.  We don't yet know the safety profile of Tysabri in longer term use.

So, those would be my three caveats - not to restrict to a specific level of disability, not to treat individuals who have unsubstantiated disease, and to require use of an alternative agent first.

DR. KIEBURTZ:  Thank you.

Let me go in order.  Dr. Jung.

DR. JUNG:  I would like to address a couple of comments made by my colleagues, first of all, regarding Dr. Porter's comments.  I think that similar to what we see in the use of Novantrone with MS, that you will not see family practitioners or even general neurologists without a large collection of MS patients using Novantrone.

I think that most of the neurologists who currently do use Novantrone are those with a substantial population of MS patients who feel comfortable using that, so I think that the concern that Tysabri would be used relative willy-nilly would be fairly unlikely.

Number two, addressing Dr. McArthur's comments, I respectfully disagree.  I think that we

have talked frequently in MS about time is brain,
and so you really do need to individualize the
treatment of the patients, and if you have someone
who is clearly going downhill quickly, that waiting
for that person to fail one of the current
therapies, given the discrepancy in terms of the
efficacy of Tysabri compared to the current
therapies on the market would be harmful to the
patients.

          We have also talked yesterday about the
unmet needs of MS patients, and although those of
us with large populations of MS patients know that
we talk when patients are diagnosed about the four
therapies that are on the market, there are
substantial numbers of patients--and I don't
remember the exact numbers--that we know are not
being treated even though there are therapies
available, and you have to look at the individual
patient in terms of needle phobia.  The idea of
doing self-injections has really turned a lot of
patients away from doing the current disease-
modifying therapies.

I know that when I have talked to patients about the idea of getting an I.V. infusion once a month, where they are not the ones who are injecting themselves, that there is that attractiveness to that.

I think obviously, we need to be very careful when we are doing informed consent to talk about the risk of PML as we know in that setting compared to what we know about the relative safety of the current commercially available disease-modifying therapies, but I think that that unmet need needs to be addressed.

We know that there is a substantial number of MS patients out there who are not being treated.

DR. KIEBURTZ: Dr. Couch.

DR. COUCH: I think we need to keep in mind that what we are proposing, as Dr. Porter alluded to, is something between a release of a drug and a long-term clinical study, that we are really looking at something that is going to collect data, a mechanism of collecting data over a longer period of time in a situation that we don't

know what is likely to happen in 5 or 10 years.

There are a number of different situations here - has the patient had pretreatment with one of the usual drugs, has the patient had pretreatment with something else, have they had a couple of courses of a blast of prednisone followed by perhaps some other anti-immune drug, et cetera. There are a lot of different situations.

The other point that has come out very strongly recently, and alluded to earlier, of course, is that the earlier you treat, perhaps the better you are able to prevent long-term disability.

I am wonder if we might not have, since the proposal is to be dealing with a limited number of skilled physicians working out of infusion centers that are going to be known to and working with the company, have a series of gradations of patients, groups that are going to agree to take the medication early after a clearly definite diagnosis is made, the people that are going take it later, people that want to try it early, people

that don't want to try it early, but have tried it
after many other things.

I think there is a lot of different areas
that need to be explored.  I don't think we know
what the effect on chronic progressive MS is and
yet yesterday we heard a number of testimonies
saying that this drug worked at least temporarily
to chronic progressive MS.

I am not sure how to answer the question.

DR. KIEBURTZ:  Dr. Temple.

DR. TEMPLE:  Actually, I wanted to go back
to--I don't know if it was a debate or not--between
Drs. McArthur and Jung and see where they disagree.

Dr. McArthur, were you basically saying
that nobody without some disability is a candidate?
Is that a proper interpretation of what you said?

DR. McARTHUR:  That nobody without
disability?

DR. TEMPLE:  You should at least have some
disability before, not just an episode or not just
the diagnosis, but some degree of disability, was
that your criteria?

DR. McARTHUR: Let me clarify what I said.
I was actually addressing the other end of the EDSS
spectrum, and just to go back to what Dr. Jung was
saying, I totally agree with her, and I think the
concept of neuroprotection, preventing neural
degeneration before it happens, I totally agree
with that.

I don't think we have yet any hard
evidence as to exactly when that should occur,
whether it needs to occur in Year 1 of multiple
sclerosis diagnosis, or Year 5, or Year 15, bearing
in mind that this is a lifetime process.

DR. TEMPLE: But just to be clear, one
could, because of the risk, say fine, we understand
getting neuroprotection in early is good, but
because of this risk, we don't want anybody who
hasn't manifested some degree of impairment,
residual impairment treated yet. I am not
advocating that. I am just saying one could say
that.

One could also say that's part of what a
patient and the physician ought to decide together,

how much they want to try to do that.  You could

also say, well, you should have sure that

interferon alone won't do the job.

I mean there is a million different things

one could impose, and I guess I should add one

could, quote "impose" them with varying degrees of

stringency.  One could say it is recommended for

use in this, one could say it is contraindicated in

other people.

These is a wide range of ways to

incorporate those views once you decide what the

views are.  Obviously, this is very important to

us.

DR. McARTHUR:  Right.  So, to answer your

question, I don't have any firm ideas of

conclusions about at the lower end of the

disability scale, because frankly, I think at that

end of the scale, the available clinical metrics

that we have are pretty imprecise.

I also think it's relatively imprecise to

decide whether a patient clinically is having an

exacerbation, a new lesion of inflammatory damage

within the central nervous system as opposed to all of the other things that can produce neurological symptoms.

I do think, however, that objectifiable MRI evidence of disease activity, contrast enhancement, there are very few people who would argue with that as being a marker or a metric of ongoing disease activity, and that is why I asked the questions as to whether there was a differential response.

There are only a relatively few number of individuals in the 1801 study who did not have contrast-enhancing lesions. It looked to me, even though the numbers were small, that the treatment effect in that small group was much less favorable for individuals with contrast-enhancing lesions.

DR. TEMPLE: That part seems less controversial. The controversial past is, is there some degree of badness that should be a pre-condition, and if so, do you suggest it, do you require it, do you make someone sign something about it, but we will get to all that.

DR. McARTHUR:  No, I would not set a
minimum level of clinical disability for this drug.
I think we all see patients who have no disability,
but terrible looking scans, and I think those
patients should be treated aggressively with
whatever one wants to treat them.

DR. KIEBURTZ:  I want to move it around,
so that we hear from other people.

Dr. Goldstein.

DR. GOLDSTEIN:  First, just a point of
clarification.  We were talking about disability
and impairment as if it's the same thing, and there
is a difference between impairment and disability.

Impairment is something that I find when I
examine a patient.  It may be an arm drift, it may
be a little problem with coordination, but it
doesn't affect activities of daily living or daily
life in any way.

Disability is something that impacts on
daily life.  It is people that can't do their
laundry, can't go upstairs, can't take care of
their kids, it's that kind of thing.  So, when we

are talking about impairment and disability here,
we are talking about two different things.

        The point that I want to try to make is
that, you know, we are going to be talking about a
lot of imponderables--well, they are ponderable,
but things without answers--because we don't have
the data.  We can ponder all we want.

        I think what we need to try to crystalize
is what we really know and what we don't know, and
the reason that I think that's so important to do
is that if we come down saying that this is
something that is worthy of being reintroduced, the
people out there need to know, and the physicians
need to know, what to have, what the basis is of
this risk-benefit discussion.

        We don't have good data on people who fail
therapy and then switch to a new therapy.  That
data does not exist as far as I can tell from
reading through this.

        The data from the 1802 study is not
relevant to that because they weren't treated with
monotherapy, and we already know from at least the

way the sponsor is proposing this, that monotherapy
is not something that they--I mean dual therapy is
not something that they are going to proceed, so we
don't know that.

We don't have data on people with
secondary progressive MS.  That data is not here.
We don't have data for people with primary
progressive MS.  Those data are not here.  So, as
we are talking about, you know, how to frame this
and how to frame risk-benefit, I think it needs to
be done in a more authoritative way than just
having patients and physicians randomly searching
the Internet for the next miracle drug and getting
misinterpretations of the available data.  I think
as we frame this, we need to frame it in that
setting.

The other point again that I have made
several times, I think, is that there are no direct
head-to-head comparisons between this drug and the
other available immunomodulatory agents, that the
data that we are comparing here is data from trials
that were done a decade ago to things that were

done relatively more recently, and we are assuming

that this difference that we are seeing means that

this may somehow be more efficacious than what

other drugs are available.

We found time after time after time after

time when we try to do that, we are just plain dead

wrong, we are just plain dead wrong when we do

head-to-head comparisons. So, that needs to also

come through that we don't know that that is the

case.

I think then people out there and

physicians can try to make informed decisions based

upon not only what we know, but what we don't know,

and as we frame this, who should get what, under

what circumstances, I think that needs to really

come through very quickly, that we are making

guesstimates here.

DR. KIEBURTZ: Let me just take one step

back and say that the only reason that we are here,

the only reason there is an advisory committee is

because there is an absence of data, and I don't

think it is going to help us too greatly to

continue to characterize what we don't know.

The reason we are asked to come here is to give our opinion in the absence of data.  So, we need to crystalize, each of us in our own minds, what we would suggest, so that these guys can hear it.  We are not decisionmakers, we are advisers. They need to hear what we would advise, and if they think we sound like a bunch of loonies, they will ignore us.

If we sound reasonable, they will take our advice, and I am not being critical of you, Dr. Goldstein.  I think  you are doing a good job of setting up what the issues are, but I also want to drive towards people coming up with their opinion on this, and I think Dr. McArthur has made a good start of that, which is given the risks, we have to be very clear on the diagnosis, we have to be definite on the diagnosis, more than so than we would be with other agents, and we have to be sure that people have definite MS.

He is suggesting that there be MR confirmation of that and that the people have

relapsing as opposed to a progressive MS, so those

kind of concrete recommendations, particularly if

people disagree with what has been said before, I

would like to hear that.

      Ms. Sitcov.

      MS. SITCOV:  Yes, I agree with Dr.

McArthur that there must be a concrete diagnosis of

MS, but I also just wanted to second something that

Dr. Jung said, and that is, I am a Patient

Representative and I am here representing patients,

and there is a very big needle phobia, and there is

a huge unmet need.

      I have been injecting intramuscularly for

six years, and I close my eyes when I do it, and I

get lucky and I hit the right spot, but there is

just a very large unmet need, and I have peers who

have flat-out said to me--they are not on anything,

they have relapsing-remitting, and if this drug

becomes available, they will get monthly infusions.

      DR. KIEBURTZ:  Dr. Jung.

      DR. JUNG:  Thank you for letter me speak

before I burst.  I want to address a couple of

comments.  First of all, I think part of what we are struggling with is the heterogeneity of the disease which I think is obvious, but we need to be very careful when we say that you need specific MRI confirmation of MS.

As we know, there is a small percentage of patients with MS who clearly have negative MRs, positive spinal fluid, and so given the conflict that is out there amongst MS neurologists about how to specifically diagnose, we need to be clear about that.  Having said that, I understand that we need to be very clear.

The other point I wanted to address was the comment that Dr. McArthur made about requiring MR evidence of active disease.  As we know, MR is exquisitely sensitive and one of the things that we need to be careful about is that we don't go over to the other side, which is do we treat the MRI scan and not the patient.

We know that there is frequent changes on MR that are seen when the patient is clinically stable, and so we need to find a comfortable

balance between that in terms of clinical

presentation versus MR.

The other point is going back to the

comment about failing current disease-modifying

therapy.  We traditionally tell patients that to

see the biologic effects of one of the

disease-modifying therapies, that they need to wait

six months before we can address whether one of the

drugs that they are taking currently is a failure,

and again recognizing that time is brain, we need

to be clear that we can't use that absolute

necessarily on all of the patients.

I think those were my main comments.

DR. KIEBURTZ:  Next, is Dr. Sacco, but I

am just going to throw in my points since I put

myself on the list of things.

I just want to concur with Dr. McArthur

that I think being absolutely certain about the

diagnosis in an uncertain world is necessary, and

although there are possibilities of people having

MS with less levels of evidence, just like there

are in other illnesses, I think whatever diagnostic

file:///C|/dummy/0308PERI.TXT

104

criteria represent the most stringent should be

employed here because of the risk of treatment, and

the drug as best we know only helps

relapsing-remitting multiple sclerosis.  That is

the only evidence we have.  It may help in other

things, but we don't have evidence of that, so we

have to be very clear that that is who comes in and

give practical ways of defining who that is.

     I am not expert enough in that to say

precisely, but I think that needs to be

operationalized in a coherent way.

     I think the other thing is based on

subgroup analysis it is very hard to predict a

clinical subgroup which is going to fare better

than others or worse than others aside from the

issue of neutralizing antibodies.

     That aside, I don't see any demographic

clinical or pretreatment characteristics which

identify a group of people who are more likely to

benefit than others, and we have precious little

data above an EDSS of 4, however, a total of

somewhere about 120 patients of 4 or higher, so

that starts to define an upper boundary around
which we have data, at least the data we are
looking at here.

I have to agree with Dr. McArthur, I can't
see a lower bound to that.  People that are
enrolled and eligible all seem to benefit.  I have
to disagree with him in that I am not certain that
there should be a requirement for prior use and
failure of other drugs, whether due to lack of
efficacy of side effects.

I agree there is a subgroup of people who
are non-progressers, who may be exposing themselves
to unnecessary risk, but at the point in time that
decision has to be made, it is impossible to know
who will be these fast and slow progressers as best
as I know at this point in time.

As long as those decisions are made with
as much information as possible, and that's
conducted in a way to minimize risks, I, for one,
can't support a criteria of having used and failed
other drugs.

Dr. Sacco is next.

DR. SACCO:  I also agree with all the
comments you made about selecting the right group,
and I think Dr. McArthur's points about the MS
group is key.

I think the other things we need to be
thinking about is when a clinical trial is done, it
is set up with inclusion/exclusion criteria, and
there are some here that it is worth going back to
and reflecting one, because then when a drug gets
released, it sometimes gets used beyond that
inclusion/exclusion criteria.

One of them was an EDSS has to be less
than 5.  You couldn't get into this trial if your
EDSS was greater than 5.  So, I think making sure
that we operationalize and make as clear as
possible that the inclusion criteria, from the
evidence we have in these trials, will be
important, and adding to that regarding the
diagnosis of MS, because what I am concerned about
after hearing yesterday, is that this is perceived
as a wonder drug, and it begins to get used in
populations that maybe the original trial didn't

include.

        That is why I think we are struggling
because of the fear of risk from the data we have
in the trials that we have in front of us, so
making as clear as possible, I think in our
inclusion/exclusion criteria, and going back to
looking at them I think would be key.

        DR. KIEBURTZ:  Dr. Koski and then Dr.
Temple.

        DR. KOSKI:  Thank you.  You know, one the
problems actually is the fact that when a patient
is getting towards an EDSS of 4 and 5, very
frequently they are beginning to enter into this
secondary progressive phase.

        So, this has been one of the issues
obviously with interferon treatment over the years,
because that was also approved primarily for
relapsing-remitting, but I will tell you that over
time, you know, increasing numbers of patients with
the secondary progressive phases actually are on
that drug or on those drugs.

        So, I think, unfortunately, it's part of

the disease, and I will bet that it will happen,
but we can try and limit it by saying that patients
under 4 or patients under 5 EDSS, you know, should
be the ones that should be considered for the drug.

DR. KIEBURTZ:  Dr. Temple and Dr. Katz.

DR. TEMPLE:  One encounters this kind of
problem all the time.  You put people in your
trials that you hope you can show improvement in.
As they get sicker, you are not sure you can do
that.

We don't necessarily always say a drug if
only for the people who have been studied.  That is
a question that arises all the time, and I just
want to point out the distinction between telling
people who the studies were done in, which is one
thing, and literally saying if you are over 4,
don't do this.

First of all, I doubt anybody would pay
any attention to that, but leaving that aside.
Those are two different things.  It is a little--I
mean I have never treated anybody, but it's a
little hard to swallow the idea that as you get

into the places where you are really worried, you
stop using the drug that looks like it works rather
well.  It just seems unlikely to prevail.

On the other hand, telling people where
the data came from, even including the patients, to
tell them, you know, that is another thing to
consider.

DR. KIEBURTZ:  Dr. Katz.

DR. KATZ:  I really want to make the same
point, but just to emphasize, remember this is
presumably, if it is remarketed, it will be done
under a very strict registry with forms that the
physician will have to sign, which says my patient
has disease X.

I mean here, to speak to Dr. Temple's
point, we can describe who the studies were done
in, but are we really contemplating having the
physician sign a form which says my patient has
relapsing-remitting MS with an EDSS of 4 or less,
is that what we are talking about, because here we
are contemplating fairly strict control over who
gets it, or at least having people sign forms that

allegedly are truthful.

So, I am wondering are we asking for that sort of documentation in this case, in other words, restricting it specifically to patient who were studied and having the physician affirm on the form that his or her patient meets all of the criteria, the inclusion criteria, is that what we want?

DR. KIEBURTZ:  We will see what people say.

Dr. McArthur.

DR. McARTHUR:  I already expressed my opinion.  I don't think there should be an upper limit restricting the use of this agent for all of the reasons that Dr. Temple just said.

I did want to clarify why I believe that this agent should probably not be used or considered as a first line drug, and just echoing off of some of Dr. Jung's comments, I mean first we have a lot of experience with the available drugs.

We heard eloquently yesterday that many, many patients do not tolerate them well.  Many patients have flu-like reactions, et cetera.  On

the flip side, we didn't hear yesterday from the
many patients who do tolerate some of these drugs
very well for long periods of time.

I think we should not fail to recognize
that a monthly infusion of a drug is a complicated
process. I am not convinced that the risk
management process that is being proposed is going
to do anything but make it a nightmare.

For example, I think the last question on
the checklist, "Are you current experiencing any
continuously worsening symptoms," et cetera, et
cetera, I would guarantee that most patients will
say yes to that, if they are answering truthfully,
and if that's the case, that is going to trigger
yet another check with a neurologist or yet another
MRI before administration of the drug.

So, this is not going to be an easy
process for patients to receive. It is not going
to be an easy, one-stop shot monthly infusion, and
that is why I believe, in addition to the safety
issues, which I do think are tremendously
important, the logistics of administering this drug

should restrict it to, if you will, a second line
agent.

       DR. KIEBURTZ:  Dr. Walton.

       DR. WALTON:  Yes.  Adding on to the
aspects that Dr. Katz asked to please ensure to be
addressed, another part of what I am hearing, and
some differing viewpoints that I would like to
encourage the committee to clearly address, is the
idea of restricting this to use as a second line
drug or not, and that will be an important piece of
advice for us to consider.

       DR. KIEBURTZ:  Dr. DeKosky.

       DR. DeKOSKY:  I just want to add my
comment that I did not believe that the drug should
be restricted to people specifically within the
lines of the trial, that is, I would not,
especially given the fact that it was those with
the higher levels of disease activity who appeared
to have a better response, at least within the
limits of the two-year trial.  I don't see a reason
to limit it just to people who were in the trial,
and would use it for EDSS's who were higher.

DR. KIEBURTZ: Dr. Koski.

DR. KOSKI: My original comment really had to do with the fact, to just reaffirm, that this really is a spectrum of disease, and one of the problems, of course, is when you really enter into the progressive phase. That is the natural history of what happens with significantly involved MS patients.

I think that then it makes it very difficult to determine on terms of these risk issues, you know, what is going on with the patient, and, indeed, as Justin says, you know, you are going to end up doing probably a larger number of MRIs most likely, and some patients will really object to this more frequent analysis of their spinal fluid.

I think that these things are manageable, you know, particularly in the context of MS centers, but these are all going to be major issues, and I agree to some extent that we may not want to limit the use of the drug to an EDSS of 4 or 5, but I think clearly these patients have to

have relapses and remissions, so that we have a
characterized population, but that might be on the
background of progression.

     DR. KIEBURTZ:  Dr. Sejvar.

     DR. SEJVAR:  I guess just to go back, and
I guess I would like to concur with Dr. McArthur
about the concept of using it as a second line
agent simply because, you know, given the fact that
people with severe debilitating disease may want to
take this risk, I still think that we are very
unclear about what exactly the risk is.

     Until additional data are available, I
think it would be reasonable.  We are not limiting
the access completely, but we are being a bit more
prudent until further data are in.

     DR. KIEBURTZ:  Dr. Hughes.

     DR. M. HUGHES:  I agree that I think the
diagnosis is most important.  I don't agree with
the idea of restricting it to second line therapy.
In my mind, we will probably get to this later, but
the observational study that is being proposed, I
am not sure that a huge amount of useful

information will come from that.

In a sense, I would prefer to see those resources, dedicated controlled studies in some of these populations that we are talking about in concert with a broader RiskMAP program.

DR. KIEBURTZ: Dr. Couch.

DR. COUCH: Just to follow up on the other comment and agree with, I think the people who are entering into a chronic progressive phase or look like they are beginning to have more frequent relapse are going to be the people that are most likely to be really wanting to have this therapy.

We don't know whether, at that point, you would be able to prevent the development of chronic progressive therapy, so I am just seconding Dr. McArthur's comments that let's don't put an upper limit on it.

DR. KIEBURTZ: Dr. Katz.

DR. KATZ: Again, just when people comment, it would be useful to know whether or not people think it should--obviously, we are talking about who it should be restricted to or not--but

specific elements of the restriction that people have in mind, it would be very important for us to hear what everybody thinks in terms of must it be limited by severity, must it be limited by as second line, and must it be limited to relapsing-remitting even if it's associated with disability, or does the committee rule out the possibility that it could be used in patients with primary progressive or other forms that weren't studied.

So, relapsing-remitting, disease severity, and second line, it would be useful if people could address those three criteria.

DR. KIEBURTZ:  Do you mind--after a little more discussion, I may actually go around on each of those questions?

DR. KATZ:  Yes, I think it would be actually useful to go around.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  I want to clarify that I am not advocating we treat anyone with an unclear diagnosis of MS, so recognizing that there are

criteria out there that we need to make sure that
the patients who qualify for the drug truly do have
MS.

I do not agree that this should be used
only as a second line therapy for the record.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  Two points.  One is, or a
question actually, can we recommend, getting back
to Question 5, can we recommend that a clinical
trial be done as part of this approval process that
we are at now?

In other words, again, what we don't have
to answer, you know, we are battling should it be
first line, should it be second line, can we
recommend that a prospective randomized trial be
done comparing this drug with another established
immunomodulatory agent and determine that, get the
data for that, at the same time that we recommend
restrictions in certain circumstances based upon
what we know now?  Is that a possible
recommendation?

DR. KIEBURTZ:  We can make whatever

recommendations we want.

DR. GOLDSTEIN:  Is that a reasonable recommendation from a regulatory standpoint?

DR. KIEBURTZ:  Let me just point that we already said that we don't recommend anything to make it contingent.

Go ahead.

DR. KATZ:  Certainly, there are times when we ask sponsors to do studies after approval, so-called Phase IV commitments, which they agree to, and they are required to complete.  So, you can certainly recommend that the sponsor, that we require such a Phase IV study of a particular design, to answer a particular question.

But right, the critical question for us, as Karl said, which is do they need to do that now before we contemplate reintroducing it.

DR. WALTON:  Also, a recommendation like that would be useful for us to understand the objective of the study.  Much of the deliberation here is related to the uncertainty of the risk of natalizumab, so for any study that you might

recommend, a better understanding of what the primary objective you see from that study and how it might be applied to our oversight over the use of natalizumab would be valuable to us.

DR. GOLDSTEIN:  I think I understand.  You know, it is getting back to Question 5, was there a study that I thought needed to be done before this was potentially reintroduced in any population, and we answered that question.

Now, what I am saying is that given the things that we don't know, is there a critical question that needs to be answered to try to address these issues that we are debating, that we don't have the data for.

The question I was asking, is that possible from a regulatory standpoint, and the answer was yes.

DR. WALTON:  Yes, it is, and you should also understand that we recognize that we only have the data that we have now.

DR. GOLDSTEIN:  I understand.

DR. WALTON:  That recommendations that we

receive from you at the present time are

recommendations for what we should do at the

present time, and that as additional data come over

the course of the next few years, that changes may

well be appropriate one way or another in whatever

is recommended or put in place at the present time.

    DR. KIEBURTZ:  Dr. Sacco.

    DR. SACCO:  I wanted to go back to the

issue--first, I will put on the record that I am

not saying this should be second line, because I

think it would be available for first line--but I

want to go back to this issue of evidence-based

recommendations, what is written in your package

insert, and what societies will write in their

evidence-based guidelines.

    I still believe that based on the group in

the trial, that is the group that is most likely

and should be treated with the drug.  So, when Dr.

Temple say, you know, well, people may do other

things, I agree, but lawyers and other people will

read what is written in package inserts, as well as

what is written in guidelines.

I think that is where we can at least try
to inform both the public, as well as the
practitioners, who is the best group to be treated.

The issue is the uncertainty of risk, as
well as the uncertainty of benefit, to me, in
people with the progressive MS, the group with EDSS
above 4 or 5 are progressive.  So, I still think
that is important, and that needs to be somehow
reflected when we think about choosing the MS group
for this drug.

DR. KIEBURTZ:  I think it should be clear,
and you can have relapsing or remitting features
with an EDSS of higher than that, you start to get
accumulating disability that is progressive
underlying it, people still have a
relapsing-remitting feature.

I think that gets to your point of if they
have that feature, but their EDSS is higher, does
that somehow exclude them just because their
accumulated disability is higher.

No one has spoken to how they think this
should be used in combination with Avonex,

122

Betaseron, Copaxone, Rebif, and Novantrone.   Is

that because nobody wants to do that, or is that

because you just haven't gotten there yet?

     Dr. McArthur.

     DR. McARTHUR:  We are all terrified.

Seriously, i can't believe anybody would recommend

that at this point.

     DR. KIEBURTZ:  I just wanted to get that

on the record.

     Ms. Sitcov.

     MS. SITCOV:  I would also be very

frightened of using Tysabri with a five-day course

of Solu-Medrol.

     DR. KIEBURTZ:  I think we definitely need

to come back to the timing and the

co-administration and the management of relapse.

We will come back to that.  We have to face that at

some point.  I know Dr. Porter is intimately

interested in that.

     Do you have something else you want to

say, Dr. Porter?

     DR. PORTER:  Yes, I just wanted to say

file:///C|/dummy/0308PERI.TXT

123

that--and this will surprise you coming from the

Industry Representative--that I think that this has

to be a second line drug.  In the classic

administration of medications, we always give drugs

first that are safe and effective.  This one is

less safe at the present time given the data that

we have, the limited data.

So, I think we would be, from the

standpoint of the point Dr. McArthur made, which is

we didn't hear about a lot of people who do well on

all these other anti-immunologic drugs, and many of

them do, number one, and number two, the

medical-legal implications of giving this drug as a

first drug before trying something else, I think

propels us for sure into saying at the moment,

maybe later this won't be true, but at the moment

this should not be the first drug that is given to

the patient with the disease.

DR. KIEBURTZ:  So, can I go through a

little exercise here now, which is I am going to

ask everybody to answer a Yes or No question, and

there is going to be a series of them, and I am

just going to go right around counterclockwise
starting with Dr. Porter and ending with Dr.
Hughes.

      Bear with me.  Just say Yes or No, and
don't explain yourself.

      Would you permit use as a first line
agent?

      DR. PORTER:  Non-voting No.

      DR. KOSKI:  Yes, I would.

      DR. GOLDSTEIN:  Not now.

      DR. DeKOSKY:  I would.

      DR. KIEBURTZ:  I should say your name.

      Dr. Sejvar.

      DR. SEJVAR:  No.

      DR. KIEBURTZ:  Dr. Ricaurte.

      DR. RICAURTE:  No.

      DR. KIEBURTZ:  Dr. Sacco.

      DR. SACCO:  Yes.

      DR. KIEBURTZ:  Dr. Jung.

      DR. JUNG:  Yes.

      DR. KIEBURTZ:  Ms. Sitcov.

      MS. SITCOV:  Yes.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  No.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  No.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  Yes.

DR. KIEBURTZ:  I vote yes.

So, there you go.  No consensus.  Sohail
will tell us what the numbers were, I presume.  I
think the point there is you are not going to get
a--there is a division of opinion, which I think
reflects the reasonableness.

DR. KATZ:  Do you actually have a tally
somewhere? I realize it's split. I would just like
to know what the exact numbers are.

DR. KIEBURTZ:  Did you include Roger?

DR. MOSADDEGH:  I did, yes.

DR. KIEBURTZ:  He's non-voting.

DR. KATZ:  Dr. Porter is a non-voting
member, but we did ask him, just to get an idea.
Give us the tally with and without Dr. Porter.  We
will figure it out.

126

DR. KIEBURTZ:  Dr. Porter voted No.

DR. MOSADDEGH:  6-6.

DR. KIEBURTZ:  6-6 excluding Dr. Porter, and Dr. Porter voted No.

You missed a vote.

DR. KIEBURTZ:  One more time.  We missed a vote.

Perhaps more slowly.  Would you allow first line use?  Dr. Porter.

DR. PORTER:  Non-voting No.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  Yes.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  No.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  Still Yes.

DR. KIEBURTZ:  This is a chance to change your vote.

Dr. Sejvar.

DR. SEJVAR:  No.

DR. KIEBURTZ:  Dr. Ricaurte.

DR. RICAURTE:  No.

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  Yes.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  Yes.

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  Yes.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  No.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  No.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  Yes.

DR. KIEBURTZ:  Dr. Kieburtz.  Yes.

7 Yes, 5 No.  The non-voting is a No.

The second question.  Would you impose any limits of functional disability specifically any cutoff scores on the EDSS for eligibility to use the drug?

DR. PORTER:  Are you talking the up side or the down side or both?

DR. KIEBURTZ:  Either.

Two votes.  Would you impose any upper

128

limit on EDSS severity?

        DR. PORTER:  Non-voting No.

        DR. KIEBURTZ:  Dr. Koski.

        DR. KOSKI:  No, but I would want to make
it very clear that there were relapses and
remissions.  I mean I think that has to be--

        DR. KIEBURTZ:  Dr. Goldstein.

        DR. GOLDSTEIN:  No.

        DR. KIEBURTZ:  Dr. DeKosky.

        DR. DeKOSKY:  No.

        DR. KIEBURTZ:  Dr. Sejvar.

        DR. SEJVAR:  No.

        DR. KIEBURTZ:  Dr. Ricaurte.

        DR. RICAURTE:  No.

        DR. KIEBURTZ:  Dr. Sacco.

        DR. SACCO:  Yes.

        DR. KIEBURTZ:  Dr. Jung.

        DR. JUNG:  No.

        DR. KIEBURTZ:  Ms. Sitcov.

        MS. SITCOV:  No.

        DR. KIEBURTZ:  Dr. McArthur.

        DR. McARTHUR:  No.

129

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  No.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  No.

DR. KIEBURTZ:  Dr. Kieburtz.  No.

One Yes in the voting group, and the non-voting was No.

The same question, different.  Would you impose any lower--not saying what it is--but would you want to impose any lower limit of disability scale score on the EDSS?

DR. PORTER:  Non-voting Yes.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  No.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  Yes.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  Abstain.

DR. KIEBURTZ:  Dr. Sejvar.

DR. SEJVAR:  No.

DR. KIEBURTZ:  Dr. Ricaurte.

DR. RICAURTE:  No.

file:///C|/dummy/0308PERI.TXT

130

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  No.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  No.

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  No.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  No.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  No.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  No.

DR. KIEBURTZ:  I vote No as well.

The tally on that is 10 No, 1 Yes, 1
Abstain, and a Yes from the non-voting member.

One more question.  We are making
progress.

Do you think MS patients without
relapsing-remitting features, that is, with primary
progressive MS or solely progressive MS without any
more relapsing-remitting features should be allowed
to take the intervention at initiation?

DR. PORTER:  You mean at this time?

DR. KIEBURTZ:  At this time.

DR. PORTER:  Non-voting No.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  No.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  No.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  No.

DR. KIEBURTZ:  Dr. Sejvar.

DR. SEJVAR:  No.

DR. KIEBURTZ:  Dr. Ricaurte.

DR. RICAURTE:  No.

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  No.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  No.

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  No.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  No.

DR. KIEBURTZ:  Dr. Couch.

132

DR. COUCH:  No.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  No.

DR. KIEBURTZ:  I vote No, as well.

I think it's unanimous on a No for
including individuals who do not have
relapsing-remitting features.

Are we getting to things that are helpful
for you guys?

DR. McARTHUR:  I just think you should
clarify that question.  It is not so much
relapsing-remitting as relapsing, and relapsing
progressive, I think would still be encompassed
with certainly my recommendations.

DR. KIEBURTZ:  Features that include
exacerbations.

DR. McARTHUR:  Take out the word
"remitting."

DR. KIEBURTZ:  Would anyone change their
vote if we say "relapsing"?  I think I am using
some different vocabulary, but I don't think anyone
changes their vote.  I think they can have a

progressive illness, but they still have to have
relapsing features.

No one endorses the idea at this point of
approval with co-administration of any of the other
agents currently approved for the use of MS.  The
committee was unanimous on that, too.

DR. KATZ:  I am sorry.  It's unanimous
that people believe it should not be
co-administered with other?

DR. KIEBURTZ:  --approved agents.

DR. KATZ:  All other approved agents.

DR. KIEBURTZ:  Avonex, Betaseron,
Copaxone, Rebif, and Novantrone.

DR. McARTHUR:  Chronic administration,
because we are still going to have to deal with the
issue of methylprednisolone.

DR. KIEBURTZ:  Yes.  The management of
acute exacerbations we have not touched on, but
chronic co-administration.

DR. KATZ:  And that is because even though
we can't say with confidence that the risk is any
different with concomitant MS therapy, we are more

134

nervous that it is, or there is no evidence that
those other drugs add anything to the effectiveness
of Tysabri?  I am just interested in what the
rationale is.

     DR. KIEBURTZ:  I will give you my
rationale, and then I will let Dr. McArthur.  I
think we don't know yet, and it will allow us to
get a clear understanding of what the risk is with
the agent alone.

     There may be circumstances and, in fact,
trials where you would allow co-administration, but
I would not support marketing, because we don't
know yet, and we need a larger sample to get a
sense of what the actual risk is.

     DR. KATZ:  We don't know yet, but we are
nervous or you are nervous that the risk is
greater?

     DR. KIEBURTZ:  That is my concern, that
there is an enhanced risk with the
co-administration of an immune modulator and
immunosuppressive agent.  Secondarily, 1802
suggests that there is--

DR. KATZ:  Well, 1802, I think suggest
that adding Avonex to Tysabri doesn't really give
you very much more.

DR. KIEBURTZ:  Adding Tysabri to Avonex,
yes.

DR. KATZ:  Right, adding Avonex to Tysabri
doesn't really give you much more than Tysabri
alone.  That is a hint, it's not proof, and we
don't know anything about what happens when you add
any of the other approved MS agents.

DR. KIEBURTZ:  Right.

DR. KATZ:  I am not advocating a position.
I just want to flesh out the committee's thinking.

DR. KIEBURTZ:  I understand.  So, did that
help what I said, and you understand my thinking?

DR. KATZ:  Yes.

DR. McARTHUR:  My opinion would really
just be based on safety issues, but I don't think
it is adequate to just list these five agents.  I
think we need to specify other immunosuppressive
agents.  They may not be approved for us in
multiple sclerosis, but they are being used, and in

my view, there is the potential for enhanced risk with the co-administration of those agents.

DR. WALTON:  We take that point very much. These were listed only because they were the approved agents and might come most prominently to mind.

DR. KIEBURTZ:  I think we have had enough discussion on Question No. 6 for the moment.

I think we will take a break for 15 minutes and come back and address Question 7.

[Break.]

DR. KIEBURTZ:  Question 7.  Considering the currently available data, please discuss whether natalizumab should be returned to the marketplace for at least some patients--and we discussed that without conclusion exactly whom, but with some guidance, I think the Agency can consider--taking into account the preceding discussion of specific populations.  After discussion, please vote on this question.

DR. Walton.

DR. WALTON:  You may want to decide how

much discussion you still need, because after all,
the previous question had very extensive
discussion.

DR. KIEBURTZ:  I am not sure we need any
discussion, unless I see someone putting their hand
up.

So, having done that, and having a full
complement, why don't we take a vote on this and we
will start with Dr. Porter, who I would like to
know even though I know it doesn't count.

So, should we return Tysabri to the
marketplace for at least a defined set of patients?

DR. PORTER:  Non-voting Yes.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  Yes.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  Yes.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  Yes.

DR. KIEBURTZ:  Dr Sejvar.

DR. SEJVAR:  Yes.

DR. COUCH:  Dr. Ricaurte.

138

DR. RICAURTE:  Yes.

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  Yes.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  Yes.

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  Yes.

DR. KIEBURTZ:  Dr. McArthur?

DR. McARTHUR:  Yes.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  Yes.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  Yes.

DR. KIEBURTZ:  It's unanimous, 12 to zero,
we vote in favor of returning it to the
marketplace.

Well, we are halfway there.

So, we have talked about in whom, and I
think discussion should now continue on a similar
vein, with not necessarily reaching consensus on
the how.

Question 8 spans three pages, and it talks

file:///C|/dummy/0308PERI.TXT

about the essential or nonessential features of an

acceptable risk management (minimization) plan.  In

this discussion, consider the risk management plan

proposed by the sponsor and comment on the

appropriateness of specific aspects of the proposed

plan.  Please include in your discussion potential

restrictions to patient availability, such as, and

then there is Items (a) through (h) with subparts

to each of those (a) through (h), somewhere between

one and five subparts.

        The first question is would we only want

patient mandatory registration that is distribution

to patients enrolled in the registry.  That is what

the sponsor proposes, but can we have discussion on

that, whether people think that is a good idea or

not, or should it be available outside of such a

registry.

        Dr. Koski.

        DR. KOSKI:  I would say that it should be

absolutely mandatory.

        DR. KIEBURTZ:  Any disagreement on that?

Dr. Katz.

DR. KATZ: You could just sort of ask for a consensus. We don't need a lot of discussion I think if everybody agrees.

DR. KIEBURTZ: I think the general feeling is that there should be a mandatory registry in keeping with the sponsor's proposal.

The second part of that is what information should be collected on all patients in the registry, and what you have heard, and I think we heard reiterated this morning, is that the physicians will be contacted by the sponsor every six months for them to relay information about deaths, PML, discontinuations, but then there is other things here - other infections, serious adverse events, concomitant immunomodulator use.

What do you think should be transmitted from the physician to the sponsor at this every six month, what is the minimal essential information?

Dr. Hughes.

DR. M. HUGHES: I guess my feeling here is that mortality, in-depth information about the causes of mortality is probably the most important

information for understanding the risks of this
drug in clinical practice.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  I think that if we look at the
experience with the NIH stroke scale, which other
people at the table can comment about more than
myself, it would not be unreasonable to require
that the patient have an EDSS recorded on each
monthly visit.  That would be relatively easy.

Perhaps elements of the multiple sclerosis
functional component that they have mentioned, can
the patient walk 25 yards, et cetera, et cetera.  I
think several easy things, these could be done by
the staff t the infusion center whether it's a
nurse, a physical therapist, a PT aide, whatever,
but I think having this kind of information in
addition to the mortality, infections, adverse
events would be very useful and would provide us
with an ongoing database by which you could begin
to establish whether this drug is effective over a
longer period of time.

DR. KIEBURTZ:  Are you referring to the

cohort study or the registry?

DR. COUCH: I am referring to patients who would be in the RiskMAP Registry, every patient.

DR. KIEBURTZ: So, the current notion is that physicians provide information every six months, and you are suggesting every month?

DR. COUCH: I am suggesting that as part of the recordkeeping, when the patient returns, you can do an EDSS very quickly, at least from the impairment/disability standpoint.

You could carry out at least one or two components of the multiple sclerosis functional component, can they walk 25 yards, can they do a few things like that, and then go ahead with the infusion, but this could be done by a trained staff at the infusion center.

This is perhaps not that much different than in the ongoing stroke studies where nurses, technicians, what have you, provide NIH stroke scale data on patients that come in for the JCAHO stroke certification.

DR. KIEBURTZ: Just so I make sure I

understand, so that information would then be held

at the site?

       DR. COUCH:  I believe this information

could be recorded and then at the six-month

interval transmitted.

       DR. KIEBURTZ:  Dr. McArthur.

       DR. McARTHUR:  I share Dr. Couch's belief

that more information is likely to be better, but I

am not sure logistically how most infusion centers

would be able to do this.  I know our own infusion

center, I would not feel comfortable that our

nursing staff who are very good at what they do,

they are not trained to do neurological exams, they

are not trained to do EDSS, and I think the

variability would really make the data less than

useful.

       DR. KIEBURTZ:  Dr. Koski.

       DR. KOSKI:  I think the other thing would

come up, I mean our own MS center would probably be

able to do that. The difference is, however,

interpreting that data on a month-to-month basis,

because there is variability that occurs, and the

other thing is that, you know, after an
exacerbation, you have some persistence of symptoms
that, to some extent, resolve.

So, unless you have that all in a linear
fashion, I think it would be very difficult to sort
of put it together in a cohort type of analysis.

DR. COUCH:  I think that would be the
advantage of having the linear information to
document exacerbations, remissions.  I am not
suggesting that we are going to look for a linear
progression, but we are going to look for what is
going on during the time the patients are getting
the infusion.

DR. KIEBURTZ:  Dr. Sejvar.

DR. SEJVAR:  I guess I would just like to
respectfully suggest that the question about
efficacy and the question about safety are maybe
two slightly different things, and the purpose of
the registry, I think should focus on the safety
question and kind of focus on that.

DR. KIEBURTZ:  Let me just remind people
about Slide 94, which is the proposed registry at

least by the sponsor.  What the sponsor proposed is any known PML event is reported I think immediately to the sponsor, but then the physicians will be queried every six months for PML, other serious opportunistic infections, death of any cause, and discontinuation.

Those are the only bits of information that would be mandatorily collected on a six-month basis.  I believe that is the current suggestion.

What Dr. Couch, if I understand it correctly, is suggesting is that that be augmented by that information being collected monthly along with EDSS and some aspects of the MS functional capacity scale.

Dr. Goldstein.

DR. GOLDSTEIN:  I tend to agree that the issue of safety is a slightly different issue than trying to track this information.  It may be better to try to track this in the cohort study.

The other point is the list of things to be reported includes concomitant immunomodulators, and it was my understanding from what we discussed

previously, that these folks should not be on

concomitant immunomodulators, so I don't know what

the purpose is of reporting that.  It should be

zero.

DR. KIEBURTZ:  These questions were

written before we voted.

DR. GOLDSTEIN:  I understand.  So, I think

that could come out, but the thing that I would

probably put in there is use of I.V.

methylprednisolone, because that might be a

surrogate indicator for exacerbation, and it is a

concomitant medication that may prove important to

know about depending upon some of the other risk.

So, I would just make that switch.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  I think we need to add serious

adverse events, because I believe that was not on

the RiskMAP.

DR. KIEBURTZ:  As currently defined,

serious adverse events would not be collected in

the context of the registry every six months, but

would be in the context of the proposed

observational cohort, which would be a subset of
people.

DR. JUNG:  I believe it should be part of
the registry, as well.

DR. KIEBURTZ:  Other comments?

Dr. Sacco.

DR. SACCO:  I think it is important just
to clarify the purpose like we have been talking
about.  We will have the opportunity I think to
talk about the cohort where we may be able to get
more of the other information that Dr. Couch is
mentioning, EDSS score, other risk factors, a
larger sample.  So, clarifying the purpose, the
registry, to me, it sounds like is giving us some
safety, but also giving us this connection
regarding who the drug should be dispensed to.
That is part of the registry, as well.

DR. KIEBURTZ:  I think the intent of the
registry, as I understand it, is to be able to
track this issue almost singularly of PML.

Dr. Temple.

DR. TEMPLE:  Just the thought that you may

not want to abandon asking about other

immunosuppressives, even though it wouldn't be

intended that they be used, because things happen

that, you know, you didn't intend.  So, someone

else, some other neurologist might put them on it

and ignore the rules.  So, I guess I wouldn't drop

that too quickly.

     The only other thing I guess I want to say

is that hoping that a registry will produce useful

effectiveness information is something of a

fantasy.  They don't really do that.

          DR. KIEBURTZ:  Dr. Dal Pan.

          DR. DAL PAN:  Yes.  One of the other

things we were thinking about with regard to the

registry was complete dosing information, so that

when we look at whatever adverse events come out,

we have some sort of accurate denominator against

which to look at the numerator.

          DR. KIEBURTZ:  And by "complete dosing,"

you refer not only to doses given in the context of

the registry, but any information about prior usage

that occurred in trials and in the previous

marketing experience?

        DR. DAL PAN:  We would be interested in all that, yes.

        DR. KIEBURTZ:  Dr. McArthur.

        DR. McARTHUR:  Is the intent here that--maybe I am moving ahead to the distribution system--but the registry forms and whatever is decided should be in those forms be received by this central distribution center before drug is dispensed?

        DR. KIEBURTZ:  I believe the proposed registry, as we saw yesterday, the forms have to be completed before shipment.  No?

        DR. KATZ:  The initial form has to be completed, the acknowledgment form or whatever we are calling it, before the initial shipment of drug, but there is currently in the proposed plan no requirement that there be sort of a real-time--and this is something actually we ask about in one of our questions--there is no requirement that there be some information received back at the distribution center every month before

the next month's shipment is released.

That is a question we had about whether or not that might be more appropriate for various reasons that you can talk about, but that is a question we have.  It's not the case in the current proposal.

DR. McARTHUR:  So, it seems to me, then, an ongoing cross-check between the receipt of safety information centrally and the dispensing of drugs is critical.  No patient is going to enter Tysabri treatment with PML.  That is an incredibly unlikely event.  It is also pretty unlikely that they will develop PML during the course of Tysabri treatment, but that is the event that we are looking for.

So, in my opinion, we have to link drug dispensing to receipt of patient safety information on a continuing basis not only for as long as the patient is receiving it, but I think for a prolonged period of time after they have received Tysabri.

DR. KATZ:  Well, again, that is a critical

file:///C|/dummy/0308PERI.TXT

151

element or potential element of the plan that we
would very much like to hear what the committee
thinks.  There are those of us who agree with you
and those of us who don't necessarily.

So, we really want to hear a discussion on
that specific point, and again I believe it is a
specific sub-question a little bit later on, so you
can talk about it now or whenever.

DR. KIEBURTZ:  We can talk about it now.

Dr. Porter.

DR. PORTER:  Good.  I think that there is
no doubt that you want to have the safety
information at hand before you dispense the drug,
but I don't think that what you want to do is have
an incredibly bureaucratic pass back to the drug
company to make sure that they look at the safety
data and say, oh, yeah, we agree with, Doc, it's
okay to give the drug.

So, I think that it's reasonable to have a
safety check, but I think it can be done at the
front line with the physician.

DR. KIEBURTZ:  Dr. Dal Pan.

file:///C|/dummy/0308PERI.TXT

152

DR. DAL PAN:  With regard to Dr.
McArthur's point, I just want to mention that
Question (c)(4), because it's exactly about
Question 8(c)(4), should there be a periodic
reauthorization of Tysabri administration, if so,
how often? For example, prior to each infusion,
every six months, or whatever other recommendation
you come up with.

So, that issue is important for us to hear
you discuss.

DR. KIEBURTZ:  If I understand it
correctly, after the initiation procedures, and the
registration of the person, depending on how we
suggest distribution, it is possible that the
person will not be seen by a neurologist for
another year, another two years.

There is no mandated reassessment,
reevaluation, examination.  It is just every six
months the physician will be called or contacted by
the sponsor and asked do you know anything about
PML, other opportunistic infections, deaths, or
discontinuations, but that doesn't require that the

physician actually have examined the patient as it
stands, as I read it.

      Dr. McArthur.

      DR. McARTHUR:  I think it's an excellent
point, and I think it would again, in my opinion,
be less than standard of care to prescribe this
drug and not follow the patient on a continuing
basis or continuing regular basis.

      I also, with respect to Dr. Porter, I
think placing this just in the hands of busy
neurologists, we are notoriously not very good at
reporting things on a voluntary basis.  I think the
FDA can attest to that in terms of their
post-marketing experience.

      That is why mandating some sort of no
form, no drug experience is I guess what I am
proposing.

      DR. PORTER:  Well, I agree with you.  In
fact, what I was saying is don't make it so tight
that every time a dose has to be administered, that
there has to be a link back to the drug company,
because that will drive everybody crazy.  But a

process of reporting the data back to the company,

I was sort of expecting.

Apparently, that is not part of the plan?

I thought that was part of the plan, that the data

that the doctor was going to be collecting on this

patient would be, as part of the registry, would be

sent back to the company.

DR. KIEBURTZ:  Could you clarify that

issue for us about the proposal?

DR. BOZIC:  We are mandating that the

doctor provide us with these data every six months

- the PML, the deaths, the discontinuations, and

what we have decided is that if we don't get these

data from the doctor, then, we are going to

directly contact the patient to obtain the data,

and if still after that we don't get the data, we

will de-enroll that patient, and if the doctor

continuously has a pattern of not giving us the

data, that doctor will be de-enrolled.

So, we have a mechanism to obtain that

safety data, and that is our proposal.

DR. McARTHUR:  So, how complicated would

it be, Dr. Bozic, how complicated would it be to
mandate that, again no form, no drug on a
six-monthly basis?  You are going to do a lot of
detective work.  The doctor doesn't send the form
back, now you are going to call the patient, the
patient is out of town, et cetera.

Why not just make it mandatory every six
months if you are on this drug, your doctor needs
to provide this form before the drug is released?

DR. BOZIC:  I think that what we are
proposing is a system that has a great deal of
controls in it already.  I can walk through all the
controls because I think it does bear repeating
since I only presented it once yesterday.

So, can I have the slide from my core
presentation, please.

[Slide.]

Before the patient and physician start
Tysabri, they discuss the risks and benefits.  They
will read and sign the patient/physician
acknowledgment that we circulated today, and then
they will send it in to Biogen Idec.

We are going to verify that that document has been signed and that the patient fulfills the criteria, in other words, they have relapsing MS, and then what we are going to do is we are going to sign the patient authorization to that patient, and then we will match them to a registered infusion center.

So, that gives the authorization to that registered infusion center to begin dosing the patient. How does that center become authorized? They have received training by our field personnel on the risks and benefits of Tysabri and the risk management requirements.

The requirements that they have to fulfill are they have to dose only patients in Tysabri Registry, they have to provide a Med Guide to the patient before every dose, they have to complete the checklist before every dose, and they have to document all this in the Tysabri infusion log.

They also receive training on the importance of reporting adverse events to us including PML, and they have to agree to submit to

periodic audits, to verify that they are compliant with this.

So, once an infusion center becomes registered, now they are known to our centralized distribution system, and they can begin receiving Tysabri shipments. So, they can have a small amount of inventory on site, and then once all that happens, the patient can begin receiving Tysabri treatments.

The other mechanisms in the system to facilitate close monitoring of the patient, close clinical monitoring of the patient are, number one, the checklist. The purpose of the checklist is many fold, so one purpose is to make sure that there are no concomitant therapies being used, so we reinforce that.

We reinforce the risk. We make sure the patient has read the Medication Guide, is aware of the contents of the Medication Guide before each dose, and also there is a neurological screening questionnaire to make sure the patient doesn't have any new neurological symptoms that need to be

investigated, and if those are detected, the dose
gets suspended and the neurologist gets called in.

So, we have a mechanism to call in the
neurologist for cause if there are new neurological
symptoms.  The other mechanism that we have to
facilitate close follow-up with the neurologist is
in the Tysabri Registry where we ask for safety
information on that patient every six months.

So, that is meant to be a prompt to the
physician to, at a minimum, be aware of what the
patient's status is. They may choose to have the
patient in the office to evaluate that, they may do
it by phone.  We leave that kind of flexibility in
the system there.

So, what I am saying is this is a highly
controlled, closed, mandatory system with a lot or
regimentation in it already.  What you might be
proposing, I mean sort of this vial-by-vial sort of
distribution model that I believe is coming up in
one of the questions, the issue with that is that
is very different to how infusion centers operate.

Most infusion centers have a small amount

of inventory on site, and what that allows them to

do is to permit scheduling of the patients in some

logical fashion. As you saw yesterday, a lot of

patients have a lot of difficulty traveling and

coming to their visits.

        So, you can imagine if a patient shows up

for their appointment, for their infusion, and the

vial isn't there, that is going to cause a lot of

disturbance to that patient, or similarly, if the

patient shows up, the vial is there, but the

patient hasn't been authorized, these kind of

logistical issues are very important in the

management and the timing of these infusion

centers.

        We did a survey also of infusion centers,

and we found out that many hospital-based and MS

centers, in fact, simply don't want to participate

in a model where they would have no inventory on

site, because of all these burdensome issues for

their patients.

        DR. KIEBURTZ:  Currently, I just want to

reiterate the point you made, that the six-month

file:///C|/dummy/0308PERI.TXT

160

safety evaluation, which is mandatory, and if the
physician doesn't do it and the patient doesn't do
it, they get disenrolled.

     DR. BOZIC:  Yes.

     DR. KIEBURTZ:  The physician can do that
in any way he or she feels is appropriate, there is
no guidance on that.  In fact, they don't even have
to contact the patient.

     DR. BOZIC:  We leave it at the discretion
of the physician.  I think it would be very hard,
as a physician, to give an answer on the status of
your patient unless you have actually contacted
them.

     DR. KIEBURTZ:  I think we could make a
recommendation to make that clear, that, for
example, you can only fill out the six-month
evaluation based on an in-person evaluation.  I
want the committee to know that's the kind of
guidance I believe the Agency is looking for.

     Dr. Katz.

     DR. KATZ:  A couple of things.  There is
at least two issues that are important for us to

hear the committee's views on.  One is how often

should the patient be seen by the physician.  You

have just said maybe every six months, and we need

to talk about that, whether you want to do that at

all.  So, that is one thing.  That is how often

they should be seen by the doctor.

            The other is are the elements of the

registry, as currently proposed, are they being

followed the way they are supposed to be followed.

For example, there is supposed to be a checklist

administered before each dose.

            One question is how do we know that is

happening if we think that is an important thing to

be done, how do we ensure that in real time that is

actually happening.  Right now the sponsor is

proposing every six months to sort of assess how

well the system is working on a number of fronts.

            Let me propose a very intensively

monitored, restrictive system.  It would be useful

for us to know whether or not the committee thinks

that it is too restrictive or not.

            Along the lines of what Dr. McArthur is

saying and along sort of the clozapine-like, you
know, no blood, no drug, no forms sent back to the
company or the distribution center, no next vial
sent, you just heard why, from a logistical point
of view, that might be very difficult to do.  You
will have to think about whether you agree with
that.

        But in the most restrictive scenario that
I would paint, in order to ensure that the dictates
of the registry are being followed, let's say the
checklist is being actually administered every
month, the company or the distribution center would
have to get back a copy of that checklist filled
out to ensure that it is being followed
appropriately and therefore the drug can be
released.

        So, that is one sort of scenario, no drug
unless you get the forms, as Dr. McArthur put it,
on a monthly basis.  That would be probably the
most restrictive.

        One other advantage of at least getting
the forms back every month, if not making drug

release contingent on that, but one of the

advantages of the distribution center  getting the

forms back every month is that if a form doesn't

come back, the distribution center or the company

can call the doctor in real time and say how come

no form, how come we didn't get last month's form.

        It could be because they forgot to send it

in or it could be because the patient discontinued

or something happened to the patient.  It would be

a signal that some follow-up is necessary.  So, one

scenario would be form sent back or something sent

back every month to the distribution center and

follow-up to the doctor or the infusion center if a

particular month's form isn't returned.

        This doesn't require that the drug be

released on  monthly basis.  You could release the

drug every six months, let's say, but still require

that the form come back every month, and if the

form doesn't come back every month, then follow-up,

as opposed to waiting for six months, because we

want to get this information in real time.  If a

patient has PML, you don't want to wait six months

to hear about it or something else bad.

So, that's one proposal.  It could be electronic, of course, the details to be worked out.  So, the question about should a form be sent back every month independent of how often the drug should be sent, it is very useful for us to know what the committee thinks about that kind of system.

DR. KIEBURTZ:  Let me make sure I understand.  So, imagine a system in which six months' worth of drug is shipped and available at the infusion site, but monthly, in advance of each of those infusions, there needs to be forms.

If those forms are not received electronically, fax, however, by the central distribution center, even though drug is at the infusion center, there would be some feedback to the infusion center you are not supposed to administer to that patient because you haven't given us the information.  Is that it?

DR. KATZ:  Something like that or just a query why didn't we get the form back, and that

would alert the company in real time with a month's
lag that something might have happened to the
patient requiring further follow-up. Yes, that's
the idea.

        DR. KIEBURTZ:  Just to expand on that a
little and perhaps a conclusion to it, if you then
had to have a physician-patient interaction on the
six-month basis, the way you get your next six
months is that that happened, there is documents
that that happened, and the prior six checklist
forms also have to be on record, otherwise, you
can't get your next six months, so that least you
wouldn't have redistribution.

        Even if forms aren't coming, it may be
hard to stop those infusions, but the maximum you
could do is an additional five without forms,
because then it would stop based on the next
evaluation.

        DR. KATZ:  Right, and making each monthly
dosage, the release of that dose contingent upon
getting the forms would be the most restrictive
because the physician could not possibly administer

even the next dose because they wouldn't have it.

DR. KIEBURTZ:  We have heard some issues about impracticality around that.

Dr. Dal Pan.

DR. DAL PAN:  I just wanted to reframe the issue the way Dr. Wysowski framed it yesterday.

So, there is three things that we want to hear about, that are separate but related, and may not be so separate.  One is what actually allow the patient to get  each dose.  Two is should there be periodic reassessments by the physician, and three, periodic reauthorizations, and you can imagine a system where you bundle all that into one or where you separate them.  So, that is what we are interested in hearing about.

The second issue is with regard to every six months Biogen Idec contacting the physician about PML and other serious adverse events, opportunistic infections, and our concern was that from the surveillance point of view, that should probably be more frequent.  Of course, we would like to hear what the committee has to say about

that, as well.

       DR. KIEBURTZ:  Dr. Couch.

       DR. COUCH:  Just along the same line, I
would like to ask Dr. McArthur and Dr. Jung what
their feeling is on what the routine follow-up
should be for a stable MS patient, how often should
that patient be seen in the regular world.

       I am assuming that if the patient does
have additional symptoms and it looks like they are
having a relapse, they are going to come in anyway,
but if you have got a stable patient, what would be
your recommendation for the length of time between
follow-ups?

       DR. KIEBURTZ:  I am going to let Dr.
McArthur speak to that and whatever else he wanted
to speak to, and then Dr. Jung.

       DR. McARTHUR:  I think the issue is not
their stability, but we are treating them with an
active drug and a drug that potentially has side
effects.  It looks like the incidence is extremely
low fortunately.  So, I think initially, in a new
entry of this agent into the market, six months

would be a reasonable compromise.

It is not practical for them to see a neurologist every month or two months, and this is probably not necessary, but every six months would seem like a reasonable compromise. If nothing happens in terms of safety issues over the next couple of years, then, we could probably liberalize that.

I would just like to go back to the whole forms issue. You know, this is not rocket science. I mean the forms should be web based. There is no reason to be shuffling paper around the country. The forms should be held centrally in a HIPAA-approved manner.

That means that Biogen Idec and the FDA, and whoever else needs to monitor these things, knows that the forms are being completed relative to the patients who have been registered into the study. I mean to rely on things being faxed around the country is just ludicrous, frankly. It should all be web based.

How you do it in terms of releasing the

drug, whether you have a small inventory for each

site with an authorization code, these are all just

details that can be worked out, but there needs to

be a mandate that that safety information gets back

before there is continuing use of the drug.

      DR. KIEBURTZ:  Dr. Jung.

      DR. JUNG:  I believe that given what we

have seen with the studies, that with the

hypersensitivity reactions and some of the problems

that can occur early on in treatment, that probably

when you first initiate treatment, seeing the

patient within the first three months would

probably be appropriate, and then if they are

stable, then, going to a six-month period is pretty

appropriate.

      I am concerned about the idea that from

just the logistical standpoint, even for a

web-based system, which I think is a great idea,

that given the nature of the patients that we are

taking care of, to expect them to be able to

smoothly receive an infusion once a month based

upon feedback from their physician on a monthly

file:///C|/dummy/0308PERI.TXT

170

basis is impossible.

You are talking about patients who are
traveling in from perhaps rural areas to an MS
center for infusion, and the idea that if their
doctor happened to not have filled out a particular
form within that week, and having the patient
turned back is just unacceptable I think.

So, I think monitoring is important, but
on a month-to-month basis trying to keep track of
that is not manageable.

DR. KIEBURTZ:  Let me just clarify.  I
think what we are talking about on a
month-to-month, is that the immunosuppression
checklist and the PML checklist is completed prior
to infusion, and that is what is sent, so that not
a physician assessment, just those checklists
although we are going about the content of those,
that those are gone through prior to infusion and
are recorded.

The physician assessment--and I think you
make a reasonable suggestion--it would have to
happen before the first dose, at three months, six

months, and every six months thereafter seems like
a reasonable schedule, getting back to Dal Pan's
question.

     But I just wanted to clarify the
difference between a physician assessment the
pre-infusion checklists, I think we are just
talking about receiving the pre-infusion
checklists.

     MS. SITCOV:  Just in terms of the
pre-infusion checklist, as a potential consumer in
this, I very much care about the safety, but it
seems so burdensome to really carry out, because so
many of us with MS, in the course of a week can
have symptoms that might show up and them remit,
and then show up again and then remit, and it
doesn't mean that I am having a flare-up, but if I
have got to report all of these, and a nurse who is
trained at this is perhaps assuming or might be
trained to look at any symptom or any change, when
am I ever going to get the drug?

     I speak of me in the singular.  I mean
that really generically.  It just strikes me as

very burdensome.  I wonder if there is just another

way.

DR. KIEBURTZ:  Dr. Koski.

DR. KOSKI:  I would like to actually

respond to certain aspects of that question and

then one other thing.

First of all, fluctuating symptoms are an

aspect of MS, and I think anybody who takes care of

MS patients realizes that.  The difference is you

are trying to look for a progressive type of

symptom that has extended over a period of time

beyond when the patient has last been seen.

So, I don't think that that type of thing

would necessarily, you know, this fluctuating type

of symptom would interrupt therapy at that time.

The other thing I wanted to comment on is

somebody brought up the issue about a physician,

the "neurologist," quote, unquote, that is caring

for the patient should perhaps see the patient if

there has been an infusion-related reaction.

You know, most of those are going to

happen very rapidly, you know, around the time that

you actually get the infusion.  Again, I can't

speak for all infusion centers.  I know with our

own infusion center, we actually do have a

physician on site.  That physician would see that

patient for the infusion-related reaction and

respond appropriately.

So, it may not be the same person, but

usually, that is right at the time the treatment is

going forward.

DR. KIEBURTZ:  Dr. Katz.

DR. KATZ:  We are now getting into I think

questions of the substance of the questionnaire or

the checklist, and we have questions specifically.

One of them is up there.

I would just like to know whether or not

there is more or less general, before we get to

those substantive questions, whether or not there

is more or less general consensus that, for

example, the requirement that the form be sent back

to the sponsor on a monthly basis is something that

we should impose.

That is the last suggestion that was on

the table, but I don't know if there is general
agreement that that is something that should be
part of this.

DR. KIEBURTZ:  I agree.  Before we get to
the substance of the checklist, both about PML risk
and immunosuppressant risk, let's talk about the
format in which it would be filled out.

Dr. Hughes, Porter, then Temple.

DR. M. HUGHES:  My question is on another
issue, so I will pass for the moment.

DR. PORTER:  My view is very simple, and
that is, I have no objection to the concept of
having these monthly forms coming back and having
it sort of a mandatory process, but I think the
forms should be at the infusion center, and if the
patient arrives and there is no form filled out,
there should be a nurse available to fill out the
form, so that they could do it on site, right there
on site.

DR. KIEBURTZ:  That's the intention.

DR. PORTER:  And then the patient isn't
penalized for coming 100 miles to get their

infusion because somebody didn't do it, or didn't
do the last one, whatever.

DR. KIEBURTZ:  That is where the forms
would be. They couldn't be completed in advance or
anywhere else but at the time of the infusion.

DR. PORTER:  As long as the patient isn't
penalized, because the patient is the one that is
left holding the bag in these processes, as has
been pointed out already.

DR. KIEBURTZ:  If it's an authorized
infusion center, there should be no difficulty in
having the forms and filling them out.  That would
be who would be an authorized infusion center that
they have them and can fill them out.

DR. PORTER:  Exactly.

DR. KIEBURTZ:  Dr. Temple.

DR. TEMPLE:  That is what I was
addressing.  What I hear people saying about this
is that you would learn early whether the forms are
not being filled out, but that would not affect the
infusion on the day they failed to fill it out.  It
would remind them that there is something they had

been check, so during the next month, they would

call up, ask what is going on, and so on.  So, it

would really affect that infusion.

DR. KIEBURTZ:  No, I mean there is going

to be the risk of infusing someone who has symptoms

of PML at the time they are infused, because

someone may not use the checklist as appropriate.

DR. TEMPLE:  But you would know that

within a short amount of time.

DR. KIEBURTZ:  You would know how many

infusions are happening without forms being filled

out based on how many don't come back, but it won't

prevent that from happening if people flaunt what

they are supposed to do.

Dr. Koski.

DR. KOSKI:  No, Dr. Temple's comment was

mine.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  Again, presumably, this

would be a web-based system, so that the reporting

would be automatic, you fill out the form and the

form is reported, so that what you are doing is

looking for a longer term compliance of every six
months you review and you say we shipped for this
number of patients, and we only have this number of
forms, if you are a bad actor and if you don't fix
this, we are stopping.

Now, the content, again, that is a
different issue, and I think we will get to that
later.

DR. KIEBURTZ:  I would also just about one
of the details here, which I would like to sort of
cover (a) through (e) before we go on to (f), (g),
and (h), and I think (d) and (e) are mooted
actually.  I think we are done with (d) and (e).
We are only talking about giving this to MS
patients who fulfill whatever the restrictions are
that you conclude on.

Is that fair?  Am I missing some
discussion on (d) and (e), which is restriction to
only MS patients, restriction to only MS patients
deemed appropriate in Question 7?  All right.

So, if, in fact, you had a distribution of
6 months' worth of vials, I think it would be

important that those vials be designated
specifically for a patient, that the stock you have
is not fungible, you can't move it around for a
different subject, that it comes, it is for that
person, and if they drop out or fail to meet
criterion, it would be possible to retrieve those
specific vials that were for that specific patient.

What do people think about that?

DR. PORTER:  Actually, I think that is a
little bit heavy on the bureaucratic side.  I think
that makes an extra burden on the infusion center
and on the sponsor, and I don't think it's
necessary.

I think you have got this process.  If you
have some vials available, it gives the infusion
center flexibility, because something is going to
happen.  Something is going to happen where you
need an infusion set for a patient who is right
here right now, but you don't happen to have their
name on it.

I think that what will happen is that you
will end up with people coming to the center, and

they won't have one with their name on it, and this
will keep them from getting infused, and it will be
unnecessarily bureaucratic.

        I don't think there is anything wrong with
having, like you have in a pharmacy, a set of
infusion packages that don't have people's name on
it.

                DR. KIEBURTZ:  Other comments on that?

                Dr. Goldstein.

                DR. GOLDSTEIN:  A question for the FDA.
You have done similar things.  I guess clozapine was
one example.  How does this work in reality?  I
mean we are very concerned obviously about putting
unnecessary burdens on the patients and on the
reporters.  At the same time, we want to make sure
that the data is being reported and reported
accurately.

        So, how have you managed these types of
things in the past?

                DR. KATZ:  From the point of view of
getting the next week's drug, and again, as Dr.
Temple said yesterday, the actual frequency has

changed over time and changes with time, but the
patient doesn't get their prescription filled until
the pharmacy sees that they have had a blood count
taken every week, well, again, every week in the
beginning and then it's less frequently over time.

Again, there are provisions that if you
meet certain criteria, you have had a case of
agran, you are in the registry and you were
prevented theoretically from ever getting that drug
again, so I think it works pretty well as far as we
know.

DR. GOLDSTEIN:  And you are capable, and
the FDA is capable of monitoring that and you feel
that the data that you are getting is reliable and
accurate and complete.

DR. KIEBURTZ:  Dr. Temple.

DR. TEMPLE:  Well, just to observe that
the burdensome part in some ways, but not an
unreasonable one I guess, I would say is the fact
that there is a pre-infusion checklist.

Having it be web-based and going to
somebody, so they can see if it is being filled out

doesn't really add to the burden all that much.
That just says you are making sure it happens.
It's as burdensome as it was before as long as
people do it.

But we are very mindful of not making it
impossible to use the drug, so you need to tell us
whether you think some of these things are
excessive or not.  That is one of the things we are
interested in.

DR. KIEBURTZ:  Go ahead, Dr. Katz.

DR. KATZ:  The major purpose of this
requirement to have the forms be sent back on a
monthly basis, if that is what you agree to, is not
to second guess the decision made at the infusion
center as to whether or not the drug ought to be
infused at that particular time really.

It is really to see that the process that
is in place is actually being followed.  It is
really a check on compliance, if you will.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  I agree with Dr. Porter.  I
think the practicalities, if you follow the

clozapine model, the pharmacy has a big bottle of

clozapine, it is not in an individual patient's

name.  They just dispense from that bottle.

        If we followed that model here, the thing

that we want to put in place and make sure that it

is happening is the safety reporting on a

continuing basis, and if that is left too much to

the discretion of the infusion center without any

consequences, meaning we have been checking your

web-based forms or your paper-based forms, and they

haven't been coming back regularly, we are not

going to ship your next six months batch of

Tysabri.

        That is where I would go.

        DR. KIEBURTZ:  And if you have a pool, the

unit of analysis moves from the patient to the

center, and there are risks inherent in that,

because if a center is not in compliance in

general, you amplify the risk, because the

noncompliance of a center can be amplified across

dozens of patients if they are infusing it

improperly by intent or mistake, whereas, if you

file:///C|/dummy/0308PERI.TXT

183

restrict the unit of analysis to the patient, the
worst you can do is infuse in that person outside.

So, it is a different check and balance.
We tend to think of what is the good, but we also
have to consider what is the possible in this
particular scenario, and there is a risk involved.

Dr. Katz.

DR. KATZ:  I have another specific
question.  Let's say that the forms are required to
be filled out monthly and received centrally with
that frequency.  If a particular form, let's say
patients are getting drug for six months, and now
on the seventh month, that form doesn't come back,
would the committee require the sponsor to call in
real time the infusion center and say how come we
didn't get the form?

We are talking about going back every six
months and sort of seeing how it is going, and
maybe won't get the next six, you know, admonishing
the infusion center you are not going to get your
next six-month supply if you don't fill out the
form.

file:///C|/dummy/0308PERI.TXT

184

So, I am wondering whether or not, because this is an idea we had floated, that if a particular monthly form on a particular patient doesn't come back, should the sponsor be required to follow up on that, because that could be the first sign that something has happened.

DR. KIEBURTZ: Dr. Porter and then Dr. Koski.

DR. PORTER: I actually think that is probably a compromise that is reasonable as long as it doesn't prohibit the patient who has traveled 150 miles to the infusion center to get their next infusion, but asking the company to follow up every 30 days is not so burdensome, because they should be tracking these anyhow.

I find that an acceptable compromise. What I am really worried about is trying to label the vials with the patient's name, because I think that will fall apart and make life very difficult and a lot of unhappy patients.

DR. KIEBURTZ: Dr. Koski.

DR. KOSKI: At least it's my

understanding, the way I understood the
distribution center, that it wasn't going to go to
a pharmacy, that it was going directly to the
infusion center.

So, I do think that some type of mandatory
monitoring of return of those forms is very
important on a regular monthly or bimonthly basis.

DR. KIEBURTZ:  We haven't spoken to this,
but some level of compliance or rigor in which a
center is applying these things might lead to--we
talked about deactivating a patient and
deactivating a physician, but we didn't talk about
deactivating a center.

The amplifying effect of a center problem
could go across multiple physicians and hundreds of
patients, so I don't believe the sponsor spoke to
the criteria for deactivating center, an infusion
center.

DR. BOZIC:  Our proposal is the infusion
centers are attesting that they are going to be
doing the checklists, they are documenting that
they are doing them, and we are going to be

auditing them.

      If a center is noncompliant, they will be deactivated. So, I wanted to make that explicit, as well.

      The other thing I wanted to say about this business of vials coming on with a patient's name on it, most hospital pharmacies simply don't purchase drug in that way. They purchase it in small quantities, in this case for natalizumab, but they don't have the patient's name on them, and again it speaks to that notion of having a little bit of scheduling flexibility.

      Then, the pharmacy would receive the drug in the hospital, and they would put the patient's name on it and issue it to the infusion center. So again, I just think there is a big burden on shipping on an individual patient basis with the patient's name on it, and I think Dr. McArthur spoke to that, as well.

      The last business here is discontinuations due to follow-up, the discontinuations and following up on them. You saw discontinuations in

187

clinical trials, but those are not reflective of what happens in the real world, and we know from many data that on current ABCR therapy, patients can discontinue at an annual rate of 20 percent, and they most discontinue for all sorts of reasons.

So, we were to follow up, you know, within a month of someone not bringing in a checklist, that could lead to  lot of phone calls both to the infusion center and to the physician.  Most of those phone calls will end up finding out that the discontinuation was, in fact, not related due to PML, because PML is a very rare event.

So, I guess what I am suggesting is that that is an enormous amount of burden on the infusion center and the physician, when, I think what we are proposing is extremely focused and targeted, and very targeted on the problem at hand.

We have heard from focus groups; from physicians, that if they have a case of PML, they are going to report it to us, and I think that speaks to the nature of the event, the level of concern, the seriousness of the event, and then we

have this additional layer of tracking where we are

asking the doctor every six months, on every

patient, under penalty of de-enrollment to provide

us with those data.

So, you know, we carefully considered all

these options, and we believe we found the right

balance of, you know, patient protection and also

burden and feasibility, and we really tried very

hard to find that right balance.

DR. KIEBURTZ:  One thing we haven't

discussed, but would help address one of your

concerns is if when someone discontinues, that that

actively be reported rather than retrospectively

grabbing that on a six-month look.

That would help issues.  It is one of the

actually hardest things to know is when someone

actually went off treatment, and it would be

important for surveillance and understanding the

actual cumulative exposure, and that can only be

addressed by knowing an end date for treatment.

We are not going to discuss this a whole

lot more.

Dr. Goldstein.

DR. GOLDSTEIN: So, what you propose then is to put that as to one of the things that is reported as part of the regularly reported registry information, that if somebody goes off therapy, that that is reported as one of those monthly reports, is that right?

So, it would be information on it, other serious adverse events and/or discontinuing therapy would then be added to those monthly reports, and presumably, there would be some way of saying the reason.

DR. KIEBURTZ: Currently, there is no monthly reports.

DR. GOLDSTEIN: With the infusions.

DR. KIEBURTZ: Checklists.

DR. GOLDSTEIN: Right, with the infusions.

Dr. Jung.

DR. JUNG: We mentioned de-enrollment of centers and of physicians. We haven't really addressed, and I don't think is in the questions, how does one get re-enrolled if one gets

de-enrolled.

We don't want there to be a nominal slap on the wrist if a center is consistently not being compliant, yet, we also need to recognize that we may need to allow some centers to come back and show that they have had improvement.

So, is there a plan that has been thought out about that?

DR. BOZIC: If this becomes the proposal, the accepted proposal, we will work with the FDA on the nature and more details around the plan.

DR. KIEBURTZ: So, let's recap and go back to (a).

So, there is a patient registry, what information would be in that. This is the sponsor contacting the prescribing physician, every six months is the current frequency, to find out about deaths, PML, other serious opportunistic infections, and treatment discontinuations, and we have proposed to add to that other serious adverse events.

There are other things that are in (a)

file:///C|/dummy/0308PERI.TXT

191

that we have not talked about including.  Use of
intravenous steroids is another thing that would be
worth tracking on a six-month basis.

Skipping over (b), because we haven't
really talked about (b) very much, what the cohort
study might be. Regarding restrictions on the
distribution system, I don't want to go through
each of these things, but have you heard enough
discussion about the issues what might be
pertinent, or do you want to hear some more
specific member-by-member comments on how
restrictive this might be?

DR. KATZ:  The one thing I think I heard,
maybe I wanted to hear it, was that the form should
be sent back monthly to the sponsor, and that if, I
guess over some period of time, from a given
center, the forms are not returned, there is some
interaction.

We just heard the sponsor say that
following up a particular patient whose last
month's form has not been received, following up on
a patient-by-patient basis in that way is

potentially problematic.  I don't think I know what
the committee thinks about whether or not there
should be specific follow-up for a specific patient
if the previous month's form has not been received
back.  I don't get a sense of where the committee
is on that.

      DR. KIEBURTZ:  Just to get to that
question, for a given patient, should the infusion
center and/or the prescribing physician be
contacted to be made aware that the required forms
that were to be completed prior to infusion were
not received on the most recent infusion?

      Is that something that should be fed back
to the centers and the prescribing physicians?

      Dr. Porter.

      DR. PORTER:  I think what you are saying
is reasonable as long as the patient who has
arrived on the site isn't penalized.

      DR. KIEBURTZ:  The infusion is done, they
are gone.  This is a retrospective.  You infused
this patient, and we didn't get the forms that you
were supposed to fill out beforehand.  There is the

implicit threat that if that carries on for long,
then, you are going to be deactivated.

The question of how long does that go on
for, or how much follow-up, I don't know that we
need to get into that.

DR. KATZ:  I am actually more interested
in not so much the admonition or the threat, but
finding out whether or not the patient was lost to
follow-up and something bad happened.

DR. TEMPLE:  How do they know specifically
that an infusion was, in fact, given?

DR. KATZ:  How does who know?

DR. TEMPLE:  How does the company know?

DR. KATZ:  Well, they won't know unless
they get the form back.

DR. TEMPLE:  No, what I am saying is they
don't get a form.  How do they know that an
infusion was given, but no form came?

DR. KATZ:  They don't know what.  All they
know is that the form didn't come back.  The way
you follow up, a patient is supposed to get
treatment more or less every month.  So, if a

patient has been getting it for X number of months,
and then the next month's form is not received,
there is a number of possibilities.

They decided not to take the drug anymore,
that is one possibility.  The other possibility is
that the patient is lost, didn't come back, you
know, is truly lost to follow-up, and you like to
find out what happened to that patient.

DR. TEMPLE:  So, what they will notice is
that somebody who has been getting infusions now is
missing a form for a period of time.  I guess my
gut says sometimes a month might be too short to
know.  Maybe they were out of the country for a
month, and you might have to wait another month.

DR. KATZ:  But you could find that out.
You would call up the infusion center.

DR. TEMPLE:  So, you would have a sort of
expected time of arrival.

DR. KIEBURTZ:  Once someone has been
approved and they are registered, one would
anticipate that forms would be coming on a regular
basis with some periodicity because either that

195

should happen, the person has discontinued, died, lost to follow-up, or they forgot to do it.

I think not getting a form should trigger a clarification, what happened here.

DR. TEMPLE:  So, as part of the registry, it seems to me they will need to set up some kind of trigger that says if it doesn't show up by blank, I have got a question.

DR. KIEBURTZ:  Right.

Dr. McArthur.

DR. McARTHUR:  I guess I am missing something here.  If my electric company can send me a bill once a month, and if I fail to pay, send me reminder notices, we should be able to have a system that a patient is scheduled for a 10:00 a.m. appointment in the infusion center, they arrive, the pre-infusion checklist is completed.

The patient has the infusion.  The presence or absence of infusion reactions are documented, and those data are completed on line during that visit, at the end of that visit, within a 24-hour period into this web-based system.

That gives you, not only the pre-infusion
checklist.  It tells you that the infusion was
done, and it tells you whether there are any
reactions to the drug.

What is the problem?

DR. TEMPLE:  There is no objection, but
you don't know, if you are the company, that the
infusion was, in fact, given if they don't report
to you.  You can only know that you expect an
infusion to be given, because one was given two
months before.

DR. McARTHUR:  Right.  So, that would
trigger a telephone call to the infusion center to
find out if the patient has developed PML.

DR. TEMPLE:  I am just saying they are
going to have to have an expected date for each
patient.

DR. KIEBURTZ:  I don't think anyone can
disagree with that.  I think we did hear some
pushback from the sponsor about being concerned
about having to initiate the dunning letter to
continue the analogy from the electric company.

file:///C|/dummy/0308PERLTXT
Case 1:05-cv-10400-WGY     Document 85-13     Filed 11/15/2006     Page 47 of 50
197

Dr. Goldstein.

DR. GOLDSTEIN:  I was just going to make a
similar kind of comment, that this kind of system
can largely be automated, and it's an automatic
thing.  You know, the report goes in, and it's an
automatic feedback if the report is missing, and
then you get at the end of a certain period of
time, a summary report they were missing X number
of reports.

Then, you could follow up for the
individual patient, but also the surveillance of a
center, as well, so it is sort of a double level
look of control, but all of this can be completely
automated.  You know, there is no papers flying
around here.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  Just the point of practicality.
Perhaps as we are designing this form, the ability
to mark a couple of things would be helpful and may
allow the sponsor not to make a lot of phone calls.

First of all, patients go on vacation, and
so if we know that there will be an anticipated

halt to the infusion for a period of time, maybe
that can be put in there, so that it doesn't
trigger a call.

        Number two, the ability to transfer
physicians.  We know that sometimes patients move
from one doctor to the next, so the ability to
easily move that patient as opposed to the
physician in terms of monitoring might be a
reasonable thing to consider.

        DR. KIEBURTZ:  If you were to follow Dr.
McArthur's model, if it's completed at the end of
an infusion, if you could indicate the next
anticipated infusion date, that would then reset
the clock as to when you would next expect a form.

        I think we have had enough discussion
about those things.  We have not discussed two
things which I want to do before we break for
lunch.

        One is there is in addition to the
registry, which I remind you is mandatory and for
everyone, the proposal to have a more expanded
cohort, which would be a subset of people followed

for some period of time with more intensive
evaluations in the mandatory registry.

We have already heard from Dr. Hughes some
thoughts about that.  Maybe you want to reiterate
those.

DR. M. HUGHES:  I can reiterate some.  To
me, the registry is really collecting information
about exposure and PML, PML mortality, and it would
probably provide very useful information on that
simply because PML is so rare in untreated
patients.

When we go to the cohort study, I am less
clear what the real objective is for this study.
If it is really to look at SAEs, other infections,
and so on, then, I think it is striking to recall
that in the two randomized trials that we have
looked at so far, the differences in the rates of
those events are potentially relatively small, and
that's in a controlled setting.

So, it is difficult for me to see that the
observational study is going to provide a lot of
useful information on those sorts of events in the

absence of having a control group.

I mentioned earlier the idea that maybe instead of the observational study, there should be randomized trials which seek to move into answering some other questions of interest. The alternative is to have a nonrandomized control group in this particular study in which you would collect the same sorts of information about infections, and so forth.

So, I think to me, the observational study as it is currently designed, I don't think it is going to provide particularly useful information in the absence of a control group.

DR. KIEBURTZ: Dr. Goldstein.

DR. GOLDSTEIN: I totally agree with that position. If you design a study, you have to know what question it is you are trying to answer, and I am not entirely clear what question is being answered by this observational study.

On the other hand, as we polled the committee for an earlier question, we were split evenly as to whether the drug should be first line

therapy or not, and there is clearly a major

uncertainty about that, and I think that is a major

clinical question for physicians caring for

patients with this disease, as well as for the

patients, as well.

So, rather than investing time and energy

for an unclear question, for an unclear reason, I

would much rather the effort be put into answering

a question that is of direct clinical relevance of

importance, which is my view would be that

head-to-head comparison as first line therapy.

Then, we will have the data as opposed to

debating the data.

DR. KIEBURTZ:  Would you like to clarify

what the aims of the observational cohort are for

us briefly?

DR. BOZIC:  Actually, let's just go

through my core slide.

[Slide.]

The primary goal of the observational

cohort study was to evaluate the safety of Tysabri

in the clinical practice setting and over the long

term.  We understand the safety of common events,

such as all SAEs, I think very well based on the

clinical trial data, and we understand those quite

well through the end of the two-year period,

because that is where most of our data are.

        So, what we don't know as well is what

will be the safety in the clinical practice

setting.  So, that is the number one goal of the

study.

        The other goal of the study is what is the

safety overall beyond two years of dosing, and so

that is why the study is five years in length.

        We can't address the safety in the

clinical practice by doing clinical trials, and

that is why we are proposing this study.  Then, the

long-term nature of it, five years again, you only

get that in an observational cohort study of this

kind.

        The second issue that came up was the

control group.  There are a variety of ways of

looking at these data  and we are proposing looking

at an external control group, a variety of

different ones.

So, for example, we could go back to the
clinical trial data and compare back to the
clinical trial data, and ask the question, you
know, if malignancies are occurring at a certain
percentage rate in the clinical trials, now, at
what rate are they occurring in the clinical
practice setting and over the long term.

So, I think that is one question that we
could answer with this study.  We could also go
back to other databases, like the SEER database,
and ask are the rates of events for malignancies
over the long term with natalizumab what we would
expect based on SEER.  So, there are a number of
valuable things we could learn from this study.

I think in terms of getting an internal
control group, like a disease-based registry, you
know, part of the issue with that is, number one,
there is a practicality issue that, in general, it
can be very difficult to enroll disease registries,
because if you think about it, Tysabri-treated
patients will be quite motivated to enter in this

type of study, whereas, patients on other therapies

may see less of a reason to participate in this

type of study, so there is a practical reason here.

The other reason is that having an

internal control group, like in a disease registry,

doesn't completely eliminate bias by any means,

because the practice patterns for Tysabri may be

quite different than they are for the ABCR drugs,

and that, in and of itself, may influence the type

of safety events that you are observing.

So, an internal control group will simply

not eliminate the bias, and that is why we are

proposing an open-label design for that.

Finally, let me just go through the next

slide, which is the sample size calculation slide,

please.

[Slide.]

So, I just wanted to share your thoughts

on how we sized this study.  We sized this study to

look at small increases in rare adverse events, and

these could be any types of adverse events, but

they are rare events that might not have been

picked up in trials, but which sometimes might be picked up in clinical practice when you treat more patients.

So, what I wanted to show you was that this study is really fully powered to address really very small differences that might occur between the clinical trial setting and in the clinical practice setting.

So, what I have shown you here are the events in clinical trials and the rates of those events as a function of, for example, the serious infections occurred at 1.4 per 100 person years in clinical trials.

This study is fully powered to detect a 1.5 times increase in that rate, which I think is a very conservative viewpoint. Similarly, even for serious opportunistic infections, which I know we are collecting in the overall registry, this study is, in fact, fully powered to look at those.

Those events occurred at 0.07 per 100 person years. I am counting the two PML cases and the Cryptosporidium in the MS placebo-controlled

experience as the rate.  That study is fully
powered to look at even very small changes in that
rate, let alone all serious adverse events, which
occurred at an incidence of 7.5 percent annually.

So, what I am saying is this study is very
well powered to detect small increases in rare
adverse events, and that is why we would advocate
for collecting all serious adverse events in this
study, but not in the Tysabri Registry, because
this study is fully powered to address common
serious adverse events.

The last thing I wanted to address was in
the Tysabri Registry, I know the committee has made
a proposal to collect all serious adverse events on
patients.  Again, the incidence of serious adverse
events in the clinical trial setting is 7.5 percent
per year, and what we are talking about collecting
are hospitalizations for MS relapses,
hospitalization for UTIs, hospitalizations for
common bacterial pneumonias.

Our recommendation would be that we can
really gain a very good understanding of those

types of events from a 5,000-patient five-year

study, and we don't need to do it in the Tysabri

Registry.

        DR. KIEBURTZ:  Thank you.

        Dr. McArthur.

        DR. McARTHUR:  So, you say fully powered.

Do you have actually the power estimates?

        DR. BOZIC:  What this is, is a probability

estimate, because you are comparing between a

background rate and looking at your ability to

detect a 1.5 times increase in that rate, so it's a

95 percent probability estimate.

        DR. KIEBURTZ:  I would be interested, I

mean I think your inferential abilities regarding

what the cause of that increased rate would be

rather limited in having an historical group that

may have a lot of different characteristics than

the treated group, so I am not sure. You could

detect a difference, but it would be difficult to

know what to ascribe it to.

        Dr. Hughes.

        DR. M. HUGHES:  I guess I would like to

make much the same comment.  You are sort of

arguing against yourself about using the placebo

period of these trials when you think that the

rationale for having this study is there may be

different rates in clinical practice, there may be

different rates over the long term.

DR. BOZIC:  But my point is that an

internal control group will actually not be that

helpful, because you may, in fact, have different

patients being treated with Tysabri than patients

treated with ABCR.

You know, doctors may choose to use

Tysabri in a different way and in different types

of patients regardless of the indication statement,

and that may influence the safety profile.  So, you

will still have that difficulty in interpreting the

data.

DR. M. HUGHES:  I guess at the end of the

day, I don't know if this observational study adds

a whole lot to the information that is needed to

evaluate the drug.

DR. KIEBURTZ:  Thank you.  I think it

would be a reasonable thing to ask the committee

another set of Yes/No questions, or one Yes/No

question, which is the following:

Do you think it's crucial for the sponsor

to commit to such a cohort study given that we have

asked that the serious AEs be incorporated in to

the registry?

DR. PORTER:  And that you are going to

have monthly monitoring.

DR. KIEBURTZ:  Go ahead, Dr. Sacco.

DR. SACCO:  I think the only thing that is

missing in the registry are certain other baseline

variables that others have raised before, so when

you want to start teasing apart potential factors,

risk factors for serious outcomes, the registry may

not have the baseline information you need.

So, if we want to have the registry answer

that question, then, I think the registry has to be

expanded a little bit with certain baseline

information to look at either by EDSS, by just

other variables that could be predictive of adverse

risk.

That is my concern about trying to have the registry do that.

I was going to say for the cohort study, depending on the outcome of interest, I agree for PML, if it's 1 per 1,000 and we have five of them, it is going to be hard to tease out risk factors, but for certain other outcomes, maybe that have a cumulative risk that is a little greater, maybe we will, depending on what baseline characteristics they collect, be able to tease out groups that seem to have a little greater risk depending on the proportionate outcome.

DR. KIEBURTZ: Dr. Goldstein.

DR. GOLDSTEIN: I assume that these baseline factors might be incorporated into that initial enrollment form, and then we would have that data, and you could do those types of analyses.

DR. KIEBURTZ: Remember there is no clinical demographic baseline features. I believe the only thing that is proposed, Dr. Sandrock, the only thing that is currently proposed at entry is

an MRI, is that correct?

        DR. BOZIC:  The data collection in the observational cohort study in terms of the demographics of the patient?

        DR. KIEBURTZ:  No, that is a separate question.

        DR. BOZIC:  In the registry, it will be just patient name and age and diagnosis.

        DR. KIEBURTZ:  But wasn't there to be a baseline MRI before initiation of treatment?

        DR. BOZIC:  Right, we are asking the doctors to give us--well, we are asking that they do the baseline MRI, we are not collecting that information, because that information will be really not very I mean I think relevant to us in terms of just finding the incidence.

        DR. KIEBURTZ:  You answered my question, thank you.

        So, that is the only bit of information unless there is a cohort study, which would gather more information by EDSS and other clinical--whatever else.  The registry won't have

that information.

Dr. Koski.

DR. KOSKI:  I actually would like to
propose that we talk about some evaluations that
should be done or what we think ought to be done on
patients prior to being placed on Tysabri.  I don't
think that is discussed in any of the questions.  I
sort of took a fast look.

In other words, if something in addition
to an MRI ought to be done or recommended.

DR. KIEBURTZ:  So, (h) is sort of what
other potential ongoing monitoring, and I suppose
we could add to that baseline monitoring.

DR. KOSKI:  Right, I am talking about
baseline.

DR. KIEBURTZ:  Go ahead.

DR. KOSKI:  I mean the thing is that to my
way of thinking, I think definitely, you know, an
MRI would be absolutely mandatory for a lot of the
reasons that we talked about earlier in terms of
disease activity.

In addition, I would honestly also feel

that in addition to somebody sort of saying, well,
I don't think I am immunosuppressed, I think that
things like maybe total lymphocyte counts, perhaps
skin testing, as I mentioned earlier, ought to also
be considered, and then in addition, and I know
that there will be some resistance to this, I think
that there ought to be a baseline CSF examination
with perhaps some PCR data done.

I know that a lot of that in the
beginning, you know, presumably is going to be
totally negative, but I think it would be helpful
in terms of the subsequent evaluations of patients,
those that do have a problem.

DR. KIEBURTZ:  Dr. Temple.

DR. TEMPLE:  I don't want to interrupt
that discussion.  I will ask my question later.

DR. KIEBURTZ:  Dr. Porter.

DR. PORTER:  Well, as an old-time
neurologist who did a lot of LPs when you had very
little else to do, and you didn't have MRI scans.
I like LPs, but I actually, in today's world, they
are considered an invasive test, and I would have

to know--let me finish--I would have to know for
sure that I was really going to get an extremely
valuable amount of information that would really
direct me toward the process of what is happening
with PML before I would be enthusiastic about LPs
for patients before they could get what half of you
think is a first line drug.

Now, we are doing LPs before the process.
I did agree with second line drug.  I am against
the idea of doing LPs before the drug is given.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  I would agree with Dr. Koski
that a cerebral spinal fluid analysis prior to
initiating Tysabri treatment would be critical.  We
don't know what we don't know, and we have already
heard from the experts that we don't know
adequately what occurs in the spinal fluid, and
unless we collect that data, we are not going to
ever find out.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  Using Tysabri is going to be
an invasive procedure, and we want to be as sure as

possible, and I think making it as safe as

possible, that we have the correct diagnosis is

critical.  There is a lot of MRI scans that are

read as being compatible with multiple sclerosis,

that don't turn out to be MS.

        So, I would agree that doing the spinal

tap with oligoclonal bands or whatever else we

could do to try to make certain we have the

diagnosis would be advisable.

        Secondly, I agree with Dr. Jung that now

we have we have another piece of the baseline for

later comparison.

        DR. JUNG:  I didn't mean to say that we

should be checking spinal fluid for oligoclonal

bands.  I meant to say for JC virus.

        DR. KIEBURTZ:  We previously talked about

serum testing for JC virus and learned that it has

a poor specificity and in addition to low

sensitivity, at least in this situation and in

other situations, and I am not sure that CSF

improves upon that.

        Dr. Clifford, do you want to comment on

216

that?

DR. CLIFFORD:  Yes, I think that it is important for the committee to remember what has been done already.

I, too, love to do LPs, do several a week on a research basis, and I think LPs belong in research settings unless there is a clear indication.

In this case, I would remind you that we had CSF analysis on patients on natalizumab, or actually not on natalizumab, but within three months of the discontinuation of natalizumab, which we know that the biologic effect carries over after the last infusion, so we did a large number, 400 or so LPs on patients in this situation.  We found no JC DNA with the most sensitive research assay that we could use.

So, I think that making it a practice to say you must do an LP so that we have this negative substantiated is really an extraordinary idea.  I really think it is unrealistic.  Further, MS patients, so there was a concern when we started

this business, is there some relation of 1
demyelinating disease with another, of JC with MS,
and there was a somewhat confusing paper in the
literature that suggested that might be the case.

We contended that wasn't the case, but we
are not satisfied with that, and so got these 400
samples from the Karolinska of documented MS
patients, looked with the most sensitive assay.
These were negative, as well.

I think with 800 samples, carefully looked
at including 400 on the drug, that this would be
really unreasonable.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  I would concur with Dr.
Clifford.  I think enough is being done with spinal
fluid already, not to make this a mandate.

I urged before that there be some attempt
to bank serum and although PCR may have limited
sensitivity and specificity, we don't know what is
going to come down the pipeline in terms of
proteomics or other markers.  If we don't have the
banked specimens, we are never going to be able to

use them, so I would urge that we at least bank

serum at baseline.

DR. KIEBURTZ: I think we have heard a

couple different proposals regarding what clinical

and laboratory assessments might be necessary

before prescribing Tysabri, and this particular

notion about having to have a JC PCR negative CSF

before prescribing it, we have not discussed right

now. I have got to say I am a little bit taken

aback, I would have to agree with Dr. McArthur and

Dr. Clifford that that seems like an excessively

high bar to place on access to treatment.

Dr. Rudick.

DR. RUDICK: I just wanted to make a brief

comment because it's hard for me to sit without

making comments in general, but I have spent much

of my career studying CSF in MS for its diagnostic

and other value, and I do not agree that you need a

CSF to make a diagnosis of multiple sclerosis.

I would recommend that the International

Panel, which has worked for several years to

establish diagnostic criteria for MS, be the

reference for the diagnosis of MS, and that the
neurologists trained in this field be the
adjudicators of whether a patient has MS, and I
would note that a CSF is not required to diagnose a
patient with relapsing-remitting MS by the
international criteria.

As a matter of fact, it was required in
the prior version for progressive MS, but that was
just recently revised and published as no longer
required. So, I think that if you required this
for diagnosis, I think you would be very arbitrary
in that requirement, and it would seem to me to be
discriminatory against patients who needed to have
Tysabri.

DR. KIEBURTZ: So, to clarify the two uses
of CSF, one would be for diagnosis, which I don't
think anyone is proposing at this moment, but two
would be for some sort of risk reduction, that by
establishing that the CSF is negative for JC PCR,
that you reduce the risk.

If the best guess of the prevalence of JC
PCR positivity in CSF in MS patients is somewhere

around, let's just be generous and say 1 in 1,000,
the likelihood of a procedure-related complication,
whether hemorrhage, infection, or persistent
headache, must be an order of magnitude higher than
that.  So, I think we need to be careful about a
procedure that may carry more risks itself than it
would mitigate.

        Dr. McArthur.

        DR. McARTHUR:  We don't have to estimate.
We know from Clifford--

        DR. KIEBURTZ:  Zero out of 800.

        DR. McARTHUR:  We don't have to estimate.
We know what it is, it's zero.

        DR. KIEBURTZ:  One is within the 95
percent confidence interval of zero, I think,
unless we had 20,000.

        Dr. Goldstein, Dr. Koski, and Dr. Hughes.

        DR. GOLDSTEIN:  Again getting back to the
point of what is collected at baseline, with all of
the caveats that we talked about in terms of the
observational study, I don't know that it would
necessarily provide an additional major burden to

obtain some baseline data that might help in
interpreting these adverse events that we are
talking about - age, baseline EDSS score, and
whether the patient was on a prior
immunosuppressive drug or not.

It is three simple check boxes that we
then have the data, and then that again obviates
all of the issues we were talking about with the
observational study, and then we could again use
those resources for other purposes.

DR. KIEBURTZ:  Suggesting that as part of
a baseline information when you are entering the
registry.

DR. McARTHUR:  That is exactly right.

Dr. Koski.

DR. KOSKI:  Well, I would also just sort
of say, I mean isn't it reasonable to have some
sort of measures, actually laboratory measures of
that, and I knew the CSF was going to be
controversial.  I just thought it needed to be
brought up.

DR. KIEBURTZ:  Dr. Hughes.

DR. M. HUGHES:  I guess I would make a
plea for keeping the registry relatively simple.  I
think it should be very much focused on the PML
question, and if there are particular risk factors
at baseline that could be measured easily in that
context, I think that is valuable.

Maybe there is a rationale for the cohort
study if you are really interested in understanding
risk factors amongst treated subjects for rarish
serious adverse events that may occur.  I still
don't believe it is particularly valuable in the
comparative setting comparing with historical
controls or understanding long-term adverse events
in an uncontrolled setting.

DR. KIEBURTZ:  I would tend to agree with
that and think that although it is an opportunity
to gather perhaps some more information about
demographic and clinical characteristics of a
subset of individuals who are in the treated group,
but I continue to think there are going to be
difficulties making inferences about changes in
adverse event rates that are ascribable to the

223

intervention because the population will be different than other populations, but it doesn't mean it's not a good idea.

Dr. Sejvar.

DR. SEJVAR:  As far as initial baseline work, again, I can think of various immune markers that would be useful to look at, but I would echo Dr. McArthur's suggestion of at least banked serum and blood.

DR. KIEBURTZ:  To draw the distinction again, and it's implicit, but maybe it isn't explicit, so I will just say it.  The registry is clinical practice.  The cohort is clinical research.  They are different things.  You know, one is going to be what everybody has to do.  The second is something that somebody will have to fill out an informed consent and elect to participate in, and questions that are addressable in one are different than the other.

I think Dr. Hughes made a good distinction, which is the registry's intent should not be compromised by additional questions, which

224

will be less well answered in that setting, and the
registry's intent is primarily around this issue of
PML and mortality and disability from it.

   Dr. Porter.

   DR. PORTER:  Are we talking about banking
samples for the 5,000 patient study, or are we
talking about the registry?

   DR. KIEBURTZ:  Samples would be part of
the cohort, not the registry, the research, not the
care.

   DR. PORTER:  Could I ask, you are going to
get 5,000 samples then.  What are you going to do
with them?

   DR. KIEBURTZ:  I would just say that this
committee is not about designing clinical research
studies.

   DR. PORTER:  Well, that is what we are
doing, though.

   DR. KIEBURTZ:  No, we are not.

   DR. PORTER:  We are drawing blood.  We are
advocating drawing blood--

   DR. KIEBURTZ:  We are making advice about

file:///C|/dummy/0308PERI.TXT

225

potential future studies, but we are not designing

it, approving it, or anything else like that.

       DR. PORTER:  My point is that unless we

are absolutely certain we know what we are drawing

these samples for, that I am not in favor of

advocating it.

       DR. KIEBURTZ:  Dr. Temple.

       DR. TEMPLE:  I am generally in favor of

banking samples because you can't predict the

future.  I think the last  discussion got at what

the company was trying to propose, that is, that

the treatment part of it, the practice part of it

should be kept relatively unencumbered and in order

to do more intense looking at something, with all

the difficulties that observational studies

require, you would identify a group of people and a

group of patients who are willing to be more

aggressively studied.

       So, I hear some tendency to try to include

the stuff from the observational study back into

the practice part of it, into the registry, and I

think the intent was that you should try to keep

them separate, much as Dr. Hughes said, don't make
it too complicated to be part of the registry, if
you have other questions, study them in the
observational study.

        Now, the limitations of that study, I
think you have all described, how much can you
learn from an observational study of that kind, so
that is a separate question, though.

        DR. KIEBURTZ:  You have heard a range of
discussion about how much to put into practice
including hedging into serious adverse events,
which is both a clinical and research thing, and I
think that may, based on the discussion, be
over-encumbering that registry.  It may not, and
there may be additional reasons to want to do a
cohort that would get at other things that the
committee members have expressed interest in.

        Ms. Sitcov.

        MS. SITCOV:  I just wanted to say that I
agree with Dr. Hughes.  I think that putting in too
much is really just an over-encumbrance and a
disincentive for the user of Tysabri.

227

        DR. KIEBURTZ:  It is 12:25.  I am not

going to pursue the question about doing a Yes/No

vote on that, because I think we have had enough

discussion that will be informative to the FDA.

        We have not gotten to the checklist.  We

will not get to the checklist before lunch.  I

think that is going to be another discussion

afterward, but I will consider the discussion on

Item 8(a), (b), (c), (d), (e), and that's it,

concluded.  I don't want to revisit those unless

absolutely necessary unless you feel that we have

not had sufficient discussion.  It sounds like we

are doing okay.

        I want to come back after lunch and talk

about the checklists and then any additional

monitoring.  Just for the sake of the observers, we

voted on Question 7.  I don't necessarily

anticipate there will be another question that we

will vote on.

        We may, we may not, but looking at the

topics heading forward, there may not be any formal

votes.  I don't want you to think that I am

228

precluding them, but just so you can plan your day.

      So, with that said, we will adjourn for

lunch and reconvene at 1:30.  Thank you.

      [Whereupon, at 12:30 p.m., the proceedings

were recessed, to be resumed at 1:30 p.m.]

229

A F T E R N O O N   P R O C E E D I N G S

[1:30 p.m.]

DR. KIEBURTZ:  Just to recap after lunch
where we are, we discussed 8(a), (b), (c), (e) and
(f), not that there was much discussion on (e) and
(f), because that was pre-staged by Question 6, and
there was nothing that was voted on, but sort of
the overall sensibility was that the proposed
information, what the sponsor proposed to be in the
registry was necessary.

There was a little bit of debate about
whether that was sufficient, whether there should
be more materials provided as part of the registry,
which would be on a six-monthly basis, but there
was no clear consensus on that.  I think that is
something, the discussion, we will leave up to the
Agency and the sponsor to work out the details on
that, and similarly, with the observational study,
there would be some additional questions that the
committee think are worth addressing, that would be
appropriate in the context of a research study
rather than mandatory as part of clinical care, and

that there should be some restrictions on
distribution, but not on a one-to-one basis, and
some mandatory monthly reporting back about the use
of the checklists and that a feedback mechanism
should expected checklists not be received, that
that would be evaluated to find out why expected
forms were not received, patient finished taking
the drug or some other problem.

        We also endorsed the idea that there
should be some actual in-person evaluation, and in
clinical care, that might be something on the basis
of baseline three months, six months, and every six
months after that, but again, that is not something
we voted on.  I think there was kind of a
discussion around those items.  Again, I presume
that that is something that will further worked out
in details between the sponsor and the Agency.

        So, that is where we are.  The things that
we have not talked about is what those specific
checklists would be that have to be completed at
the time the patient arrives at the infusion center
and is preparing to have the infusion, there should

be some evaluation to check on two things.

One, is there evidence that the individual
is or has been immunosuppressed, which would
increase the risk, or is there some evidence that
the individual may now have signs or symptoms of
PML.

I think we are essentially left with the
notion that any exacerbation--and I don't mean to
paraphrase the sponsor here--but I believe what we
heard is that any exacerbation would be treated as
if it could be a new case of PML and evaluated as
such.

We haven't talked about what that
evaluation would entail, but at least we know that
that would entail an MRI scan and physical exam.

Let's go back to the checklist, what
should be on the checklist, and we have proposals
of both, I believe, in front of us about--it's one
checklist--about what would be evidence of
immunosuppression or risk for immunosuppression and
what might be evidence of having signs or symptoms
consistent with the development of PML.

So, I would like to entertain some discussion about the proposed checklist.

Dr. Jung.

DR. JUNG:  I think as Ms. Sitcov had mentioned earlier, as is common for most MS patients, having waxing and waning of neurological symptoms is a part of the disease, so we need to be able to draw a line between at what point we get concerned.

So, I would propose that we consider changing the language for the last question in the patient checklist to persistent new symptoms or new symptoms that have persisted over perhaps a week or several weeks time as we know that the decline associated with PML is a more subacute, progressive set of symptoms as opposed to symptoms the last several days

DR. KIEBURTZ:  There was some discussion or some speculation if there were a subset of symptoms that are characteristic of PML that could be differentiated from the signs or symptoms of an exacerbation of MS.

233

I think Dr. McArthur, you at least alluded to that that would be a very difficult task because virtually anything could be either.

DR. McARTHUR: I think virtually anything with the exception of optic neuritis could overlap.

DR. KIEBURTZ: Myelopathy perhaps.

DR. McARTHUR: Well, myopathy, but I think from a symptomatic standpoint, it is very difficult for just going on symptoms to distinguish no localization.

DR. KIEBURTZ: Dr. Sejvar.

DR. SEJVAR: I think maybe temporal profile might be somewhat more helpful, but even that is difficult to separate the overlap, I think.

DR. KIEBURTZ: You mean temporal profile in one sense that it's acuity?

DR. SEJVAR: Right.

DR. KIEBURTZ: Dr. Goldstein.

DR. GOLDSTEIN: Just two points about this. One is I think this needs to go through the usual language correction for people's reading levels as we would normally do for any consent

234

document.  This has a lot of very high level terms
here that I think could be confusing or
misconstrued or misunderstood, so I assume that is
one thing that would happen.

I think the second point that I think
comes out here somehow is that this is a
surveillance system that has unknown insensitivity
and specificity for picking up anything.  We are
sort of making this up as we go along based upon
our best guess.

I think that that needs to come through
also, at least in some framework, and that this is
something also that is going to be reevaluated as
time goes on.

DR. KIEBURTZ:  So, just to reiterate that
a little.  I think that part of the Patient
Medication Guide should indicate that by asking
these questions, it doesn't reduce the risk of a
person getting PML to zero, that somehow by
completing this and going through this process, the
risk is reduced to nothing.

We would hope that it's reduced, but I

think it is important to convey the sense that this
is an attempt to reduce risk, but we don't know
that yet.

          Dr. Sacco.

          DR. SACCO:  I would agree, and I think we
could probably sit here for a long time and try to
figure out a questionnaire that could perhaps
differentiate PML from MS, and it's going to be
hard.

          I think really from what I understand, if
there is any neurological change, whether it's MS
or for the PML, that is going to throw up a flag
and then they are going to be evaluated further,
probably with an MR, so I don't know if we need to
really try to tease apart getting this question
right for just PML.

          DR. KIEBURTZ:  And I would propose that.
I think the nature of the questions here are is a
checklist appropriate.  I think everyone feels that
we need some document like this.  We have already
talk about it, that it should be done monthly in
advance of each infusion, and that it should be

conveyed to a central area where it would be
expected, and its lack of arrival would prompt some
action, where is it, what happened, trying to
follow up about that.

I think one of the questions would be is
We have not necessarily talked about who
should administer it.  I don't think this needs the
involvement of a physician or a neurologist.  It
doesn't need a neurologist, doesn't need a
physician.

I think one of the questions would be is
it possible to have it be performed by infusion
center staff, who are not that necessarily familiar
with either MS or PML, and I think that is
something that might be useful to talk about.

Dr. Katz.

DR. KATZ:  I don't know if you are done
with the discussion about how the questionnaire or
the checklist should inquire about neurologic
symptoms, but recognize that differentiating PML
from MS may be very difficult, if not impossible,
on a checklist, but it is important for us to know
what the committee thinks about that, because if we

say something like any change in neurologic status,
we have already heard that that would be extremely
burdensome, people would never get their
treatments.  They would all be shipped off to the
neurologist for further evaluation if the question
is of that sort.

        I know it is hard, but it would be useful
for us to know a little bit more about what we
think the checklist should say in that specific
regard, because we don't want to make it so
sensitive that no one ever gets their treatment
without first being seen by the doctor.

        DR. KIEBURTZ:  Dr. Couch.

        DR. COUCH:  One of the other indicators at
least of temporary immunosuppression is the
appearance of herpes zoster, and would that be
something that if the patient shows up with active
herpes zoster, which is a pretty common occurrence,
should the treatment be withheld at that particular
time.

        Dr. McArthur.

        DR. McARTHUR:  I don't think there were

any instances of zoster, or maybe one, in the
1801/1802 studies.

     DR. KIEBURTZ:  Is it an irrelevant
clinical measure of immunosuppression, the
occurrence of zoster, I guess, would you want to
use it as a sentinel, but to get back to Dr. Katz's
question, so we have some discussion about that.

     One of the things that I have heard, I
believe, is that the persistence of the change
would be one thing that would trigger, and perhaps
the nature of the change.  I think I have heard
some discussion about whether it is a change in
symptoms or a change in signs, that is, if people
have--I guess it is all symptoms until you have an
exam.

     Dr. Jung.

     DR. JUNG:  I would like to ask Dr.
Clifford, do patients with PML typically respond to
I.V. steroids?  The reason for bringing this up is
I can envision that we would be doing MRI scans on
every single one of our patients getting Tysabri on
a monthly basis.

Again, given the fact that patients do manifest new symptoms on a regular basis, and given the fact that if you look at the description of the patients that have been described with PML, they had a persistence of their symptoms over a course of time.

DR. CLIFFORD:  Right.  So, the first question is patients with PML did not normally respond to steroids even transiently.  There often are confusions of this sort, and people are given steroids, and PML patients simply don't respond. The one exception to that is something that we are experiencing currently, and that is in the presence of a reconstituting immune system, there are what are called IRIS reactions or immune reconstitution reactions, which are a much more inflammatory form of the disease where part of the symptoms are due to the inflammation.

Those patients may have a partial response to steroids, but PML patients themselves, I think are really quite unresponsive to steroids in my experience.

DR. JUNG:  So, would it be reasonable,
then, to say that if patients come in with
persistent new symptoms, you examine them, you
think there may be a possibility that they may be
having a clinical relapse of MS, treat them with
the standard course of I.V. steroids.  If they
don't respond, then, move forward to pursuing the
possibility of PML?

DR. CLIFFORD:  I think that this is
something that we have to train and work with
clinicians to refine.  I think that the company has
set up an iterative process where we are going to
have to learn how this works in this kind of
practice, and I can envision the early part of it
having quite a few iterations of people with
symptoms coming in.

I think that somebody here was suggesting
that some have new symptoms, persistent over at
least a few days, and I think what would happen in
practice is there to be a signal, and the whole
point of this, I suggested this, I wasn't part of
the writing or planning for this part of the

process at all, because I was entirely on the
Adjudication Committee, but I was asked about what
would be helpful, and I said, well, the most
sensitive signal in my mind that can be done
frequently is to ask for symptoms, because this is
not a clinically silent disease for long, and
therefore, people do come and tell you there is
something different, and families and others, you
know, they can't handle their silverware the same
way they did, and that is definite, and they can
tell you about that before you could possibly do
recurrent blood tests, scans, and other things, and
I think it is just important to take that seriously
even in a patient with MS.

So, the intention here was to bring this
to light and to have a clinician then evaluate
them, and say, oh, yeah, well, this patient has had
this four times in the last five years.  Then, you
know, they could follow it for another two weeks
and see if it went away or give steroids.

If it is the first time they have ever had
anything like that, then, I, as a clinician, would

do a scan, and if there were anything strange, I
would think about a spinal tap, but I think people
will have to learn how to do that.

I think it is important that clinicians,
in an interactive process with the sponsor, who is
trying to help them to apply this, be allowed to
use a degree of clinical judgment, so that it
doesn't get out of hand in terms of how sensibly it
can be managed.

I think it can be done, but I think that
there will be a different learning curve in
different places, and folks will be terrified, they
will be too casual.  You know, I think people will
have to work with them.

DR. KIEBURTZ:  I will go to you, Dr.
McArthur, next, but just to reiterate, the
checklist is a screening procedure that would most
likely happen at the level of the infusion center,
which is going to be hopefully sensitive, but not
necessarily terribly specific, but not so horrible
that everyone is screening positive, horrible in
the sense of its specificity, but that that would

then trigger an evaluation by a clinician who is
familiar with the patient, may or may not be in
person, probably wouldn't be in person initially,
but maybe followed up in person and maybe followed
up with more things.

        I think we are not necessarily talking
about what the post-screening activities are yet.
I would like to focus still on what the content of
the screen question is, but what happens after that
in terms of the interaction between the clinician
and the patient over the phone, in person, and what
subsequent laboratory testing is decided before
that person says no, it's okay, this does not
appear to be evidence of PML.

        That is another discussion, but right now
I want to stay focused on the questionnaire.

        Dr. McArthur.

        DR. McARTHUR:  This is another question
for Dave Clifford.  My read of these cases, and I
did not see any of these cases, is that they
presented in a somewhat different way than
HIV-associated PML.

I mean typically, HIV-associated PML, we
think of clear consciousness, motor deficits,
visual deficits, cerebellar deficits, and then only
later on is there more of an encephalopathic
dementia type syndrome.  It is relatively late, but
these cases all presented with frontal lesions,
panhemispheric lesions where encephalopathy and
cognitive dysfunction was an early phenomenon, so
could we try and focus the symptoms more on those?

I realize that if PML is associated with
Tysabri, it, of course, may not be only associated
with frontal lobe lesions, but could we use that
somehow?

DR. CLIFFORD:  I have counseled against
that because I think that it is just not right to
try to determine a pattern of disease on three
cases, and so I really believe it's safer for us to
think about the way white matter, subacute white
matter diseases present.

I do think that the cases that have been
seen in the setting of natalizumab treatment have
been very recognizable as PML cases in the sense of

file:///C|/dummy/0308PERI.TXT

245

the tempo in the areas of involvement.  I mean they

went from a silent lesion to definite clinical

symptoms one month late to severe disability by

three months, and death by four or five months.

       We are not dealing with a form of PML that

is very different from what we see in badly

immunocompromised patients, and I think it would be

a mistake, and the way I led the screening of the

entire exposed population was just to assume any

definite focal progressive symptom had to be

questioned, and I think that is the approach that I

would counsel should be engaged by these questions,

as well.

       DR. KIEBURTZ:  I think that

characterization of new, focal, and enduring

symptoms is a reasonable framework to think about

this.

       Dr. Sacco.

       DR. SACCO:  I was just going to emphasize

that, as well.  I would ask the question, if a

patient was coming to an infusion center, and they

had this questionnaire, and say it was a relapse,

which is possible, it does occur even though the
drug reduces relapses.

I assume then they would not get the
infusion, they would have to go to their clinician
to decide the next step.  So, whether it's a
relapse or whether it's PML starting, the clinician
gets brought in, and they are not given the
infusion.

DR. KIEBURTZ:  Correct.  I mean the
instructions are if it is yes to whatever this
question is, the infusion is suspended, and the
person is referred to their clinician.

DR. SACCO:  So, I go back to saying that
whether it's a relapse or it's PML starting, I
think that's the appropriate plan for now, that we
should be doing, getting clinicians involved in the
decision-making process of what the next step is
for that patient.

DR. KIEBURTZ:  I believe that is what the
proposal was.

Ms. Sitcov.

MS. SITCOV:  This really illustrates my

lack of medical knowledge, this question, but if
someone were to say to me is your immune system
suppressed, you know, if they asked me did I have
an organ transplant or do I have AIDS or leukemia
or lymphoma, I would say no to all of those.

But are there other conditions, and there
must be, for example, for about a nine-month period
last year, I had C. diff, and does that make my
immune system suppressed?

DR. KIEBURTZ: A point well taken.  I
think it has been alluded to that questions about,
that's a qualitative judgment, do you have a
suppressed immune system.  I think that is what Dr.
Goldstein was getting to before.  That question is
probably not a good one, but asking about specific
conditions, HIV infection, AIDS, leukemia,
lymphoma, organ transplant, and anything else.  I
think the Agency can work with the sponsor and what
conditions maybe herpes, a recent herpes zoster is
one of them, conditions that suggest a compromised
immune system.  A point well taken.

I think similarly having a sheet of what

would be considered an immunosuppressive or

immunomodulating drug, have you taken any of these,

do you remember taking any of these in the last

month to look at, to say yes or no, and I think

similarly recordings, we have already alluded to on

the six-month basis, but I think this is not a bad

point in time to be asking the subjects have you

received intravenous methylprednisolone or other

high-dose steroid treatments since your last

infusion, yes or no, would be a reasonable thing to

be checking here in this context.

Other comments or questions about this?

Dr. Goldstein.

DR. GOLDSTEIN:  Just a general question.

Are these forms going to be sent back or will the

prescribing physician have access to these forms on

each one of their patients?  As I understand it,

this goes to the central location.  The sponsor

looks at it, the FDA will look at it, but what

about the doc on the ground, does he get these

reports on a regular basis?

DR. KIEBURTZ:  Currently, the proposal, as

I understand it, is the prescribing physician would
be notified about the response to this checklist
only if there was Yes to the new, focal, and
persistent symptoms.

    DR. GOLDSTEIN:  Right, and as I read it,
it's the patient's responsibility.  They don't get
the drug.  It is the patient's responsibility to
contact the physician about it.  What I am saying
is that maybe this should be another one of these
automated things that these forms go to the
prescribing physician on some regular basis also,
because the patient may or may not decide to call
the doctor that day.

    DR. KIEBURTZ:  I am not sure every
prescribing physician would want every form that
has No's on it, but some way of notifying the
prescribing physician if there is a Yes to the
question.

    Dr. Katz.

    DR. KATZ:  Do we think it's the patient's
responsibility to contact the physician if the
infusion nurse gets a Yes answer?  I guess I was

250

under the impression that the infusion center would

take the responsibility to call the physician.

DR. GOLDSTEIN: Yes, and that is why I was

raising the question. Around here I think it says

the physician should be consulted, but it doesn't

say who or under what circumstances.

DR. KIEBURTZ: I would just assume that

the infusion center would take that responsibility.

DR. KATZ: The other thing is, just to

correct something that you said, Dr. Goldstein, we

here don't anticipate receiving these forms.

Again, we would have to work out with the sponsor,

you know, periodic reports from them to see how

this whole system is working, but we don't

anticipate getting the forms.

DR. KIEBURTZ: Dr. DeKosky.

DR. DeKOSKY: Two things I wanted to bring

up for discussion. The first, in general, subjects

who have MS come to clinic for treatment by

themselves. What about levels of cognition

impairment in people who have more severe disease,

and whether or not they are able to provide this

sort of information, is that a concern, and how do
we deal with it?

        The second question, trying to put myself
in a--having been a patient relatively recently, so
I am having symptoms.  I know, I have had the
disease for several years, and I know when I am
waxing and waning, and I know when I am getting a
response, but I am also here to get this drug that
is supposed to help keep me better.

        Why would I tell you if I want to play the
odds against relatively low, hopefully, likelihood
of developing a fatal disorder, why would I tell
you that I am having these if I know that it means
I will not get my medication?

        That is the piece I think we haven't
discussed.  Well, it sort of feeds in, in part, to
the cognitive issue although I think it is
different from the standpoint of impairment of
cognition, but that is one of the things that I
couldn't see my way to a clear response of the
patient who would say I will pass up getting this
medicine especially over the first couple of months

file:///C|/dummy/0308PERI.TXT

252

or years while people are so focused on this as a
new option, and we probably should discuss that and
whether there is a way to have less of a problem
with people deciding they won't tell the physician
or the nurse, because it means they won't get their
drug, and they will figure that out fairly soon.
In fact, they ought to be able to read that they
won't get their drug, especially for people who
know their disease.

DR. KIEBURTZ:  So underreporting of these
new symptoms or misreporting unintentionally due to
some kind of cognitive impairment, we have not
talked about and is likely to occur to a certain
degree.  I think the underreporting is really going
to be--I don't know how to address that frankly,
other than as long as people are informed of the
risk and realize that they are putting themselves
at potentially increased risk, but the misreporting
due to cognitive impairment, this does presuppose,
the checklist presupposes a certain ability to know
these things, or come to the infusion with someone
who does know them, if you don't come alone.

file:///C|/dummy/0308PERI.TXT

253

DR. DeKOSKY:  In the perfect world, someone who had enough cognitive impairment, and maybe physical impairment along with it, since they currently bring someone with them who could answer the questions.  My question was about the case in which these is someone who, as part of their impairment, doesn't recognize that they have a disability, simply cannot remember, or loses the insight to know that these are important questions to be able to answer.

DR. KIEBURTZ:  It is a good concern to which we don't have a concrete solution right now.

Dr. Sacco.

DR. SACCO:  Sometime in studies the way you have to approach this is the examiner or interviewer has to make some decision about how cognitively intact the person is to answer the questions, that the person is able to either provide consent or at least answer the questions appropriately, and maybe somehow we have to indicate that.  If the infusion nurse, which isn't a physician, isn't doing any mental status, but if

254

there is some doubt in the ability to answer the
questions appropriately, then, the whole system
gets defaulted.

DR. KIEBURTZ: That is a possibility. The
definitions of that will be tricky.

Dr. Goldstein.

DR. GOLDSTEIN: I think we are getting to
the point that we raised earlier, that we don't
know what the sensitivity and specificity is of the
screening procedure. It is being instituted as the
best idea of the best notion that we have right
now, but that data, and the sponsor I believe said
that, it will be looked at forwardly in an
iterative process depending upon outcomes.

The other thing is that there is a check,
and that is the physician evaluations at the three-
and six-month periods. So, in addition to the
subjective data that we are getting, that will be
obtained from the questionnaire, there will be
objective data from physician assessments also.
That will help them also in designing this thing as
it goes forward.

file:///C|/dummy/0308PERI.TXT

255

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  Yes.  This is in terms of reporting symptoms at the infusion center where there is the questionnaire administered by a nurse or whomever.

I know from knowing enough people with MS, myself included, that part of the way to successfully cope with the illness at times is the degree of denial, and you can't get  away from that.  That just has to be added to the equation.

Dr. DeKosky.

DR. DeKOSKY:  In a way, I am sorry, I may have confounded the issue of the cognitive status of the person, which I think we just have to deal with, with the issue of what appears to be a relatively strong predilection to not tell you about symptoms if it means you are going to miss your drug.

While we may not be able to solve that, I think the question is whether or not we have way to check on it or some other way to put something else in place that would increase perhaps the

sensitivity to having this.

My specific concern is for people who know
their disease.

DR. KIEBURTZ:  One thing may be, which was
just alluded to, that the exams that follow may
pick up things that were not alluded to at the time
of the questionnaire completion.

Dr. Couch.

DR. COUCH:  One of the problems that MS
patients run into may be a slow cognitive decline
that continues over a period of time, and perhaps,
although the Folstein Mini-Mental Status is not a
particularly good instrument--and Dr. DeKosky is
shaking his head over there--it has been shown to
have a low sensitivity, but good specificity.

If we had that as one of the things that
we are evaluating initially, then, perhaps yearly,
you might be able to see that there is a cognitive
decline, is not a cognitive decline.  When the
patient reaches a Mini-Mental Status of, pick a
number, 25, 27, you then have to have information
from other people.

257

DR. KIEBURTZ:  That may be something that
the sponsor would want to consider putting into the
cohort study, which would help get at it, because
people will be completing the checklists.  Everyone
will be getting the checklists.  The cohort gives
you the opportunity to look at the veracity of the
checklist versus other instruments.

Dr. Koski.

DR. KOSKI:  Again, I can only speak to our
own infusion clinic, but basically, all of these
biologicals, and this includes when Tysabri was
being infused, were being administered by an RN.

In addition, we also had the policy that
we have a physician on call for the infusion
clinic, and the physician saw each patient before
they actually received their infusion.  It was a
brief visit, but you got to know these patients,
and I think that reasonable or very good infusion
clinics are going to be able to handle this.

Over time, particularly when a patient is
coming in on a monthly basis, you know how they are
responding, you really do.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  A couple of issues.  The cognitive dysfunction associated with MS is not easily picked up even by the most astute clinician, and certainly the Folstein Mini-Mental Status exam is useless when it comes to that.

The idea of trying to do neuropsych testing on every person before they get infused is obviously not possible.  I think there are other ways which have nothing to do with the checklist itself, but perhaps going forward to how do we monitor our patients, perhaps with more regularly scheduled MRI scans that will give us some objective evidence of disease would be a better way to sort that out.

That would also deal with the potential for underreporting of symptoms for fear of having the infusion taken away.

DR. KIEBURTZ:  So, it sort of edges us into (h) if you guys have heard enough discussion about (f) and (g).  Thank you.

So, this regards JC testing in serum or

file:///C|/dummy/0308PERI.TXT

259

CSF, MRI, quantitative cognitive testing or some
kind of screening instrument and full or brief
physical examination or questionnaire.  Let me just
dissociate two things.

One would be a screen-positive individual
would go into clinical assessment, and whatever
that might be, we are not talking about that right
now, what we are talking about is there some other
routine evaluation that would be mandated as part
of participation in the registry.

We have said we think it is reasonable to
require a physician evaluation before it started,
at three months, six months, and six months
thereafter.  We haven't specified what the contents
of that evaluation are aside from what one would
imagine is a history and physical exam.

The question is would we propose something
more to be required to be part of routine clinical
care at any of those time points in everyone
receiving the intervention.          .

Dr. Sejvar.

DR. SEJVAR:  I guess even before we start

260

with that discussion, I mean just a practical
question, who pays for all this.  Is it the
patient's insurance?

          DR. KIEBURTZ:  That's a question I am not
sure we can take up right now, but presumably if it
was mandated as part of care, appropriate use of
the medication, at least some insurance companies
would pay for it, but it would not be considered
research optional.

          It's the clinical care aspect of
administration of the medication.  Of course, many
patients don't even have insurance, so that means
they would be paying for it along with the rest of
their care.

          Certainly any of these things, MRI,
physical exam, possibly cognitive testing, and
depending on the outcomes of that, may be part of
what happens when someone has new persistent and
focal symptoms, which might travel with new,
persistent, and focal signs, obviously are going to
be evaluated as to whether this is a relapse,
potentially treated for that, or possibly PML, and

I think an MRI is going to be part of that, and the question of whether CSF is part of that.

But just moving away from that, to what would necessarily be part of the routine evaluation at zero, three, six, and ongoing six-monthly intervals, is there something besides a neurologist's or a clinician's interview and physical exam that we think would be necessary and mandatory as part of appropriate use of the drug?

Dr. McArthur.

DR. McARTHUR:  This is not in individuals who screen positive on whatever symptoms.  This is just routine, everybody is doing fine.

DR. KIEBURTZ:  They come back at their three and six months.  They have no relapse, no problems, they are doing well.  So, it would apply to them equally.  This isn't triggered by any event.  This is just routine mandatory care.

DR. McARTHUR:  I think the standard of care now for most MS patients on immunomodulatory therapy would be to do regular cranial MRIs, because the question is should they be done more

262

frequently in individuals on this particular

treatment.

       DR. KIEBURTZ:  Regular means?

       DR. McARTHUR:  Well, one to two years.  I

mean there are no hard data at this point as to how

frequently or how infrequently one should do them,

but I would appreciate input from anybody,

including in the audience I guess.

       DR. KIEBURTZ:  No.

       DR. McARTHUR:  No?  Stay quiet.

       DR. KIEBURTZ:  Dr. Katz.

       DR. KATZ:  I just want to make one point.

The way you posed the question was should there be

any other routine mandated testing at these time

points, and you noted the time points to be three

months, six months, and then six months afterwards,

which is when I think people thought that the

neurologist should see the patient.

       The question was meant to be broader than

that and whether or not, for example, something

instead of the checklist is the only thing that is

done every month.  The question is should any of

263

these things be done every month or whatever
frequency.  I wouldn't limit your thinking about it
to the doctor visits.

        You may ultimately decide that, if
anything, should be done routinely, it should be
done at those times, but I wouldn't want to
restrict thinking about it at the outset of the
discussion to those specific times.

        DR. KIEBURTZ:  Thanks for that
clarification.

        DR. McARTHUR:  If I can finish my thought
then.  So, I mean if I was giving Tysabri, I would
want to do a scan every six months.

        DR. KIEBURTZ:  Dr. Sacco.

        DR. SACCO:  I was going to speak against
any routine monitoring.  I mean just as we don't
know about the specificity and sensitivity for the
questions, I am not sure doing routine MRI scans,
say, annually, every six months, or any of these
other tests will help us right now, and it will
throw a lot more cost into the system.

        So, I would prefer, now that we have had

the reauthorization and we have the clinicians

being brought into the system every--I think it was

at three months, six months, and every six months

afterwards, that that alone would hopefully provide

a system of detecting either PML or worsening MS.

      DR. KIEBURTZ:  Dr. Jung.

      DR. JUNG:  I believe, first of all, that

it is not necessarily accepted as the standard of

care that any scan get done every one to two years.

There may be regional differences, but I don't

believe that that is assumed.  We may all have very

strong opinions about that.

      Number two, I disagree with Dr. Sacco, in

that my concern if we are not clear about what the

expectations are for monitoring this drug once it

is used, is that insurance companies will not

readily pay for MRI scans q three months or q six

months even if you think it is clinically indicated

for a drug like this unless we say that we think

this is critical, and I think it is unreasonable to

put the clinician or the patient--to give them the

burden of trying to prove that they need the study

file:///C|/dummy/0308PERI.TXT

265

given the fact that it's readily recognized that

there is this risk associated with this drug.

DR. KIEBURTZ:  Let me just get back to Dr.

Katz's point.  I would like to hear from anyone who

feels that something aside from the checklist needs

to be done on a monthly basis.

Dr. McArthur.

DR. McARTHUR:  I don't think anything

needs to be done on a monthly basis because

frankly, there is no test to identify PML with the

exception of MRI and spinal fluid JC virus.  We

have already discussed that the clinical symptoms

and signs are not precise enough to make the

differentiation between those from MS, those from

PML, those from nerve root disease, those from

carpal tunnel, et cetera.

So, if we are not going to do spinal fluid

monitoring, which we have already debated and

discussed, I would advocate that we need to

engineer into the recommendations, regular MRI

monitoring.  As a clinician, I would not administer

Tysabri unless I was allowed to obtain some

266

objective measure of what was happening in that
patient's brain.

I am very concerned about PML and as far
as I am concerned, the only way of detecting PML in
somebody whom I am administering this drug is by
doing serial MRIs.  Six months may not be enough, I
accept that, but there has to be some practical
interval.

DR. KIEBURTZ:  Dr. Jung.

DR. JUNG:  I agree with Dr. McArthur, and
I would again state that knowing how insurance
companies work, because I do reviews of requests
for MRs, that unless something is specifically FDA
indicated, that there is a very good possibility
that that link-up will be disconnected down the
road.

So, for the sake of the patient and for
the sake of the physicians, who are taking the risk
of giving this drug, we need to make sure that
there is some mandate associated with that.

DR. KIEBURTZ:  So, nothing is being
suggested more frequently than every month--that is

the checklist--the only thing we have suggested
more frequently than every six months is in the
first three months regarding a physician evaluation
that you are hearing comments about every six
months or some interval of MRI.

Dr. Temple.

DR. TEMPLE:  I just want to be clear we
know what everybody thinks about, you know, how
urgent and how stringent that is.

That is, you got through the every month
part, but do you believe, are you advising us that
every six months there should be an MRI as a
condition of continuing on the drug, or is it a
vaguer recommendation than that, that, you know,
good practice suggests you might, that is less
forceful, what exactly are you recommending?

Then, I have a previous question.  Maybe
you think you have answered it and maybe you have,
and that is, that the physician is going to be seen
every six months.  Was it your thought that the
patient and physician acknowledgment forms would be
redone at six months, is that the form, or should

we develop a different form, or what exactly did
you have in mind?

DR. KIEBURTZ:  We didn't discuss that
specific issue.

Dr. DeKosky, then, Goldstein and McArthur.

DR. DeKOSKY:  if we can talk about the
first one first.  I would like to know--this is not
my field--I would like to know what it is we are
looking for with a scan on people every six months.

Is it that we are looking for nascent PML
developing in the brains of those people, and is
that the reason we are doing, the recommendation of
Justin is that we do scans every six months?

DR. McARTHUR:  At least two out of the
three cases had lesions which were atypical on
their MRI, atypical for multiple sclerosis.  So,
again, we can't scan patients every month, we
probably cannot scan patients every three months.
Every six months would be a reasonable compromise.

If a lesion appeared that was atypical for
an MS plaque, I think that would be a major
trigger.

        DR. DeKOSKY:  I agree.  I may not recall
these correctly, but I thought the reasons for the
scans were the clinical symptoms that developed,
though, rather than a random survey every six
months looking for, or that any of them, in fact,
were picked up on an incidental scan.  It wasn't
driven by a behavioral change.

        But you are advocating a scan even in the
absence of any behavioral change to see if
something is rising even with this low incidence.
I know it is not easy, I am trying to track your
thinking.

        DR. McARTHUR:  No, it's not easy, and I
completely take your point, I mean that the MRIs in
the three cases obviously were triggered because it
was a neurological syndrome.

        I think we are obviously, or I am erring
on the side of conservatism and managing patients
in what I think is the safest possible way, and the
only way I can think of to monitor patients for a
nascent or developing brain infection is with
cranial MRI that is practical.  We can't do spinal

270

taps, we have discussed that.

I don't know if six months is going to be frequent enough to capture an evolving PML lesion, recognizing the infrequency of that event.  That would be my recommendation.

DR. KIEBURTZ:  Dr. Goldstein.

DR. GOLDSTEIN:  I just wanted to take the same point that was just raised.  We have no data at all that a screening MRI scan will, in fact, detect preclinical disease, nor that that detection would change anything.

I take your point, though, that there needs to be some language that doesn't preclude physicians from doing that if they think it is clinically indicated or as part of their own individual care.

So, I think wording to that effect, that MRIs should be obtained for clinically relevant indications, and you may consider surveillance a clinically relevant indication, and that hopefully will take care of the third party carrier issues related to getting it paid for.

271

DR. KIEBURTZ:  Let me also come back to
Dr. Temple's point, which not everyone may see the
distinction. Maybe everybody does and it is
redundant to say it again. There is a difference
between it being recommended, strongly recommended,
and required, and I think you are looking for some
level of certainty that this must be done on
everyone at this minimum frequency.

Dr. Koski.

DR. KOSKI:  Like Justin, I basically do
think that when you are following an MS patient,
just as part of the normal care for them, that I
usually get an MRI at least on a yearly basis, and
part of it is because sometimes there are silent
lesions, you get an idea about the disease burden
over time that is going on, and it might indicate a
need for a change in therapy.

I think it is very difficult, because I
think that the evolution of these lesions probably
does occur over one to two months perhaps.  Should
we mandate each six months, I am just not sure.  I
certainly think that in patients that do have

272

sustained progression during this period of time,
we are going to be getting intermittent MRIs, so I
guess the issue is the frequency.

DR. KIEBURTZ:  Dr. Ricaurte.

DR. RICAURTE:  Just getting into the issue
of is it a screening MRI, and should we give some
thought to linking the MRI with a change in signs
and symptoms that are sustained.  It gets into the
quandary that you are going to end up doing lots of
MRIs, but then at least it reduces it to the group
of patients that has developed a new persistent
sign.

So, just the thought of perhaps--I am not
against the idea of doing at least initially for
the first few years, making it a requirement to
look every six months, but just raising the
question of whether perhaps initially, wouldn't it
be wise to link the imaging study to the onset or
development of a new focal problem.

DR. KIEBURTZ:  I think it is highly likely
that everyone who has that will get an MRI.

Dr. Sejvar.

file:///C|/dummy/0308PERI.TXT

273

DR. SEJVAR: I guess in addition to the level of the individual patient, at which time detection of developing PML may or may not be helpful in the eventual management, but I guess the biggest reason that we are trying to detect this early is sort of to take action on the whole population.

So, I guess that is one of the things that I am struggling with in terms of considering routine MRI, how frequently or whatnot. I mean we are looking for a sentinel event to call the safety of the drug into question.

DR. KIEBURTZ: Dr. Jung.

DR. JUNG: To address Dr. Temple's question, I would suggest that the wording be strongly recommend at six-month intervals or as clinically appropriate. I think that gives you enough leeway and doesn't mandate.

DR. TEMPLE: For the MRI.

DR. JUNG: Right.

DR. KIEBURTZ: Dr. Sacco.

DR. SACCO: I was going to emphasize the

strong recommendation for those that have
neurological symptoms, and I guess I would ask is
that we are doing the cohort study, I presume, and
maybe getting MRIs in those 5,000 patients at
six-month intervals for the cohort study under
research purposes would be another approach to look
at the detection of MRI for detecting PML and other
changes.

DR. KIEBURTZ:  Dr. McArthur.

DR. McARTHUR:  I just wanted to get back
to Dr. Goldstein.  If we go to our experience with
HIV and PML, it is clear that there can be lesions
on MR well before there are clinical symptoms.  So,
in cohort studies that have been done looking at
serial MRIs, it is not infrequent to see, if you
will, silent PML lesions, and Dr. Clifford might
want to address that.

DR. KIEBURTZ:  I will take the point.  You
can get lesions before symptoms.

DR. CLIFFORD:  If I could just give a
couple of comments on this topic.  My assumption is
that the MR scan is probably the earliest signal if

you could do them with adequate frequency, that you
would see the pathology before you would see the
symptoms in a number of people, and that is why we
insisted on MR screening of the entire natalizumab
exposed population when we were trying to rule out
the presence of active PML.

It really bothers me because although I
don't know how long before clinical symptoms occur
that you can get an MR signal given the pace of
development of this disease. My assumption is that
it probably is, on average, no more than a few
months that you would have an MR signal before you
would have clinical disease, which means that at
best, you are maybe gaining a month on the
screening inventory for how early you might detect
a signal if you did this monthly.

Every six months, you are gaining very
little from the sensitivity that you have gained by
doing the clinical screen, and at a cost of, if
there are two scans a year on 2,000 patients to
discover one case one month earlier, and what do we
have. We don't have a treatment for this

condition.  For all we know, it's an all or none,
roll the dice, I am sorry you have been the
unfortunate 1 in 1,000 that has developed this
illness.

        Our hope, of course, is that earlier
detection, stopping the interference will result in
a lesser lesion or perhaps no lesion.  That is what
we would love to see, but I think we have no
assurance of that.

        The other thing that I think don't forget.
We heard a lot about the troubles access for
patients that hate needles, shot, monthly shots are
aversive.  Well, let me tell you MR scans are not
popular among our patients either, and so I think
in terms of access and cost for a group of
patients, that you are adding a very substantial
burden, and I think that given that we have no
treatment for the complication we are looking for,
and that we would gain on my estimate only a month
or maybe a little more of lead time compared to
clinical symptom management, I think that is a high
cost to pay.

file:///C|/dummy/0308PERI.TXT

277

I would be willing to see annual screening
for the first two years or something until we have
a better feel for this, but I would hate to see
legislation of what is not really an evidence-based
recommendation on a firm basis.

DR. KIEBURTZ:  Ms. Sitcov.

MS. SITCOV:  My question may not be moot,
but what I was going to say is if I were to go on
Tysabri, I would want to have MRIs done as
frequently as my insurance company would pay for
them.

DR. KIEBURTZ:  Dr. Couch.

DR. COUCH:  I think one of the issues with
the MRI, just as an additional issue, and that is,
there ought to be a protocol specific as much as
possible, so that you don't have MRIs that have to
have a lot of different protocols, try to get the
same protocol for everything, and get it out to all
the centers that are handling the patients, so that
the data becomes relatively comparable.

DR. KIEBURTZ:  Dr. DeKosky.

DR. DeKOSKY:  Why would we do one

278

annually?  All that does, if it's because they are

on the drug, is give us an even lower estimate of

the time that we might catch someone in the act of

developing a pre-symptomatic lesion.

I think the issue of standard of care for

MS patients probably is where we need to leave this

with respect to MR.  I agree with Dr. Clifford,

that is why I was asking Justin for more detail,

that this is not a way we are going to catch this

disease even if, in fact, we think that there is a

chance if we give antiviral agents that we could

slow someone down or stop them from developing

worse disease.

So, if we say, well, it doesn't make sense

to do it every six months because we wouldn't catch

people.  It makes less sense to do it once a year

with the specific intent of trying to catch a

lesion.  Otherwise, I would say the MRs should be

left to the clinicians and their judgment about how

frequently to do them to their patients.

DR. KIEBURTZ:  I presume, Dr. Katz and Dr.

Walton, you have heard enough discussion on this.

I think there is feelings that range from making
strong recommendations to staying with current
practice. I am not going to try to strive to
derive a consensus from the committee on this. I
think you have heard the range of viewpoints. I
don't think it would necessarily be productive.

        DR. TEMPLE: I agree with that. I still
would like to--no, you don't have to answer, you
can leave it to us, of whether what you actually
had in mind was redoing the enrollment forms or
perhaps a modification of them at six months or
some period.

        DR. KIEBURTZ: So, remember when people
enter, there is this process by which--I forget the
particular form--

        DR. TEMPLE: Well, there is a Physician
Acknowledgment and Patient Acknowledgment. That is
sort of the vehicle for enrollment.

        DR. KIEBURTZ: It would be signed at
baseline. Then, of course, there is this screening
checklist monthly. The question is at the times
that the clinician is actually again seeing the

patient, should this document be revisited at each

of those in-person meetings?

     My guess would be that would be a good

idea.  Does anyone feel strongly to the contrary?

     DR. GOLDSTEIN:  To be done annually or at

every three months, six months?

     DR. KIEBURTZ:  It should be redone at some

time point.

     DR. GOLDSTEIN:  Yes.

     DR. KIEBURTZ:  Okay.  That's good.

     We are leaving Question 8.  There is no

vote, there is no consensus.  There is a lot of

discussion.  Just to bear in mind for the committee

members and for the public, in this kind of

situation, and many times it is not necessary to

drive to consensus or vote on something.

     These are discussion items and hearing the

discussion in a dispassionate forum is useful to

the Agency, and the fact that there is disagreement

and lack of consensus doesn't mean people haven't

thought about it.  It means that is where we are,

and I think that the Agency and the sponsor, having

281

heard that, can negotiate in good faith on what

makes sense.

Question 9.  For subjects who have

received natalizumab in clinical trials, and who

have not received for at least a year or longer, do

you recommend any further monitoring?  That is,

people who were in trials, who have now been out

for at least a year or longer, should they be

monitored in any further way, and if so, how and

for how long?

This kind of ties in with the next

question.  What happens to people who now that it

is going to be, presuming our advice is--well,

let's just say in the world in which it returns to

marketing, what happens when someone discontinues,

how long do you monitor them after that?

So, for example, the registry kind of

evaluations, which are to be done on a six-month

basis, would you continue to do the registry kind

of evaluations on a six-month basis or some less

frequent basis getting those kind of endpoints, and

if so how long would you continue to do that for?

282

Again, I think the notion behind this, I
presume is that the risk of PML does not cease with
the ceasing of the intervention, and you would need
to continue to follow people who are at risk for
some period of time to see if the event occurs.  Do
I have the reasoning right?

Dr. Sejvar, did you have any thoughts on
that?

DR. SEJVAR:  I guess I would just like to
offer that the answer to both of those would be
yes.  I mean again, I think that the National Death
Index provides one avenue for that, but again there
is going to be a significant time delay associated
with that.

So, I think that some sort of real-time
follow up of patients who have come off the drug is
necessary, and then I guess the question is how
frequently, and I would think maybe once, you know,
a yearly follow-up is reasonable.

DR. KIEBURTZ:  I would tend to argue the
annual follow-up.  Again, the reason for more
frequent evaluation and follow-up is to try to "nip

in the bud" or identify incipient or early cases
with the idea that discontinuation of the drug
might have some favorable impact, none of that
being known, but a reasonable hypothesis.

        Here, the intervention has been
terminated, there is no point in trying to
intervene earlier or stop it, but following the
group on an annual basis, I think less an annually,
you have a higher risk of not getting the
information again, but the question is if you did
it annually, how long do you do it annually for,
two years, three years, five years.  I mean you
have to do it for some period of time.

        I don't know if anyone has any thoughts on
that.

        Ms. Sitcov.

        MS. SITCOV:  My feeling is--did I read in
the FDA response, your recommendation was five
years?

        DR. WALTON:  No, we did not make any
recommendations on that length of follow-up.

        DR. KATZ:  In the observational study, I

284

think the sponsors are going to follow patients for

five years.

        DR. WALTON:  But that was for patients who

were getting--

        DR. KATZ:  Continuing on the drug.

        DR. WALTON:  Continuing natalizumab, yes,

or within that study, those who had discontinued

it.

        DR. KIEBURTZ:  Do you want to comment, Dr.

Dal Pan?

        DR. DAL PAN:  I believe in the

observational study, it was following people for

five years after they had discontinued natalizumab.

        DR. WYSOWSKI:  After starting Tysabri.

        DR. KIEBURTZ:  After starting.  Okay.

        Just for the record, we are trying to sort

out what--

        DR. McARTHUR:  Three years sounds like a

good number.

        DR. BOZIC:  May I just clarify?

        DR. KIEBURTZ:  Clarify about what?

        DR. BOZIC:  The length of follow-up in the

285

observational study.

        DR. KIEBURTZ:  I don't think that is the
question. Thank you, though.

        Does anyone feel that evaluation less
frequently than annually is appropriate?  Does
anyone feel that no follow-up after discontinuation
is appropriate?

        [No response.]

        DR. KIEBURTZ:  Do you need further
discussion on that?

        DR. WALTON:  I think some sense of how
long you feel that that annual evaluation should
continue would be useful to us.

        DR. KIEBURTZ:  Beyond the discussion of
two, three, to maybe five years?

        DR. WALTON:  I wasn't sure if that was the
general consensus.

        DR. KIEBURTZ:  Okay.  People's thoughts on
how long that might--I mean at some point, the risk
of PML from the intervention must dissipate.

        DR. McARTHUR:  It is quite likely if
somebody discontinues this agent, that they will go

286

on to another agent, which might be even more of a

potent immunomodulatory drug.  Again, I think we

have to be practical.  Five years would seem like a

good time period to me, but I think we have to

compromise a little bit, so three.

What can we say?  There is no data to say

how long.

DR. KATZ:  I think we understand the

conversation.

DR. KIEBURTZ:  Back to 10(a).  Do people

feel any differently about discontinuing in the

setting of marketed use versus previous clinical

trials, or should it apply the same way?  It's the

same, okay.

So 10(b).  If a patient discontinues and

plans to initiate treatment with another

immunomodulatory agent, should they have a pause

before initiating that treatment?  If so, for how

long should that pause be?

Dr. Jung.

DR. JUNG:  I guess it depends upon the

reason for discontinuing the drug.  If

discontinuation is due to adverse events, then, can

you afford to wait a prolonged period of time

before starting another agent if the patient is

relapsing.  So, I think there needs to be more

clarification.

      DR. KIEBURTZ:  Other comments?

      So, following up, more clarification in

what way, Dr. Jung?

      DR. JUNG:  I am sorry?

      DR. KIEBURTZ:  You said there needs to be

more clarification of the question?

      DR. JUNG:  Is the reason for

discontinuation because the patient is failing

versus is the reason for discontinuing the drug

because the patient has adverse events to the drug

itself.  That would push you towards two separate

paths in terms of where the patient is going.

      DR. KIEBURTZ:  Bear with me.  So, say it

is because they are failing, would you want to

impose a waiting period?

      DR. JUNG:  I don't know the answer to

that.  I think it is something we need to discuss.

file:///C|/dummy/0308PERI.TXT

288

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  Are we also talking about steroids here, or is it just other approved drugs for MS?  In the example I would raise, if somebody is failing and having a relapse and they are going to come in--

DR. KIEBURTZ:  Let's take relapse aside. I mean I think you have to treat a relapse as you treat it, but I think failing in terms of having a number, not the acute treatment of a relapse, but that they are having progressive disability or having a high relapse rate, and you think that you want to shift to a different drug.

DR. KATZ:  Just for clarification, I think this is sort of the reverse question that we talked about before, which is if you want to start Tysabri, how long do you have to be off some other immunosuppressant.  I think this is just the reverse side of that coin because of the risk of--how long do you have to wait before starting another drug after coming off Tysabri because of the potential risk for PML, to be seen in the

context, you know, the potential increased risk to
be seen in the context of essentially concomitance.

        I don't think we were looking for the
various different reasons, the different waiting
periods depending upon the reason the drug was
discontinued.  It was this question of when do you
think the risk of PML dissipates, and I quite
frankly don't know how you would answer that
question, but that is what we were trying to get
at.

        DR. KIEBURTZ:  Thanks for that.

        DR. McARTHUR:  You have asked an
unanswerable question.

        DR. KIEBURTZ:  It's a very steep path.  I
think, though, that the context is if somebody is
doing badly on the treatment and you are stopping
it in anticipation of shifting to another
treatment, there is a little bit more pressure to
be able to start the other treatment in the setting
of clinical failure of clinical poor progression as
opposed to if someone has been very stable and say
they develop neutralizing antibodies and you decide

290

they need to come off, but they have been quite
stable and they come off, you might be able to
pause more leisurely before you start another
treatment.

So, I think there is some point in making
that difference. It is going to be very hard to
have someone who is doing badly, who you say, okay,
we have got to get off of this, and then say, well
now we are going to wait a year before we initiate
treatment, or two years, or three years. I don't
think that is plausible or necessarily defensible
because then the accumulating disability sits in
contrast to the increased risk of PML that might
happen, theoretical increased risk of PML that
might happen with the co-administration of another
immunomodulatory drug shortly afterwards.

So, I think we do have to think about
that. I think if the person is stable and doing
fairly well and has to stop, or just decides they
don't want to take it anymore, you have a longer
period of time where you might wait.

But is there some minimum period of time

you should be forced to wait in the setting of
clinical deterioration causing switching off the
drug?

        Dr. McArthur.

        DR. McARTHUR:  I think what you have just
described is really an argument for making it just
clinical judgment, and there is so many scenarios,
there are so many reasons why one might wait or one
might accelerate a switch, it just has to be part
of clinical judgment.

        I don't think any of us have any data
whatsoever to say three months is safe, but two and
a half months is unsafe.

        DR. KIEBURTZ:  Dr. Goldstein.

        DR. GOLDSTEIN:  I think what I would fall
back on is what we have data for, and that's the
way the 1801 trial was done.  About 30 percent of
them were on prior immunomodulatory drugs, and
there was a washout period, I think--is that right,
that was required--before they could start on this
drug.

        That is the only data we have, and we

file:///C|/dummy/0308PERI.TXT

292

think that that is relatively safe doing it in that
setting, so I would extrapolate and say, well, if
you had to pick a number, that's the number I would
pick.

In terms of the urgency, I agree you don't
want to wait.  On the other hand, we also have no
data that acute administration of this drug alters
the acute exacerbation, so I think balancing those
two together, I would just use the same protocol
that was used in the trial.  That is what we have
some data for at any rate.

DR. KIEBURTZ:  Two weeks?

DR. GOLDSTEIN:  Yes.

DR. KIEBURTZ:  Part (c) is going to be the
question which will probably be the most pressing
immediately after this goes on the market is anyone
who is on ABCR is going to want to know how long do
they have to wait before they can take Tysabri, and
is there some minimum period of time.  Two weeks,
is that long enough?

DR. GOLDSTEIN:  Again, that is the only
thing that we have data for.

DR. KIEBURTZ:  I understand.  I am just
seeing if there is any difference of opinion.  I
don't know enough to have a difference of opinion,
but I would tend to think that a little bit longer
may be a little bit better, but not a lot longer.

Dr. Sejvar.

DR. SEJVAR:  I guess maybe at the bare
minimum, understanding that there is an effect that
sort of outlasts the pharmacokinetics and
pharmacodynamics, but couldn't we use those
parameters as a bare minimum, or is that where that
two weeks came from?

DR. KIEBURTZ:  I think we heard that, you
know, as Dr. Sandrock alluded to, you can actually
do some in vitro analysis of how long the
pharmacodynamic effects are, but are there more
sort of elusive measures of immune function that
might be suppressed for longer periods of time,
that when you start to co-administer Tysabri, those
increase the risk.

I think this is very hypothetical, and
just sort of a clinician sensibility that maybe a

little bit longer to let things wash out before you

start something else, but that may be overly

cautious.

     Ms. Sitcov.

     MS. SITCOV:  I think it was I who asked

the question yesterday about how long one needs to

wait, and you mentioned two weeks, but I don't

understand why two weeks versus three weeks or five

weeks.

     DR. KIEBURTZ:  Are you addressing that to

Dr. Sandrock?

     MS. SITCOV:  Yes.

     DR. SANDROCK:  So, if the question relates

to how long after stopping Tysabri, when we could

restart--we said two weeks based on the PK and the

pharmacodynamic effects of interferon, which you

can measure for at least a week after an injection

based on interferon-inducible genes, we felt that

two weeks was reasonable.

     If you would like me to address the other,

I will.

     DR. KIEBURTZ:  Do you think there is any

reason to think based on any information you have

that the immunomodulatory effects of interferons

last longer than two weeks?

DR. SANDROCK:  Well, there is not a lot of

data on that.  Everything that I just based the two

weeks on is based on pharmacodynamic measures.

DR. KIEBURTZ:  Actually, since you

offered, I will take you up on it.  The other way

around?

DR. SANDROCK:  In the case of washing off

of Tysabri, the drug is given every four weeks,

because we maintain saturation of alpha-4 integrin

receptors for the dosing interval, and we see

saturation levels falling at about eight weeks.

So, eight to 12 weeks would be our recommendation

after the last dose of Tysabri.

Again, that is based on pharmacodynamic

measures that we can look at.

DR. KIEBURTZ:  Dr. Katz.

DR. KATZ:  Also, we have been talking

about the washout after one comes off an

interferon, and two weeks was the number that the

sponsors proposed based on dynamic considerations,
but there are other immunomodulating drugs that
patients may be one.  They may not be approved for
MS, but they may be on for MS.  How long one should
wait to wash those drugs out presumably varies with
the drug, I would assume.

        So, you could suggest that it is drug
dependent, you know, you would have to know
something about the pharmacodynamics of each of the
potential drugs the patients might be on, and say
for azathioprine, it is this long, for CellCept it
is that long.  That is one approach. ·

        DR. KIEBURTZ:  I am not sure exactly what
Dr. McArthur meant by clinical judgment, but it may
be in part that there is not going to be one answer
for any drug, it is going to have to be in the
context of what is known about the drug, but on the
other hand, that will leave the door open for just
about any interval.

        DR. TEMPLE:  It also seems worth noting
that in the cases that did occur, it took something
close to two years of both of them being given

continuously for anything to emerge.  It is hard to
think that a week or two of common exposure would
do the same thing, but we, of course, don't
actually know that.

DR. KIEBURTZ:  Sufficient discussion on
10?  Oh, Dr. Koski, I am sorry.

DR. KOSKI:  That's okay.  I really don't
agree with--excuse me--I do agree with the two to
three months, but I think the other thing is
presumably, if you are removing the patient because
they are not doing well, or not performing
adequately, you are going to have MRI data that
will help to confirm at least that none of the
lesions at least are similar to PML.

So, I think that will also help to make
that decision as part of your clinical decision.

DR. KIEBURTZ:  I think that is a good
point.  So, those are patients who are going to
have more extensive evaluation, and that may shape
your risk about or your thinking about risk about
initiating other treatment.

We will move on to Question 11.  I think

the nub of it is if in the previous discussion, you

have advised reintroducing the marketing and have

suggested only monotherapy, which is what we

suggested, please discuss if and when exploration

of the safety and efficacy of concurrent use with

beta-interferons should be evaluated - never risk

it, evaluate it in concurrent clinical trials, only

after the risk of PML or other infections is better

quantified, evaluated in a concurrent clinical

trial now, some other approach.

        To frame that up, do you think it is just

off the table permanently, whether it is a question

that can be addressed by further research, and

should that further research be commenced now or

after accumulation of more data in the monotherapy

situation, and potentially more evaluation of the

subjects who were previously dosed, who have also

been allowed to restart their treatment.

        I would be interested in people's thoughts

on that.

        Dr. DeKosky.

        DR. DeKOSKY:  We heard yesterday that

299

there had been no cases of PML reported with the
other medications, is that correct, up to this
time, reported, although there may have been cases?

DR. KIEBURTZ:  Sorry, there have been no
cases reported?

DR. DeKOSKY:  With the other drugs
approved for long-term use in MS, is that correct?

DR. KIEBURTZ:  I don't believe there has
been any other reported cases of PML.

DR. DeKOSKY:  So, my suggestion would be
that I would go for (b), that if, in fact, this is
largely about an interaction with this particular
medication, that it would be useful to have some
experience with this medication's ability to
produce other cases before combining it, which was
the circumstance, we think, under which it was
unearthed.

So, I would wait.  I wouldn't rule it out
forever, but I would wait to see whether or not the
signal was worse with longer experience with this
drug.  It is my opinion.

DR. KIEBURTZ:  I think the confidence

interval around the current estimate, I mean the
point estimate is 1 in 1,000, but that goes up to 3
in 1,000, and down to 1 in 10,000.  I suppose any
99 percent confidence interval, 1 in 100 probably
falls in there, so I think the more information you
have might give you a sharper point estimate and
narrow the confidence interval.

        Is that--I am saying in a different way
what I think I hear you saying.

        DR. DeKOSKY:  We are up to 5,000 cases
being followed.  That ought to narrow the
confidence limits enough to let us make a realistic
estimate of what the potential risks would be of
doing another combination study.

        DR. KIEBURTZ:  Dr. Sacco and Dr. McArthur.

        DR. SACCO:  I think given our answer in
No. 4, which was that we are not sure this could
occur with use of this drug alone, that I would
also agree with (b), that gaining more experience
with continued use of the drug alone in a large
sample, in probably more than 5,000.  5,000 will be
in the cohort study, but in the registry, could be

even greater.  We heard that in the first few
months this drug became available, it was like
7,000 people were signing up to get it.

So, i would like to get that data before
embarking on the next set of studies with
combination therapy.

DR. McARTHUR:  Is the question restricted
to Avonex or, by implication, do you mean other
approved agents in combination?

DR. WALTON:  The question focused on
Avonex because that happened to be the one
concomitant use where we had some experience that
natalizumab adds something, had benefit, but didn't
have the efficacy data that other thing added to
natalizumab offered additional benefit.

But it really does apply certainly to all
the interferon-betas and really to any of the
concomitant use drugs that might be thought of.

DR. McARTHUR:  Then, I would go along with
(b).

DR. KIEBURTZ:  Does anyone advocate (a)
never evaluate concurrent use?  Does anyone

advocate (c), which is permitting clinical trials

of concurrent use of an approved medication with

Tysabri--mind you this is research, clinical

trials--right now, is anyone in favor of that?

       MS. SITCOV:  Could you please repeat that

       DR. KIEBURTZ:  Is anyone in favor of

option (c), that is, initiating clinical trials at

the time of re-approval of marketing?

       [No response.]

       DR. KIEBURTZ:  I think we have

uncharacteristic unanimity of opinion around option

(b).

       Dr. Temple.

       DR. TEMPLE:  Well, (c) is in the setting

of a clinical trial, informed consent, and so on.

Some of the points that people made earlier that we

didn't really know how the drug works in people

with aggressive primary progressive disease.

       Do you think that couldn't even be studied

in a combination form with informed people?  That

seems very strict.

       DR. KIEBURTZ:  Say the question again.

DR. TEMPLE:  Well, (c) is about whether,
in an IND setting, you could look at concurrent
use.  So, what I am asking is if you took some
aspect of MS that is not now well studied, people
who aren't relapsing-remitting, but just going
straight downhill, we don't really know what
Tysabri does in that setting.  That is a point that
people have made repeatedly and yet that is a very
difficult situation that you might think calls for
risk taking.

So, under the setting of an IND,
ordinarily, you think people are allowed to make
those kinds of choices.

DR. KIEBURTZ:  I think we might have been
thinking about the circumstance only of the
approved--I mean for relapsing-remitting, so maybe
we should think about it a little more broadly.

Dr. DeKosky.

DR. DeKOSKY:  I was wondering, Bob, if you
meant that to be done in a combination therapy
without, for example, doing the study of Tysabri
first in primary progressive.  I mean in terms of

file:///C|/dummy/0308PERI.TXT

304

relative risk and the length of the consent form, I

would at least like to know whether or not that

drug worked.

        DR. TEMPLE:  You might even compare the

combination with each of the singles in that

setting.

        DR. KIEBURTZ:  So, you could have a

factorial design, I think.

        DR. TEMPLE:  But really the point I am

making is that we often, but not absolutely always

if you are really scared, we often have more

discretion in a setting of an investigational use

where you can tell everybody, and they can say yes,

I have waited, I have thought about it, I am

willing.  To say no would be a very unusual and

strong statement about this.  I just wondered if

you really meant it.

        DR. KIEBURTZ:  Dr. Goldstein.

        DR. GOLDSTEIN:  I guess you were asking

our advice.  Obviously, the Agency will do what the

Agency does, but I think first getting this

information that we want to collect, that we are

file:///C|/dummy/0308PERI.TXT

305

all concerned about first, I think is appropriate.
I think first testing the drug as monotherapy in
these other clinical situations is quite
appropriate, and then if you get a signal on
monotherapy, and this turns out to be relatively
safe as monotherapy, then, if you want to go ahead
and then look at combinations, I think that is an
entirely reasonable approach.

      We are concerned about this.  That is what
this whole discussion has been about.

      DR. KIEBURTZ:  Dr. Koski.

      DR. KOSKI:  I completely agree in the
sense that I think it is fair to do it under an
investigational status, and I definitely think that
monotherapy needs to be tried first.  There is very
few other things that have shown efficacy actually
in the progressive varieties.

      DR. KIEBURTZ:  Dr. Sacco.

      DR. SACCO:  I think just a point earlier
of the same thing, with progressive MS, I think we
should do monotherapy.  I was concerned the drug
was going to get used in all of these other MS

varieties, as well, so I would very much say let's

do other trials for other kinds of MS, but probably

stick with monotherapy or direct head-to-head

comparisons of two single active drugs.

   DR. KIEBURTZ: Dr. McArthur.

   DR. McARTHUR: The same as Dr. Goldstein,

but just restating it. I think we need to allow

the system, the registry, the drug distribution,

collection of information from the pre-infusion, I

think we need to allow that system to show that it

can work either just in terms of the logistics of

collecting the data. Hopefully, we are not going

to see any signal in terms of PML cases, but just

to show that the system itself can work.

   DR. KIEBURTZ: I would be interested if

committee members are comfortable in trying to

quantify what would be adequate additional

monotherapy observation, like how many thousands of

person years additional, you know, another 5,000,

another 10,000, because if we say we would like to

get some more, are we able to quantify how much

more before it's enough?

DR. McARTHUR:  If there were 7,000 patients who enrolled within the first few months, I think to get 5,000 times two years, that is 10,000 patient years would be a pretty reasonable number.

DR. KIEBURTZ:  My guess is they would be able to accumulate 10,000 person years of experience in less than two years, my guess.

Dr. Goldstein.

DR. GOLDSTEIN:  There is a corollary to that question, and it was one that was raised yesterday, is we are doing all of this surveillance and we are looking for these adverse events.  What level of adverse events would trigger concern, one case, two cases, 10 cases?  Where is the trigger going to be pulled?  Do we have any feeling for that?

DR. KIEBURTZ:  I am not sure.

DR. WALTON:  I think if we see cases that raise our concern again, it is entirely possible that we will be inviting you back to discuss this again.  That, after all, is what triggered this

file:///C|/dummy/0308PERI.TXT

308

advisory committee in the first place, the

occurrence of these cases.

      DR. KIEBURTZ:  I think we made our

decision-making around the notion that the point

estimate of 1 in 1,000 is about right, and that if

accumulated experience starts to move that point

estimate upwards significantly, I think it would be

reasonable to reevaluate this discussion.  What

does upward significantly mean?  I don't know, but

we will know it when we see it.

      DR. TEMPLE:  As Russ said when we started,

we expect cases, and if they are at about that

rate, we would hardly be surprised.  We don't

necessarily believe that it is only because of

concomitant therapy that these cases occurred.  For

all we know, it is going to be exactly the same

with monotherapy.  That is our ongoing assumption

even though we don't want anybody to do anything

but use monotherapy, we don't really know.

      DR. KIEBURTZ:  I think the committee

members, I hope have deliberated in awareness that

it is likely that t here will be cases of PML, and

it is likely that there will be deaths from it.  I
mean that has to be the background against which we
are making these decisions.

        The point is that there is death and
disability associated with other interventions that
are approved and on the market, and against the
face of the disability and death that occurs with
the illness, is it a reasonable balance that an
informed physician and patient, clinician and
patient can make together, and I think our
unanimous decision was that was yes with certain
restrictions.

        That may need to be revisited based on the
actual observed frequency of the problem with more
people, over a longer period of time.

        Dr. McArthur.

        DR. McARTHUR:  So, if in the unhappy event
that a patient on monotherapy does develop PML,
should we have a developed plan of exactly what to
do, what to tell that patient?  I realize there are
no proven therapies for PML, but there are some,
let's just call them alternative therapies that are

file:///C|/dummy/0308PERI.TXT

310

being proposed.

Certainly in the HIV literature, at least
one of the patients in our packet received several
forms of antivirals.  Do we have an emergency plan
is what I am asking.

DR. KATZ:  I don't think one specific plan
has been proposed, and I am not sure we are in a
position at this point to say what one should do in
a case of a case. Clearly, that will have to be
thought about, but I am not sure, I am not an
expert clearly, and I don't know that there is a
treatment algorithm for patients who get PML.

I am sure, as you say, there are multiple
different sorts of treatments that people give.  I
don't think we are in a position to mandate a
particular one at this point.

DR. McARTHUR:  I am looking at you, but
maybe I should be asking the sponsor what is the
emergency plan for if and when a patient on Tysabri
monotherapy gets PML.  What will happen?

DR. KIEBURTZ:  Dr. Sandrock or does
anyone--I mean you don't have to reply to that, but

file:///C|/dummy/0308PERI.TXT

311

if you are interested--sorry, that's a little

loose.  I mean if you are willing to share your

thoughts on it now.

       DR. SANDROCK:  Our recommendation is

obviously to suspend natalizumab.  We are talking

to some of the investigators about the possibility

of using plasma exchange as a way of removing

natalizumab more quickly, but that is just one of

our thoughts.

       DR. KIEBURTZ:  The other part of Dr.

McArthur's question, is there any specific clinical

management of PML should it happen beyond trying to

remove the agent, any antiviral treatment plan or

other treatment plan that has been articulated?  It

is perfectly acceptable to say you are thinking

about it.

       DR. CLIFFORD:  Well, clearly, there is no

correct answer that has been demonstrated for the

treatment of PML. Only two years ago I was standing

in an international meeting proposing

interferon-beta as an excellent plan for a

controlled trial of treatment for PML in HIV

file:///C|/dummy/0308PERI.TXT

312

patients, and I think that I have given up on that

as a primary hypothesis, but the flip side of that

is that I am not at all--with the Agency--I am not

at all convinced that interferon has anything to do

with incidental happening that both of the cases

that were observed in MS were in interferon-treated

patients.  I think that that is something that

could have very easily happened by chance.

On a theoretical basis, the interferons

have activity against DNA viruses.  We have used

interferon-alpha.  Quite recently, several of us

have published on a number of cases where we have

actively thought that there might be a signal of

activity of interferons against JC virus, so that

has actually been on the table fairly recently.

In terms of the theoretical approach, the

use of cytosine arabinoside has the best in vitro

evidence, and while my group did a control trial

that did not demonstrate in the pre-HAART era that

this was an effective treatment for PML, we have

revisited the thought, because we really believe

the problem is drug penetration, and it is very

file:///C|/dummy/0308PERI.TXT

313

possible that in the setting what we will see--if

we see another case associated with natalizumab, it

is very possible that there will be an inflammatory

reaction, that there will be more breakdown of the

blood-brain barrier as the drug is withdrawn, and

the JC infection is exposed to an increasingly

active immune response, and that we could augment

that with cytosine arabinoside.

So, I think that is something that I would

actively consider, but all of these things are

really investigational approaches, and we could

certainly have discussions about giving a formula,

but it would turn into another trial, and I hope

there will not be enough patients to really do a

meaningful trial.  If there were, then, I suspect

we would be stopping again anyway.

DR. KIEBURTZ:  Thank you, Dr. Clifford.

Dr. Sacco.

DR. SACCO:  I just wanted to check.  I

know we are getting to the end of the questions, if

there may be another, but we never touched on, and

I thought you were going to bring it up, the issue

of neutralizing antibodies and whether that has a
role in any of our deliberations.

I thought it was in our questions, and I
am realizing, we got to the end now, and it hasn't
been unless there is a new question we don't know
about.

DR. KIEBURTZ:  It does go back to what
would be--8(h), should there be some routine
testing for neutralizing antibodies, or should that
be in response to some clinical event, because the
presence of neutralizing antibodies seems to be a
signal for increased risk and decreased efficacy,
so the risk-benefit ratio would be perturbed.

The question is should testing only be
driven by clinical events, or should it be done at
some specified time points as a mandatory part of
use.

Thoughts on that?

DR. KOSKI:  Certainly patients who had
maybe infusion reactions early on, patients that
appeared to have progression in their symptoms.
Their MRI did not show something that might be

315

compatible with PML.  I mean you would want to look

and see if these antibodies are there since it is

associated with decreased efficiency, and also

infusion reactions.

DR. KIEBURTZ:  Dr. Sacco.

DR. SACCO:  I don't know how this works

with the FDA and the sponsor, but I mean whether

there would be a recommendation to check antibodies

should symptoms occur, and then consider

discontinuation of the medicine?

DR. KIEBURTZ:  A recommendation is

certainly something that could be proposed.  The

question is would it be required, and the

discussion I hear is mostly--I mean if it was

required, everyone would have it done at a certain

time point no matter what their symptoms were.

I don't hear a lot of enthusiasm for that,

but it could be required or strongly recommended in

the setting of certain clinical phenomena including

lack of clinical benefit and the occurrence of

certain kinds of adverse events.

DR. DeKOSKY:  I am remembering that the

316

development of the antibodies was relatively early in the course, that if you didn't have them by 12 weeks, you probably weren't going to get them, so we might want to temper that.  Someone that is having response problems a year out, that that may not be a terribly useful thing to go after.

        The other thing we didn't discuss, and I am not sure if you need feedback about it or not, is frequency of high-dose methylprednisolone for breakthroughs.  We didn't discuss that and whether at some frequency, reconstitute immunosuppression or immunomodulation.

        DR. KIEBURTZ:  And hence, whether the drug should be restricted if you are having a certain frequency?  I think these things are going to intersect because if you are having a high rate of relapse, you are going to get imaged again, these other things are going to happen, so that it will probably be driven by those clinical events is my guess.  It is not going to pan out that someone is going to have a high exposure to pulse steroids, and not be getting these other things happening.

Is that fair?

        DR. McARTHUR:  That's fair.

        DR. KIEBURTZ:  I detect a certain group
fatigue, but we will persevere if there is other
important issues that the Agency would like us to
address.

        DR. McARTHUR:  Dr. Kieburtz, I just found
another page of questions here.

        [Laughter.]

        DR. KIEBURTZ:  Dr. Katz.

        DR. KATZ:  I think you have answered our
questions.  I would like very much to thank the
committee. It has been very difficult and I think
you have managed to get through the questions and
give us all the information we need.  So, I very
much appreciate your doing that.

        I would also just like to acknowledge the
folks who spoke in the public session, who were
particularly courageous, not only handling their
illness or their family members' illness, but
coming here and giving their testimony.  That is a
difficult thing to do.

318

     Finally, last but not least, I would
really like to publicly acknowledge the Agency's
presenters.  You saw the slide of all the people
who were involved in looking at these data, and
there were probably even more than that, but the
folks who presented - Alice Hughes, Susan
McDermott, Diane Wysowski did a tremendous amount
of work in a very, very short period of time, and
their presentations were only the tip of the
iceberg of the amount of work that they actually
put in, and I think they need to be acknowledged.

     Also, two folks who didn't speak here
today, who have done a tremendous amount of work
preparing for this, Wilson Bryan and Kathy
Needleman in the Division, so I would really like
to acknowledge their efforts.  I think it has been
extraordinary.

     DR. KIEBURTZ:  Could I just say I have had
several discussion with the committee members, and
I just want to reiterate some of those comments.
First of all, I know it is very difficult for the
sponsor to have so many things they would like to

file:///C|/dummy/0308PERI.TXT

319

say, and we don't call on you in the circumstance,
and I am sure you are familiar with that, but thank
you for the comments you did provide and the
information you provided, which was very helpful
and effectively organized, and for answering our
questions when we had them.

And to the FDA for presenting very clearly
and providing us materials that were cogently
organized and obviously reflect a lot of work, and
just to reiterate, the open public hearing was
particularly--of course, it was moving, but it was
also instructive, and as many of you might realize,
it is an incredibly courageous thing to get up and
say those things in public, particularly when they
have such an emotional content, so we thank those
speakers for their willingness and courageousness
in doing that.

I would just like to thank the members of
the committee for sticking with it, these are
tricky issues, for the Agency for having
forbearance with us in not necessarily given
concise answers in open discussion.

file:///C|/dummy/0308PERI.TXT

320

       Unless there is anything else that needs
to be said, I think I will adjourn the meeting at
this time.

       [Whereupon, at 3:15 p.m., the proceedings
were adjourned.]

- - -